UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-7577 _____    _____ Caption [use short title] _____

Motion for: Release Pending Appeal _____

_____

_____

Set forth below precise, complete statement of relief sought:

Mr. Douglass Mackey moves for release pending appeal

pursuant to 18 U.S.C. 3143(b) and Fed. R. App. 9(b).          United States v. Mackey

He poses neither a flight risk nor a danger to the public,

and his appeal presents at least two substantial questions

that would lead to reversal of his conviction.

_____

MOVING PARTY: Douglass Mackey _____    OPPOSING PARTY: United States of America _____

☐ Plaintiff          ☑ Defendant

☑ Appellant/Petitioner          ☐ Appellee/Respondent

MOVING ATTORNEY: Jacob (Yaakov) M. Roth _____    OPPOSING ATTORNEY: Erik D. Paulsen _____

[name of attorney, with firm, address, phone number and e-mail]

Jacob (Yaakov) M. Roth, Jones Day          Erik D. Paulsen, EDNY U.S. Attorney's Office

51 Louisiana Ave. NW, Washington, DC 20001          271 Cadman Plaza East, Brooklyn, NY, 11201

202-879-3939; yroth@jonesday.com          718-254-6076, erik.paulsen@usdoj.gov

Court- Judge/ Agency appealed from: U.S. District Court for Eastern District of New York - Judge Ann M. Donnelly

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain):_____

_____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this court? ☐ Yes ☑ No
Requested return date and explanation of emergency:
Mr. Mackey is scheduled to report to prison by January 18, 2024, so he respectfully requests
a decision on release pending appeal before that date.

_____

_____

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No If yes, enter date:_____

Signature of Moving Attorney:

/s/ Yaakov M. Roth _____ Date: Nov. 1, 2023 _____ Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

# 23-7577

# United States Court of Appeals
# for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

DOUGLASS MACKEY,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of New York
Case No. 21-cr-00080-AMD

## DEFENDANT DOUGLASS MACKEY'S MOTION
## FOR RELEASE PENDING APPEAL

Eric S. Dreiband
Yaakov M. Roth
Joseph P. Falvey
Caleb P. Redmond
Harry S. Graver
JONES DAY
51 Louisiana Ave, N.W.
Washington DC 20001
(202) 879-3939

*Counsel for Defendant-Appellant
Douglass Mackey*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................. 1

BACKGROUND.................................................................................. 3

LEGAL STANDARD............................................................................ 5

ARGUMENT ...................................................................................... 7

I.    MACKEY PRESENTS NEITHER A FLIGHT RISK NOR A PUBLIC DANGER ......... 8

II.   MACKEY'S APPEAL PRESENTS "SUBSTANTIAL" QUESTIONS THAT
      WOULD WARRANT REVERSAL IF DECIDED IN HIS FAVOR.............................. 8

      A.    Whether § 241 Proscribes Political Misinformation Is At
            Minimum A Close Question ..................................................... 8

      B.    Whether Internet Data Traveling "Through" EDNY Suffices
            For Venue Is At Minimum A Close Question ................................... 16

CONCLUSION ................................................................................. 20

CERTIFICATE OF COMPLIANCE ........................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*281 Care Comm. v. Arneson,*
    766 F.3d 774 (8th Cir. 2014) ..................................................................... 14

*Anderson v. United States,*
    417 U.S. 211 (1974) .................................................................................... 11

*Blessing v. Chandrasekhar,*
    988 F.3d 889 (6th Cir. 2021) ..................................................................... 18

*Carroll v. Carman,*
    574 U.S. 13 (2014) (per curiam) ................................................................. 9

*City & Cnty. of San Francisco v. Sheehan,*
    575 U.S. 600 (2015) (per curiam) ............................................................... 9

*City of Tahlequah v. Bond,*
    595 U.S. 9 (2021) (per curiam) ................................................................... 9

*Comm. v. Lucas,*
    34 N.E.3d 1242 (Mass. 2015) ................................................................... 14

*Cugini v. City of New York,*
    941 F.3d 604 (2d Cir. 2019) ...................................................................... 11

*Dubin v. United States,*
    599 U.S. 110 (2023) ................................................................................... 14

*Ex Parte Yarbrough,*
    110 U.S. 651 (1884) ................................................................................... 10

*Gilbert v. Indeed, Inc.,*
    513 F. Supp. 3d 374 (S.D.N.Y. 2021) ...................................................... 18

*Jarecki v. G.D. Searle & Co.,*
    367 U.S. 303 (1961) ................................................................................... 12

*Johnson v. TheHuffingtonPost.com, Inc.,*
    21 F.4th 314 (5th Cir. 2021) ..................................................................... 18

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Kelly v. United States*,
140 S. Ct. 1565 (2020) ............................................... 14

*Lyons v. Rienzi & Sons, Inc.*,
856 F. Supp. 2d 501 (E.D.N.Y. 2012)............................ 18

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ................................................. 15

*McNally v. United States*,
483 U.S. 350 (1987) ................................................. 14

*Minn. Voters Alliance v. Mansky*,
138 S. Ct. 1876 (2018) .............................................. 15

*Mullenix v. Luna*,
577 U.S. 7 (2015) (per curiam) ................................... 9

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ................................................. 9

*Reynolds v. Sims*,
377 U.S. 533 (1964) ................................................. 10

*Rickert v. State Pub. Disclosure Comm'n*,
168 P.3d 826 (Wash. 2007) ........................................ 14

*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021)..................................................... 9

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) ...................................... 14

*United States v. Acosta*,
470 F.3d 132 (2d Cir. 2006)........................................ 12

*United States v. Alvarez*,
567 U.S. 709 (2012) ............................................ 14, 15

*United States v. Auernheimer*,
748 F.3d 525 (3d Cir. 2014)........................................ 18

iii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Bathgate,*
    246 U.S. 220 (1918) ............................................................................. 10, 13

*United States v. Bilanzich,*
    771 F.2d 292 (7th Cir. 1985) ...................................................................... 6

*United States v. Brennan,*
    183 F.3d 139 (2d Cir. 1999) ...................................................................... 18

*United States v. Brown,*
    293 F. App'x 826 (2d Cir. 2008) ............................................................... 19

*United States v. Butler,*
    25 F. Cas. 213 (D.S.C. 1877) .................................................................... 10

*United States v. Classic,*
    313 U.S. 299 (1941) ................................................................................... 11

*United States v. Davis,*
    689 F.3d 179 (2d Cir. 2012) ...................................................................... 19

*United States v. Garcia,*
    340 F.3d 1013 (9th Cir. 2003) .................................................................... 7

*United States v. Geibel,*
    No. 02-1645 (2d Cir. Mar. 5, 2003) .......................................................... 19

*United States v. Gilbert,*
    355 F. Supp. 3d 1168 (N.D. Ala. 2018) ..................................................... 6

*United States v. Gradwell,*
    243 U.S. 476 (1917) ................................................................................... 10

*United States v. Hamilton,*
    46 F.4th 389 (5th Cir. 2022) ...................................................................... 6

*United States v. Hansen,*
    599 U.S. 762 (2023) ................................................................................... 16

*United States v. Kirk Tang Yuk,*
    885 F.3d 57 (2d Cir. 2018) ........................................................................ 19

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*United States v. Lanier*,
    520 U.S. 259 (1997) ............................................................................... 9, 16

*United States v. McDonnell*,
    792 F.3d 478 (4th Cir. 2015) ...................................................................... 6

*United States v. Miller*,
    808 F.3d 607 (2d Cir. 2015) ................................................................. 17, 19

*United States v. Mosley*,
    238 U.S. 383 (1915) .................................................................................. 11

*United States v. Pollard*,
    778 F.2d 1177 (6th Cir. 1985) .................................................................... 6

*United States v. Porat*,
    76 F.4th 213 (3d Cir. 2023) ....................................................................... 6

*United States v. Purcell*,
    967 F.3d 159 (2d Cir. 2020) ..................................................................... 17

*United States v. Ramirez*,
    420 F.3d 134 (2d Cir. 2005) ................................................................ 17, 18

*United States v. Randell*,
    761 F.2d 122 (2d Cir. 1985) ................................................................. 6, 16

*United States v. Robinson*,
    813 F.3d 251 (6th Cir. 2016) .................................................................... 10

*United States v. Saylor*,
    322 U.S. 385 (1944) .................................................................................. 11

*United States v. Siegelman*,
    561 F.3d 1215 (11th Cir. 2009) .................................................................. 6

*United States v. Stone*,
    188 F. 836 (D. Md. 1911) ......................................................................... 11

*United States v. Tobin*,
    2005 WL 3199672 (D. N.H. Nov. 30, 2005) ........................................... 11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Wilson,*
No. 19-cr-10080 (D. Mass. May 19, 2022) ................................................ 6

*United States v. Zimny,*
857 F.3d 97 (1st Cir. 2017) ....................................................................... 5

*Utility Air Regulatory Group v. EPA,*
572 U.S. 302 (2014) ................................................................................. 14

*White v. Pauly,*
580 U.S. 73 (2017) (per curiam) ................................................................ 9

**STATUTES**

14 Stat. 471 (1867) ...................................................................................... 12

17 Stat. 323 (1872) ...................................................................................... 12

28 Stat. 36 (1894) ........................................................................................ 13

18 U.S.C. § 241 ...................................................................................*passim*

18 U.S.C. § 3143 .................................................................................*passim*

18 U.S.C. § 3237 ......................................................................................... 19

Deceptive Practices and Voter Intimidation Act, 109th Cong. S. 1975
(2005) ...................................................................................................... 13

**OTHER AUTHORITIES**

110th Cong. S. 453 ....................................................................................... 13

Eugene Volokh, *Are Douglass Mackey's Memes Illegal?* TABLET
(Feb. 9, 2021) ............................................................................................ 7

Richard Hasen, CHEAP SPEECH (2022) ........................................................ 7

*Webster's Dictionary* (1828) ....................................................................... 12

## **INTRODUCTION**

For the first time in U.S. history, a private citizen has been sentenced to prison for sharing political "misinformation." Defendant-Appellant Douglass Mackey was a self-described Internet troll who posted hundreds of Twitter messages daily in the days preceding the 2016 presidential election. Among them were two "memes" claiming voters could vote for Hillary Clinton by text message. Almost four years later—and two days into the Biden Administration—he was arrested, and charged with one count of violating 18 U.S.C. § 241, a Civil War-era statute that forbids conspiring to "injure, oppress, threaten, or intimidate" any person in the exercise of a federal right. A jury convicted, and a district judge sentenced Mackey to seven months in prison.

Mackey now asks this Court to grant release pending appeal, so he is not required to serve his entire term before this Court can consider the validity of this unprecedented conviction. The Government opposes this relief. But the law demands it. A court "shall" grant release pending appeal if the defendant is not likely to flee or pose a danger to the public, the appeal is not for purposes of delay but rather raises a "substantial question" that, if resolved in the defendant's favor, is "likely to result in" reversal. 18 U.S.C. § 3143(b). There is no dispute that Mackey (who has been free on bond for years) poses neither a flight risk nor a public danger. And his appeal will present at least two fundamental legal challenges to his conviction, success on either of which would result in reversal. Both of those issues are undoubtedly "substantial," which this Court has defined in this context to mean "novel," "close," or "debatable."

1

First and foremost, Mackey's conduct was *not a crime*. It is at least "close" or "debatable" whether § 241 forbids political misinformation—*i.e.*, speech that deceives others about whether or how to vote. It is certainly "novel." For over 150 years, this statute has been used in the voting sphere exclusively to combat *coercive acts* (like threatening voters) and *ballot-box fraud* (like shredding ballots). It has never before been invoked to criminalize misinformation—even though deceptive political speech has been ubiquitous since the Founding. Statutory text and history cut powerfully against this sweeping expansion. It would also render § 241 egregiously overbroad under the First Amendment—exactly what the Supreme Court recently warned courts *not* to do. As if all that were not enough, § 241's vagueness led the Court to impose a special standard—mirroring qualified immunity—that limits its reach to "clearly established" violations. It is inconceivable to claim Mackey violated *clearly established law* by tweeting political misinformation. Even if one believes this conduct *could be* and *should be* illegal, one cannot credibly say Congress has "clearly" criminalized it.

Second, the Government chose to prosecute Mackey in the Eastern District of New York (EDNY)— home of the Clinton campaign headquarters—even though it is undisputed that *neither he nor any other alleged co-conspirator* lived there, tweeted from there, or took any other actions there. The district court upheld venue solely on the basis that his tweets caused Internet data to *travel through* EDNY—via either fiber-optic cables or wireless signals—en route to Twitter's servers elsewhere. This Court has *never* upheld criminal venue on that theory, which would allow *any* offense involving Internet activity

to be prosecuted in *any* district in the country. To the contrary, this Court has warned that "venue-anywhere" theories must be avoided, and has further required a showing of "substantial contacts" between the offense and the venue—a test the lower court ignored because it so obviously could not be satisfied.

Again, the question at this phase is not whether Mackey is correct—only whether his appellate challenges are "substantial" in that they are novel, close, or debatable. That much cannot seriously be disputed. This Court should grant release pending appeal, so that Mackey's appellate rights are not rendered hollow in the interim.

## BACKGROUND

1.   Mackey is a self-described troll who sent hundreds of thousands of tweets, many political in nature, under the screen name "Ricky Vaughn." This case arises from two memes he posted on Twitter on November 1 and 2, 2016:



3

ECF 174 (Post-Trial Op.), at 9. Media outlets picked up the vote-by-text story, and Mackey touted his trolling success, saying he had "haphazardly post[ed]" a meme that wound up on television. *Id.* at 11. Others were less enthusiastic, however, and Mackey's Twitter account was suspended on November 2. *Id.* at 11 & n.16.

The Clinton campaign observed these memes before Mackey shared them, and coordinated with the company that controlled the 59925 number so that any messages triggered auto-responses explaining that the ad was not associated with the campaign. That auto-message was installed the same day of Mackey's suspension, one day after he tweeted his first voting misinformation meme. *Id.* at 13. There is no evidence anyone failed to properly vote on account of Mackey's tweets.

**2.** On January 22, 2021, two days after the inauguration of President Biden and more than four years after the tweets, FBI agents arrested Mackey. An EDNY grand jury charged him with one count of conspiracy in violation of 18 U.S.C. § 241 for conspiring to "injure, oppress, threaten, and intimidate" persons in the exercise of their right to vote. ECF 8.

Judge Nicholas Garaufis denied Mackey's motion to dismiss the indictment. As to § 241, the court construed it as prohibiting all acts to *impede* one's ability to vote—including speech aimed to deceive about the time, place, and manner of an election. ECF 54, at 32-33. As to venue, the court ruled in relevant part that venue would be proper in EDNY if the Government proved that electronic data underlying the tweets "passed through" the district. *Id.* at 17-21.

Mackey was tried in March 2023, with Judge Donnelly presiding because Judge Garaufis became ill. The Government relied mainly on tweets and messages. Mackey testified, reiterating that he did not work, live, or post anything online in EDNY during the conspiracy period, and that he posted the memes for media attention but did not believe anyone would actually be fooled. Post-Trial Op. 16-17.

The jury twice advised the court that it could not reach a unanimous verdict. *See* ECF 116. Only after twice being sent back did the jury convict.

**3.** Mackey sought post-trial relief, again arguing (among other things) that spreading political misinformation was not a clearly established violation of § 241, and that venue was improper in EDNY. ECF 135 at 29-36. Judge Donnelly denied post-trial relief, treating the motion-to-dismiss order as "law of the case" on these two legal issues. Post-Trial Op. 43-48. She sentenced Mackey to seven months in prison, and denied release pending appeal. *See* Minute Entry (Oct. 18, 2023); ECF 178.

## LEGAL STANDARD

Under 18 U.S.C. § 3143(b), a court "shall" order release of a defendant pending appeal if (i) the defendant is "not likely to flee or pose a danger to the safety of any other person," *id.* § 3143(b)(1)(A), and (ii) his appeal is "not for the purpose of delay" but rather "raises a substantial question of law or fact" that, if resolved in his favor, will "likely" result in reversal, *id.* § 3143(b)(1)(B). Satisfying this test creates an "entitlement to release." *United States v. Zimny*, 857 F.3d 97, 101 (1st Cir. 2017).

This Court construed the "substantial question" element of § 3143(b) in *United States v. Randell*, 761 F.2d 122 (2d Cir. 1985). *Randell* observed that other Circuits had defined a "substantial" question variously to mean one that is "novel" and "has not been decided by controlling precedent," "a 'close' question or one that very well could be decided the other way," or one that is "fairly debatable." *Id.* at 125. *Randell* agreed with those other Circuits, and did not think their formulations "differ significantly from each other," though it expressed preference for the "close" articulation. *Id.*

In light of that standard, this Court obviously need not find that the district court "committed reversible error." *United States v. Pollard*, 778 F.2d 1177, 1181-82 (6th Cir. 1985). Rather, release is warranted if the appeal presents a close question, so long as "it is more probable than not that reversal … will occur *if the question is decided in the defendant's favor.*" *Id.* at 1182 (emphasis added); *see also United States v. Bilanzich*, 771 F.2d 292, 298 (7th Cir. 1985). That is, the question must be both close and material.

Two additional points warrant emphasis. *First*, it is especially common to grant release when an appeal involves the scope of a vague federal statute.[1] Indeed, courts in such cases commonly grant release even when the defendant ultimately loses on the

---

[1] *See, e.g.*, Order, *United States v. Porat*, 76 F.4th 213 (3d Cir. 2023) (No. 22-1560), ECF 17 (scope of wire fraud); Order, *United States v. Wilson*, No. 19-cr-10080 (D. Mass. May 19, 2022), ECF 2624 (scope of honest services fraud); Order at 2, *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) (No. 21-11157) (scope of § 666); Order, *United States v. McDonnell*, 792 F.3d 478 (4th Cir. 2015) (No. 15-4019), ECF 39 (scope of honest services fraud); Mar. 27, 2008 Order at 1–2, 4, *United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009) (No. 07-13163) (scope of § 666); Order, *United States v. Gilbert*, 355 F. Supp. 3d 1168 (N.D. Ala. 2018) (No. 17-CR-00419), ECF 324 (same).

6

merits (as occurred in all but one of the cases cited in n.1). This underscores that the standard for release pending appeal is a distinctly *lower* standard than the ultimate merits.

*Second*, because Mackey's sentence is only seven months, he is likely to serve most (if not all) of it during the appeal. Merits briefing alone could consume seven months. Mackey will never be able to recover that missed time with his newborn child, even if he ultimately prevails. This Court should therefore grant release so long as he has a viable path to reversal. *See United States v. Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003) (so holding). By contrast, the Government will suffer no prejudice from this relief: If his convictions are ultimately affirmed, Mackey will serve his full sentence.

## ARGUMENT

This is an incredibly easy case for release pending appeal. There is no question that Mackey poses neither a public danger nor a flight risk—he has been free on bond without issue since early 2021. ECF 7. Nor should it be hard to recognize this appeal as "substantial" in challenging the Government's sweeping and unprecedented theories of both guilt and venue. Indeed, noted scholars have written about the novel issues this case presents. Eugene Volokh, *Are Douglass Mackey's Memes Illegal?*, TABLET (Feb. 9, 2021); Richard Hasen, CHEAP SPEECH 110-11 (2022). And if this Court ultimately rejects either of the Government's aggressive theories, Mackey's sole conviction will be reversed—but he will never be able to recover time spent in prison in the interim. This is exactly the type of case for which § 3143(b) exists.

I.     MACKEY PRESENTS NEITHER A FLIGHT RISK NOR A PUBLIC DANGER.

The first prong of the test—that the defendant is "not likely to flee or pose a danger," 18 U.S.C. § 3143(b)(1)(A)—has never been disputed.  Mackey has been free for almost three years since his indictment, and for more than six months since his conviction, without incident.  His "crime" was non-violent.  He has participated in all pre-trial, trial, and post-trial proceedings.  And he is committed to vindicating himself through appeal.  He clearly "is not likely to flee or pose a danger to the safety of any other person or the community if released."  *Id.*

II.    MACKEY'S APPEAL PRESENTS "SUBSTANTIAL" QUESTIONS THAT WOULD WARRANT REVERSAL IF DECIDED IN HIS FAVOR.

Mackey also satisfies the other element of § 3143(b), since his appeal will raise at least *two* "substantial" questions: whether his conduct was criminal, and whether venue was proper.  And if he prevails on either, his conviction would be reversed.

