To Be Argued By:
ERIK D. PAULSEN

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-7577

UNITED STATES OF AMERICA,

*Appellee,*

-against-

DOUGLASS MACKEY, also known as "Ricky Vaughn,"

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANT'S MOTION FOR BAIL PENDING APPEAL

COREY R. AMUNDSON,
Chief, Public Integrity Section
United States Department of
Justice

BREON PEACE,
United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

WILLIAM GULLOTTA,
Trial Attorney,
(Of Counsel).

ANTHONY BAGNUOLA,
ERIK D. PAULSEN,
FRANK TURNER BUFORD,
Assistant United States Attorneys,
(Of Counsel).

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................ii

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS ..................................................................... 4

I.     Background ................................................................................. 4

      A.     Offense Conduct ................................................................ 4

      B.     Proceedings Below ............................................................ 6

           1.     Motion to Dismiss ..................................................... 6

           2.     Trial .......................................................................... 9

           3.     Post-Trial Motion ................................................... 10

           4.     Sentencing and Appealed-From Order ................................................................... 11

ARGUMENT – MACKEY'S MOTION FOR BAIL PENDING APPEAL SHOULD BE DENIED ................................................ 13

I.     Applicable Law ....................................................................... 13

      A.     Statutory Scheme ............................................................ 13

      B.     Standard of Review .......................................................... 15

II.     Mackey's Prosecution Follows a Legal-Historical Tradition of Enforcing Voting Rights Under § 241 ...................................................................... 15

III.     Venue Was Properly Laid in EDNY ....................................... 22

CONCLUSION ................................................................................. 29

# TABLE OF AUTHORITIES

Page

## CASES

Anderson v. United States,
  417 U.S. 211 (1974) ..................................................................... 19, 20

Screws v. United States,
  325 U.S. 91 (1945) ............................................................................ 16

United States v. Abuhamra,
  389 F.3d 309 (2d Cir. 2004) ........................................................ 14, 15

United States v. Alvarez
  567 U.S. 709 (2012) .......................................................................... 21

United States v. Brown,
  293 F. App'x 826 (2d Cir. 2008) ...................................................... 24

United States v. Chilingirian,
  280 F.3d 704 (6th Cir. 2002) ............................................................ 15

United States v. Classic,
  313 U.S. 299 (1941) ..................................................................... 18, 20

United States v. Kirk Tang Yuk,
  885 F.3d 57 (2d Cir. 2018) ............................................................... 27

United States v. Kozminski,
  487 U.S. 931 (1988) .......................................................................... 19

United States v. Lanier,
  520 U.S. 259 (1997) ............................................................. 16, 17, 19

United States v. Miller,
  753 F. 2d 19 (3d Cir. 1985) ............................................................. 14

United States v. Ng Chong Hwa
  No. 18-CR-538 (MKB), 2021 WL 11723583
  (E.D.N.Y. Sept. 3, 2021) .................................................................. 24

United States v. O'Sullivan,
No. 20-CR-272 (PKC), 2023 WL 7110292
(E.D.N.Y. Oct. 27, 2023) ....................................................... 15

United States v. Randell,
761 F.2d 122 (2d Cir. 1985) ................................................... 14

United States v. Rowe,
414 F.3d 271 (2d Cir. 2005) ........................................... 26, 27

United States v. Royer,
549 F.3d 886 (2d Cir. 2008) ................................................. 26

United States v. Saylor,
322 U.S. 385 (1944) .............................................................. 19

United States v. Stone,
188 F. 836 (D. Md. 1911) ...................................................... 20

United States v. Tobin,
No. 04-CR-216-01-SM,
2005 WL 3199672 (D.N.H. Nov. 30, 2005) ........................... 18

## STATUTES

18 U.S.C. § 241 ....................................................... 1, 6, 7, 10

18 U.S.C. § 3143(b) ................................................... 2, 5, 13

18 U.S.C. § 3143(b)(1)(A) ................................................... 13

18 U.S.C. § 3143(b)(1)(B) ................................................... 13

18 U.S.C. § 3237(a) ........................................................... 24

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-7577

───────────────────────

UNITED STATES OF AMERICA,

Appellee,

-against-

DOUGLASS MACKEY, also known as "Ricky Vaughn,"

Defendant-Appellant.

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANT'S MOTION FOR BAIL PENDING APPEAL

## PRELIMINARY STATEMENT

Defendant-Appellant Douglass Mackey, also known as "Ricky Vaughn," was convicted in March 2023 after an eight-day jury trial in the United States District Court for the Eastern District of New York ("EDNY") (Donnelly, J.) of conspiracy against rights, in violation of 18 U.S.C. § 241 ("§ 241"), stemming from Mackey's effort to prevent targeted

2

portions of the electorate from validly exercising their right to vote in the 2016 Presidential Election. The district court sentenced Mackey principally to seven months' imprisonment; a judgment of conviction issued on October 25, 2023. Mackey unsuccessfully moved in the district court for bail pending appeal. He now moves this Court for the same relief.