A.     Whether § 241 Proscribes Political Misinformation Is At Minimum A Close Question.

The most fundamental question raised by this appeal is whether Mackey's tweets constituted a crime at all.  The answer is no.  Section 241 does not extend to political misinformation—this is an unprecedented reading of a Civil War-era statute, contrary to its text and history, foreclosed by the First Amendment, and in the teeth of a host of canons of construction.  Even if that reading were plausible, § 241 is limited to "clearly established" violations: the protective qualified-immunity standard.  Given all that, to claim this appeal is not even "substantial" strains credulity.

8

1.      Section 241 forbids conspiring to "injure, oppress, threaten, or intimidate any person" in the "free exercise or enjoyment of any right" under federal law. That broad formulation fails to "delineate the range of forbidden conduct with particularity." *United States v. Lanier*, 520 U.S. 259, 265 (1997). To avoid void-for-vagueness concerns, the Supreme Court has thus "limited" the "coverage" of § 241 "to rights fairly warned of," meaning those "clearly established" at the time. *Id.* at 267, 270-71. This is the same standard that governs qualified immunity in civil litigation. *Id.* at 270-71.

Federal law is "clearly established" only if "every reasonable [defendant] would have understood" his conduct to be proscribed. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). This familiar inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). What must be "clearly established" is the "violative nature of [the] *particular conduct*." *Id.* (emphasis added); *see also Lanier*, 520 U.S. at 270.

These principles are demanding, and the Supreme Court has repeatedly reversed where courts evaluated the conduct at issue at "a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).[2] Indeed, if a case "presents a unique set of facts," that "alone should [be] an important indication … that [the] conduct did not violate a 'clearly established' right." *White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam).

---

[2] *See also, e.g.*, *City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021) (per curiam); *White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam); *Mullenix v. Luna*, 577 U.S. 7, 11-13 (2015) (per curiam); *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612-14 (2015) (per curiam); *Carroll v. Carman*, 574 U.S. 13, 17-18 (2014) (per curiam).

**2.** Despite the ubiquity of political misinformation, never before in § 241's 150-year history has it been used to prosecute deceptive speech. Rather, it has been applied in the voting context only to two categories of conduct: Coercion (*e.g.*, violence or threats) and election fraud (*e.g.*, stuffing or shredding ballots).

Its original core was coercion. The statute derives from the Enforcement Act of 1870, enacted to safeguard elections from "open violence and insidious corruption." *Ex Parte Yarbrough*, 110 U.S. 651, 658 (1884). Consistent with this principal focus on the "security of life and limb to the voter," *id.* at 661, the first election-related § 241 prosecution involved officials who conspired to kill a Black man because he was going to vote for a Republican. *See United States v. Butler*, 25 F. Cas. 213, 220 (D.S.C. 1877). Still today, coercive acts aimed to prevent voting remain the heartland of § 241. *E.g.*, *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016) ("[Defendant] … coerced and threatened voters to get them to vote for her by absentee ballot.").

Starting in 1915, the Supreme Court extended § 241 to cover certain other efforts by public officials to "deny or restrict" the right to vote. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). Even then, however, the Court stressed that it does not reach everything "supposed[ly] injurious[] to … [the] freedom, honesty, or integrity of an election," *United States v. Bathgate*, 246 U.S. 220, 226 (1918), or give the Government broad license to "stretch[] old statutes to new uses, to which they are not adapted and for which they were not intended," *United States v. Gradwell*, 243 U.S. 476, 488 (1917).

10

Rather, the Supreme Court and lower courts have read § 241 to prohibit a narrow set of conspiracies that deprive citizens of the right to vote by destroying ballots or voter registration applications, stuffing ballot boxes, casting fake ballots, or failing to count legitimate ballots.[3] In short: classic electoral fraud.

By contrast, neither the Government nor the district court ever cited *a single case* of § 241 being used to prosecute political misinformation that may simply *impede* voting. The Government's best effort was two district court cases, but trial court orders cannot form "clearly established" law. *See Cugini v. City of New York,* 941 F.3d 604, 615 (2d Cir. 2019) (requiring Supreme Court authority, Second Circuit cases, or "robust consensus" of appellate precedent). Regardless, its cited cases are inapposite. One involved public officials who prepared doctored ballots that made it "impossible" for illiterate voters to vote for anyone but the Democrat. *United States v. Stone*, 188 F. 836, 838 (D. Md. 1911). The other involved jamming telephones to interfere with get-out-the-vote efforts (and a jury later *acquitted*). *United States v. Tobin*, 2005 WL 3199672 (D.N.H. Nov. 30, 2005). Neither case involved a citizen disseminating political misinformation.

That § 241 has never before been invoked or applied in this way, even as false political speech runs rampant, itself suffices to demonstrate that Mackey did not violate "clearly established" law. And, at minimum, that this question is "substantial."

---

[3] *See, e.g.*, *United States v. Mosley*, 238 U.S. 383, 393 (1915); *Anderson v. United States*, 417 U.S. 211, 236-45 (1974); *United States v. Classic*, 313 U.S. 299, 331-41 (1941); *United States v. Saylor*, 322 U.S. 385, 390-93 (1944).

**3.** Statutory text and history, corroborated by a brigade's worth of canons of construction, confirm that the Enforcement Act of 1870 does not harbor a political speech code that somehow escaped notice for 150 years.

Start with text. Section 241 proscribes conspiracies to "injure, oppress, threaten, or intimidate" any person in the exercise of federal rights. The Government agrees the operative word here is "injure." ECF 54, at 34 n.12. But "injure" does not naturally cover mere *deception*; it connotes a *coercive* act. *Compare Webster's Dictionary* 6914 (1828) (Injure: "To hurt or wound"), *with id.* at 4261 (Deceive: "To mislead the mind"). Injure must also be read in light of the other verbs in the statute, *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961), and those words—oppress, threaten, and intimidate—all involve coercion too. As this Court has recognized, the "most obvious" construction of these verbs together is to sweep in all "conduct that involves … applying physical force." *United States v. Acosta*, 470 F.3d 132, 136 (2d Cir. 2006) (per curiam). By contrast, when Congress wants to capture the distinct harm of *deceit*, it uses different words, like "defraud." That was equally true in 1870.[4]

Section 241's history reaffirms that it does not reach deceptive electoral speech. The Enforcement Act of 1870 originally "prescribe[d] a comprehensive system … to secure [the] freedom and integrity of elections," including a host of very detailed rules

---

[4] *See, e.g.*, 17 Stat. 323 (1872) ("That if any person having devised or intending to devise any scheme or artifice to defraud…"); 14 Stat. 471 (1867) ("If two or more persons conspire … to defraud the United States …").

governing voting practices. *Bathgate*, 246 U.S. at 225. In 1894, Congress repealed those election-related provisions (28 Stat. 36 (1894)), while leaving in place what is now § 241. The Supreme Court recognized that the repeal necessarily narrowed the scope of the statute, meaning the repealed provisions constitute the *outer bounds* of what § 241 can reach. *Bathgate*, 246 U.S. at 226. But even though that Act reached a prodigious array of offenses—from impersonating voters, to leveraging contracts to influence voting, to evicting people for their vote, and much else—even it did not criminalize mere deceit. Political misinformation was not within the Act's original bounds and thus cannot be within whatever residuum was preserved by § 241 after the broader repeal.

At the very least, given § 241's text and history, whether it can now be expanded to false political speech is plainly a "substantial" question.

That conclusion is only bolstered by a barrage of canons of construction. If the Government is right that "injure" is synonymous with "impede," and that § 241 covers anything that may impede voting, the consequences are astounding. The law would reach any "false" political speech—every distortion designed to depress or promote turnout, every lie told by a candidate or supporter. For years, Congress has debated proposals to narrowly prohibit certain false speech about elections.[5] Yet the premise of this conviction is that all of that—and more—has been illegal since 1870.

---

5 *See, e.g.*, Deceptive Practices and Voter Intimidation Act, 109th Cong. S. 1975 (2005); 110th Cong. S. 453 (reintroducing); 117th Cong. S. 1840 (same).

That "staggering breadth" is itself "implausible." *Dubin v. United States*, 599 U.S. 110, 129 (2023). Moreover, this reading also triggers "a sweeping expansion of federal criminal jurisdiction," *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020); discovers a major "unheralded power" in a "long-extant statute," *Util. Air Regulatory Grp. v. EPA*, 572 U.S. 302, 324 (2014); and leaves a criminal law's "outer boundaries ambiguous," *McNally v. United States*, 483 U.S. 350, 360 (1987). Those are all things the Supreme Court has forcefully instructed courts not to do. Whether this Court should do them anyway is at least a "substantial" question.

**4.** As if all that were not enough, the Government's reading would render § 241 obviously unconstitutional under the First Amendment. Indeed, if § 241 means what the Government says, it would be the most pronounced violation of the First Amendment's overbreadth doctrine in the U.S. Code.

The Supreme Court has made crystal clear that the First Amendment protects false speech on matters of public concern. Indeed, all nine Justices agreed on this point in *United States v. Alvarez*, which invalidated the Stolen Valor Act, even though the case otherwise fractured the Court. 567 U.S. 709, 723 (2012) (plurality); *id.* at 736 (Breyer, J., concurring); *id.* at 750 (Alito, J., dissenting). Courts have since repeatedly struck down laws proscribing false speech about candidates. *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016); *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014); *Commonwealth v. Lucas*, 34 N.E.3d 1242, 1257 (Mass. 2015); *see also Rickert v. State Pub. Disclosure Comm'n*, 168 P.3d 826, 829-31 (Wash. 2007).

14

On the Government's reading, § 241 would sweep in more speech than all those statutes. If any lie or deceit that "hampers," "inhibits," or "frustrates" voting is a crime, *see* ECF 54, at 34, then § 241 would reach *any* false speech that bears on how one votes—whether to convince or dissuade someone to vote for a particular candidate, or to discourage him from voting at all. It would stretch from the "political arena" to "barstool braggadocio." *Alvarez*, 567 U.S. at 737 (Breyer, J., concurring). It would cover Sen. Harry Reid's false claim that Mitt Romney failed to pay taxes, and Rep. George Santos's lies about his CV. This statute designed to combat KKK violence would become a comprehensive political speech code, with *none* of the "limiting features" that *Alvarez* emphasized were crucial when criminalizing false speech. *Id.* at 736.

To be clear, none of this necessarily means Congress could not permissibly enact a law narrowly targeted at particular political misinformation, such as false statements about time, place, and manner of elections. The point is that § 241 does not remotely do that. And unless a law is limited *on its face* to a certain category of speech, it cannot be artificially limited. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344 (1995). So it does not matter if Congress *could* enact a narrow ban covering Mackey's conduct—a hard question under *Alvarez*. What matter is that Congress *has not*—and that is an easy question. *Accord Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1889 n.4, 1891 (2018) (agreeing that, in polling places, "State may prohibit messages intended to mislead voters about voting requirements," including the campaign button at issue, yet still invalidating the statute because it swept more broadly).

15

Simply put, if Congress passed a law that criminalized "any false speech intended to affect how or whether someone votes," nobody would defend its constitutionality. But that is what the Government reads § 241 to say. Since there is an obvious narrower reading—one that comports with text, history, and canons—the Court should eschew the interpretation that thrusts this long-extant statute into constitutional peril. *See United States v. Hansen*, 599 U.S. 762, 771 (2023) (adopting narrow reading of statute that criminalized "encourag[ing] or induc[ing]" illegal immigration, in part to avoid creating a collision with First Amendment overbreadth principles).

\*     \*     \*

If this Court somehow still harbors doubt, recall the two heavy thumbs on the scales. So long as it was not "apparent" when Mackey posted his memes that doing so would be a crime, he is entitled to acquittal. *Lanier*, 520 U.S. at 272. And so long as this question is itself "novel," "close," or "debatable," Mackey is entitled to remain out of prison pending appeal. *Randell*, 761 F.2d at 125. The one thing that is plainly *not* a close call is that Mackey is entitled to release under § 3143(b).

## B. Whether Internet Data Traveling "Through" EDNY Suffices For Venue Is At Minimum A Close Question.

The Government's theory of venue is equally unprecedented, equally aggressive, and equally untenable. It rests entirely and exclusively on the fact that Mackey's tweets caused Internet data to *pass through* EDNY en route to the rest of the country. Whether that is a legally viable theory is at the very least a "substantial" question too.

16

**1.** To prevent "prosecutorial abuse," the Founders limited criminal venue to the district "where the wrong was committed." *United States v. Miller*, 808 F.3d 607, 614 (2d Cir. 2015). In conspiracy cases, the Government must make two showings: (i) that "the acts constituting the offense—the crime's 'essential conduct elements'—took place" in the forum; and (ii) that those acts bear "substantial contacts" with the forum. *United States v. Ramirez*, 420 F.3d 134, 138-39 (2d Cir. 2005). Absent that proof, the conviction must be reversed. *United States v. Purcell*, 967 F.3d 159, 198 (2d Cir. 2020).

Here, however, it is undisputed that Mackey did not commit *any acts*—let alone "essential" acts—in EDNY. He did not live there, form any agreements there, or post the memes from there. To the contrary, all agree that Mackey lived in and used Twitter from his "apartment in Manhattan." Post-Trial Op. 44-45. Nor did the Government adduce any evidence that any alleged co-conspirator took action in EDNY. ECF 140 at 35. Indeed, the *only* acts the Government proved in EDNY were the efforts by the Clinton campaign to coordinate auto-response messages to attempted votes-by-text— which obviously did not *further* the conspiracy. *See* Post-Trial Op. 12-13.

**2.** Instead, the Government argued—and the trial court agreed—that venue could be established merely by proving that data associated with Mackey's tweets briefly "passed through" EDNY waters (by fiber-optic cables) or EDNY airspace (by wireless transmission). ECF 140 at 35; *see also* Post-Trial Op. 44-45 (finding venue established because "deceptive images passed through the internet infrastructure"). Treating that evanescent connection as justifying venue, however, is legally indefensible.

*First*, that theory would let the Government prosecute Mackey in any district with access to Twitter—which is to say *every* district. After all, the Internet data associated with a Twitter post flows "like water" across the entire country. Post-Trial Op. 13; *see also* ECF 123 at 176. Indeed, if this suffices for venue, that means *any* crime involving online activity on a website or social media platform could be prosecuted in *any* district. Yet venue statutes "should not be so freely construed as to give the Government the choice of a tribunal favorable to it." *United States v. Brennan*, 183 F.3d 139, 146-47 (2d Cir. 1999). To the contrary, they must be "narrowly construed." *Ramirez*, 420 F.3d at 146. This longstanding "rule favoring restrictive construction of venue provisions," *Brennan*, 183 F.3d at 146, is especially critical today because the "ever-increasing ubiquity of the Internet" amplifies the "'danger'" of allowing the Government "to choose its forum," *United States v. Auernheimer*, 748 F.3d 525, 541 (3d Cir. 2014).

*Second*, courts have widely rejected this "pass through" theory in the analogous context of specific personal jurisdiction; they "routinely" disclaim personal jurisdiction over individuals whose social-media posts or online publications travelled to the forum. *Blessing v. Chandrasekhar*, 988 F.3d 889, 905-07 & n.15 (6th Cir. 2021).[6] That is why, for instance, an anti-"MAGA" comedian cannot be haled into court wherever her tweets travelled. *Id.* The same goes for this pro-MAGA Twitter troll.

---

[6] *See also Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318-19 (5th Cir. 2021); *Lyons v. Rienzi & Sons, Inc.*, 856 F. Supp. 2d 501, 510 (E.D.N.Y. 2012); *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 413 15 (S.D.N.Y. 2021).

*Third*, even if fleeting Internet data travel could constitute "essential conduct" in the forum, the Government also needed to prove that the alleged criminal conduct bore "substantial contacts" with EDNY, considering "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012); *see also Miller*, 808 F.3d at 622. There is no way the Government could satisfy that test, which is why the lower court simply ignored it.

**3.** In upholding venue, the district court rested on cases involving *direct point-to-point communications* like calls, texts, emails, and wire transfers. ECF 54 at 13-21. But unlike here, those targeted communications are "directed at" particular districts, and so do not present the danger of licensing the Government to select any district it wishes. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 75 (2d Cir. 2018). And the only cases where this Court has upheld venue based on transmission "*through*" the forum—as opposed to *to* or *from* the forum—were governed by a different venue rule that expressly allows prosecution in districts "through … which" something "move[d]." 18 U.S.C. § 3237(a), par. 2; *see, e.g.*, *United States v. Brown*, 293 F. App'x 826, 829 (2d Cir. 2008).

\*     \*     \*

Again, Mackey is entitled to release if his appeal presents a substantial question that is material to his conviction. The Government's envelope-pushing venue theory independently satisfies that standard too. *See United States v. Geibel*, No. 02-1645 (2d Cir. Mar. 5, 2003) (granting release pending appeal in case involving venue challenge).

## <u>CONCLUSION</u>

The Court should grant release pending appeal, and Mackey respectfully requests that it do so before his reporting date of January 18, 2024.

Date: November 1, 2023          Respectfully submitted,

<u>*/s/ Yaakov M. Roth*</u>

Eric S. Dreiband
Yaakov M. Roth
Joseph P. Falvey
Caleb P. Redmond
Harry S. Graver
JONES DAY
51 Louisiana Ave, N.W.
Washington DC 20001
(202) 879-3939

*Counsel for Defendant-Appellant*
*Douglass Mackey*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume and typeface requirements of Fed. R. App. P. 27(d), because it includes 5190 words, and has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

November 1, 2023                    */s/ Yaakov M. Roth*
                                     Yaakov M. Roth

# EXHIBIT 1: Sentencing and District Court Denial of Bond Pending Appeal

1

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 21CR80(AMD)
4                                 :
            Plaintiff,            :
5                                 :
         -against-               : United States Courthouse
6                                 : Brooklyn, New York
   DOUGLASS MACKEY,               :
7                                 :
            Defendant.            : Wednesday, October 18, 2023
8                                 : 11:30 a.m.
                                   :
9                                 :
                                   :
10
   - - - - - - - - - - - - - - X
11
         TRANSCRIPT OF CRIMINAL CAUSE FOR A SENTENCING
12         BEFORE THE HONORABLE ANN M. DONNELLY
            UNITED STATES DISTRICT JUDGE
13
               A P P E A R A N C E S:
14
   For the Government:    UNITED STATES ATTORNEY'S OFFICE
15                         Eastern District of New York
                            271 Cadman Plaza East
16                         Brooklyn, New York 11201
                         BY: ERIK PAULSEN, ESQ.
17                            TURNER BUFORD, ESQ.
                             WILLIAM GULLOTTA, ESQ.
18                            Assistant United States Attorneys
   For the Defendant:     ANDREW J. FRISCH, ESQ.
19                         40 Fulton Street
                            New York, NY 10038
20

21

22

   Court Reporter:    **SOPHIE NOLAN**
23                     225 Cadman Plaza East/Brooklyn, NY 11201
                        NolanEDNY@aol.com
24 *Proceedings recorded by mechanical stenography, transcript
   produced by Computer-Aided Transcription*
25

Sophie Nolan, RPR - Official Court Reporter

Proceedings                                        2

1                      (In open court.)

2              (The Hon. Ann M. Donnelly, presiding.)

3                      (Defendant present.)

4              THE COURTROOM DEPUTY:  This is criminal cause for

5       sentencing, Docket Number 21-CR-80, *USA versus Douglass*

6       *Mackey*.

7              Counsel, state your appearance, government first.

8              MR. PAULSEN:  Good morning, Your Honor.  Erik

9       Paulsen for the United States Government.  I'm joined at

10      counsel table by Turner Buford, Bill Gullotta and also Erica

11      Vest from Probation.

12             THE COURT:  Good morning.

13             MR. FRISCH:  For Mr. Mackey, Andrew Frisch.  Good

14      morning.

15             THE COURT:  Good morning, Mr. Frisch.

16             Good morning, Mr. Mackey.

17             Mr. Frisch, we got your communication this morning

18      that Mr. Mackey's wife had a baby last night.  I certainly

19      would have adjourned this proceeding if you wanted me to.

20             MR. FRISCH:  I appreciate that.  As I advised the

21      Court, and I wanted to give you a heads up to know about it as

22      opposed to telling you on the bench, she had an emergency

23      C-section last night.  Everyone is fine as far as I know.

24      However, we're prepared to proceed today.

25             THE COURT:  I understand that she's on the phone as

```
                        Proceedings                         3
```

1  well as Mr. Mackey's mother; is that correct?

2          MR. FRISCH:  That's my understanding.

3          THE COURT:  Can both Mrs. Mackeys, can everybody

4  hear?

5          MS. MACKEY:  Good morning this is Kathy Mackey.  I'm

6  having a hard time hearing you.  His wife was not able to join

7  us.