As discussed below, however, the issues Mackey intends to present on appeal—that § 241 does not criminalize his conduct and that venue was improper in the EDNY—do not present "substantial question[s]" under 18 U.S.C. § 3143(b). Rather, as the district court found in rejecting Mackey's pre- and post-trial motions, this prosecution fits with a long legal and historical tradition of using § 241 to protect voting rights and any one of numerous settled theories of venue rendered Mackey's prosecution proper in the EDNY.

As he did below, Mackey continues to insist that the lack of a direct historical analog for his Twitter-based voter suppression efforts removes this case from the established core of § 241 voting-rights cases. But the originality of his methods does not raise fresh questions about the longstanding laws he broke. The issues here are not sufficiently

3

"substantial" to overcome the strong statutory presumption favoring his detention. His motion should be denied.

4

## STATEMENT OF FACTS

I. Background

    A. Offense Conduct

Mackey was a prolific social media user who boasted a Twitter following exceeding 51,000 users. (DE:174[1] at 4). He commented extensively upon politics and belonged to private, invitation-only political groups on Twitter, including one called "War Room," whose members sought "to develop election memes that would 'go viral' and 'trend.'" (Id. at 4-5). In the run-up to the 2016 Presidential Election, Mackey's posts mostly "disparaged Hillary Clinton or supported Donald Trump." (Id. at 4). This included "originating hashtags designed to 'cause as much chaos as possible' by creating 'controversy . . . for the sole purpose of disparaging Hillary Clinton.'" (Id. at 5). Some of those efforts were explicitly meant to "depress . . . voter turnout" for Clinton. (Id. at 7-8).

This strategy escalated to a specific scheme to trick likely Clinton voters into staying home on Election Day 2016 by persuading

---

[1] "DE" refers to entries on the district court's docket. "GA", "Br." and "Ex." refer, respectively, to the Government's Appendix, Mackey's brief, and its attached Exhibits.

5

them they could successfully cast a vote via text message. (Id. at 8). Initial proposals had focused on text-by-hashtag messaging but some in Mackey's orbit favored a "more believable" approach. (Id.) So realistic were the suggested tactics that members of the War Room openly "worried about . . . people on Trump['s] side thinking this is legit and they stay home." (Id. (emphasis added)).

Consistent with this devising, on November 1, 2016, from his Manhattan apartment, Mackey tweeted a graphic "depict[ing] a Black woman holding a sign that reads 'African Americans for Hillary'" and purporting to announce that people could vote for Clinton via text message. (Id. at 8-9). The next day, Mackey tweeted a second graphic "depicting a Latina woman sitting in a conference room with a phone and a laptop" and—in English- and Spanish-language text—reiterated the false message that people could vote for Clinton via text message. (Id. at 9-10). That same day, Mackey retweeted a graphic from a co-conspirator expressing the same false information. (Id. at 10). All three graphics aped the font, colors, and insignia featured in real Clinton campaign ads, including the hashtag #ImWithHer. (Id. at 9-10, 12).

6

Upon learning of these deceptive posts, Twitter immediately suspended Mackey's account. (Id. at 11). Prior to Mackey's tweets, Clinton's campaign, headquartered in the EDNY, likewise took efforts to mitigate the risk of voter suppression from the text-to-vote fraud. (Id. at 12-13).

B.    Proceedings Below

On February 10, 2021, a grand jury in the EDNY indicted Mackey for conspiring to injure, oppress, threaten, or intimidate others' right to vote, in violation of 18 U.S.C. § 241. (DE:8).

1.    Motion to Dismiss

On June 24, 2022, Mackey moved to dismiss the indictment on the same grounds he raises here. (DE:43). The district court denied Mackey's motion in its entirety.[2] (DE:54).