8          THE COURT:  Okay.  And I am going to ask you to mute

9  if you could okay?

10         MS. MACKEY:  Okay.

11         THE COURT:  This is a sentencing proceeding.

12  Mr. Mackey was convicted after a jury trial of the sole count

13  of the indictment which charges that between September and

14  November of 2016, he, together with others, conspired to

15  injure, oppress, threaten or intimidate one or more people in

16  the free exercise and enjoyment of a right and privilege

17  secured to them by the Constitution and laws of the United

18  States, specifically the right to vote.

19         I'm going to go over the materials that I reviewed

20  in preparation for today's proceeding.  Obviously I presided

21  over the trial, but also in connection with the trial and in

22  connection with today's proceeding, I reviewed Justice

23  Garaufis's opinions on various matters.  I've also re-reviewed

24  the trial transcripts as well as the exhibits that were

25  introduced.

Proceedings                                                    4

1        I've reviewed the presentence investigation report,

2   the one from September 8th of 2023.  That included a

3   sentencing recommendation.  I've also reviewed the addendum to

4   the presentence investigation report of October 5th of 2023,

5   and their revised sentencing recommendation from October 6th

6   and I just want to double check that everybody received those

7   sentencing recommendations; is that correct?

8        MR. PAULSEN:  Yes, Your Honor.

9        MR. FRISCH:  Yes.

10       THE COURT:  Okay.  Probation is recommending a

11  sentence of ten months custody with two years of supervised

12  release and some special conditions.  They are obviously

13  recommending the $100 special assessment and that Mr. Mackey

14  be excused from mandatory drug testing.  I've reviewed the

15  Government's objections to the presentence investigation

16  report, the defendant's objections to the presentence report.

17  Then there was an additional amendment to the objections that

18  was submitted on September 23rd.  The Government's reply to

19  those objections and then the defendant's sentencing

20  memorandum and the exhibits from September 26th; the

21  government's sentencing memorandum from October 3rd, as well

22  as Mr. Frisch's two supplemental submissions that were

23  submitted on October 12th.

24       Is that -- have I missed anything?  Let me as the

25  Government.

Proceedings                                    5

1          MR. PAULSEN:  I don't believe so, Your Honor.

2          THE COURT:  Mr. Frisch?

3          MR. FRISCH:  I don't believe so.

4          THE COURT:  Mr. Frisch, have you and Mr. Mackey read

5     and discussed the presentence report?

6          MR. FRISCH:  Yes.

7          THE COURT:  I am going to go through the calculation

8     of the advisory guidelines range as I'm required to do.

9     Probation calculates the total offense level as 12.  There's a

10    base offense level of 12 and Probation does not identify any

11    adjustments.  So the adjusted offense level is also 12.  The

12    defendant has a criminal history score of zero which

13    corresponds to a criminal history category one for a total

14    offense level of 12 and a criminal history category of one.

15    The guideline range is ten to sixteen months.

16          Both the Government and the defendant ask that I

17    incorporate the anticipated guidelines reduction, which is

18    scheduled to take effect next month, actually in a couple of

19    weeks, which is a reduction for zero-point offenders.  That

20    reduction, if applied, would take two points off and result in

21    a total offense level of 10, which lowers the guideline range

22    to six to 12 months.  I am going to apply that reduction

23    because Mr. Mackey would be entitled to it if he were

24    sentenced in a few weeks and it's a reduction that I've been

25    routinely applying to defendant's who appear before me for

Proceedings                                                        6

1   sentencing who fall within that category.  But a sentence

2   within this range because the guidelines are not yet in effect

3   is treated as a variance.

4           I'm going to go over the objections to the

5   guidelines calculations.  First, Mr. Frisch objects that or

6   contends that Mr. Mackey is entitled to a two-point downward

7   adjustment because he had what is characterized as a minor

8   role in this conspiracy, citing that he wasn't present in the

9   chats when people discussed and formulated the false memes

10  that are in question and the only contact that he had with the

11  co-conspirators was in the context of these chats and because

12  he didn't actually create the memes himself or direct them.

13          I agree with Probation that the downward adjustment

14  is not applicable.  The downward adjustment for a minor role

15  is not applicable on these facts.  I don't think looking at

16  the evidence at trial that the defendant's role in this

17  conspiracy could in any way, shape or form be characterized as

18  minor.

19          The evidence showed that he understood the scope and

20  structure of the conspiracy and that he was one of the leading

21  and most influential members of the conspiracy because of the

22  wide reach of his influence on Twitter.  And it was this very

23  prominence on Twitter, the status about which he boasted and

24  of which he was proud, that enabled the conspiracy's

25  disinformation to spread.  I think one of the witnesses

Proceedings                                        7

1    testified "like wild fire."

2           So it was -- his participation in achieving the

3    conspiracy's goals of lowering the turnout among certain

4    voters was significant and it was potentially more effective

5    because of his influence on Twitter.  He -- I think I said

6    enough about it, but he was dispensing advice on how to make

7    effective memes and was a leader in the conspiracy.  So I

8    agree with Probation that the two-point downward adjustment is

9    not applicable.

10          There is also a request -- the defendant also

11   requests that he get a downward departure on the theory that

12   his behavior was aberrant.  This is the -- under the

13   guidelines a downward departure in situations where, you know,

14   there's a momentary lapse or there was a single criminal

15   transaction in cases and it's akin to the analysis for the

16   minor adjustment, but this case under its facts is not about

17   minor lapses or momentary lapses in judgment.

18          I know the characterization of Mr. Mackey's conduct

19   is "two clicks," but that's not a fair characterization in my

20   view of what the case was at all.  This was a conspiracy that

21   took place over a series of months and intensified in the

22   lead-up to the presidential election so a downward departure

23   for aberrant behavior in my view is not appropriate.

24          I want to note some of the other objections to the

25   presentence investigation report.  Mr. Frisch objects to the

Proceedings                                                8

1    description of the offense and the offense conduct portion of

2    the presentence report.  I agree with Probation that the

3    offense conduct is accurately described and I'm not going to

4    change anything about that.

5              There is also an objection to Probation's statement

6    that Mr. Mackey hasn't accepted responsibility.  Obviously

7    he's gone to trial and is planning to challenge his conviction

8    on appeal, as is his right, but I think as a factual matter he

9    hasn't accepted responsibility, but obviously I recognize his

10   right to assert his innocence.  I'm not changing the

11   presentence report.  I'm accepting it as amended by the

12   addendum to the presentence investigation report.

13             I will say, though, I don't think there's any need

14   to discuss this further, I'm not going to be imposing those

15   internet restrictions.  I think both sides agree that those

16   are not appropriate in this case, and so those will -- I'm not

17   imposing those unless somebody else wants to talk about that

18   further.

19             I have reviewed carefully really everything about

20   this case including the parties' submissions, but I will hear

21   from you further if you wish to say anything else.

22   Mr. Frisch, I will hear from you first and then from the

23   Government and then if Mr. Mackey wants to say anything, I

24   will hear from him as well as well.

25             I will remind everybody to speak into the microphone

Proceedings                                                9

1   and not speak too quickly.

2         Mr. Frisch, anything else you would like to add

3   to --

4         And I also want to say that the submissions were

5   extremely thorough from both sides.

6         MR. FRISCH:  Your Honor, thank you.  Forgive me, I'm

7   getting over a long-lasting cold.  I just want to make sure

8   that the objection in my letter of September 22nd to paragraph

9   40 is reflected.  I don't recall if Officer Vest reflected

10  this in one of her addenda, but it's just a factual question

11  as to --

12        THE COURT:  Tell me what page that's on.

13        MR. FRISCH:  It's at paragraph 40 of the PSR.

14        THE COURT:  So it's page eight?

15        MR. FRISCH:  Let me see.

16        THE COURT:  No, page nine.

17        MR. FRISCH:  And in my letter, I pointed out that or

18  I asked that the paragraph be amended to note that Mr. Mackey

19  moved from Brooklyn to Manhattan in 2012 and left his job the

20  Dunham & Associates in Brooklyn in June of 2016.

21        THE COURT:  I thought you added that, no.

22        MS. VEST:  Your Honor, on page two of the addendum,

23  the fourth paragraph down, it does make the amendment to the

24  PSR incorporating that information.

25        MR. FRISCH:  Excellent.

Sophie Nolan, RPR - Official Court Reporter

Proceedings                                          10

1      THE COURT:  Okay.

2      MR. FRISCH:  Your Honor, if I can talk a little bit

3  this morning about why any prison under the circumstances of

4  this case is greater than necessary to achieve the statutory

5  goals of sentencing, why a noncustodial sentence, perhaps,

6  including community service, is sufficient within the meaning

7  of the statute and there's a number of reasons and I'll go

8  through them and I ask that they be considered separately, but

9  also together.

10      We know from the government that prison is not

11  necessary is not necessary to deter generally this kind of

12  conduct.  What do I mean?  According to the Government's

13  evidence, when Tia, T-I-A, when Tia reported to Mr. Microchip

14  that she had been suspended from Twitter for posing one of

15  these memes, Mr. Microchip said, quote, I guess don't post

16  those then, close quote.  And that was early morning of

17  Election Day 2016.  So even as the goal of the conspiracy as

18  charged by the Government was about to be realized, suspension

19  of Twitter was sufficient to stop these memes.

20      Whatever the circuit may have to say about

21  Mr. Mackey, Mr. Gulotta presentation of Mr. Microchip

22  established that his fear of disclosure of his identity

23  significantly contributed to resolution of a prospective

24  charge against him.  Just fear of disclosure, disclosure of

25  his identity, was sufficient.  And we know that Mr. Mackey

Proceedings                                11

1   took the unusual step three years before his arrest to check

2   himself to check himself in for inpatient psychotherapy and

3   genuine self-correction just because his identity was made

4   public.

5           THE COURT:  I'm sorry to interrupt you, but can you

6   elaborate?  Was there a diagnosis?  I thought there was -- is

7   there a report or something from that facility?

8           MR. FRISCH:  I did not submit a report from the

9   facility.  My understanding, as consistent with the

10  pre-sentence report, it was a course of psychotherapy and very

11  intense counseling to address what Mr. Mackey believed was a

12  need to get his life on the right track essentially and was so

13  serious about it that he did it inpatient.

14          THE COURT:  But was -- and I just -- it's connected

15  to the doxing; is that correct?

16          MR. FRISCH:  That was the impetus for him to realize

17  that he needed to correct himself, that he needed help.

18          THE COURT:  And was there a diagnosis -- I mean,

19  typically if you're going to check yourself in and I'm not a

20  professional, but was there a particular condition that this

21  was supposed to address?

22          MR. FRISCH:  Can I have one moment?

23          THE COURT:  Sure.

24          (Pause in proceedings.)

25          MR. FRISCH:  Thank you, Judge.  My understanding was

Sophie Nolan, RPR - Official Court Reporter

Proceedings                                    12

1    there was no diagnosis in a formal sense in the way that

2    sometimes psychotherapists or counselors identify a particular

3    disorder or a particular condition.  It was more of addressing

4    what Mr. Mackey perceived to be the need for help with his

5    general life stuff, and general counseling and to do it in a

6    way that was intensive; that is, not one or two hours a week

7    but to go someplace where he could have the benefit of an

8    environment most conducive to essentially general

9    psychotherapy.  That's my understanding.

10           THE COURT:  Okay.  Go ahead.  I'm sorry to

11   interrupt.

12           MR. FRISCH:  So, for these reasons, the record

13   establishes that prison is not necessary, even for general

14   deterrence, because the folks that were doing this were

15   deterred by things before the government intervened and

16   certainly short of prison.

17           Second, in panel discussions within this courthouse,

18   in seminars, in public commentary and law reviews, as a

19   community we bemoan the focus on prison that is peculiar among

20   western nations.  But all of those concerns tend to fall by

21   the wayside when we appear for actual sentencings.  Most of

22   the time, virtually all the time, the Government can theorize,

23   well, prison is necessary in this case for a particular reason

24   or not and what we talk about outside of courtrooms at

25   sentencing really isn't addressed, but it's hard to think of a

Proceedings                                    13

1   case or circumstances more -- making prison more unworthy as

2   here.  It isn't that we can't theorize that prison could

3   provide -- could advance the statutory goals of sentencing,

4   but it's hard to find a case that where prison seems not to be

5   something we must impose to paraphrase the statutory command.

6           The Government did not prosecute Mr. Mackey because

7   he formulated the memes or orchestrated anything.  The

8   Government prosecuted him over the past three years, not so

9   much to deter what was already deterred before and without

10  government intervention, but to make a point.  And there's

11  nothing about prison that necessarily would be required under

12  our circumstances to further make that point.

13          The Government says, well, Mr. Mackey has not

14  accepted responsibility, that his voluntary introspection,

15  self-correction, even three years before his arrest, his

16  idiosyncratic or at least it's no -- it doesn't obviate the

17  need to impose prison, but I think there are features of this

18  case that distinguish it.  The quantum of evidence in the

19  lion's share of federal criminal cases, maybe all of them or

20  virtually all of them, but certainly the lion's share proves

21  guilt to or close to a certainty.  It doesn't have to, but

22  invariably it does.  There's, for example, a robbery on a

23  surveillance video or there's an undercover drug transaction

24  or there are wiretaps or there's multiple investors relying on

25  the same misrepresentation, and more; the lion's share of

Proceedings                                              14

1   federal criminal cases prove some actual harm, not all of

2   them, but the lion's share narcotics bought and sold assets

3   stolen by force or by fraud, death, physical injury,

4   contraband is seized.

5          In these ways, this case is different from the

6   lion's share of federal criminal cases.  Now, to prove a

7   legally sufficient case, proof to a certainty is not required,

8   nor should it be and to prove a legally sufficient case of

9   conspiracy, proof of harm or reliance is not required, nor

10  should it be.  But finding legal sufficiency is a different

11  exercise than imposing prison.  Finding that our protocols for

12  fact finding establish legal sufficiency does not establish

13  that prison must follow.  The parsimony clause, our

14  longstanding and traditional national reference for liberty,

15  required by statutory command establishes an institutional

16  reluctance to impose prison, a humility about it.  It's not

17  the default.  The default is no prison.

18         Prison is the exception when we must, when it's

19  necessary.  None of us can purport to know with any degree of

20  certainty what Mr. Mackey was thinking of November 1st, seven

21  years ago; not the Government, not the jurors.  We do the best

22  we can to determine if someone formed criminal intent at the

23  time of action and we indulge less than certainty to sustain

24  legal sufficiency as we must and we bring to that process all

25  of our imperfections and frailties and maybe that's okay when

Proceedings                              15

1    it comes to establishing legal sufficiency but we have to

2    think of it different when we decide whether we must impose

3    prison.

4              In fact, the standards are the opposite.  The

5    standard for legal sufficiency is to indulge all the

6    government inferences, but for prison it's whether we must do

7    it; whether the circumstances compel it.  It's dangerous for

8    the state to be so confident that it knows what someone was

9    thinking at a point in time that not only would we find

10   legally sufficient evidence to sustain a conviction but more

11   to vindicate -- and to vindicate a purported statutory command

12   defining a crime, but in addition, we're going to impose

13   prison; so certain are we that we know exactly what you were

14   thinking accommodating the Government's inferences of guilt

15   does not mean that we accommodate inferences that prison is

16   necessary.  It is and should be a different analysis.

17             Ricky Vaughn disappeared years ago, years before

18   Mr. Mackey's arrest.  Doug Mackey over the past years has done

19   everything right, everything just as he should have.  Letters

20   submitted to the Court describe him and these are quotes:  A

21   man of faith and integrity deeply committed to a life of

22   service to others.  He holds himself to a high standard

23   ethically, morally and conscientiously.  A person of

24   unwavering honesty and a strong moral compass who consistently

25   goes above and beyond to help those in need, demonstrating

Proceedings                                      16

1   dedication to making our community a better place.  Those are

2   quotes, many of them from people who Mr. Mackey met in the

3   church as he's rededicated his faith to the church and as a

4   result of the inpatient counseling that he had.

5          The Court today is sentencing someone who

6   self-corrected on his own before and without government

7   intervention.  We know that suspension from Twitter, the

8   disclosure of identity, was sufficient to deter these means

9   and even if there remains some theoretical basis to believe

10  that prison is necessary, the arguments against it

11  substantially and compellingly outweigh the reasons for it.

12  And I will end with this thought:  It is a juror, one of the

13  jurors who wrote to the Court that a sentence of community

14  service in his -- in her view, would be sufficient, and I

15  believe she's right.

16         THE COURT:  All right.  Thank you so much

17  Mr. Frisch.

18         Mr. Paulsen.

19         MR. PAULSEN:  Thank you, Your Honor.  The Government

20  agrees with Probation that a guidelines term of incarceration

21  is the proper sentence in this case.  I don't want to belabor

22  the points that we've made in our submission as I know Your

23  Honor has read it, but I would like to emphasize the one

24  consideration that we think is especially important and that's

25  the need for general deterrence, particularly for conduct

Sophie Nolan, RPR - Official Court Reporter

Proceedings                                    17

1   affecting the very important right to vote.

2          As any number of courts have commented, including

3   the Supreme Court, voting is the right that secures all the

4   other rights that we hold dear as American citizens.  The

5   conspirators in this case south to undermine that very

6   important right.  They wanted to trick people into casting

7   their votes in a way that wouldn't count, so the votes would

8   essentially disappear.  And they did this during an election

9   season where voting results were expected to be very close, so

10  small numbers of votes wouldn't matter.

11         As the Court noted a moment ago, this plan wasn't

12  hatched on a whim.  It was discussed and strategized for

13  several weeks in private groups where the defendant had been a

14  leading member.  And it was executed using the methods the

15  defendant and his associates had honed and perfected

16  throughout the elections.  There was nothing about this

17  conduct that was worthy of the protection accorded to other

18  political activities.

19         The defendant and his co-conspirators were not

20  engaging in political arguments or making a social critique or

21  contributing to the marketplace of political ideas.  They were

22  just trying to injure the right to vote.  They were comitting

23  a fraud; one that was aimed at the most sacred rights

24  available in our democracy.  Now, among the factors this court

25  will always consider in crafting an appropriate sentence is

Proceedings                                    18

1    the need for deterrence.  The Government submits that it may

2    be likely that the defendant is not going to commit this

3    particular crime again.

4          While the defendant has been evasive about his

5    current online activities, he appears to have withdrawn from

6    social media after his doxing and the reckoning it has caused

7    in his personal life.  The defendant may be right; specific

8    deterrence does not weigh very heavily here.  General

9    deterrence, however, is an entirely different matter.  We

10   submit that the need for general deterrence in this case is

11   absolutely paramount.

12         The sentence this court imposes today is going to

13   send a message to the general public.  It's going to send a

14   message to the people that celebrated what the defendant did

15   and send a message to people considering following in his

16   footsteps.  It's going to send a message to everyone out there

17   willing to undermine the right to vote.  The sentence you

18   impose today is going to be all the more important given how

19   relatively easy it is to commit crimes like this anonymously.

20         The defendant has a case in point.  Despite becoming

21   an internet celebrity and the intense object of interest of

22   various journalists, he was able to remain anonymous for

23   years.  He used VPN and hid his real name.  Others will no

24   doubt follow in this path and try to undermine voting rights

25   while taking advantage of the broad anonymity that the

Proceedings                                    19

1    internet permits.

2            The sentence today needs to send a message to those

3    potential bad actors and the sentence today needs to let the

4    general public know that there will be significant

5    consequences for crossing that line and undermining the right

6    to vote.  For these reasons as well as all the others we

7    outlined in our submission, Your Honor, the government submits

8    that a term of incarceration is essential here.

9            We submit that a sentence between six and twelve

10   months, as recommended by the guidelines, would be sufficient

11   but not more than necessary to serve the purposes of

12   punishment and we ask that the Court impose such a sentence.

13   Thank you.

14           THE COURT:  Thank you so much.

15           Mr. Mackey, you have a right to speak if you would

16   like to be heard.

17           THE DEFENDANT:  No, thank you, Your Honor.

18           THE COURT:  Thank you, so much.

19           Well, it is, to say the least, not an easy task to

20   impose a sentence on any human being because of what it means

21   for you, Mr. Mackey, and because of what it means for your

22   family.  I do want to acknowledge your family, both your wife

23   and your mom, who are on the phone, your father and your

24   brother who have been here for every single day of these

25   proceedings.  I watched as they came and supported you and it

Proceedings                                    20

1    must have been agonizing for them; first to learn about what

2    you had been doing which appears to have come as a complete

3    surprise and then to have to come here and watch their child

4    on trial in a criminal case in a federal courthouse.  It is

5    one of the sad constants in criminal cases that innocent

6    people, like your parents, like your siblings and like your

7    wife and now your new baby, suffer because of your actions.