First, rejecting Mackey's contention that his use of Twitter differentiated this case from its doctrinal predecessors, the court observed that § 241 has long been used to prosecute conspiracies to injure

---

[2]    U.S. District Judge Nicholas G. Garaufis initially presided over this case and denied Mackey's pretrial motion to dismiss. On March 19, 2023, the matter was reassigned to U.S. District Judge Ann M. Donnelly. (DE dated 3/19/23).

the right to vote; the application of § 241 necessarily has continued to evolve "as modes of voting and would-be wrongdoers' corresponding methods for injuring those votes have shifted." (Id. at 29). The court surveyed § 241's historical use in instances of non-forceful suppression efforts, such as conspiracies to deprive voters of needed transportation to a polling place. (Id. at 30). The historical record proved that "[f]or more than a century, courts have held that this statute flexibly proscribes conspiracies to injure the right to vote in a variety of contexts and undertaken using a variety of mechanisms." (Id.). Moreover, "[f]ederal courts have for decades defined injury to or oppression of rights as including behavior that obstructs, hinders, or prevents; frustrates, makes difficult, or indirectly rather than directly assaults the free exercise of rights." (Id. at 32-33 (internal quotation marks, citations, and alterations omitted)). Thus, based on "the statute's historical usage," Mackey's indictment represented "the latest in a long line of electoral and voting rights prosecutions under 18 U.S.C. § 241." (Id. at 30).

The court also found that Mackey's First Amendment rights were not infringed. Applying intermediate scrutiny to the conspiracy's fraudulent campaign advertisements, which contained objectively false

information, the court concluded that the use of § 241 was appropriately tailored to further the government's substantial interest in the integrity of the electoral process.  (DE:54 at 49-50).  Moreover, any purported speech contained in the deceptive tweets was unprotected because it was incidental to criminal conduct or fell within the historically recognized fraud exception.  (Id. at 52-53).

Second, the court found Mackey's conduct prosecutable in the EDNY "under any one of several theories" advanced by the government. (Id. at 11, 17).  A jury could find, e.g., that his deceptive tweets into the EDNY were overt acts in furtherance of the conspiracy.  (Id. at 17).  In that case, venue would not be defeated by the apparent lack of a prior case involving the interstate transmission of tweets (as opposed to other forms of communications).  (Id. at 18).  Or Mackey's tweets could foreseeably have passed through the EDNY en route from Manhattan to Twitter's servers, since "[v]enue is proper in any district through which electronic communications in furtherance of the conspiracy pass[]."  (Id. at 18).  Further still, his tweets could foreseeably have been viewed by third parties in the EDNY—such viewing unwittingly furthering the ends of the conspiracy—or, given his social media influence, could

9

foreseeably have reached Manhattan's large, metropolitan neighboring district.  (Id. at 19-20).

     2.  Trial

Mackey's case was tried to a jury in March 2023.  The government's case-in-chief established that Mackey's fraudulent tweets were intended to deceive likely Clinton voters.  A co-conspirator admitted that his own public posts promoting false vote-by-hashtag messages contained no information about a candidate or political issue; they were "just . . . false information about how to vote" in the hope "that Hillary Clinton voters [would] see th[em] and then vote incorrectly."  (GA 2).

The government proved that electronic communications sent from Manhattan necessarily traversed the EDNY's waters to reach Twitter's servers.  (DE:174 at 44-45).  And Clinton campaign staffers testified that they in fact received substantially similar tweets at Brooklyn headquarters during the relevant time period.  (Id. at 45-46 & n.36).

Mackey testified in his own defense.  He admitted the graphics in question were modeled on real Clinton campaign ads and included the hashtag #ImWithHer, at least in part, to antagonize the

10

campaign and divert its Brooklyn-based resources to addressing his posts.  (GA 4-5).

The jury convicted him.  (DE:115).

3.    Post-Trial Motion

On May 12, 2023, Mackey moved for a judgment of acquittal or a new trial, again claiming his conduct as proven did not come within the scope of § 241 and venue was not properly laid in the EDNY. (DE:135).

The district court rejected those arguments for a second time. (DE:174).   Citing to her predecessor judge's "carefully considered" pretrial ruling on the scope and applicability of § 241, the court rejected Mackey's renewed attempt to argue that he lacked fair notice that his conduct was illegal.  (Id. at 46-47).  A jury charge consistent with that ruling was thus not a basis for post-conviction relief.  (Id.).  As to the legality of the government's venue theories, Mackey failed to provide "cogent" or "compelling" reasons for the court to depart from the earlier holdings finding those theories valid.  (Id. at 43 (internal quotation marks omitted)).  And under those theories, the evidence at trial was sufficient to sustain the jury's verdict.  (Id. at 44-46).

4.   <u>Sentencing and Appealed-From Order</u>

On October 18, 2023, the district court sentenced Mackey principally to seven months' imprisonment.  (Ex. 1 at 26).  The court advised Mackey that she was not sentencing him "for [his] political beliefs or for expressing those beliefs."  (<u>Id.</u> at 21).  "[U]nlike your expressions of political opinions," she said, "your actions in connection with this conspiracy are not protected by the First Amendment . . . the evidence bore this out that this case was about conspiracy and injury, not speech. Speech was just . . . the method that you used to commit this crime."  (<u>Id.</u> at 21-22).