8            I also want to assure you that every judge in this

9    courthouse, including me, considers regularly whether prison

10   is an appropriate sentence.  As a Court who presides over the

11   alternatives to incarceration, one of the programs in this

12   courthouse, I am keenly aware of the difficulties, to say the

13   least, faced by people who have a prison sentence and I, like

14   other courts, regularly conclude that prison is not necessary

15   even when a guideline sentence is high.

16           So, I want I want to begin by saying that the

17   starting point as it is in every case is determining the

18   guidelines, but although I have done that, the sentence I

19   impose today is the sentence I would have imposed regardless

20   of what the guidelines are.

21           In considering what the appropriate sentence is in

22   this case, I look to the statute Section 3553(a) factors and

23   the factors include that the Court consider the following

24   factors in determining a sentence that is -- that is

25   sufficient but not greater than necessary to meet the goals of

Proceedings                                    21

1    sentence.  Those factors include the seriousness of the crime,

2    that the sentence show with respect for the law, that the

3    sentence be fair and just, that it act as a specific deterrent

4    to the defendant in front of me, as a general deterrent to

5    anyone else who would consider engaging in the same conduct,

6    to the extent the defendant needs rehabilitation, that's

7    another factor, and I also consider your history and your

8    background.

9          It is with these principles that I sentence you

10   today.  I have given careful consideration to the arguments

11   that your very excellent lawyer has made in your defense.

12   I've read the letters submitted by your friends and family.  I

13   want to be clear about what you are not being sentenced for

14   today.  You are not being sentenced for your political beliefs

15   or for expressing those beliefs.

16          One of the foundational principles of our country,

17   of this democracy, is that people cannot be prosecuted for

18   their political beliefs or for expressing them.  Each one of

19   us has the right to hold opinions and to express those

20   opinions.  You have that right.  You are not being prosecuted

21   for your support of a particular candidate.  Citizens of this

22   country have the right to support the candidate of their

23   choice and to express their support.  You have that right.

24   You are not being sentenced today for your beliefs or what

25   your beliefs might have been, of people of different

Proceedings                                22

1    backgrounds, different races or for your beliefs about women.

2    You are not being sentenced for expressing opinions about any

3    of those groups.  Every person has the right to express his

4    opinion.  Even when those views are repellent, you have that

5    right.

6          What you are being sentenced for is the offense for

7    which a unanimous jury found you guilty, and that is

8    conspiring with other people to injure, oppress, threaten or

9    intimidate one or more people in the free exercise and

10   enjoyment of a right or privilege secured to them by the

11   Constitution and the laws of the United States.  That's the

12   right to vote.

13         It is one of the cornerstones of our democracy.

14   That's the right that you conspired with others to take and

15   unlike your expressions of political opinions, your actions in

16   connection with this conspiracy are not protected by the First

17   Amendment Judge Garaufis held, and he was correct, the

18   evidence bore this out that this case was about conspiracy and

19   injury, not speech.  Speech was just the way that you and the

20   method that you used to commit this crime.

21         You're obviously a well-educated person and

22   intelligent but you used your considerable talent and skills

23   not to persuade other people to believe like you believe but

24   to try to take something precious from certain classes of

25   voters, voters who have the same right that you do, to vote

Proceedings                                     23

1    for the candidate of their choice and to have that vote count.

2    You decided that certain voters didn't deserve that right;

3    either because of who they were, what they looked like or what

4    candidate they supported.  The fact that you employed speech

5    in this conspiracy was only in the service of lies.  It was

6    just a tool.

7            It's been said throughout the trial and suggested

8    today that nobody would have fallen for the scheme, for the

9    voting by text meme, but one of the people that I think was

10   one of your followers seemed to fall for it because at some

11   point on Twitter or on a chat the person said, Why don't we

12   get to do this."  So, clearly somebody thought it would work

13   and Mr. Samiri (ph)  from I-Vision who was the company that

14   least the short code was concerned that people might think

15   this was legitimate because it wouldn't be outside of the norm

16   for something like that to happen in the near future.

17           So, how to analyze this conduct in the framework of

18   the 3553(a) factors and the goals of sentencing.  I want to

19   focus on a couple of those goals and the first is this

20   sentence has to reflect the seriousness of the crime.  There's

21   no question that this is a serious crime.  I think the

22   Government quoted *Westbury against Sanders* from the Supreme

23   Court, but in 1964 the Supreme Court said that, "No right is

24   more precious in a free country than that of having a voice in

25   the election of those who make the laws under which as good

Proceedings                                    24

1  citizens we must live.  Other rights, even the most basic, are

2  illusory if the right to vote is undermined."

3        Dr. Martin Luther King, in his *Give Us the Ballot*

4  speech said that, "The denial of this right, the sacred right

5  to vote, is a tragic betrayal of our democratic tradition and

6  it is democracy turned upside down.  So long as I do not

7  firmly and irrevocably possess the right to vote, I do not

8  possess myself.  I cannot make up my mind.  It is made up for

9  me.  I cannot live as a democratic citizen observing the laws

10 I have helped to enact.  I can only submit to the edict of

11 others."

12       Conspiring to injure people in the free exercise of

13 the sacred right to vote is nothing short of an assault on our

14 democracy.  The sentence has to reflect the seriousness of

15 that attempt.  This crime, as Judge Garaufis expressed so

16 eloquently in his decision denying the motion to dismiss, has

17 taken many forms over the years.  The method that you and your

18 co-conspirators employed was, perhaps, just as insidious and

19 perhaps even more cloaked in anonymity with the ability to

20 reach untold numbers of people all over the country using

21 familiar-seeming imagery to think people into thinking that

22 they could vote in a way that they couldn't vote, the

23 potential for depriving people of these basic rights is

24 staggering.

25       Another one of the 3553(a) factors is deterrence,

Proceedings                                          25

1    general deterrence.  This sentence must act to deter anyone

2    else who would do what you did.  The sheer number of people

3    who were participating, and this shows that this is something

4    that people may seek to do again and it must be clear to

5    anybody else who would seek to do this, to steal someone's

6    fundamental right to vote, that there will be a consequence.

7    There's also a matter of specific deterrence and also in

8    connection with the need that the public is protected from

9    future crime.

10          You've testified that you've changed.  That's what

11   you told the jury.  You apologized to your family for saying

12   hateful things about different kinds of people.  They were

13   entitled to that.  Your lawyer has said and you testified at

14   trial that you suffered a great deal when you lost that cloak

15   of anonymity, when your identity was revealed and that you got

16   treatment for that.  I have no doubt in my mind that that was

17   a very difficult time for you, but it's not clear to me that

18   that treatment was connected to the conduct at issue here.

19   Every judge in the sentencing proceeding wants to know as much

20   as possible about the person being sentenced so that I can

21   make sure that the sentence is in line with those goals of

22   sentencing.

23          But I realize that there's a lot that I don't know

24   about you.  It's my observation is that you reveal what you

25   want to reveal.  You've chosen not to reveal what you're doing

Proceedings                                                    26

1   now except for a sort of a vague label of anonymous political

2   commentary.  I don't know what that means.  I guess you're

3   entitled not to tell me what you do, but it makes it difficult

4   for me to be certain and confident that this is not something

5   that you will repeat in some other form.

6          So taking into account all of these factors a

7   non-incarceratory sentence would not serve the purposes of

8   sentencing.  It would not reflect the seriousness of the

9   crime.  It would not act as a deterrent either to you or other

10  people and I can't be certain that the public would not be

11  protected.

12         So, for that reason, I have concluded that a

13  sentence of seven months in prison with two years of

14  supervised release is the appropriate sentence.  As I said

15  before, I decline to impose those conditions that Probation

16  sought.  I don't think they were -- I understand the

17  rationale, but I think under these circumstances, unlike other

18  cases where those conditions are imposed, that there's too

19  great a risk of infringing on your First Amendment rights.

20  You will, however, have to cooperate with Probation and abide

21  by whatever conditions they impose.

22         I do want to address a request that has been made to

23  Probation twice, to the probation officer in this case.  That

24  request was that if she learns where you are working and with

25  whom, that she withhold that information from the Court and

Proceedings                                    27

1    instead notify your lawyer so that he can apply to the Second

2    Circuit.  That is not an appropriate request.  Probation is an

3    arm of the Court and you can't ask a Probation officer to keep

4    information from the Court.  Probation records are sealed so

5    the information will not become public.  In addition to the

6    seven months, I'm also imposing a $15,000 fine.  The record

7    reflects that you have an ability to pay and it is also

8    warranted by the circumstances of this case.

9          I am going to ask Probation Officer Vest to just --

10   typically we impose a payment schedule and I would just seek

11   your recommendation on that.

12         MS. VEST:  Yes, Your Honor.  So, the fine would be

13   due immediately.  Our recommendation for a payment schedule

14   would be a rate of $25 per quarter while the defendant is in

15   custody and a rate of 10 percent of gross monthly income while

16   on supervised release.

17         THE COURT:  All right.  Thank you.

18         I also do want to notify you of your right to

19   appeal.  As your lawyer already knows, you must file a Notice

20   of Appeal within 14 days of the filing of the entry of a

21   judgment or within 14 days of the filing of a Notice of Appeal

22   by the Government.  If you ask, the Clerk will prepare and

23   file a notice of appeal for you.  If you can't afford to pay

24   for an appeal or for an appellate lawyer, you have the right

25   to apply for leave to appeal in forma pauperis.  That means

Proceedings                              28

1    you can file to have the Court waive the filing fee.  On

2    appeal, you can also apply for a court-appointed lawyer.

3              Now, I didn't get a response from the Government on

4    this question.  Mr. Frisch has asked that I give him bond

5    pending appeal.

6              Do you have a position on that?

7              MR. PAULSEN:  Yes, Your Honor.  We oppose them.

8              THE COURT:  Put your reasons on the record, but I

9    think I know them.

10             MR. FRISCH:  So, the standard as interpreted by the

11   Second Circuit for bond pending appeal is whether there are

12   substantial and nonfrivolous issues and the purpose of the

13   appeal is for other than delay.  There are many issues, as

14   we've discussed in pretrial and post-trial briefing, that are

15   novel, interesting, that are certainly not frivolous and are

16   substantial and create, in this case, a real possibility on

17   any one of a number of grounds of reversal.

18             We've litigated this and discussed this so much both

19   with Your Honor and with Judge Garaufis that I will not seek

20   to identify all of them today, but the highlights are venue,

21   the application of Section 241 to this conduct, the defense's

22   view of a significant Brady violation in this case and the

23   insufficiency of the evidence.  Those are the ones that come

24   first to my mind.  There may be others.

25             I think the issues in the nature of this case which

Proceedings                                                    29

1   is a first -- it's the first type of case predicated on this

2   type of conduct, should be subject to Appellate review and

3   Appellate resolution before we wind up with a situation where

4   Mr. Mackey has served his sentence before the Appellate court

5   can address it.  So, for those reasons, we ask the Court to

6   stay the sentence pending appeal and to keep in place the

7   conditions release to which Mr. Mackey has been completely

8   compliant.

9           THE COURT:  Mr. Paulsen?

10          MR. PAULSEN:  Yes, Your Honor.  Our reading of the

11  statute, 3143(b)(1), indicates that bail is granted in such

12  circumstances -- in extraordinary circumstances where it's not

13  for the purpose of delay, as the defendant noted, but it

14  raises a substantial question of law likely to result in

15  either reversal or an order for a new trial.  While the memes

16  used by the defendant in this case were different than some of

17  the other cases.  The established legal principles that Judge

18  Garaufis elucidated in his long opinion have been around for

19  100 years and our review of law is that this is not a case

20  where an appellate court is likely to disturb Judge Garaufis's

21  findings of the law nor find that the jury's decision was not

22  bounded in fact.

23          We do not believe these are the sort of

24  extraordinary circumstances where the Court should postpone

25  the defendant's sentence for what will likely be a lengthy

Proceedings                                    30

1   appeal.

2           THE COURT:  Well, I agree that the question -- first

3   of all, the statute, 18 U.S.C. Section 3143(b), permits the

4   Court to grant bail pending appeal and the applicable part of

5   that statute is -- is whether there is a substantial question

6   of law or fact that's likely to result in a reversal in order

7   for a new trial or for a non-incarceratory sentence or for a

8   reduced sentence.  And a substantial question is a close

9   question or one that could very well be decided either way.

10          Having just rejected the Rule 29 and Rule 33 motions

11  and having carefully considered all of those arguments, I do

12  not believe this is one of those cases where bail pending

13  appeal is appropriate.  Obviously you can go to the Second

14  Circuit and they may feel differently.

15          I will, however, permit Mr. Mackey to surrender and

16  I think probably sometime in January if that's a date that is

17  a time that is after the holidays.

18          MR. FRISCH:  I'm thinking if that will give us

19  enough time, give the Circuit enough time to hear us and I

20  think the answer is if we need more time to apply for it then,

21  but I think January after the holidays is otherwise okay.

22          THE COURT:  How is January 18th?  One other thing I

23  neglected to do was impose the $100 special assessment which

24  I'm doing.

25          Are there any other matters that need to be

Proceedings                                    31

1  addressed?

2          MR. PAULSEN:  No, Your Honor.  There were no open

3  counts.  Nothing further.

4          THE COURT:  Mr. Frisch, anything else?

5          MR. FRISCH:  Your Honor, if I can ask that Your

6  Honor recommend to the Bureau of Prisons that Mr. Mackey be

7  designated to the satellite camp in Miami as his first choice

8  and if that's not available the satellite camp in Pensacola,

9  Florida.  As Your Honor knows, those are the two satellite

10 camps in the state of Florida as far as I know.  As, Your

11 Honor knows, Mr. Mackey and his family live in Florida.

12         THE COURT:  I can make that recommendation.  Okay.

13 All right.  Thank you so much, everybody.

14         MR. PAULSEN:  Thank you, Your Honor.

15

16         (Matter adjourned.)

17                    - ooOoo -

18

19

20

21

22

23

24

25

**EXHIBIT 2: District Court Memorandum and Order as to Defendant's Motion for a New Trial or Acquittal**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                                  :

**UNITED STATES OF AMERICA**,
                                                  :

              – against –              :    **MEMORANDUM DECISION AND ORDER**

**DOUGLASS MACKEY**,
                                                  :    21-CR-80 (AMD) (SB)

                            Defendant.       :

                                                  :

-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

     On March 31, 2023, the defendant was convicted of one count of conspiracy to injure, oppress, threaten or intimidate one or more persons in the free exercise and enjoyment of the right to vote, in violation of Section 241 of Title 18 of the United States Code.  (ECF No. 115.) Before the Court are the defendant's motions to set aside the verdict or for a new trial.  The Court heard oral argument on September 11, 2023.  As explained below, the motion is denied.[1]

     In seeking relief, the defendant first claims that the government suppressed exculpatory material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), when it provided him with FBI interviews of Clinton campaign workers on the second day of testimony.  Second, he argues that the government should have disclosed impeachment material about the cooperating witness before Judge Garaufis ruled on the government's application to permit the witness to testify using a pseudonym.  Third, he argues that the trial evidence did not establish venue in this district.  Finally, he challenges the sufficiency of the evidence in two respects: that the evidence

---

[1] This case was originally assigned to Judge Nicholas Garaufis, who ruled on pretrial matters, including the defendant's motion to dismiss the indictment and the government's motion to permit a cooperating witness to testify using a pseudonym.  Judge Garaufis contracted COVID-19 after the jury was selected, and the case was reassigned to me on Sunday, March 19, 2023.

did not show a "clearly established" violation of Section 241 and that the evidence of conspiracy

was legally insufficient.  (ECF No. 134.)  The government opposes.  (ECF No. 140.)

## BACKGROUND

### I.    Pretrial Motions

On February 24, 2023, the government sought protective measures to safeguard the

identity of its cooperating witness, including allowing him to testify using the name Microchip,

which was his online moniker, and to disclose his identity to defense counsel on an "attorney's

eyes only" basis.  (ECF No. 66 at 1.)[2]  The government also sought to preclude cross-

examination about Microchip's cooperation in ongoing, unrelated investigations.  (*Id*.)  The

defendant opposed, arguing that the jury had to know Microchip's real name to judge "the

validity of his testimony."  (ECF No. 73 at 11.)  In addition, he maintained that Microchip's

cooperation in unrelated matters was relevant to his political or other motivations for testifying,

which bore on his credibility.  (*Id.* at 1, 11.)

Judge Garaufis employed the three-step test described by the New York Court of Appeals

in *People v. Stanard*, 42 N.Y.2d 74, 84 (1977), to determine "whether the government should be

'permitted to shield a witness's identity, address, or occupation.'"  (ECF No. 82 at 6 (quoting

*United States v. Urena*, 8 F. Supp. 3d 568, 572 (S.D.N.Y. 2014)).)  This test first requires the

government to demonstrate why the witness should be permitted to testify anonymously—for

example, whether his testimony would subject him to harassment, humiliate him or put him in

danger.  *Urena*, 8 F. Supp. 3d at 572–73.  The burden then shifts to the defendant to demonstrate

the materiality of the witness's real name to the issue of guilt.  *Id.* at 573.  Relevant factors are:

---

[2] At oral argument on this motion, the government explained that it advised defense counsel of
Microchip's identity on February 13, 2021.  (Sept. 11, 2023 Oral Argument Transcript ("Sept. 11, 2023
Tr.") 48:24–49:3.)  Defense counsel maintained that he knew Microchip's identity "independent of the
government." (Sept. 11, 2023 Tr. 30:17-18).

"(1) the extent to which the right to cross-examine is infringed, (2) the relevance of the testimony to the question of guilt or innocence, (3) the nature of the crime charged and the quantum of proof established aside from the testimony of the witness, (4) the nature and significance of the interest or the right asserted by the witness, and (5) the nature of and extent to which the proposed cross-examination would produce evidence favorable to that party and . . . whether such evidence would be merely cumulative." *Id*. (quoting *Stanard*, 42 N.Y.2d at 84).  The court then weighs these interests to determine whether the witness's "testimony is sufficiently material to the question of guilt or innocence to overcome the interest to the opposing party." *Id*.  "In determining materiality, the court is required to keep in mind that the underlying purpose of identity testimony is to establish a background setting in which to test veracity." *Id*. (quoting *Stanard*, 42 N.Y.2d at 84).

Judge Garaufis found that the government made the required showing that disclosure of Microchip's real name could result in online or physical harassment, or danger.  (ECF No. 82 at 7–8.)  He also concluded that the defense had not met its burden of showing that testimony about Microchip's identity was material to the question of guilt or innocence.  (*Id.* at 8.)  Judge Garaufis also noted that allowing Microchip to testify under a pseudonym would "only very slightly" infringe upon the defendant's rights under the Confrontation Clause, because "the relevant exchanges and interactions all took place over the internet, where the CW was known by [the] online moniker[]" under which he would testify at trial, rather than by his legal name or personal background.  (*Id*. at 8.)[3]

---

[3] Judge Garaufis also granted the government's request to preclude cross-examination about Microchip's ongoing cooperation with law enforcement in other cases, because it fell "outside the bounds of the Government's disclosure requirements" and was not relevant to this case.  (ECF No. 82 at 10.)  Judge Garaufis gave the defendant leave to renew the argument during trial if he could "articulate a particular basis on which CW's work would be relevant beyond the general proposition that there may be political

## II.     The Evidence at Trial

### a.      The Government's Case

The evidence at trial established the following facts.  As of July 2015, the defendant, then

26 years old, began posting on Twitter[4] under the pseudonym "Ricky Vaughn."[5]  (Government

Exhibit ("GX") 902.)  By September 2016, the defendant, under this pseudonym, had amassed

51,000 followers on Twitter.  (GX 200-D at 27.)  A research group at the Massachusetts Institute

of Technology developed a list, which included politicians and major news outlets, of the 150

"most influential voices" posting about the 2016 presidential election on Twitter.  (Trial

Transcript ("Tr.") 258:19–259:3-15, 260:8-10.)  The rankings were based on the accounts'

influence on Twitter—who was "getting the most retweets"—as well as the extent to which

social media commentary poured over into traditional media coverage.  (Tr. 259:3-15; GX 1001.)

The defendant was ranked 107th.  (GX 1001 at 4.)

The defendant followed the upcoming presidential election closely and tweeted his

observations and commentary about it.  On April 10, 2016, the defendant tweeted, "It's a fool's

errand to babble on complaining about low-information voters.  Either stay out of mass politics

or play the game."  (Tr. 401:11-14.)  The defendant tweeted many election-related "memes,"

which either disparaged Hillary Clinton or supported Donald Trump.