Mackey then moved for bail pending appeal, claiming "many issues" in the case, specifically those "discussed in pretrial and post-trial briefing," were "novel, interesting," "not frivolous" and "substantial," such that they "create . . . a real possibility on any one of a number of grounds of reversal."  (Ex. 1 at 28).

The court disagreed, noting that in adjudicating Mackey's pre- and post-trial motions, the court had "carefully considered" the very arguments Mackey indicated he would raise on appeal.  (<u>Id.</u> at 30).  In doing so, the court rejected the idea that the questions here were "close"

12

or "could very well be decided the other way."  (Id.)  Mackey was permitted to self-surrender by January 18, 2024.  (Id.)

       This motion followed.

<u>ARGUMENT</u>

MACKEY'S MOTION FOR BAIL
<u>PENDING APPEAL SHOULD BE DENIED</u>

Mackey argues that his appeal raises a "substantial question" under 18 U.S.C. § 3143(b), warranting bail pending appeal. Specifically, he again contends that: (1) § 241 does not criminalize the conduct for which he was convicted; and (2) venue was improper in the EDNY. Because neither of these claims presents a substantial question, Mackey's motion should be denied.

I.  <u>Applicable Law</u>

A.  <u>Statutory Scheme</u>

As relevant here, § 3143(b)(1) provides that a court "shall" order a sentenced defendant detained pending appeal unless the court finds, by clear and convincing evidence, "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in" reversal, a new trial, a non-carceral sentence, or a reduced carceral sentence. 18 U.S.C. § 3143(b)(1)(B).[3]

---

[3]   The government does not assert that Mackey presents a risk of flight or danger to the community. <u>See</u> 18 U.S.C. § 3143(b)(1)(A).

Contrary to Mackey's suggestion in the district court, a "substantial" question is more than "interesting" or "not frivolous"; it is a "close question or one that very well could be decided the other way." United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985) (internal quotation marks omitted). Even where a question raised on appeal is "substantial," the court "must then consider whether that question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." Id. (internal quotation marks omitted).

Under this framework, there is a "presumption in favor of detention." United States v. Abuhamra, 389 F.3d 309, 319 (2d Cir. 2004). "Once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it [absent] exceptional circumstances." United States v. Miller, 753 F. 2d 19, 22 (3d Cir. 1985) (internal quotation marks omitted).[4]

---

[4] Mackey wrongly claims the Court "'shall' grant release pending appeal" if it makes certain factual findings. (Br. 1). On the contrary, there is no such presumption favoring release and "the burden is not on the Government to justify why no bail pending appeal should be

15

B.  Standard of Review

This Court reviews the denial of a motion for bail pending appeal for an abuse of discretion, reviewing factual determinations for clear error and legal questions de novo.  See United States v. Chilingirian, 280 F.3d 704, 709 (6th Cir. 2002); Abuhamra, 389 F.3d at 317 (addressing review of bail pending sentencing).

II.  Mackey's Prosecution Follows a Legal-Historical Tradition of Enforcing Voting Rights Under § 241

As the district court painstakingly explained, the scope of § 241 and its applicability to voter suppression efforts are well-trodden legal issues; neither poses any "substantial" question for this Court.

Mackey argues that § 241 has never been held to proscribe the dissemination of "political misinformation" intended to injure the right to vote and, as such, he lacked fair notice that it was illegal to disseminate fraudulent campaign advertisements intended to frustrate voters' ability to validly cast a ballot.  (Br. 10-11).  But even if the Court

_____

granted." United States v. O'Sullivan, No. 20-CR-272 (PKC), 2023 WL 7110292, at *5 (E.D.N.Y. Oct. 27, 2023).

16

finds Mackey's tweets fairly characterized as "political misinformation" (which they are not), the illegality of his conduct was obvious.

The apparent absence of a prior case involving the precise conduct at issue, i.e., Twitter-based voter suppression, does not deprive Mackey of fair notice of § 241's parameters. Rather, § 241's "general terms incorporate constitutional law by reference . . . and many of the incorporated constitutional guarantees are, of course, themselves stated with some catholicity of phrasing. The result is that neither the statutes nor a good many of their constitutional referents delineate the range of forbidden conduct with particularity." United States v. Lanier, 520 U.S. 259, 265 (1997). As the scope of prohibited conduct is tied to the protection of constitutional rights, the specific delineation of which is subject to evolving judicial interpretation, fair notice of the statute's reach is afforded when a defendant "is charged with violating a 'right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them.'" Id. at 267 (quoting Screws v. United States, 325 U.S. 91, 104 (1945)).