The defendant was also a prominent member of private, invitation-only Twitter direct

message groups—the War Room, the Madman Group, and the Micro Chat—of self-described

---

or other motivations behind the CW's decision to cooperate."  (*Id.* at 10–11.)  The defendant did not
renew this argument at trial.

[4] Although Twitter is now known as "X," the Court uses the platform's name at the time of the conspiracy
for ease of reference.

[5] The defendant used three Twitter accounts during the conspiracy: @Ricky_Vaughn99,
@theRickyVaughn, and @ReturnofRV.  (GX 902.)  These are also known as Twitter "handles."  (Tr.
648:19-22.)

"trolls" whose goal was to develop election memes that would "go viral" and "trend."[6]  (Tr. 358:18–359:8, 411:17-20, 427:18-23; GX 200-D at 17.)  Within these groups, the defendant and other members discussed general "meme-theory"[7] and strategy to maximize the memes' reach. (*See* GX 200.)  The defendant coordinated retweets and alerted members to hashtags that they should "trend:" for example, taking hashtags associated with pro-Clinton messaging and "hijack[ing]" the hashtags with pro-Trump imagery (GX 200-B at 6; *see, e.g.*, GX 200 at 75 (Ricky Vaughn: "pls help me trend #InTrumpsAmerica"); Tr. 732:21-25), or originating hashtags designed to "cause as much chaos as possible" by creating "controversy . . . for the sole purpose of disparaging Hillary Clinton."  (Tr. 500:3-6, 500:20-24; *see, e.g.*, Tr. 499–500 (discussing the "Podesta emails hashtag"); GX 400 at 28–29 (the War Room admiring the success of the #DraftOurDaughters hashtag).)

---

[6] The defendant was not a member of the Mad Men group or the Micro Chat group during the conspiracy period.

[7] The following is an example: "Member: can a meme be anything other than a picture with writing on it?

Ricky Vaughn:  yeah definitely[.] meme is any kind of idea that spreads from person to person[.] memes can be represented visually[.]

Member: And with well written tweets? []

Ricky Vaughn: a well written tweet can definitely become a meme[.] An example is Lyin Ted[.] That is now a meme[.] Everyone understands it[.] really good memes go viral[.]

Member: makes sense now[.]

Ricky Vaughn:  really really good memes become embedded in our consciousness[.]

Member:  Thanks for the input[.]"

(GX 200 at 1–2.)

Microchip,[8] a member of the conspiracy, testified pursuant to a cooperation agreement.[9] He testified about the terms of the cooperation agreement[10] and about his guilty plea, and the extent to which he stood to benefit by cooperating.[11] (*See* Tr. 559–64.) He described the War Room as a place to share ideas among an exclusive group that included "only people that were considered influential within our circle." (Tr. 510:14-17.) He explained that his "talent [was] to make things weird and strange so that there is controversy" (Tr. 500:1-3), while the defendant's strengths were amplifying the group's ideas, given his large number of followers, and providing "good ideas for strategies of creating memes, different political messaging" (Tr. 507:9-10). The members of the private Twitter messaging groups also used the websites 4Chan and Reddit,[12] and searched their messaging boards to see "what other content's out there." (Tr. 498:14-24; GX 410 at 15.) Both Microchip's and the defendant's Twitter accounts had avatars that featured a MAGA hat, which was associated with the Trump campaign. Microchip was not worried that

---

[8] As discussed below, Judge Garaufis permitted the witness to testify using his online moniker.

[9] Microchip pled guilty to conspiracy against rights, the same crime for which the defendant was convicted and is awaiting sentencing. (Tr. 480:14-24, 548:7-14.)

[10] Microchip testified that he "agreed to possibly be a witness on the case" and to "help [the government] on other cases." (Tr. 480:17-19.) In exchange for his cooperation, Microchip "get[s] some discounted points . . . on sentencing" and the government "won't charge [him] for other crimes connected to this crime." (Tr. 481:3-5.) He also hopes that "the [g]overnment will file a letter" on his behalf "with the judge" who will ultimately sentence him. (Tr. at 481:11-13.)

[11] The Court granted defense counsel's application to ask Microchip about "his personal interest in remaining anonymous" as long as counsel did not ask questions that would reveal Microchip's identity. (Tr. 473:16–474:22, 476:2-14.) Defense counsel cross-examined Microchip about tweets in which he admitted taking drugs. In one tweet, Microchip said, "3,109 crazy tweets over two weeks. What can I say, I'm insane, [on pills], don't shower, can barely take care of myself, hear voices, talk to the walls, and predict the future." (Tr. 589:1-6; see Def. Ex. X.) In another, he said, "I'm now 36 hours into my Adderall and ChatGPT marathon" (Tr. 579:24–580:1); another tweet read, "I drink Black Rifle coffee, wear a fishnet trucker hat, have a Jesus tattoo, and inject testosterone" (Tr. at 579:9-13).

[12] 4chan is an online "messaging board" where people "gather together to talk about different topics." (Tr. 376:24-25, 497:5-9.) Reddit is also an online messaging board; Microchip testified that it is "kind of like social media, but with "closed-off" groups called "sub-Reddits" that focus on specific topics. (Tr. at 498:2-10.)

his avatar would undermine the disinformation he tweeted, because those tweets were designed to "spread like wild fire . . . as far as it could go," eventually reaching the Twitter feeds of users who did not necessarily support Donald Trump.  (Tr. 597:18–598:9.)

Groups like the War Room admired the defendant's influence, which rivaled that of paid media pundits, as well as his success at garnering "impressions."[13]  (*See, e.g.*, GX 200 at 24, 26, 34.)  The defendant considered himself to be a leader of these groups, with particular skill in developing content that could go viral.  (GX 200-D at 8 ("I never asked or wanted to be a leader, but so many people are asking it of me, so I feel a responsibility."); *see also* Tr. 506:23–507:5, 753:21–754:5 (the defendant acknowledging that his words "carried [weight] with the people in [the Twitter] group").)  By the beginning of 2016, the defendant described his online persona to fellow group members as "powerful.  I have something great going on."  (GX 200 at 29.)

In the year leading up to the 2016 presidential election, the defendant devoted considerable time and energy to cultivating his social media influence, and described his followers as his "loyal army on Twitter."  (*Id.* at 32; *see also id.* at 33 (describing his followers as his "active fans")).  In a May 2016 group message, he reflected on his success: "I feel a giant sense of relief.  This sounds dumb but for the past six months I've sacrificed a giant slice of my life to shitposting [sic].[14]  Looking forward to taking my foot off the gas[.]"  (GX 200-D at 13.)

In an October 27, 2016 post, co-conspirator HalleyBorderCol wrote, "[L]et's depress illegal voter turnout [with] a nice hoax."  (GX 400 at 27.)  Another group member made a graphic portraying an immigration officer arresting a man who appears to be Latino at a polling

---

[13] Twitter defines impressions as "[t]imes a user is served a Tweet in timeline or search results." X HELP CENTER, *Definitions*, *available at*: https://help.twitter.com/en/managing-your-account/using-the-tweet-activity-dashboard.

[14] The defendant testified that "shitposting" is a Twitter "term of art" that "meant posting a lot of stuff, just kind of [to] distract or get the conversation going, that kind of thing."  (Tr. 666:16–667:2.)

place. (*Id.* at 30.) The same member boasted October 29, 2016 that his meme had "ma[de] the news;" the member attached an article from the *Independent* online newspaper that characterized the image as "tweeted at Spanish-language outlets likely aimed at intimidating Latino voters." (*Id.*) In the group message on the same day, HalleyBorderCol posted images and tweets representing that people could cast their votes by tweeting #Hillary and #PresidentialElection on November 8 (*id.* at 31–33) or by texting "Hillary" to 59929 (*id.* at 31). HalleyBorderCol and other group members discussed strategies for maximizing the reach of this misinformation. (*See id.* at 27, 31–33.)

Microchip saw these images and tweeted on October 30, 2016: "Remember @Hillary Clinton voters, on Nov 8th, you can vote from home by #Tweeting "#Hillary," this is only set up for @HillaryClinton voters." (*Id.* at 32; *see* Tr. 509:1–510:24.) Microchip shared the tweet with the War Room. (GX 400 at 32.) Another member of the group responded, "I like that idea- but what if we made it more believable . . . [b]y acting like it's unfair that they can text and vote and we can't[.]" (*Id.*) Shortly thereafter, someone on Twitter responded, apparently in earnest, to Microchip's "vote from home" tweet: "[W]e should do our own for @realDonaldTrump." (*Id.* at 33.) Citing this tweet, Microchip told members of the War Room, "[H]ere's what I worried about, [], people on Trump side thinking this is legit and they stay home, I'm plotting, will have something soon[.]" (*Id.*) The defendant was a member of the War Room at the time but did not send any messages in this conversation.

On November 1, 2016 at 5:30 p.m., the defendant, still a member of the War Room, published as "Ricky Vaughn" the first of two tweets that announced that people could register their vote by texting on their phones. (Tr. 42:25–43:1, 44:11-19.) The image depicts a Black woman holding a sign that reads "African Americans for Hillary." (GX 720.)



Transposed on the photograph are two text blocks that read "Avoid the line," "Vote from home" and "Text 'Hillary' to 59925.  Vote for Hillary and be a part of history."  At the bottom of the image, a "fine print" disclaimer reads, "Must be 18 or older to vote.  One vote per person. Must be a legal citizen of the United States.  Voting by text not available in Guam, Puerto Rico, Alaska or Hawaii."  In the bottom left corner is an image that resembles the campaign logo—a bold H with a right-pointing arrow.  Ricky Vaughn tweeted the image with the hashtags "#ImWithHer" and "#GoHillary."  (*Id.*)

On November 2, 2016 at 12:30 a.m., the defendant tweeted the second image, depicting a Latina woman sitting in a conference room with a phone and a laptop.  (GX 721.)



9

The image includes text blocks with substantively similar language in Spanish: "Ahorra tiempo.  Evita las colas.  Vota desde casa o trabajo.  Envía un sms escribiendo 'Hillary' al número 59925 este 8 de Nov."  Another text block reads, "¡Hagamos historias, juntos y juntas! - H."  The image also contains a logo in the bottom left corner and a small-font disclaimer, and Ricky Vaughn's tweet included the same hashtags.[15]  (*Id*.)

On November 2, 2016, the defendant also retweeted a graphic from War Room member @nia4_trump.  (Tr. 505:23-24, 749:16-25; GX 722.)



That graphic has a third image of Hillary Clinton transposed on a blue background and text that read "Save Time Avoid the Line Vote from home," along with instructions to "Text 'Hillary' to 59925 and we'll make history together This November 8th."  The bottom of the graphic contains a small-font disclaimer and H logo.  (GX 722.)  The accompanying tweet reads, "@TheRickyVaughn thanks for spreading the word! #MAGA #ImWithHer #Vote Hillary from home! Save time & Avoid the line!"  (*Id*.)

---

[15] Robert McNees testified that an apparent typo caused a space between "Go" and "Hillary."  This broke the hashtag so the tweet was only linked to the hashtag "Go."  (Tr. 48:15-23.)

Robert McNees, a physics professor and active Twitter user, saw the three tweets, which were similar to graphics he understood to be official Clinton campaign images.  (Tr. 53:9-16.) He took screenshots of the images, reported them to Twitter that afternoon, and posted a message to his own social networks encouraging his friends to report them.  (Tr. 53:17–54:1.)  The same day, Twitter suspended the defendant's account.  (Tr. 749:23-25.)[16]  On November 4, 2016, the defendant returned to Twitter under a new handle: @ReturnofRV.  (GX 902.)  He tweeted a screenshot of television news coverage of his "voter disinformation attempt"—the tweet containing the image of a Black woman—with the text, "[that feeling when] you haphazardly post a /pol/ meme and it winds up on CNN."  (GX 400 at 39.)  The members of the War Room celebrated his return and congratulated him on the reach of the tweet.  (*Id*. at 39–41.)

Throughout the next week, members of the Micro Chat group continued to discuss the text-to-vote graphics.  (GX 410 at 18–20.)  At this point, the defendant was not a member of the Micro Chat group, although there was overlap in membership between the Twitter users in the War Room and Micro Chat.  On November 8, 2016, Microchip shared another manufactured image in the Micro Chat—a famous comedian holding a sign saying "Save time.  Avoid the line. Vote from home.  Tweet ClintonKaine with the hashtag #Presidential Election on November 8th, 2016 between 8 AM and 6 PM to cast your vote."  (*Id.* at 22.)  A member of the chat commented, "I hope some stoners fall for it [] Especially somewhere like Colorado[.]"  (*Id*.)

Jess Morales Rocketto, the digital organizing director of the Clinton campaign, testified that the campaign used text messaging campaigns to "get out the vote" in the days before the election (Tr. 78:1-15) and to answer voters' questions about where, when and how to vote (Tr.

---

[16] Twitter suspended the defendant's account @RickyVaughn_99 on October 6, 2016.  The defendant created a new account, @TheRickyVaughn.  That account was suspended on November 2, 2016.

79:17-22.)  Rocketto testified that "African American and Latino voters are more likely to use text message than anyone else.  Also younger voters love text message, that's the primary way that they communicate."  (Tr. 84:1-6.)  People who wanted to "opt-in" to messages from the Clinton campaign could text a short code—47246.  (Tr. 82:2-8.)

Rocketto saw the text-to-vote tweets shortly before Election Day.  (Tr. 84:13–85:6.)  In her view, the graphics were designed to resemble campaign imagery; they incorporated "a really good copy" of the campaign logo, a similar color scheme, fonts and visual style, and disclosures that would be mandated for a paid advertisement.  (Tr. 87:14–88:11, 90:6-16, 90:20-23.)  She sent the tweets to her bosses, including Theodore Goff, who alerted the campaign's communication team so that they could share the graphics with reporters covering the campaign. (Tr. 91:12-16, 92:23–93:1.)

Lloyd Cotler, the text message campaign manager for the Clinton campaign[17] (Tr. 97:19), was working at the campaign's Brooklyn headquarters when he saw two text-to-vote graphics: "[O]ne was a graphic of an African American woman with a text-your-vote for Hillary call to action on it.  And one was in Spanish, with the same kind of language but in Spanish."  (Tr. 99:10-22.)[18]  Cotler contacted Mattias Chesley, the Clinton campaign's account manager at Upland Software, the company that provided the text message software platform for the campaign.  (Tr. 108:14-20, 109:1-6.)  Cotler asked Chesley to identify the operator of the "short code" that the tweets advertised.  (Tr. 109:15.)

---

[17] The campaign conducted organizing, fundraising, and voter engagement by text message.  (Tr. 97:22-25.)

[18] On cross-examination, defense counsel asked Cotler about Campaign Employee #1, a campaign worker who monitored social media for the campaign, and his understanding of her job responsibilities.  (Tr. 103.)

Chesley alerted Omer Samiri, the president of iVision, which was the company that leased the short code. (Tr. 111:1-3.) Samiri testified that iVision "immediately . . . went on Twitter and started playing some offense to reach out to the Twitter profiles that were sharing this graphic. To basically get them to remove the posts." (Tr. 118:8-14.) Mr. Samiri knew the ad "wasn't real" (Tr. 119:9), but said that "[t]here was a concern that people would think it was legitimate. I think given technology and innovation and, you know, it won't be outside the norm for something like this, maybe, in the future to exist" (Tr. 120:8-11). In addition, Samiri was worried that iVision would be seen as "somehow involved in this," and did not want "any punitive action taken on behalf of the carriers to turn off the short code and adversely affect our business." (Tr. 119:5-6, 119:12-16.) On November 2, 2016, iVision set up an automated response message which appeared when anyone texted the word "Hillary" to the short code; the message informed them that they were not opting into campaign messages, and that they could "text the real Hillary for America for more details." (Tr. 111:1-22, 119:22–120:2.)

To establish venue, the government called witnesses who testified about the internet infrastructure that connects Twitter users in New York to their online networks. Joel Hendrickson, an engineer for Charter Communications (Tr. 248:16-19), the media company that provides internet services for Spectrum customers (Tr. 248:24–249:1), testified that an internet transmission travels like water, from "a small creek to a river to an ocean" (Tr. 250:22-24). A Spectrum customer connects his device, such as a phone or a laptop, to the Spectrum cable modem in his apartment, either wirelessly or by using an Ethernet cable. (Tr. 250:25–251:5.) The signal from the modem is aggregated with the signals from modems in other apartments, and aggregated again with signals from other apartment buildings, and again, and again, snowballing until it reaches the fiberoptic cables surrounding the island of Manhattan. (Tr. 251:6-14.) In

13

order to leave Manhattan and reach its destination, the signals pass through one of three fiberoptic cables, which run through the Lincoln Tunnel, the Holland Tunnel or the 59th Street Bridge. (Tr. 251:15-20), to Twitter's servers (Tr. 140:2-5). In 2016, Twitter's servers were located in Atlanta and Sacramento. (Tr. 139:25–140:1.) Michael Anderson, an engineer at Twitter, testified that any tweet or private direct message sent by a Twitter user in Manhattan over Spectrum's network would have been routed through both those servers. (Tr. 140:2–141:6.) An FBI agent also provided expert opinion that any signal sent from a Manhattan apartment's home router or a mobile phone data network destined for Atlanta or Sacramento would have to leave the island "through one of these fiber optic lines running under one of the bodies of water surrounding Manhattan." (Tr. 195:13-15.)

Anderson reviewed the metadata associated with the text-to-vote tweets and determined that the defendant sent the graphics at issue using both his computer and his mobile phone. (Tr. 142:16–143:15.) Marc Bertucci, the defendant's roommate during the conspiracy, testified that their internet provider was Spectrum. (Tr. 147:25.) The venue testimony established that when the defendant tweeted the graphics from his apartment, on devices connected to the internet via Spectrum, those transmissions necessarily traveled through the waters surrounding the island of Manhattan to get to their destination, Twitter's servers in Atlanta or Sacramento.

### b. The Defendant's Case

The defendant testified as part of the defense case. In 2014, the defendant, then 24 years old, created a Twitter account. (Tr. 646:6-7.) He estimated that he sent "hundreds of thousands" of tweets over the four years that he was "online as Ricky Vaughn." (Tr. 646:3-5.) In 2015 and 2016, he used Twitter every day, tweeting or retweeting "[t]ypically hundreds of times per day." (Tr. 654:23–655:3.) When he began tweeting as Ricky Vaughn, he was employed as an economics analyst, but he was fired in June 2016. (Tr. 652:19-20.) The defendant never

revealed his real name to his Twitter followers and had never met any of the members of the War

Room or the other private messaging groups in person, including Microchip.  (Tr. 646:15-22,

647:4-6.)  The defendant's relationships with his followers, including Microchip, was

exclusively online; the defendant maintained that the only thing that he and Microchip had in

common was their support for Donald Trump.  (Tr. 646:23–647:3.)  He did, however, address the

group members with "terms of endearment," like "fam" and "team."  (Tr. 687:2-8.)  He also

referred to them as his friends.  (Tr. 739:24–740:5.)

The defendant found the text-to-vote graphics (GX 720, 721) on 4chan (Tr. 647:9-12),

and then "copied and pasted" them to Twitter without thought, in "a split second" (Tr. 681:19-

25.)  The next day, @nia4_Trump "mentioned" the defendant in a tweet.  (GX 722

("@TheRickyVaughn thanks for spreading the word!").)  The defendant saw the mention in his

notifications and retweeted her message (Tr. 687:12-24),[19] but did not do so to "trick,"

"threaten," "intimidate," "oppress," or "injure" voters or their right to vote (Tr. 650:1-12).  The

defendant estimated that he tweeted or retweeted about 300 times on November 1 and 2, 2016.

(Tr. 682:3-7.)

The defendant claimed that he did not see the War Room messages in which members

workshopped different types of text-to-vote graphics in the days and hours before he tweeted or

retweeted the images at GX 720, 721 and 722.  (Tr. 649:16-25.)  Nor did he share the two

graphics he claims he found on 4chan (GX 720, 721) with the private Twitter groups, although

he did frequently share other memes within those chats or ask its members to photoshop memes

---

[19] Whenever a Twitter user "mentions" another user by writing out his Twitter handle, the mentioned user
   is automatically notified of the tweet.  (Tr. 648:16–649:1.).  In this way, Twitter users can direct their
   public tweets to certain individuals.

for him (Tr. 670:17–671:1, 683:1-5).  The defendant belonged to "dozens" of Twitter messaging

groups, and could not read every message sent in every group.  (Tr. 670:1-13.)