17

The <u>Lanier</u> Court rejected a proposed standard for fair notice that would have required prior judicial decisions establishing criminal liability under "fundamentally similar" facts. <u>Id.</u> at 267-70. Instead, the Court analogized the concept of fair warning for § 241 violations to that of "clearly established" law in the qualified-immunity context and observed that it had "upheld convictions under § 241 . . . despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." <u>Id.</u> at 269.

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

<u>Id.</u> at 271 (internal quotation marks omitted).

Protecting the right to vote has consistently been at the forefront of § 241's enforcement for over a hundred years. (DE:54 at 24-30). That established tradition is not negated by Mackey's use of modern technology; old crimes are regularly committed in new ways. Indeed, the key inquiry for fair-notice purposes is whether the right at issue in any

case is one a defendant could have anticipated would be covered by the statute:

> It is no extension of the criminal statute . . . to find a violation of it <u>in a new method of interference</u> with the right which its words protect. For it is the constitutional right, <u>regardless of the method of interference</u>, which is the subject of the statute and which in precise terms it protects from injury and oppression.

<u>United States v. Classic</u>, 313 U.S. 299, 324 (1941) (emphasis added); <u>see also</u> <u>United States v. Tobin</u>, No. 04-CR-216-01-SM, 2005 WL 3199672, at *4 (D.N.H. Nov. 30, 2005) ("It is not the novelty of the means employed, or the originality of the scheme devised, that 'fair notice' speaks to, but the purpose of the conspiracy or the object of the conduct. Here the alleged purpose of the charged conspiracy was to injure or oppress any person in the free exercise of their right to vote. Such conduct is plainly prohibited by § 241.").

Mackey's crime, while technologically savvy, is simply the latest in a long line of voter suppression efforts that fits comfortably within § 241's embrace. Using Twitter to trick would-be voters into abstaining from their constitutional right to vote is hardly a radical extension of prior precedent; instead, this case is one in which "a general

19

constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the situation in question." Lanier, 520 U.S. at 271.

Mackey argues the operative terms in § 241—"injure, oppress, threaten, or intimidate"—require some form of coercive act to establish guilt. (Br. 12-14). But this ignores § 241's historical application to conduct like casting fake ballots or refusing to count validly cast ballots— activities that have no inherently coercive element. (DE:54 at 35-36). These cases are why the Supreme Court routinely short-hands the conduct proscribed by § 241 as "interfering with" or "preventing" the free exercise of established constitutional rights. See, e.g., Lanier, 520 U.S. at 264-65 (noting § 241 "speaks of conspiracies to prevent" the free exercise of a constitutional right); United States v. Kozminski, 487 U.S. 931, 941 (1988) (noting § 241 "prohibits interference with" established rights); Anderson v. United States, 417 U.S. 211, 223 (1974) (noting the defendant must act with "intent to interfere with" the right in question)).

Nor is it correct to claim that the statute has never been interpreted to cover deceptive or fraudulent conduct. See United States v. Saylor, 322 U.S. 385, 389 (1944) (§ 241 covered the submission of fraudulent ballots that "falsifie[d] the count of votes legally cast");

20

<u>Anderson</u>, 417 U.S. at 225 (§ 241 covered defendants' scheme to manipulate voters needing assistance by "aligning their bodies so as to conceal" the casting of fraudulent ballots); <u>United States v. Stone</u>, 188 F. 836, 838-40 (D. Md. 1911) (§ 241 covered the preparation of a ballot designed to confuse persons of limited literacy into voting for a particular party; "Unlawfully to deprive a citizen of the United States of his right to vote at [an] election is to injure him in any ordinary use of the word 'injure.'").

Against this backdrop, Mackey's case stands among the historical precedents outlawing under § 241 coordinated efforts to defraud voters concerning the time, place, and manner of voting with the intent that they forfeit their right to vote. That Mackey and his co-conspirators accomplished this objective with a "new method of interference" does not, therefore, render the application of the statute novel or "substantial" in the sense relevant to a grant of bail pending appeal. <u>Classic</u>, 313 U.S. at 324.

Nor is there a "substantial" First Amendment question here:

[t]his prosecution targets only false speech intentionally used to injure other individuals' attempt to exercise their constitutionally

> guaranteed right to vote, and to secure an outcome of value to Mr. Mackey—an advantage in a Presidential election for his preferred candidate—despite Mr. Mackey's knowledge that the statements in his tweets were false.

(DE:54 at 47).

It is thus unlike United States v. Alvarez, which expressed skepticism of laws criminalizing the making of false statements that did not also require "proof of specific harm to identifiable victims," or "that the lies be made in contexts in which a tangible harm to others is especially likely to occur," or otherwise "limiting the prohibited lies to those that are particularly likely to produce harm." 567 U.S. 709, 734 (2012) (Breyer, J., concurring).