        The defendant testified that at "the beginning," the War Room was a "strategy War

Room" and its members aimed to "keep this group open" and "generally free of tweets" so that

the members could coordinate with one another.  (Tr. 737:4-21; GX 400 at 1.)  According to the

defendant, however, "it became completely filled with tweets toward the end" and was "basically

unreadable;" the defendant claimed that he had notifications for the group "on mute . . . because

there were so many messages coming in every day."  (Tr. 737:17-18, 739:7-10.)  The defendant

did not have to "coordinate" with the members of the War Room because anything "they were

talking about" would go "viral" and "trend" and that when his "friends are tweeting about a

hashtag and I liked the hashtag, then I will join in."  (Tr. 739:11–740:16.)

        The defendant understood "voter turnout" to be "one of the most important things for

[political] campaigns" because "it determines whether they win or lose."  (Tr. 672:19-24.)  The

defendant said that it was not "unusual" for campaigns to "demoralize the opponent's voters."

(Tr. 672:21–673:17.)  When he tweeted to his followers that the 2016 election was "on a knife's

edge," he meant that it was "close in the electoral college."  (Tr. 674:20–25.)  He told his

followers that "the election was close because I believed it, and so they would go vote."  (Tr.

675:1-3.)

        The defendant admitted that on November 8, 2016, he retweeted the following tweet

from Microchip: "Heard from Hillary they have so many voters out there that if you plan on

voting for Hillary just stay home, you're not needed #ElectionDay."  (Tr. 675:12-18, 675:22-24;

GX 200 at 123.)  The defendant thought the tweet was "funny" and did not "think anyone would

take this seriously."  (Tr. 675:20-21.)  He only shared the text-to-vote memes to "get publicity,"

and was joking when he wrote in the War Room that "Buzzfeed took the bait" by reporting on the memes. (Tr. 678:1-13; GX 410 at 11.) The defendant "thought it was funny that the media thought that this was an attempt to deceive voters, not just a ridiculous post that no one would possibly believe that you could text by vote." (Tr. 681:1-8.)

The defendant believed that Black voters "were a very important group in the [2016] election," and that Black voter turnout would be decisive. He tweeted on September 2, 2016 that "the only thing standing in Trump's path is . . . black voters." (Tr. 702:15-21; GX 200 at 98.) On November 2, 2016, one day after tweeting the vote-to-text meme featuring a Black woman, the defendant tweeted, "Obviously, we can win Pennsylvania. The key is to drive up turnout with non-college whites, and limit black turnout." (Tr. 702:25–703:4; GX 200 at 105.) The defendant predicted "low black turnout" and tweeted, "Very slight changes in the electorate will lead to a Trump landslide, small increase in white non-college voters, small decrease in blacks." (Tr. 719:9-13; GX 1005-04.) The defendant admitted that he sent multiple tweets, which he characterized as "exaggeration" and "hyperbole," denigrating Black people. (Tr. 722:13-17; *see also* Tr. 726:6-15, 727:3-19, 728:9-20.) For example, he described Black people as "gullible," and wrote, "Black people will believe anything they read, okay Twitter. And we let them vote why?" (Tr. 721:25–722:2, 724:9-10; GX 1005-23.)

He also suggested ways to deter Black people from voting. On September 5, 2016, he tweeted, "Idea: Create #woke #BlackTwitter #nevervote memes, seed them in black social spaces." (GX 200 at 110.) In another tweet a few minutes later, he offered an example: "A vote for Hillary just means four more years of Hillary Clinton taking black votes for granted. Send her a message, fam. #nevervote." (GX 200 at 111.)

Nevertheless, the defendant claimed that his selection of a text-to-vote meme depicting a Black woman was "random." (Tr. 702:4-6.) He agreed that "tricking some number of black people out of voting [would] have served [his] aims overall," but he "didn't think that meme could actually trick anyone into not voting." (Tr. 703:7-12.) And, although the defendant believed in 2015 and 2016 that Black people were "stupid" (Tr. 729:9-14), he did not think that "anyone could believe that you could text your vote anonymously. Especially when it's coming from a Twitter account with a MAGA hat . . . . I don't think it matters whether you're smart, stupid, gullible, or not gullible. I don't think that anyone would fall for that" (Tr. 730:13-20).

At the time of the conspiracy, the defendant also believed that "naturalized citizens should not get the vote." (Tr. 773:12-17; GX 1005-33; GX 1005-34.) He wrote, "Immigrants, the children of immigrants, et cetera cannot be trusted to vote in the interests of their new country." (Tr. 774:4-9.) In addition, the defendant believed that women should not be able to vote, a view he expressed with the hashtag "#Repealthe19th." (Tr. 775:2-16, 776:3-16, 780:20–781:4; GX 1005-19 ("Women are children with the right to vote."); GX 1005-21 ("It's impossible to have a functioning Government when single women and single mothers vote.").)

The defendant testified that he no longer believed that "black people are stupid," though he did believe that in 2015 and 2016. (Tr. 729:9-14.) The defendant also testified that he "apologized" "[t]o [his] family" "for the things [he] said as Ricky Vaughn" "[b]ecause it was in bad taste[, i]t was wrong[ and i]t was offensive." (Tr. 784:14-21.) In April 2018, he began an "in-patient psychotherapy program so [he] could try to turn [his] life around." (Tr. 687:14–688:2.) The defendant explained that he entered the program after "[he] had been doxed in the media" and felt "[he] needed to make a change." (Tr. 687:16-18.) After two months of the in-patient program, he began receiving out-patient psychotherapy. (Tr. 687:25–688:7.)

### III.    Midtrial Motions

In his opening statement, defense counsel argued that the text-to-vote "scheme" could not have fooled anyone, and that the timing of the defendant's tweets—a full week before Election Day—refuted the claim that he meant to trick voters.  (Tr. 23:3–25:7.)  Defense counsel also argued that the government could not prove a conspiracy, because the memes shared in the Twitter messaging groups were not the same memes that the defendant tweeted, and that the defendant shared these memes only "after other memes [] already begun going viral days before."  (Tr. 33:1-7.)  Defense counsel maintained that the defendant was merely "shit post[ing]" in order to "[d]istract from the main conversation, get under the skin of the other side, [and] get the other side off message."  (Tr. 33:8-18.)

That same day, eleven witnesses testified as part of the government's case, including Clinton campaign workers Jessica Morales Rocketto and Lloyd Cotler.  (*See* Tr. 216.)  As described above, Rocketto was in charge of digital organizing, and she testified about the use of Clinton campaign imagery in the memes, provided context about the campaign's methods of reaching voters by text, and the campaign's reaction to seeing the memes circulate on social media.  (*See generally* Tr. 76–85.)  On cross-examination, defense counsel asked Rocketto when Cotler, who reported to her, took action on the memes.  (Tr. 95:11-15.)  Cotler testified about the campaign's response to text-to-vote disinformation they saw on the internet.  (*See* Tr. 99:10–102:3.)  Defense counsel asked Cotler when he reached out to the campaign's vendor which administered its own texting short code (47246), and about whether he recalled another employee who monitored social media for the Clinton campaign ("Employee #1") (Tr. 102:15–

103:7); defense counsel also asked Cotler whether Employee #1 specifically monitored 4chan and Reddit[20] (Tr. 103:8-18).

The next morning, before testimony began, prosecutors gave defense counsel FBI 302 reports ("302s") of two interviews with Employee #1.  (ECF No. 134 at 18.)  The reports reflect Employee #1's concern with the text-to-vote tweets.  Employee #1 described the campaign's efforts to get Facebook and Twitter to take the content down.  (ECF No. 134-15 at 2.)  Employee #1 shared the tweets with the press team, who dealt with legacy media, so that they could alert the general population that it was misinformation.  (*Id*. at 3.)  Employee #1 did not recognize the defendant's online moniker or Twitter handle.  (*Id.* at 1.)  Employee #1 believed that "[t]here was no one single influencer and no official metric for what [Employee #1] was seeing.  These graphics were designed to suppress the vote and began appearing about three months leading up to Election Day."  (*Id*. at 3–4.)  When it came to general misinformation, or "shitposting" on the internet, Employee #1 observed that the digital staffers were overwhelmed by the sheer volume of "shitposting" and misinformation on the internet, and that senior staff did not provide them with enough resources to combat it.  (*Id*. at 3.)

After the election, Employee #1 spoke with lawyers about campaign misinformation in advance of a congressional hearing.  (ECF No. 134-14 at 3.)  Thereafter, she "experienced harassment from an unknown entity;" she received "strange messages" (*id.*) and "pictures of [Employee #1] were slid under the door at her residence, along with other 'creepy stuff.'"  (ECF No. 134-15 at 4.)  One day, a woman knocked on Employee #1's door and told her that she was being paid to follow Employee #1.  (ECF No. 134-14 at 3.)  The woman also told Employee #1

---

[20] The Court granted the government's application to seal the names of the non-testifying employees because their privacy interests outweighed the public's interest in disclosure.  (Order, Apr. 27, 2023).

that she "would be killed if [she] did not stop reporting on the [social media] misinformation." (*id.*; *see also* ECF No. 134-15 at 4.) The woman visited Employee #1's home "every [] day for five days," and once yelled at her through her apartment window. (ECF No. 134-14 at 3.)

The defendant moved for a mistrial, claiming that Employee #1's statements to FBI agents were *Brady* material that should have been produced before trial because they were material to his theories of defense. (Tr. 227:3-10, 227:24–231:23, 234:7-11.) The government explained that it gave the defendant the 302s because defense counsel argued in his opening that his "goal was to rile up the Clinton campaign," and the campaign's "reactions" to the defendant's tweets "are proof that the campaign was riled up." (Tr. 629:9-13.) The Court denied the motion without prejudice so that it could review the 302s, the previous day's testimony and the parties' opening statements. (Tr. 234:12-14, 235:2-4.) The government also offered to re-call Cotler and Rocketto for additional cross-examination. (Tr. 236:8-10.)

During the lunch break, at defense counsel's request, the government turned over sixteen more 302s for various campaign employees. (ECF No. 134 at 19; *see* ECF Nos. 134-3–20.) Three employees discussed the text-to-vote graphics. Employee #2 said that campaign staffers discussed the text-to-vote graphics but "no one knew what to do" next if they identified the "original poster." (ECF No. 134-4 at 3.) The staffers discussed reporting the tweets to the Department of Justice, but the head of the campaign's communications team told Employee #2 that the campaign should "focus on winning the election," not the issue of "misinformation around the manner by which voters could cast their vote." (*Id.*) Employee #2 believed that the "voter suppression efforts" were "organized" and that those behind the efforts aimed to "disrupt the Clinton Campaign's get out [the] vote efforts." (*Id.* at 2–3.) Employee #2 recalled that "there were many memes purporting that people could vote via text message" and thought that

these people first coordinated on "private platforms" and then "moved the products to Facebook or Twitter." (*Id*. at 3.)

Employee #3, Rocketto's boss, discussed the text-to-vote graphics with her. Although Employee #3 did not recall the specific text-to-vote tweets, he alerted Twitter and Facebook to "ad[vertisements] advising people to vote on the wrong dates." (ECF No. 134-13 at 1–2.) Twitter removed this content from its platform, but Facebook was resistant. (*Id*. at 2.) Employee #3 said that "there was a direct concerted effort to coordinate the push of" general misinformation, especially by using the #imwithher hashtag that accompanied the text-to-vote meme. (*Id*. at 3.)

Employee #4 also monitored social media during the run-up to the 2016 election and recalled seeing text-to-vote memes. (ECF No. 134-20 at 1.) Employee #4 recognized the defendant's online moniker. (*Id*. at 2.) Employee #4 also said that "the texting tactic was used frequently." (*Id*. at 1.) In an effort to "mitigate" the disinformation on Twitter about the time, place and manner of voting, Employee #4 drafted "positive" messaging "re-iterating all the legitimate ways in which someone could vote" (*id*. at 1–2), while other campaign teams worked directly with Twitter to take down the misleading content (*id*. at 2). According to Employee #4, junior staff members rang alarm bells about the misinformation, but the senior staff members' response was "lackluster;" Employee #4 observed that things had changed since 2016, and that now "entire teams on campaign staffs" are devoted to dealing with social media disinformation. (ECF No. 134-20.)

Employee #5 worked on the Clinton campaign as a senior social media strategist, focusing mostly on "pushing out the correct voting information" for each state on Facebook. (ECF No. 134-3 at 1, 2.) Employee #5 recalled graphics "mimicking the iconography of the

22

campaign" that contained misinformation like "Did you know you can vote by text" or "vote later than election day." (*Id.* at 3.)  Employee #5 did not remember the graphics in the defendant's tweets. (*Id*. at 3–4.)  Employee #5 did not recognize the Ricky Vaughn avatar but noted that "there were a lot of trolls, many of whom wore MAGA hats similar to that of [the defendant's] avatar." (*Id*. at 4.)  Employee #5's team took this very seriously, and it seemed that some "outside sources" mocked them for that.[21] (*Id.* at 3.)  Employee #5 would have notified Rocketto if there had been a decision about how to react to the disinformation. (*Id*. at 4.)

The next morning, March 22, 2023, the defendant asked for an adjournment to review the reports and either renew his motion for a mistrial or reopen to the jury and "admit excerpts of the reports into evidence." (ECF No. 106.)  The Court heard testimony for the rest of the day from Microchip and Special Agent Anthony Cunder, the government's summary witness, but granted the defendant's motion for a continuance, adjourning trial for a half-day so that the parties could review the reports and prepare for oral argument on the motion. (Tr. 592:1-8.)

On March 23, 2023, the Court heard argument on the defendant's motion for a mistrial or to reopen to the jury and admit excerpts of the reports.  Defense counsel claimed that the 302s for Employees #1 and #4 were *Brady* material because they showed that the memes were "not a big deal to the Clinton campaign" (Tr. 609:8-12), and that campaign representatives did not report the memes to the Government; according to defense counsel, this information contradicted Rocketto's testimony that the memes were "horrible" and "recognized [] as a problem" (Tr. 610:6-11.)  In addition, defense counsel maintained that these 302s, as well as Employee #2's 302, tended to show that the memes were "all over the internet," including on websites like 4chan. (Tr. 609:12-24.)  The defendant claimed that he should have been able to cross-examine

---

[21] The report did not include an explanation of what the employee meant by "outside sources."

Rocketto with this information, because it supported the two theories of defense on which he

opened—that the Clinton campaign did not think that the disinformation was a "big deal"

supported his argument that the defendant did not intend to trick voters when he tweeted the

memes, and that the memes were ubiquitous, making it unlikely that the War Room inspired the

defendant to tweet the text-to-vote memes.  (Tr. 610:6–612:24.)

　　　　The government responded that the campaign's reaction to the defendant's tweets was

not probative of the defendant's intent, and that, in any event, the campaign formally responded

to the text-to-vote memes in late October.[22]  (Tr. 624:14–626:4, 628:15-24.)  The government

also pointed out, in response to defense counsel's arguments about the ubiquity of these memes,

that the government had given defense counsel the evidence that text-to-vote memes appeared as

early as September 2016, and that it was in fact part of the proof at trial.  (Tr. 627:3-20.)

　　　　The Court outlined four measures to address counsel's concerns.  First, the government

could recall Cotler and Rocketto so that defense counsel could cross-examine them about the

subjects he raised in his motion for a mistrial.  (Tr. 631:2-5.)  Second, the government could

make the campaign staffers available for the defense to call as part of its direct case.  (Tr. 631:6-

7.)  Third, the government could call any of the staffers on its case.  (Tr. 631:8-9.)  Finally, the

parties could enter into a stipulation regarding what the staffers would have said.  (Tr. 631:10-

17.)  The Court denied the defendant's motion for a mistrial, finding that Clinton campaign

staffers' reactions to the vote-to-text memes was neither exculpatory nor material, and rejecting

the defendant's argument that the campaign "stand[s] in the shoes of . . . prospective voters" for

---

[22] The government also explained that it first became aware of the defense claim that his intent was
merely to "rile up" the Clinton campaign during defense counsel's opening statement.  (Tr. 629:4-13.)

purposes of Section 241.  (Tr. 634:5-23.)  The Court asked defense counsel to decide whether he

wanted to avail himself of any of the steps the Court suggested.  (Tr. 635:2-20.)

After a recess of about 20 minutes (Tr. 635:20-22), defense counsel announced that he

did not want to have Cotler or Rocketto recalled for additional cross-examination, nor did he

want to call any of the staffers as part of the defense case (Tr. 636:9-17, 637:14-25).  Counsel did

not ask to interview any of these witnesses to determine whether he wanted to call them as

witnesses, nor did he ask that the government call them.  The parties eventually agreed to the

following stipulation:

> In the months prior to the 2016 presidential election, [graphics] containing
> misinformation concerning how to vote were posted and shared on political messaging
> boards such as 4chan.  At least one member of the Clinton campaign staff observed these
> [graphics, which] contain[ed] misinformation concerning how to vote on 4chan in the
> months prior to the 2016 presidential election and brought them to the attention of other
> staff members after she observed them.

(Tr. 825:6-13; Def. Ex. BB.)[23]

## LEGAL STANDARD

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment

and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  While the

court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a

perceived miscarriage of justice," that discretion should be exercised "sparingly and in the most

extraordinary circumstances."  *United States v. Ferguson*, 246 F.3d 129, 133–34 (2d Cir. 2001)

(citation omitted); *see also United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ("Because

motions for a new trial are disfavored in this Circuit the standard for granting such a motion is

---

[23] The defendant wanted the government to stipulate to portions of the 302s without including other
aspects of the reports.  (ECF No. 134-2.)  The government rejected the stipulation as a
mischaracterization of the reports.

strict.").  "In considering whether to grant a new trial, a district court may itself weigh the evidence and the credibility of witnesses, but in doing so, it must be careful not to usurp the role of the jury."  *United States v. Canova*, 412 F.3d 331, 348–49 (2d Cir. 2005).  The court should grant a Rule 33 motion only if "letting a guilty verdict stand would be a manifest injustice," because of "a real concern that an innocent person may have been convicted."  *Ferguson*, 246 F.3d at 134 (citation omitted).

A district court may grant a new trial on the basis of a *Brady* violation if the late disclosure denied the defendant a fair trial.  *See, e.g., United States v. Douglas*, 525 F.3d 225, 246 (2d Cir. 2008) ("The question [of materiality] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))).

Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(1).  A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to the prosecution," and will uphold the jury's verdict if it determines that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (citation omitted).

Viewing the evidence in the light most favorable to the prosecution means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility."  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citation omitted).  A court "must consider the Government's case in its totality rather than in its parts," and the sufficiency of the evidence test "may be satisfied by circumstantial evidence alone."  *United*

*States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (citations omitted). Thus, a defendant

challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Hawkins*,

547 F.3d 66, 70 (2d Cir. 2008) (citation omitted).

If the court "enters a judgment of acquittal after a guilty verdict," it "must also

conditionally determine whether any motion for a new trial should be granted if the judgment of

acquittal is later vacated or reversed," and "must specify the reasons for that determination."

Fed. R. Crim. P. 29(d)(1). The standard "that governs whether to grant a new trial under Rule

33" also "applies to determining whether to conditionally grant a new trial under Rule 29(d)."

*United States v. Full Play Grp., S.A.*, No. 15-CR-252, 2023 U.S. Dist. LEXIS 155565, at *80

(E.D.N.Y. Sept. 1, 2023) (citing *United States v. Finnerty*, 474 F. Supp. 2d 530, 545 (S.D.N.Y.

2007)).

## DISCUSSION

### I. Rule 33 Motion for a New Trial

#### a. Midtrial Disclosures of the 302 Reports

According to the defendant, the government's disclosure of the notes from the interviews

of Clinton campaign staffers, on the second day of testimony, violated *Brady v. Maryland*, 373

U.S. 83 (1963). He claims that the material was exculpatory because it "harmonize[d]" with his

defenses that he neither conspired with the members of the War Room nor intended to defraud

voters. (ECF No. 134 at 22 (quoting *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir.

2012)); ECF No. 148 at 3.) And although at trial defense counsel said that he had "no issue with

these three prosecutors, they've been good to work with" (Tr. 230:3-4), the defendant now

accuses the government of intentionally withholding the 302s until the second day of the trial, in

a play of "unconstitutional gamesmanship" and "undeniable," "unfathomable deceit to secure a

conviction." (ECF No. 148 at 10–11, 17–18.) The defendant reiterated this accusation at the

hearing on this motion, and claimed that he was not merely "manufacturing indignation." (Sept. 11, 2023 Oral Argument Transcript ("Sept. 11, 2023 Tr.") 26:6-7.) He argued that the government's failure to produce the 302s—and the fact that it "withheld" some of Microchip's tweets to Judge Garaufis when applying for Microchip's anonymity—constituted "deliberate" "affirmative misrepresentations or affirmative omissions" that amounted to "prosecutorial fraud." (Sept. 11, 2023 Tr. 28:21–29:5, 33:12-13.) Under these circumstances, the defendant says, the Court has no other option but to grant his motion. The government responds that the material was not exculpatory, but that in any event, the defendant received the interview reports in time to make use of them at trial.[24] (ECF No. 140 at 10, 16–19.)