The trial evidence showed, and the district court reiterated at sentencing, that Mackey's tweets were not protected political speech—they did not touch upon any candidate's policy views, qualifications, or political affiliations, and he does not seriously contend otherwise. Thus, applying § 241 to "a narrow set of prosecutions regarding conspiracies to make verifiably false utterances about the time, place, or manner of elections that would injure the right to vote" does not require setting foot upon the slippery slope Mackey imagines, for the distinction between

22

false statements "about the substance of what is on the ballot" and the means by which the ballot can be accessed is self-evident. (DE:54 at 49-51). This is especially true given § 241's intent requirement, namely, that the government prove an offender's specific intent to injure the right to vote—a safeguard against "accidental misinformation" being criminalized. (Id. at 48, 51).

III.   Venue Was Properly Laid in the EDNY

Nor does the EDNY's venue pose any "substantial" question for this Court. Unlike the settled venue theories endorsed by the district court, Mackey's arguments require a wholesale reexamination of precedent. That is a radical proposition; not a "close" call.

The trial evidence proved that Mackey's deceptive tweets passed through the EDNY en route from Manhattan to Twitter's servers elsewhere.[5]   As the district court found, this was consistent with longstanding principles establishing venue "in any district through

_____

[5]    The government also proved that Mackey's tweets were intended to be viewed by third parties in the EDNY, which Mackey himself admitted during his testimony.  Although Mackey does not address this theory in his brief, it provided an independently valid basis for the jury to find venue in the EDNY.  (DE:54 at 17-19).

which electronic communications in furtherance of the conspiracy pass."
(DE:54 at 15 (collecting cases)).  Mackey never seriously contests the
validity of this doctrine; again, pointing exclusively to the originality of
his Twitter-based methods, he instead calls for a reexamination of the
doctrine to account for the expansive reach of internet communications.
The Court should decline his invitation.

Driven by a common-sense acknowledgement that
communication-reliant schemes will naturally evolve to incorporate
newer technologies, the law in this Circuit has kept up with the times.
Thus, precedents established for mailed letters and telephone calls have
been repeatedly extended to faxes, bank wires, emails, and voice-over-
internet communications.  (DE:54 at 18 (finding Mackey's legal
interpretation "narrow" and "ignor[ant of] the interpretative dynamism
necessitated by the rapid technological change of our era.")).  Mackey
offers no principled basis to differentiate tweets from other forms of "pass
through" activity that this Court, among others, has found sufficient to
establish venue for continuing-violation offenses based in conspiracy,
despite bearing the burden in this Court to do so.  (DE:54 at 15, 18-20
("There is no meaningful difference between automatic routing of funds

24

or wire communications and the movement of electronic messaging over Twitter servers. If an electronic wire gives rise to venue in a district by merely passing through, so too do electronic Tweets." (citing <u>United States v. Brown</u>, 293 F. App'x 826, 829 (2d Cir. 2008) (summary order); <u>United States v. Ng Chong Hwa</u>, No. 18-CR-538 (MKB), 2021 WL 11723583, at *21 (E.D.N.Y. Sept. 3, 2021)[6] (citing intra-Circuit cases in which "pass through" activities conferred venue in continuing violation cases based on 18 U.S.C. § 3237(a)"))).

He tries by saying tweets are not "directed at" a particular district, thus rendering venue proper anywhere Twitter can be accessed. (Br. 18-19). While true enough that Twitter empowers users to send messages—and, as here, amplify harm—to a greater degree than its historical antecedents, Mackey's rationale presents no "substantial" question since venue below was not established merely through proof that he used Twitter. Rather, consistent with the district court's specific

---

[6] An appeal in <u>United States v. Ng Chong Hwa</u>, No. 23-6333, is currently pending before the court.

25

limiting principle,[7] the government presented precise evidence that, by virtue of Mackey's location in Manhattan, the electronic transmissions associated with his deceptive messages did, in fact, pass through the EDNY en route to Twitter's servers.  This was an exact and definitive offer of proof, and one that would have been unavailable in any number of other venues, let alone in "every district."  (Br. 18 (emphasis in original)).

Mackey's call for restraint in laying venue rings hollow, for his indiscriminate dissemination of the deceptive materials in this case showed none.  The incongruity in this argument is hard to miss: by Mackey's logic, fraudsters can both exploit Twitter's awesome reach to instantly contact countless far-flung victims and benefit from that awesome reach by restrictively interpreting venue rules to avoid

---

[7]      In denying Mackey's pretrial motion, the district court specifically held it would not be sufficient for the government to "merely prove that the communication was 'likely to have passed through' the Eastern District."  (DE:54 at 19 n.9).  As noted above, the government proved as a matter of fact that the messages transited through the EDNY.