As an initial matter, the Court must determine whether the government actually suppressed the 302s for purposes of *Brady* when it disclosed them on the second day of testimony. If the government did suppress the reports, the question is whether the defendant nevertheless had a reasonable opportunity to use the evidence at trial or to use the evidence to obtain additional evidence for use in the trial. After careful analysis of the evidence at issue and the record as a whole, the Court concludes that the government did not suppress the 302s, that the information contained in them was not exculpatory, and that in any event, the defendant had a reasonable opportunity to use the information during the trial.

The government has a duty to disclose all material evidence favorable to a criminal defendant. *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Brady*, 373 U.S. at 87). "Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is

---

[24] At oral argument on this motion, the government represented that it had "endeavored to turn over things quite early in this case to give [defense counsel] nearly everything we had," that it had dealt with counsel "in a collegial way," and that the prosecutors were "shock[ed]" and "dismayed" by the "venom" in defense counsel's accusations. (Sept. 11, 2023 Tr. 63:3-11, 63:19-20.)

a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Mahaffy*, 693 F.3d at 127 (citations omitted.) "Where

suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character

harmonize[s] with the theory of the defense case,' a *Brady* violation has occurred." *Id*. at 130–

31 (quoting *United States v. Triumph Capital Grp.*, 544 F.3d 149, 164 (2d Cir. 2008)).

      "A reasonable probability of a different result is . . . shown when the government's

evidentiary suppression undermines confidence in the outcome of the trial." *Douglas*, 525 F.3d

at 246 (quoting *Kyles*, 514 U.S. at 434). "Even if evidence is exculpatory and material . . . , the

[g]overnment is not required to disclose it 'if the defendant knows or should have known of the

essential facts permitting him to take advantage of any exculpatory evidence.'" *United States v.*

*Saipov*, 17-CR-722, 2023 U.S. Dist. LEXIS 86030, at \*4 (S.D.N.Y. May 16, 2023) (quoting

*United States v. Frank*, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998)). Rather, the government must

"disclose sufficient information to the defendant to ensure that the defendant will not be denied

access to exculpatory evidence known only to the Government." *Id*.

        *i.*    *Whether the Evidence is Exculpatory*

      The defendant does not specify in his written motion which reports he believes contain

exculpatory information; he attaches all eighteen to his motion.[25]  At oral argument, he claimed

that seven of the reports were *Brady* material (Sept. 11, 2023 Tr. 7:17-19), and directed the Court

to his proposed stipulation (*see supra* note 24), which lists the campaign workers whose 302

reports contain purportedly exculpatory material (*see* ECF No. 134-2).

---

[25] In addition to the reports discussed in the oral motion, the defendant's proposed stipulation included the
reports of two campaign workers who documented campaign efforts to research online trends and
"shitposting" on Reddit and Twitter. (*See* ECF No. 134-2.) As discussed below, the defendant does
not explain why these campaign efforts were relevant or exculpatory.

The defendant argues that the information in these 302s was exculpatory for two reasons. First, the reports showed generally that the Clinton campaign "recognized that vote-by-text memes were pervasive on multiple places online for months before November 1, 2016" and were "not orchestrated by just one person or group but multiple layers of people," thereby challenging the government's theory that the defendant conspired with others in private Twitter messaging groups to formulate and workshop these graphics.[26] (ECF No. 134 at 24; *see also* Tr. 622:19-22.)

Second, the reports support the defense that his tweets were mere "shitposting," intended to "rile up" or distract the Clinton campaign and to make the campaign divert resources that it could have used for other messaging or get-out-the-vote efforts. (ECF No. 134 at 15–17, 21.) The defendant claims that the interview reports, presumably of Employees #1 and #3, reflect that senior campaign officials did not take the misleading tweets seriously enough to take action against them. (*Id.* at 23–24.) Because the campaign stood in for their voters as "victims" of the conspiracy against rights, the defendant argues, the fact that campaign officials thought the tweets were "not a big deal" supports his defense that he did not intend for the tweets to deceive voters. (*Id.* at 19; *see* Tr. 616:25–617:14.)

The government responds that nothing in the 302s is exculpatory; rather, the reports support the government's theory of conspiracy—at least four campaign workers believed that the dissemination of misinformation, including the defendant's tweets, was a coordinated attempt to affect the outcome of the 2016 election, rather than just "shitposting," and the campaign "did take action to combat the misinformation." (ECF No. 140 at 10–11, 15–16.) Moreover, the

---

[26] The defendant does not identify which reports contained this information; it could be that he is referring to Employee #2, who told agents that he "witnessed countless memes" on 4chan and other websites. (ECF No. 134-4 at 2.)

campaign workers' opinions about the nature and significance of the disinformation and

shitposting are "wholly irrelevant to the question of the defendant's intent." (*Id.* at 13.)

The defendant was charged with violating Section 241 of Title 18 of the United States

Code, which is entitled "Conspiracy Against Rights." The statute provides in relevant part:

> If two or more persons conspire to injure, oppress, threaten, or
> intimidate any person in any State, Territory, Commonwealth,
> Possession, or District in the free exercise or enjoyment of any right
> or privilege secured to him by the Constitution or laws of the United
> States, or because of his having exercised the same ... [t]hey [shall
> be punished].

The indictment alleged that the objective of the charged conspiracy was to "injure, oppress,

threaten or intimidate one or more persons in the free exercise and enjoyment of their right to

vote." (ECF No. 8.) The government had to prove that the defendant knowingly and

intentionally joined the conspiracy with the intent to further that objective.

Certainly, the pervasiveness of misleading memes and graphics might support the defense

that the defendant "haphazardly" posted content he found in different places on the internet. (*See*

ECF No. 134 at 17, 21, 23–24; ECF No. 134-4 at 2 (Employee #2 stating that he saw

disinformation graphics about voting in late September 2016).) But the fact that Clinton

campaign staffers recognized that these memes were widespread says nothing about the

defendant's specific intent in posting them, or his involvement in orchestrating the spread of the

misinformation.

As to the argument that the defendant intended only to rile up the campaign, the reports

show, at most, that some senior campaign officials were not as concerned about the defendant's

postings and the spread of misinformation as the more junior staffers, who monitored social

media and brought the disinformation to their supervisors' attention. This is not exculpatory.

Whether the senior members of the Clinton campaign adequately assessed the risk—or had

adequate resources to combat the risk—of the defendant's misinformation campaign has nothing

to do with whether the defendant knowingly and intentionally conspired to deprive others of the

right to vote.  The defendant's argument that the campaign and its staffers were "victimized," as

surrogates of their voters, by the conspiracy, is also irrelevant.  The defendant's theory is

incorrect—it is the voters, not candidates or campaign workers, that the statute was enacted to

protect.  In any event, the perceptions of the campaign workers—whether they did enough to

prevent the defendant from spreading misinformation about how to vote— is not relevant to the

defendant's intent.

### ii.      Whether the Evidence was Material

Evidence is "material" "if there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."  *Madori*, 419

F.3d at 169 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)).  Materiality is a "result-

affecting test" that requires the prosecutor to predict whether nondisclosure of a certain piece of

information would alter the proceeding's outcome, not "an evidentiary test of materiality that can

be applied rather easily to any item of evidence ([i.e.,] would this evidence have some tendency

to undermine proof of guilt?)."  *In re United States (Coppa)*, 267 F.3d 132, 142 (2d Cir. 2001).

"[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government

has not deprived the defendant of due process of law simply because it did not produce the

evidence sooner.  There is no *Brady* violation unless there is a reasonable probability that earlier

disclosure of the evidence would have produced a different result at trial[.]"  *Id.* at 144 (citations

omitted).  When "disclosure is first made on the eve of trial, or when trial is under way, the

opportunity to use it may be impaired."  *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001).

Accordingly, the Court considers whether the defendant had a "reasonable opportunity to act

upon the information efficaciously," that is, "either to use the evidence in the trial or to use the

information to obtain evidence for use in the trial." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (citing *Leka,* 257 F.3d at 100).

As explained above, the Court suggested multiple ways to cure any potential prejudice: 1) recalling the witnesses for cross-examination on the subjects that the defendant claimed were impeachment material; 2) having the government make the staffers available in the event the defendant wished to call them; 3) directing the government to call the staffers; and 4) stipulating with the government about what the witnesses would have said had they testified. The defendant argues that none of these measures would have worked, and that nothing short of a mistrial would suffice.[27] However, the defendant rejected three of the suggested measures out-of-hand: recalling Rocketto and Cotler for additional cross-examination, calling the staffers himself, or having the government call them. In fact, defense counsel did not interview the staffers before declining to call them as witnesses.[28]

Regardless, the reports that the defendant claims are exculpatory (ECF No. 134-2) would not have lent any meaningful support to the defense. First, staffers' statements about the prevalence throughout the Election of shitposting and voter disinformation (*see* ECF No. 134 at 21) are immaterial, even if those statements were relevant to the defendant's argument that he was merely participating in that trend to "rile up" the campaign. That the defendant wanted to

---

[27] At oral argument on this motion, the defendant conceded that during trial he asked the court to permit him to re-open and to introduce portions of some 302s; however, he maintained that those steps would have been insufficient. (Sept. 11, 2023 Tr. 6:3-9.)

[28] As discussed above, the parties eventually agreed to a stipulation. The defendant faults the government for rejecting his proposal; the government maintained that defense counsel's proposal mischaracterized what the staffers said and omitted significant details. The Court may, in narrow circumstances, force the government to accept a defendant's stipulation to a particular fact "when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him," such as a relevant prior conviction. *United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir. 2001) (quoting *Old Chief v. United States*, 519 U.S. 172, 190 (1997)). This case does not fall within those narrow circumstances.

distract the Clinton campaign does not mean that he could not have also conspired to deprive

people of their right to vote; these goals are not mutually exclusive.

Second, statements that senior staffers did not take the posts as seriously as younger,

front-line staffers did are also not material to the defense.  As discussed above, campaign

staffers' perceptions of the posts are irrelevant to the defendant's intent; for the same reason,

there is no reasonable probability that, had these statements been disclosed to the defense, the

result of the proceeding would have been different.  Further, the defendant's claim that the 302s

show that the campaign as a whole did not take the memes seriously is not accurate.  Employee

#3 described the campaign's efforts to work with Twitter and Facebook to remove the text-to-

vote graphics from their platform (ECF No. 134-13 at 3).  Cotler testified that the campaign

decided to share the tweets with media outlets to combat the misinformation.  (Tr. 92-93.)  Cotler

also alerted the company that provided the campaign's text message software platform, which

reached out to Omer Samiri at iVision, the company that leased the "short code" used in the

defendant's messages.  iVision then "started playing some offense" to determine who was behind

the false messages, so they could be taken down.  (Tr. 118:10-14.)  iVision then set up an

automated response message to inform people that the defendant's messages were not from the

Clinton campaign.  (Tr. 119:20–120:2.)

The defendant also argues that if he had the reports before trial, he would have had access

to even more "potentially exculpating material," such as the campaign's daily reports and

presentations about 4chan and Twitter, including text-to-vote memes, daily PowerPoint

presentations about online trends, and the "records and recollections" of apparently "dozens" of

campaign staffers that monitored online misinformation and tracked social media trends.  (ECF

No. 134 at 24–25.)  But the defendant does not explain how any of this information would have

led to admissible evidence bearing on the defendant's intent or membership in the conspiracy.
Moreover, other information found in the 302s—for example, Employees #1 and #3's opinions
that the text-to-vote misinformation was "coordinated"—supported the government's theory of
the case.  (ECF No. 134-13 at 3; ECF No. 134-15 at 4)

     Finally, many of the statements echo information to which the defendant had access well
in advance of trial, and therefore do not constitute "evidence known only to the government" that
the prosecutors were required to disclose.  *Saipov*, 2023 U.S. Dist. LEXIS 86030, at *10; *see
also United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) ("[A] new trial is generally not
required when the testimony of the witness is corroborated by other testimony or when the
suppressed impeachment evidence merely furnishes an additional basis on which to impeach a
witness whose credibility has already been shown to be questionable." (citations omitted)).  For
example, before trial, the government produced material that established that text-to-vote
graphics began to be disseminated in September 2016; the government turned over an online
discussion of text-to-vote disinformation that began on September 26, 2016.  (GX 430 at 43.)
Similarly, the search warrant affidavit, produced to the defendant in July 2021 and reviewed by
the Court, included this information: "In or about and between June 2016 and November 2016,
images began appearing on social media websites that purported to be announcements from the
presidential election campaign of Hillary Clinton."  (ECF No. 139-1 ¶ 12.)  The defendant does
not explain why the Rocketto and Cotler interviews, which he concedes were provided to him
before trial, were not a sufficient "window" into the "universe" of allegedly exculpatory material
from the campaign about the prevalence of "shitposting" and voting misinformation.  Indeed,
testimony from additional campaign employees would have been largely cumulative of
Rocketto's and Cotler's testimony about the campaign's general response to election

disinformation, the extent to which the campaign devoted resources to combatting the

disinformation, and the specific response to the defendant's postings.

The defendant relies principally on *United States v. Mahaffy*, 693 F.3d 113 (2d Cir.

2012), in which the defendants "fortuitously found multiple exculpating depositions attended by

a member of the prosecution team" only after the defendants were convicted after a retrial.  (ECF

No. 134 at 21–22.)  According to the defendant, this Court is doing what the district court did in

*Mahaffy*: finding "the new information to be much ado about nothing: immaterial, not

exculpatory when considered in context, and insufficient to negate evidence of criminal intent."

(*Id.* at 22 (citing *United States v. Mahaffy, et al.*, No. 05-CR-613, 2010 U.S. Dist. LEXIS 73162

(E.D.N.Y. July 21, 2010), ECF No. 901).)  Citing the Second Circuit's observation that a *Brady*

violation occurs when the material's "exculpatory character harmonizes with the theory of the

defense case" (*id.* (quoting *Mahaffy*, 693 F.3d at 132)), the defendant argues that the 302s in this

case are "analogous" (*id.* at 21), in that they "corroborated and underscored" the defense case

that the tweets were mere "shitposting" and that "people were 'mocked' for taking them

seriously" (*id.* at 23–24.)  As discussed above, the defendant contends that the 302s could have

led the defense to additional admissible evidence, including campaign materials about online

voter misinformation.  (*Id.* at 24–25.)

*Mahaffy* is an entirely different case, and involved clearly exculpatory material that the

government withheld through two trials.  693 F.3d at 133.  The *Mahaffy* defendants were charged

with multiple crimes, including securities fraud, securities fraud conspiracy, Travel Act

violations, witness tampering, and making false statements.  *Id.* at 121.  At the first trial, the jury

acquitted the defendants of everything except one count of securities fraud conspiracy, on which

the jurors could not reach a verdict, and the trial court declared a mistrial.  *Id.*  The defendants

were convicted at the second trial. *Id.* In both trials, the government's theory of securities fraud conspiracy was that the defendants "deprived their employer firms of confidential information." *Id.* The "critical issue" was "whether portions of the [transmitted] information actually were confidential." *Id.*

The "primary SEC staff attorney investigating the case who conducted almost all of the SEC depositions" was "cross-designated as a Special AUSA" and "sat at counsel table during the trial." *Id.* at 122. "Several weeks" before the first trial, this lawyer emailed two members of the prosecution "specifically caution[ing] them that portions of at least one of the deposition transcripts contained possible *Brady* material[.]" *Id.* He wrote, "This is the last time I will bring this possible Brady issue up, but look over this excerpt when you get a chance. Tell me whether this requires some disclosure to defense counsel . . . ." *Id.* Despite this specific warning from a member of its team, a warning given not for the first time, the government did not disclose the deposition testimony to the defense at either trial. It was not until the SEC administrative proceedings after the second trial that SEC attorneys, who had "close[ly] collaborat[ed]" with the prosecution teams at both trials, disclosed to defense counsel 30 transcripts of investigative depositions, taken before the first trial, that included exculpatory testimony on the "central question" of whether the transmitted information was confidential, as well as testimony that directly "contradicted or undermined the testimony of key government witnesses" on that issue. *Id.* at 119. There was "no question that the government knew about the transcript that [the SEC attorney] attached, along with the other twenty-nine transcripts, prior to the first trial," and certainly prior to the second trial. *Id.* at 122–23.

The Second Circuit concluded that the "withheld SEC testimony strongly suggest[ed]" that the transmitted information was not confidential, as the defense argued, and "called squarely

into question the credibility of the government's key cooperating witness." *Id.* at 132–33. Therefore, the testimony was "material and favorable to the defense." *Id.* at 133. The court also found that there was a "reasonable probability that [the defendants] would not have been convicted had the transcripts been disclosed." *Id.* at 134. Accordingly, the court vacated the "component of the defendants' convictions" that relied on the conclusion that the information was confidential. *Id.*

Unlike *Mahaffy*, where the government sat on clearly exculpatory material for years and through two trials, the prosecutors in this case turned over the 302s on the second day of the trial. (ECF No. 134 at 21.) The defendant could have called the witnesses himself, recalled the two campaign workers who did testify, or asked the Court to direct the government to call the witnesses. As explained above, the defendant did not do any of those things, and chose not to interview the witnesses.[29] Nor, as explained above, do the statements in the 302s bear on a "central question" crucial to the government's theory; the campaign staffers' varying senses of urgency regarding Twitter misinformation has nothing to do with the defendant's intent.

In short, there is no "reasonable probability" that the outcome of the proceedings would have been different if the government turned over the 302s before trial.

---

[29] The defendant contended at oral argument that it "imposes an unfairness on the defense" to require it to request an adjournment of the trial to take the time required to investigate and interview these witnesses where the defense had already prepared for trial "fastidiously" and given its opening, and where the trial took only "four days," "the jurors are told it's not going to be more than two weeks," and the material "should have been turned over before." (Sept. 11, 2023 Tr. 10:21–12:1.) Defense counsel did not request additional time to interview the witnesses at the trial. As defense counsel conceded, the trial did not take only "four days." (Sept. 11, 2023 Tr. 20:5-11.) Moreover, the Court never suggested that time would not permit counsel to interview the witnesses.

b.     **The Government's Application to Permit the Cooperating Witness to Testify Anonymously**

As explained above, Judge Garaufis concluded that the cooperating witness would face harassment and threats if he were publicly identified, and accordingly granted the government's application to permit the witness to testify as "Microchip."  The defendant argues that Judge Garaufis might have ruled differently had the government disclosed certain information—largely in the form of public tweets—before the application; the defendant cites Microchip's public admissions that he used drugs, owed money to the IRS, feared that public disclosure of his real name would jeopardize his employment, and offered to cooperate with the FBI.  (ECF No. 134 at 9.).  The defendant concedes that he had all of this information at trial and used it to cross-examine Microchip.  (*Id.* at 9–11.)  He claims, however, the government had a *Brady* obligation to disclose this material, including reports of Microchip's interviews with the FBI, before Judge Garaufis's March 8, 2023 ruling on the government's application, so that the defense could use it to oppose the government's application.[30]  (*Id.* at 9–10, 14.)  The defendant argues that the government's disclosure of the information on March 10, 2023—two days after Judge Garaufis ruled on the application—was belated.  (*Id.* at 8.)  This argument is not persuasive for multiple reasons.[31]

First, aside from the fact that the defendant had and used the impeachment material to cross-examine Microchip at the trial, Microchip's tweets cannot support a Rule 33 motion for a

---

[30] As he did in his claims about the interviews of the Clinton staffers, the defendant characterizes the government's disclosures about Microchip as "a cherry-picked sliver of the truth" that render the prosecutors untrustworthy.  (ECF No. 148 at 15.)  The defendant appears to make this argument to establish a pattern of "deliberate deception" that compels dismissal of the indictment to deter "unconstitutional prosecutorial gamesmanship" (*id.* at 18), and suggested as much in oral argument (*see* Sept. 11, 2023 Tr. 39–41).  There was, however, no Brady violation.