26

prosecution for far-flung injuries.[8]  The district court saw no basis to reward Mackey for the scope of his fraudulent ambition, and he identifies none on appeal.

And for good reason: in analogous cases involving use of the internet to commit wide-ranging harms, this Court has declined to absolve perpetrators of responsibility for their own use of mass electronic distribution to create venue in multiple places.  See United States v. Royer, 549 F.3d 886, 893, 895 (2d Cir. 2008) (finding the venue statute to "particular[ly] appl[y] where, as here, the use of modern communications facilities to execute a sophisticated criminal scheme inherently contemplates activities throughout many parts of the country . . . Indeed, the defendants, having concocted a scheme that . . . defrauded investors throughout the country, can hardly complain that their very modus operandi subjected them to prosecution in numerous districts, including the Eastern District of New York."); United States v. Rowe, 414 F.3d 271,

---

[8]    As noted above, Mackey's stated goal was to "'go viral' and 'trend.'"  (DE:174 at 4-5).  These terms only have meaning in the context of social media platforms like Twitter; they have special meaning for Mackey, who admits he was ranked among Twitter's most influential voices on the 2016 Presential Election.  (Br. 4).

279 (2d Cir. 2005) (finding venue in the Southern District of New York appropriate where defendant hosted child pornography in Kentucky but made it accessible everywhere, noting that "this crime occurred in any district in which the advertisement appeared; that is to say, anywhere where the Internet chat room was accessible and was actually accessed by anybody"). As in those cases, the touchstone is whether the essential acts of the conspiracy implicate the chosen district of prosecution, irrespective of whether the defendant, though his own actions, also rendered such prosecution possible in numerous additional venues.[9]

\* \* \*

Mackey failed to show that either the scope and applicability of § 241 or the propriety of venue in the EDNY presents a "substantial"

---

[9]     Mackey says the district court "simply ignored" the "substantial contacts" test. (Br. 19). It did not. (DE:54 at 16-17 (outlining "[t]he substantial contacts test in the Second Circuit"), 21 (discussing the applicability of the test to Mackey's case)). Instead, after careful consideration, it recognized that the "substantial contacts" test does not apply in conspiracy cases. (Id. (quoting United States v. Kirk Tang Yuk, 885 F.3d 57, 70 (2d Cir. 2018)). Yet, "as an additional check on fairness," the court applied the test anyway and found that the "two chief ills" against which the test meant to guard, namely, "bias and inconvenience," were "not substantially present in this case." (Id. at 21 (internal quotation marks omitted)).

question here. The district court was well within its discretion to reject Mackey's claims of novelty in favor of the clear weight of existing right-to-vote authority. And the court acted reasonably in declining Mackey's invitation to reexamine settled venue law based solely on Mackey's feigned concerns over Twitter's reach.

29

## CONCLUSION

For the reasons stated above, the Court should deny Mackey's

motion.

Dated:     Brooklyn, New York
           November 13, 2023

                                    Respectfully submitted,

                                    BREON PEACE,
                                    United States Attorney,
                                    Eastern District of New York.

                       By:  /s/_____
                                    ERIK D. PAULSEN,
                                    FRANK TURNER BUFORD,
                                    Assistant U.S. Attorneys


COREY R. AMUNDSON,              BREON PEACE,
Chief, Public Integrity Section United States Attorney,
United States Department of     Eastern District of New York
Justice                         271-A Cadman Plaza East
                                Brooklyn, New York 11201
                                (718) 254-7000

WILLIAM GULLOTTA,               ANTHONY BAGNUOLA,
Trial Attorney,                 FRANK TURNER BUFORD,
(Of Counsel).                   ERIK PAULSEN,
                                Assistant United States Attorneys,
                                (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because the brief contains 4,811 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Brooklyn, New York
   November 13, 2023

       /s/ ANTHONY BAGNUOLA
       ANTHONY BAGNUOLA
       Assistant U.S. Attorney

A P P E N D I X

## TABLE OF CONTENTS

Page

Trial Transcript Excerpt,
  United States v. Mackey, 21-CR-80 (AMD),
    Dated March 22, 2023 .................................................................GA 1

Trial Transcript Excerpt,
  United States v. Mackey, 21-CR-80 (AMD),
    Dated March 23, 2023 .................................................................GA 3

407

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                       21-CR-80(AMD)
 3   UNITED STATES OF AMERICA,
                                       United States Courthouse
 4                                     Brooklyn, New York

 5            -versus-                 March 22, 2023
                                       9:30 a.m.
 6   DOUGLASS MACKEY,

 7            Defendant.

 8   ------------------------------x

 9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE ANN M. DONNELLY
10               UNITED STATES DISTRICT JUDGE
                      BEFORE A JURY
11