[31] The defendant did not ask Judge Garaufis to reconsider his decision after the government disclosed the impeachment material on Microchip.

new trial based on the government's failure to disclose under *Brady* because "the

evidence . . . was a matter of public record, which [the defendant] himself had the ability to, and

ultimately did, locate." *United States v. Moslem*, No. 19-CR-457, 2023 U.S. Dist. LEXIS

153310, at *11 (S.D.N.Y. Aug. 30, 2023) (quoting *United States v. Teman*, 465 F. Supp. 3d 277,

343 n.38 (S.D.N.Y. 2020), *aff'd*, No. 21-1920, 2023 U.S. App. LEXIS 14247 (2d Cir. June 8,

2023)). The government disclosed that Microchip was the confidential informant well in

advance of trial on February 13, 2023. As defense counsel stated at oral argument on this

motion, he knew Microchip's true identity "independent of the government." (Sept. 11, 2023 Tr.

30:17-18.) Microchip posted the tweets at issue on his public Twitter account, which the

defendant could have found—and did find—at any time after he learned that Microchip was the

government's cooperating witness.

      The government did not violate its *Brady* obligation for the same reason. "The

[g]overnment does not violate its obligation under those cases where the defendant 'knew or

should have known of the essential facts permitting him to take advantage of any exculpatory

evidence.'" *Moslem*, 2023 U.S. Dist. LEXIS 153310, at *12 (quoting *United States v. LeRoy*,

687 F.2d 610, 618 (2d Cir. 1982)); *see United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)

("[T]he rationale underlying *Brady* is not to supply a defendant with all the evidence in the

Government's possession which might conceivably assist the preparation of his defense, but to

assure that the defendant will not be denied access to exculpatory evidence known only to the

Government."); *United States v. Constantine*, No. 20-4278, 2022 U.S. App. LEXIS 8374, at *2

(2d Cir. Mar. 30, 2022) (summary order) (affirming district court's denial of Rule 33 motion

based on alleged *Brady* violation where defendant had access to facts enabling him to take

advantage of exculpatory material); *United States v. Whyte*, No. 19-CR-64, 2023 U.S. Dist.

LEXIS 40465, at *3 (D. Conn. Mar. 10, 2023) (evidence not newly discovered, and no *Brady* or

*Giglio* violation, where defendant could have found public information regarding witness before

trial).

Regardless, Judge Garaufis did not need to evaluate Microchip's general credibility to

determine whether he should be permitted to testify using a pseudonym. The "underlying

purpose of identity testimony is to establish a background setting in which to test veracity."

*Urena*, 8 F. Supp. 3d at 573 (quoting *Stanard*, 42 N.Y.2d at 84). To prevail, the defendant would

have had to show that Microchip's true name was truly probative with regard to the question of

guilt or innocence. As Judge Garaufis found, the defendant did not make that showing,

especially since "the relevant exchanges and interactions all took place over the internet," where

Microchip was known by his moniker rather than his "legal name or personal background."

(ECF No. 82 at 8.)

Thus, Microchip's true name did not establish anything about "his credibility or

knowledge regarding" the alleged conspirators, especially since the defendant and the alleged co-

conspirators knew him only by his online moniker. *See Urena*, 8 F. Supp. 3d at 573. [32]

---

[32] The defendant argues that it was especially important for the government to turn over impeachment
material because Microchip would not have testified if Judge Garaufis denied the government's
application. A court considering whether to permit a witness to testify anonymously does not consider
whether that witness would testify without a grant of anonymity; rather, it assesses whether restricting
cross-examination about the witness's identity denies the defendant his right of cross-examination. *See
Alford v. United States*, 282 U.S. 687, 694 (1931) ("The extent of cross-examination with respect to an
appropriate subject of inquiry is within the sound discretion of the trial court. . . . There is a duty to
protect [the witness] from questions which go beyond the bonds of proper cross-examination merely to
harass, annoy or humiliate him."); *Smith v. Illinois*, 390 U.S. 129, 133–34 (1968) (White, J. concurring)
("I would place in the same category those inquiries which tend to endanger the personal safety of the
witness.") In any event, Microchip testified that his testimony was not contingent on a promise of
anonymity. (Tr. 597:14-17.)

## II. Motion for Acquittal

### a. The Evidence at Trial

The defendant's Rule 29(c) challenge to the sufficiency of the evidence is unavailing.

#### *i. Venue*

On May 13, 2022, Judge Garaufis ordered the government to provide a bill of particulars on the issue of venue, and gave the government leave to amend its theory of venue "should that theory change during discovery, motion practice, or while preparing for trial." (ECF No. 36 at 5 n.1 (citation omitted).) The defendant subsequently moved to dismiss the indictment for improper venue, arguing that the defendant did not commit overt acts in, engage in essential conduct in or have substantial contacts with the district. (ECF No. 54 at 1, 8.)[33] Judge Garaufis determined that the indictment was facially sufficient as to venue on the theory that (1) the defendant's or a co-conspirator's tweeting or retweeting of deceptive images into the Eastern District was an overt act in furtherance of the alleged scheme,[34] (2) deceptive images passed through the Eastern District of New York, (3) it was reasonably foreseeable that the defendant's tweets "would reach or pass through a judicial district as large as the Eastern District of New York" on its way to his thousands of followers. (ECF No. 54 at 16–20.) Judge Garaufis rejected the government's effects-based theory that venue would be proper because intended victims of the misinformation conspiracy were "located" in the Eastern District. (*Id*. at 20–21.)

---

[33] Judge Garaufis's opinion, published on January 23, 2023, is also available at 2023 WL 363595 and 2023 U.S. Dist. LEXIS 11335.

[34] Although conspiracy under Section 241 does not require the government to prove an overt act, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense." (ECF No. 54 at 13 (quoting *Whitfield v. United States*, 543 U.S. 209, 218 (2005)).)

In its final instructions, the Court charged that venue in the Eastern District was proper if a preponderance of the evidence established any of the following:

- Either the defendant, or a co-conspirator, or an innocent non-conspirator (caused to act by members of the conspiracy) tweeted an allegedly deceptive image into the Eastern District in furtherance of the alleged scheme, provided that, if tweeted by someone other than the defendant, that act was reasonably foreseeable to the defendant; or

- The allegedly deceptive images sent by the defendant in furtherance of the conspiracy had passed through the Eastern District of New York as they were transmitted to Twitter's servers and beyond, or if deceptive images sent by others in furtherance of the conspiracy had foreseeably passed through the Eastern District of New York as they were transmitted to Twitter's servers and beyond; or

- That the allegedly deceptive images were viewed in the Eastern District and that such viewing (even if innocent) was a foreseeable overt act furthering the ends of the conspiracy.

(ECF No. 114 at 29–30.)

The defendant argues that Judge Garaufis should have granted his pretrial motion to dismiss, and that the Court's instruction that venue can be premised upon the defendant's tweets passing through or being viewed in the Eastern District was erroneous. (ECF No. 134 at 32–33.) The Court declines to disturb Judge Garaufis's holdings concerning the theories by which the government could prove venue at trial on a post-trial motion. That order is the law of the case, and "govern[s] the . . . issue[] in subsequent stages in the same case." *New York v. Adamowicz*, 932 F. Supp. 2d 340, 345 (E.D.N.Y. 2013) (quoting *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992)). The Court may depart from the law of the case "only when there are 'cogent' and 'compelling' reasons for doing so," which the defendant has not provided. *Id.* (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)). Therefore, the Court's instruction to the jury was a correct statement of the law of the case, and was not erroneous.

The defendant also challenges the sufficiency of the evidence of venue, contending that the government did not show that "essential conduct elements" took place in the Eastern District, and thus did not prove venue by a preponderance of the evidence.  (ECF No. 134 at 32.) "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, venue is properly laid in any of the districts where an essential conduct element of the crime took place."  *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005) (citations omitted); *see also* 18 U.S.C. § 3237(a) ("Except as otherwise expressly provided . . . , any offense against the United States begun in one district and completed in another, or committed in more than one district, may be . . . prosecuted in any district in which such offense was begun, continued, or completed.").  In this case, the "essential conduct" included the defendant's tweets of text-to-vote graphics to his followers, who he expected would retweet the graphic and "push it [out] further."  (Tr. 753:13-20.)

At trial, the government argued that venue was proper in this District because the deceptive images passed through the internet infrastructure in the Eastern District of New York.[35]  The defendant lived in Manhattan when he sent the tweets (Tr. 652:24–653:5), and his

---

[35] The government opted to argue venue under this theory, but as discussed above, the Court instructed the jury that the government could prove venue under any of three theories.  The defendant proposed that the verdict form include a separate question asking whether the government proved venue (*see* ECF No. 103); the government objected that it had not "found any examples where the jury has been asked separately on the . . . verdict form[] to find venue" (Tr. 814:8-11; *see* ECF No. 102).  The Court "was not aware of any case law" that required submitting venue to the jury as a separate question (Tr. 822: 8), and accordingly gave the jury a general verdict form.

The defendant did not seek a special verdict or interrogatories, pursuant to Rule 49, that would have shown on which theory the jury found venue.  Therefore, "the defendant[] waived the ability" to seek, "post-verdict, a new trial based on the failure of [the government] adequately to support one of the three sets of facts on which the general verdict was based."  *Morse v. Fusto*, 804 F.3d 538, 552 (2d Cir. 2015).  In other words, the defense cannot now re-argue the alternative theories of venue that the government opted not to prove after the judge gave all three theories to the jury, and after the defendant did not request a sufficiently detailed special verdict.  *See id.* (finding the defendants "cannot now complain," after failing to object, "that it is impossible to know whether the verdict would have been different had the inadequately supported [theory] been withdrawn from the jury's consideration"

roommate testified that their internet provider was Spectrum (Tr. 147:25).  An engineer from Twitter explained that the defendant sent the tweets using a computer and a phone, and that the tweets were transmitted from his apartment in Manhattan to Twitter's servers in both Sacramento and Atlanta.  (Tr. 139–43.)  A witness from the FBI and a witness from Spectrum testified that this internet signal would necessarily have passed through fiber optic cables in the waters surrounding the island of Manhattan, on its way to Twitter servers in Sacramento or Atlanta.  (Tr. 194:15-25, 250:25–251:20.)  Because the Eastern District encompasses the waters surrounding the island of Manhattan, 28 U.S.C. § 112, this testimony established venue by a preponderance of the evidence.  *See United States v. Brown*, 293 F. App'x 826, 829 (2d Cir. 2008) (summary order) (affirming a district court holding that a wire transfer automatically routed through Manhattan was sufficient to find venue in the Southern District); Sept. 3, 2021 Redacted Op. at 46, *United States v. Ng Chong Hwa*, No. 18-CR-538 (E.D.N.Y. Sept. 10, 2021), ECF No. 84-1 (extending this principle to include use of "Goldman's telecommunications facilities, which transited through the Eastern District of New York").

Judge Garaufis also wrote in his pretrial order that "a reasonable jury could find that logging onto Twitter and viewing the Deceptive Tweets was an overt act and that though the viewers were innocent third parties, their doing so unwittingly furthered the ends of the conspiracy against their right to vote."  (ECF No. 54 at 19 (citing *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) ("This includes not just acts by co-conspirators but also acts that the conspirators caused others to take[.]"); *United States v. Abdullaev*, 761 F. App'x 78, 84 (2d Cir. 2019) (summary order) ("We have repeatedly found venue proper where an out-of-district

---

because allowing them the challenge "would allow them 'another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions" (quoting *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002))).

defendant causes an overt act to be committed by an innocent third party within the district of venue[.]"); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (stating that the defendant "need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there")).)  Under this theory, a person who was not a part of or even aware of the conspiracy could still further the conspiracy by retweeting the images; indeed, a key part of the conspirators' strategy was that Twitter users would spread the images "like wild fire" to an even wider population of Twitter users, including those inclined to vote for Hillary Clinton.  (*See id.*; *see* Tr. 598:1-2.)[36]

Viewing the evidence in the light most favorable to the government, as the Court is required to do, the government established venue in this District by a preponderance of the evidence.

### ii.    Fair Notice

The defendant argues that acquittal or a new trial is required because "the evidence did not show a violation of Section 241." (ECF 134 at 29.)  In the alternative, he argues that a new trial is warranted "because the jury instructions erroneously adopted the government's overbroad reading of Section 241, defining its scope to forbid anything that may 'hamper,' 'frustrate,' 'slow,' or 'prevent' (among other things) one's full ability to vote."  (*Id*. at 31 (quoting ECF No. 114 at 40–41).)

The defendant claims that he did not have fair notice that Section 241 encompassed conduct other than coercion (defined as violence or threats) or ballot-box fraud (defined as destroying votes or stuffing ballot boxes).  (*Id.* at 29.)  His conduct, the defendant argues, was

---

[36] In fact, Cotler, one of the Clinton campaign employees, testified that he saw the graphics when they were "going around on social media."  (Tr. 99:10-17.)

"deceit," which is not encompassed by the word "injure," and that to read Section 241 to cover

conduct "that deceives or discourages the exercise" of the right to vote renders it overbroad

under the First Amendment. (*Id*. at 30.)

As an initial matter, the Court did not instruct the jury that Section 241 covers speech

aimed to "deceive" or "discourage" voters. (*See* ECF No. 114.)  In any event, Judge Garaufis

held that "the record of historical prosecutions of conspiracies to injure the right to vote,

combined with a reasonable reading of the statute itself, constituted ample warning" that the

defendant's conduct violated federal law designed to protect voters (ECF No. 54 at 24–30

(collecting election-related § 241 cases), 32–36 (collecting case law defining "injury" within

§ 241), 36–38 (summarizing DOJ and congressional materials addressing enforcement of

§ 241)), that the statute's "intent requirement ensures that accidental misinformation will not be

criminalized" (*id.* at 51), and that prosecutions of § 241 for "conspiracies to make verifiably false

utterances about the time, place, or manner of elections that would injure the right to vote [are]

unlikely to encourage selective prosecutions or chill broad categories of constitutional speech"

because enforcement will encompass only a "narrow set" of cases (*id*.).  The Court will not

disturb that carefully considered ruling on a post-trial motion.

The Court charged the jury that Section 241 "covers conduct intended to obstruct, hinder,

prevent, frustrate, make difficult or impossible, or indirectly rather than directly assault free

exercise of the right.  For example, hinder is defined as to make slow or difficult the progress of,

to hamper, to hold back, to prevent, to check." (ECF No. 114 at 40.)[37]  The charge was

consistent with Judge Garaufis's pretrial decision that Section 241's definition of injury can be

---

[37] The defendant requested that the Court charge that the statute covers "conduct intended to harm,
frighten, prevent, inhibit, or punish the free actions of other persons in the exercise and enjoyment of"
the right to vote.  (ECF No. 96 at 2.)

caused by acts that "obstruct," "hinder," "prevent," "frustrate," "make difficult or impossible,"

"or indirectly rather than directly assault" the free exercise of a constitutional right. (ECF No. 54

at 32–33) (citing cases defining Section 241 to cover conduct characterized by each of these

verbs).)

### iii.    Conspiracy

The defendant argues that the government did not prove beyond a reasonable doubt that

he participated in a conspiracy. He argues that there was no "meeting of the minds" between the

defendant and the other members of the private Twitter messaging groups. (ECF No. 134 at 27–

28.)

"The government may prove the defendant's knowing participation in a conspiracy

through circumstantial evidence," such as the "defendant's association with conspirators . . . [or]

his presence at critical stages of the conspiracy that cannot be explained by happenstance . . . ."

*United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (citations omitted) (collecting cases).

"[I]t is enough that the parties have a tacit understanding to carry out the prohibited conduct."

*United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989) (quoting *United States v. Rubin*, 844

F.2d 979, 984 (2d Cir. 1988). "Nevertheless, to be guilty of conspiracy . . . there must 'be some

evidence from which it can reasonably be inferred that the person charged with conspiracy knew

of the existence of the scheme alleged in the indictment and knowingly joined and participated in

it.'" *Id.* (citing *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)).

There was abundant circumstantial evidence from which the jury could infer that the

defendant entered into an agreement to deprive others of the right to vote by keeping them from

voting in the 2016 presidential election. The government introduced an almost yearlong record

of direct messages that established the defendant's membership and affiliation with groups of

self-branded "disinformation trolls." (*See, e.g.*, GX 200-D; GX 400; GX 410.) The members of

these groups, including the defendant, coordinated their efforts to spread their political messages and disinformation as widely as possible across Twitter, and ultimately refined their efforts to keep certain groups of voters from voting.

The defendant was not simply present in these groups. To the contrary, he prided himself on his leadership position in the groups, his influence over his many followers—his "loyal army on Twitter"—and on his talent for publicizing memes widely. (GX 200 at 32–33.) The members of the Twitter groups respected him and saw him as a leader. (Tr. 428:11-17, 506:25–507:1.) The defendant sometimes participated in the groups' strategy discussions; even when he did not join in the conversation, he regularly tweeted out the political messages or disinformation that the groups decided to push. (*See, e.g.*, Tr. 842–50.)

As the presidential election neared, the evidence showed that these groups increasingly focused on depressing voter turnout by spreading disinformation about the time, place and manner of the election. In the days leading up to the defendant's posts, the groups strategized about how to design their disinformation—in the form of false text-to-vote ads—so that Hillary Clinton voters would believe they were real. They also considered when the graphics should be distributed—either immediately before the election or somewhat earlier, so that early voting might be affected—and whether the graphics were effective. (*See, e.g.*, Tr. 376:3-14, 459:11-14, 511:10-25, 512:15–513:4.)

On October 27, 2016, HalleyBorderCol suggested in the War Room that they "depress illegal voter turnout [with] a nice hoax." (GX 400 at 27.) Another group member boasted that his graphic portraying an immigration officer arresting a Latino man at a polling place "ma[de] the news" and attached an article saying that the image was "likely aimed at intimidating Latino voters." (*Id*. at 30.) In the War Room on the same day, HalleyBorderCol posted vote-by-tweet

and vote-by-text images and discussed strategies for maximizing the reach of this misinformation.  (*Id*. at 31.)  On October 28 and 29, 2016, Jakekass and 1080p discussed "work[ing] on a new fake ad campaign."  (Tr. 460:22–461:17.)

Two days before the defendant made his posts, Microchip shared this tweet with the War Room: "Remember @Hillary Clinton voters, on Nov 8th, you can vote from home by #Tweeting "#Hillary," this is only set up for @HillaryClinton voters."  (Tr. 510; GX 400 at 32.)  Another member of the group wanted to "make it more believable" and to "give the impression that only Hillary Clinton voters can do this," not Trump voters.  (Tr. 511:15-23.) Then, on November 1 and 2, 2016, the defendant tweeted the two false text-to-vote graphics and retweeted a third, all of which pushed the same message as the tweets by HalleyBorderCol and Microchip, and were similarly focused on Hillary Clinton voters.  (Tr. 386:2-11; GX 720; GX 721; GX 722.)  The defendant was suspended from Twitter for tweeting the false ads but returned shortly thereafter; the group members celebrated his return and congratulated him on the tweets.  (Tr. 749:24.)

Moreover, the defendant's efforts to affect the election—by discussing, creating and spreading deceptive information about how to vote—also supported the conclusion that his tweets were not mere "coincidence" unrelated to the planning in the War Room in the days and weeks before the election.  *Compare Nusraty*, 867 F.2d at 762.  The defendant repeatedly tweeted about how close the election would be (Tr. 703:20–704:1) and was focused on "turn[ing] out" groups of voters that supported Trump and limiting turnout of those who did not, like Black voters (Tr. 702:25–703:4).  He also posted other tweets leading up to the election, beyond the false text-to-vote ads, that were aimed at encouraging Black people not to vote.  (Tr. 704:2–8.) He discussed that strategy with members of the Twitter messaging groups.  (Tr. 703:4-6.)  The defendant's messages with his co-conspirators and his tweets throughout the campaign illustrate

50

that he shared the same objective as the members of the conspiracy—preventing Hillary Clinton

supporters from voting—and he tweeted the fraudulent text-to-vote graphics as part of that effort.

The Court has "examined the entire case, take[n] into account all facts and circumstances, and [made] an objective evaluation." *Aguiar*, 737 F.3d at 264 (quoting *Ferguson*, 246 F.3d at 134). "[V]iewing the evidence in the light most favorable to the prosecution," "deferring to the jury's assessment of the witnesses' credibility," and considering the evidence "in its totality, not in isolation," the Court finds that the defendant has not sustained his "heavy burden" to show that he is entitled to relief under Rule 29. *Id.* A rational jury could conclude from all the evidence that the defendant, together with others, conspired "to injure, oppress, threaten, or intimidate" one or more people "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States:" specifically, the right to vote. 18 U.S.C. § 241. For these reasons, the defendant's motion is denied.

**CONCLUSION**

For these reasons, the defendant's motion for a new trial or acquittal is denied.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      October 17, 2023