12   APPEARANCES

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  ERIK PAULSON, ESQ.
                                   TURNER BUFORD, ESQ.
16                                 WILLIAM J. GULLOTTA, ESQ.
                              Assistant United States Attorneys
17


18
     For the Defendant:      BY:  ANDREW J. FRISCH, ESQ.
19                            40 Fulton Street
                              New York, New York 10030
20


21
     Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
22                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
23
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25
```

MICROCHIP - DIRECT - MR. GULLOTTA                483

1  A    Oh, yeah.

2  Q    Next to that there's an account WDFX2EU7.

3        Is that your -- was that one of your Twitter

4  accounts.

5  A    Oh, yeah, mm-mm.

6  Q    So you posted this tweet?

7  A    Yes, I did.

8  Q    Does this tweet contain any information about a

9  candidate?

10 A    No, nothing like that.

11 Q    Does it contain any information about a political issue?

12 A    No, not at all.

13 Q    So it's just information -- false information about how

14 to vote?

15 A    Yeah, just false information about how to vote.

16 Q    So why did you tweet this?

17 A    Because the hope would be that Hillary Clinton voters see

18 this and then vote incorrectly.

19        MR. GULLOTTA:   Can we show the witness Government's

20 Exhibit 400-45, please?  And if we can zoom in on the image.

21        (Exhibit published.)

22 BY MR. GULLOTTA:

23 Q    Okay.

24        Do you recognize this image Micro.

25 A    I do.  It's Aziz Ansari.

605

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        21-CR-80(AMD)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5            -versus-                   March 23, 2023
                                        9:30 a.m.
6   DOUGLASS MACKEY,

7            Defendant.

8   ------------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE ANN M. DONNELLY
10              UNITED STATES DISTRICT JUDGE
                       BEFORE A JURY
11

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  ERIK PAULSON, ESQ.
                                  TURNER BUFORD, ESQ.
16                                WILLIAM J. GULLOTTA, ESQ.
                             Assistant United States Attorneys
17

18
    For the Defendant:       BY:  ANDREW J. FRISCH, ESQ.
19                           40 Fulton Street
                             New York, New York 10030
20

21
    Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
22                           Phone:  718-613-2268
                             Email:  RivkaTeich@gmail.com
23
    Proceedings recorded by mechanical stenography.  Transcript
24  produced by computer-aided transcription.

25

D. MACKEY - DIRECT - MR. FRISCH                685

1   A    That doesn't mean anything, it's just random Latin words.

2   Q    You posted that, correct?

3   A    Yes.

4   Q    When you shared these, what would the affect have been if

5   sharing it with the avatar of the Bane mask with the MAGA cap?

6   A    Well, I don't see how anyone could possibly take that

7   seriously as voting --

8        MR. PAULSEN:  Objection, your Honor.

9        THE COURT:  Sustained.

10  BY MR. FRISCH:

11  Q    When you retweeted or shared this, did you anticipate

12  that the recipients would see the avatar?

13  A    Yes.

14  Q    Is it possible that they could not have seen the avatar?

15  A    No.

16  Q    Would there have been a way for this to be disseminated

17  further on the Internet or on Twitter without the avatar?

18  A    Someone would have to screenshot it, taking out the

19  avatar, or copy and paste it and post it elsewhere.

20  Q    At the time did you think that's would happen?

21  A    No.

22  Q    What about the hashtags on these two.  The one that says

23  #ImWithHer and #GoHillary, were they there when you saw them?

24  A    Were they there when I saw?

25  Q    When you saw these memes on 4chan with the hashtag, did

D. MACKEY - DIRECT - MR. FRISCH                    686

1    you put them on?

2    A    I put them on.

3    Q    Why?

4    A    The Hillary Clinton campaign is constantly monitoring

5    their hashtag.  If I put the hashtags on, then maybe they

6    would freak out about it, or they would have to spend time

7    dealing with it rather than focus on their campaign.

8    Q    The third one, you testified about this earlier.

9    A    Yes.

10   Q    Do you recall when you retweeted this one?

11   A    November 2.

12   Q    And this is different from the other two in the way that

13   you transmitted them; is that correct?

14   A    Yes, it was retweet.

15   Q    Do you see in the upper left it says: @TheRickyVaughn

16   thanks for spreading the word?

17   A    Yes, that's a mention.

18   Q    So explain again what you mean by, it's a mention?

19   A    It says @TheRickyVaughn, that's a mention.  So you get a

20   notification from Twitter that somebody has mentioned you in a

21   tweet.  And so you can do what you like once you see the

22   tweet.

23   Q    That's how you came to receive it, correct?

24   A    Yes.

25   Q    That is when you retweeted it, correct?