# 23-7577

## United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DOUGLASS MACKEY,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of New York
Case No. 21-cr-00080-AMD

## OPENING BRIEF OF DEFENDANT-APPELLANT DOUGLASS MACKEY

Eric S. Dreiband
Yaakov M. Roth
Joseph P. Falvey
Caleb P. Redmond
Harry S. Graver
JONES DAY
51 Louisiana Ave, N.W.
Washington DC 20001
(202) 879-3939

*Counsel for Defendant-Appellant
Douglass Mackey*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...............................................................................ii

INTRODUCTION ..............................................................................................1

JURISDICTIONAL STATEMENT ...................................................................3

STATEMENT OF ISSUES ................................................................................3

STATEMENT OF THE CASE ...........................................................................3

     A.    Mackey Blasts Hundreds of Political Tweets Each Day............................4

     B.    Mackey Finds and Tweets Publicly Available Memes Encouraging Clinton Supporters To Vote by Text Message.............................................4

     C.    The Government Prosecutes Mackey Under a Novel Theory.................7

     D.    A Deadlocked Jury Eventually Convicts......................................................9

STANDARD OF REVIEW ................................................................................9

SUMMARY OF ARGUMENT........................................................................10

ARGUMENT ....................................................................................................12

I.    MACKEY DID NOT VIOLATE § 241, LET ALONE "CLEARLY" DO SO ...................12

     A.    Section 241 Is Limited to Violations of "Clearly Established" Law.......13

     B.    Section 241 Has Never Been Applied to Political Misinformation .......15

     C.    Section 241 Does Not Criminalize Political Misinformation .................18

     D.    The First Amendment Forecloses the Government's Reading..............25

     E.    At Minimum, Mackey's Conduct Did Not "Clearly" Violate § 241 .......33

II.    THE GOVERNMENT PROSECUTED MACKEY IN AN IMPROPER VENUE.................35

     A.    The Government Failed To Prove "Essential Conduct" in EDNY ......36

# TABLE OF CONTENTS
(continued)

**Page**

B. The Government Also Failed To Prove "Substantial Contacts"
with EDNY ..................................................................................44

III. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT MACKEY CONSPIRED TO
INJURE VOTING RIGHTS ...............................................................47

 A. The Evidence Failed To Establish Mackey's Knowing Agreement .......47

 B. The District Court's Analysis Cannot Withstand Scrutiny......................51

CONCLUSION ....................................................................................52

CERTIFICATE OF COMPLIANCE................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*281 Care Comm. v. Arneson,*
766 F.3d 774 (8th Cir. 2014) ..........................................................................29

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
141 S. Ct. 2485 (2021) ...................................................................................24

*Anderson v. United States,*
417 U.S. 211 (1974) .......................................................................................16

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) .......................................................................................33

*Best Van Lines, Inc. v. Walker,*
490 F.3d 239 (2d Cir. 2007) ..........................................................................41

*Blessing v. Chandrasekhar,*
988 F.3d 889 (6th Cir. 2021) .........................................................................41

*Brnovich v. Democratic Nat'l Comm.,*
141 S. Ct. 2321 (2021) ...................................................................................23

*Brown v. City of New York,*
862 F.3d 182 (2d Cir. 2017) .................................................................... 15, 33

*Bush v. Gore,*
531 U.S. 98 (2000) .........................................................................................34

*Carpenter v. United States,*
138 S. Ct. 2206 (2018) ...................................................................................43

*Ciminelli v. United States,*
598 U.S. 306 (2023) .......................................................................................23

*City of Tahlequah v. Bond,*
595 U.S. 9 (2021) (per curiam) ................................................................ 14, 33

*Comm. v. Lucas,*
34 N.E.3d 1242 (Mass. 2015) ........................................................................29

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Connelly v. United States,*
79 F.2d 373 (3d Cir. 1935) ............................................................................ 17

*Crolich v. United States,*
196 F.2d 879 (5th Cir. 1952) ......................................................................... 17

*Cugini v. City of New York,*
941 F.3d 604 (2d Cir. 2019) .................................................................... 15, 17

*Dubin v. United States,*
599 U.S. 110 (2023) ....................................................................................... 23

*Ex Parte Yarbrough,*
110 U.S. 651 (1884) ....................................................................................... 15

*Felix v. United States,*
186 F. 685 (5th Cir. 1911) ............................................................................. 15

*Fields v. United States,*
228 F.2d 544 (4th Cir. 1955) ......................................................................... 17

*Gilbert v. Indeed, Inc.,*
513 F. Supp. 3d 374 (S.D.N.Y. 2021) ........................................................... 41

*Guinn v. United States,*
238 U.S. 347 (1915) ....................................................................................... 16

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995) ....................................................................................... 19

*Hammerschmidt v. United States,*
265 U.S. 182 (1924) ....................................................................................... 19

*Johnson v. TheHuffingtonPost.com, Inc.,*
21 F.4th 314 (5th Cir. 2021) .......................................................................... 41

*Jones v. United States,*
529 U.S. 848 (2000) ....................................................................................... 24

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Kelly v. United States*,
  140 S. Ct. 1565 (2020) ................................................................. 24

*Klein v. United States*,
  176 F.2d 184 (8th Cir. 1949) ........................................................ 17

*Ledford v. United States*,
  155 F.2d 574 (6th Cir. 1946) ........................................................ 17

*Little v. United States*,
  93 F.2d 401 (8th Cir. 1937) ..................................................... 17, 34

*Lyons v. Rienzi & Sons, Inc.*,
  856 F. Supp. 2d 501 (E.D.N.Y. 2012) ......................................... 41

*Malley v. Briggs*,
  475 U.S. 335 (1986) ...................................................................... 14

*McDonnell v. United States*,
  579 U.S. 550 (2016) ...................................................................... 24

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ................................................................ 27, 30

*McKenna v. United States*,
  127 F. 88 (6th Cir. 1904) ............................................................. 17

*McNally v. United States*,
  483 U.S. 350 (1987) ...................................................................... 24

*Minnesota Voters Alliance v. Mansky*,
  138 S. Ct. 1876 (2018) ................................................................. 32

*Mullenix v. Luna*,
  577 U.S. 7 (2015) (per curiam) ................................................ 14, 33

*Murray v. UBS Sec., LLC*,
  43 F.4th 254 (2d Cir. 2022) ......................................................... 46

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Percoco v. United States,*
598 U.S. 319 (2023) ................................................................... 46

*Pereida v. Wilkinson,*
141 S. Ct. 754 (2021) ................................................................ 39

*Plumhoff v. Rickard,*
572 U.S. 765 (2014) .................................................................. 14

*Prichard v. United States,*
181 F.2d 326 (6th Cir. 1950) ..................................................... 17

*Reynolds v. Sims,*
377 U.S. 533 (1964) .................................................................. 16

*Rickert v. State Pub. Disclosure Comm'n,*
168 P.3d 826 (Wash. 2007) ....................................................... 29

*Rivas-Villegas v. Cortesluna,*
595 U.S. 1 (2021) (per curiam) .................................................. 14

*Russello v. United States,*
464 U.S. 16 (1983) .................................................................... 19

*Ryan v. United States,*
99 F.2d 864 (8th Cir. 1938) ....................................................... 17

*Shannabarger v. United States,*
99 F.2d 957 (8th Cir. 1938) ....................................................... 17

*Smith v. United States,*
599 U.S. 236 (2023) ............................................................ 31, 35

*Susan B. Anthony List v. Driehaus,*
814 F.3d 466 (6th Cir. 2016) ..................................................... 29

*Talley v. California,*
362 U.S. 60 (1960) .................................................................... 30

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Travis v. United States,*
364 U.S. 631 (1961) ...............................................................................35

*Twitter, Inc. v. Taamneh,*
598 U.S. 471 (2023) ................................................................................4

*United States v. Acosta,*
470 F.3d 132 (2d Cir. 2006) (per curiam)...............................................19

*United States v. Alvarez,*
567 U.S. 709 (2012) .......................................................................*passim*

*United States v. Auernheimer,*
748 F.3d 525 (3d Cir. 2014) ................................................ 41, 43, 44, 45

*United States v. Barker,*
514 F.2d 1077 (7th Cir. 1975) ...............................................................17

*United States v. Bathgate,*
246 U.S. 220 (1918) .................................................................16, 20, 21

*United States v. Bradberry,*
517 F.2d 498 (7th Cir. 1975) .................................................................17

*United States v. Brennan,*
183 F.3d 139 (2d Cir. 1999) ...................................................39, 40, 41

*United States v. Brock,*
789 F.3d 60 (2d Cir. 2015)........................................................................9

*United States v. Brown,*
293 F. App'x 826 (2d Cir. 2008) (unpub.) .......................................42, 43

*United States v. Bryant,*
516 F.2d 307 (7th Cir. 1975)..................................................................17

*United States v. Butler,*
25 F. Cas. 213 (D.S.C. 1877)..................................................................15

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Calonge*,
74 F.4th 31 (2d Cir. 2023) ............................................... 43

*United States v. Classic*,
313 U.S. 299 (1941) ..................................................... 16, 34

*United States v. Davis*,
689 F.3d 179 (2d Cir. 2012) ......................................... 44, 45

*United States v. DeFilippo*,
No. 3:21-CR-128, 2023 WL 5000385 (D. Conn. Aug. 4, 2023) ................................ 34

*United States v. DeLaurentis*,
491 F.2d 208 (2d Cir. 1974) ............................................ 24

*United States v. Epskamp*,
832 F.3d 154 (2d Cir. 2016) .............................................. 9

*United States v. Fontana*,
231 F.2d 807 (3d Cir. 1956) ............................................. 17

*United States v. Fortenberry*,
No. 22-50144, 2023 WL 8885105 (9th Cir. Dec. 26, 2023) ................... 39, 40, 41, 42

*United States v. Gilboe*,
684 F.2d 235 (2d Cir. 1982) ........................................ 42, 43

*United States v. Gradwell*,
243 U.S. 476 (1917) ..................................................... 16, 20

*United States v. Hansen*,
599 U.S. 762 (2023) ...................................................... 13

*United States v. Haynes*,
1992 WL 296782 (6th Cir. Oct. 15, 1992) ........................ 17

*United States v. Howard*,
774 F.2d 838 (7th Cir. 1985) ........................................... 17

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Jang,*
  No. 1:07-cr-52, 2007 WL 4616927 (S.D. Ind. Dec. 27, 2007) .................................41

*United States v. Johnson,*
  323 U.S. 273 (1944) ........................................................................ 35, 36

*United States v. Kenner,*
  No. 13-CR-607, 2019 WL 6498699 (E.D.N.Y. Dec. 3, 2019) ...................................42

*United States v. Kim,*
  246 F.3d 186 (2d Cir. 2001) ...............................................................42

*United States v. Kirk Tang Yuk,*
  885 F.3d 57 (2d Cir. 2018)..........................................................*passim*

*United States v. Lange,*
  834 F.3d 58 (2d Cir. 2016)...............................................................35, 42

*United States v. Lanier,*
  520 U.S. 259 (1997) ...............................................................13, 14, 24, 33

*United States v. Miller,*
  808 F.3d 607 (2d Cir. 2015) ......................................................35, 36, 40, 45

*United States v. Morado,*
  454 F.2d 167 (5th Cir. 1972) ...............................................................17

*United States v. Morgan,*
  393 F.3d 192 (D.C. Cir. 2004) .............................................................40

*United States v. Morrison,*
  529 U.S. 598 (2000) ........................................................................34

*United States v. Mosley,*
  238 U.S. 383 (1915) ........................................................................21

*United States v. Naranjo,*
  14 F.3d 145 (2d Cir. 1994)...............................................................42

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Ng Chong Hwa,*
No. 18-CR-538, 2021 WL 11723583 (E.D.N.Y. Sept. 10, 2021) .............................42

*United States v. Nusraty,*
867 F.2d 759 (2d Cir. 1989) ...........................................................47, 50, 51

*United States v. Olinger,*
759 F.2d 1293 (7th Cir. 1985) ...............................................................17

*United States v. Price,*
383 U.S. 787 (1966) ...........................................................................34

*United States v. Provoo,*
215 F.2d 531 (2d Cir. 1954) ..................................................................40

*United States v. Purcell,*
967 F.3d 159 (2d Cir. 2020) .............................................................. 38, 43

*United States v. Ramirez,*
420 F.3d 134 (2d Cir. 2005) ..........................................................*passim*

*United States v. Randell,*
761 F.2d 122 (2d Cir. 1985) ..................................................................33

*United States v. Robinson,*
813 F.3d 251 (6th Cir. 2016) .................................................................16

*United States v. Rommy,*
506 F.3d 108 (2d Cir. 2007) ..................................................................42

*United States v. Rowe,*
414 F.3d 271 (2d Cir. 2005) ..................................................................42

*United States v. Royer,*
549 F.3d 886 (2d Cir. 2008) ..........................................................36, 37, 42

*United States v. Rutigliano,*
790 F.3d 389 (2d Cir. 2015) .............................................................. 42, 43

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Saavedra,*
   223 F.3d 85 (2d Cir. 2000)..........................................................40, 45

*United States v. Salinas,*
   373 F.3d 161 (1st Cir. 2004).......................................................39, 40

*United States v. Saylor,*
   322 U.S. 385 (1944).........................................................................16

*United States v. Stevens,*
   559 U.S. 460 (2010).........................................................................30

*United States v. Stone,*
   188 F. 836 (D. Md. 1911)................................................................18

*United States v. Thompson,*
   No. 6:09–16, 2013 WL 5528827 (E.D. Ky. Oct. 4, 2013)...........28

*United States v. Tobin,*
   No. 04–CR–216, 2005 WL 3199672 (D. N.H. Nov. 30, 2005)......18

*United States v. Townsley,*
   843 F.2d 1070 (8th Cir. 1988).........................................................17

*United States v. Valle,*
   807 F.3d 508 (2d Cir. 2015) ...............................................47, 50, 51

*United States v. Vernace,*
   811 F.3d 609 (2d Cir. 2016) ...........................................................50

*United States v. Weston,*
   417 F.2d 181 (4th Cir. 1969) ..........................................................17

*United States v. Young,*
   745 F.2d 733 (2d Cir. 1984) ...........................................................47

*Utility Air Regulatory Grp. v. EPA,*
   572 U.S. 302 (2014).........................................................................24

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Walker v. United States,*
    93 F.2d 383 (8th Cir. 1937) ........................................................ 17, 34

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) .....................................................................24

*White v. Pauly,*
    580 U.S. 73 (2017) (per curiam) .............................................. 14, 33

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. amend. I ................................................................*passim*

U.S. Const. amend. II ......................................................................23

U.S. Const. amend. XIV ...................................................................35

U.S. Const. amend. XV ....................................................................35

18 U.S.C. § 241.........................................................................*passim*

18 U.S.C. § 3237 ....................................................... 34, 38, 39, 43

28 U.S.C. § 1291 .............................................................................3

Deceptive Practices and Voter Intimidation Act,
    109th Cong. S. 1975 (2005)...........................................................22
    110th Cong. S. 453 (2007)..............................................................22
    117th Cong. S. 1840 (2021)............................................................22

Enforcement Act of 1870,
    16 Stat. 140 (1870) ...................................................................*passim*

Minn. Stat. § 204C.035 (2021) ......................................................30

14 Stat. 471 (1867) .........................................................................19

17 Stat. 323 (1872) .........................................................................19

28 Stat. 36 (1894) ...........................................................................20

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

Stolen Valor Act,
  18 U.S.C. § 704...................................................................................25, 27, 30

**OTHER AUTHORITIES**

David S. Aria & Evan Ringel, *First Amendment Limits on State Laws Targeting Election Misinformation*, 20 First Amend. L. Rev. 291 (2022).........................30

Fed. R. Crim. P. 18...........................................................................................35

Richard L. Hasen, *A Constitutional Right to Lie in Campaigns and Elections?*, 74 Mont. L. Rev. 53 (2013) ............................................................................30

Hr'g Before Sen. Jud. Comm. on S.453, S. Hrg. 110-277 (June 7, 2007) ......................22

Michael T. Morley, *The Enforcement Act of 1870, Federal Jurisdiction Over Election Contests, and the Political Question Doctrine*, 72 FLA. L. REV. 1153 (2020) ............................................................................15

S. 453, Rep. No. 110-191 (Oct. 4, 2007) ............................................................22

*Webster's Dictionary* (1828)..............................................................................18, 19

# INTRODUCTION

For years, Congress has debated, as a matter of policy, whether to criminalize the spread of political or electoral misinformation. And scholars have debated, as a matter of constitutional law, whether such a prohibition would withstand scrutiny under the First Amendment. Those are hard questions. This case asks whether Congress *already* criminalized this conduct (and much more) 150 years ago. That is an easy question. As even proponents of new legislation have openly admitted, such speech is not currently a federal offense.

The statute at issue, 18 U.S.C. § 241, forbids conspiracies "to injure, oppress, threaten, or intimidate" anyone in the "free exercise or enjoyment" of any federal right. Part of the Enforcement Act of 1870, that statute has always been understood in the voting context to prohibit *coercion* (like assaulting or threatening voters) and *ballot-box fraud* (like shredding or stuffing ballots). Until this case, it was never deployed against mere *deceptive speech*, even though misinformation has been endemic in our politics since the Founding. Reading § 241 to sweep in speech that deceives voters would, atop many other problems, render it grotesquely overbroad under the First Amendment—exactly how the Supreme Court recently cautioned *not* to construe criminal statutes. And if all that were not enough, prosecutions under § 241 are limited to "clearly established" violations—the same demanding standard that governs qualified immunity. That means the real question is whether § 241 *clearly* criminalizes voting misinformation. To ask that question is to answer it.

And that answer requires reversal. Douglass Mackey was convicted of one count under § 241 for posting on Twitter, in the days preceding the 2016 presidential election, two "meme" images falsely suggesting that supporters of Hillary Clinton could vote by text message. Mackey testified that he posted the memes to garner media attention, and there is no evidence that anyone failed to cast a proper vote because of his tweets. But a deadlocked jury eventually convicted, and now—for the first time in U.S. history—a citizen has been sentenced to prison for spreading political misinformation. This Court should reverse, because the conviction rests on an untenable interpretation of § 241, at odds with text, history, precedent, canons, and constitutional limits. Title 18 has not secretly harbored a political speech code since the Civil War—and certainly has not *clearly* done so.

Reversal is independently required because venue for this offense did not lie in the Eastern District of New York (EDNY). It is undisputed that neither Mackey nor any of his alleged co-conspirators lived, tweeted, or took any other action in EDNY. Rather, the Government and lower court premised venue solely on the basis that internet data associated with Mackey's tweets briefly traversed EDNY waters or airspace en route to Twitter's servers and the rest of the country. But that theory would allow the Government to prosecute this offense and many others *anywhere*. This Court has never upheld criminal venue on such a boundless and ephemeral basis, and courts routinely reject such theories in the analogous civil context of personal jurisdiction.

Finally, the Government did not adduce any evidence that Mackey's tweets were in furtherance of a criminal conspiracy. While the indictment alleged that he conspired with members of Twitter chat groups, the evidence was undisputed that he found the memes on an internet message board and posted them without coordination. Even if the tweets could be characterized as "injuring" citizens in the exercise of their right to vote, Mackey was not part of any conspiracy and therefore did not violate § 241.

## JURISDICTIONAL STATEMENT

The district court entered final judgment on October 25, 2023. SA109. Mackey noticed an appeal the same day. A380. 28 U.S.C. § 1291 confers jurisdiction.

## STATEMENT OF ISSUES

**1.** Whether a private citizen commits a "clearly established" violation of 18 U.S.C. § 241 by spreading misinformation about how to vote.

**2.** Whether criminal venue for a conspiracy offense can be premised solely on the travel of "internet data" across a district's waters or airspace.

**3.** Whether the evidence was sufficient to allow a jury to find the existence of a criminal conspiracy beyond a reasonable doubt.

## STATEMENT OF THE CASE

This appeal arises from a criminal prosecution. Following a jury verdict, Judge Ann Donnelly (EDNY) denied post-trial relief, sentenced Mackey to seven months in prison, and entered final judgment. SA57, 109-10. This Court ordered that Mackey be released on bond pending appeal. Mot. Order (Dec. 4, 2023).

### A. Mackey Blasts Hundreds of Political Tweets Each Day.

Twitter (now "X") is a social-media platform that allows members of the public to create an account and post short messages ("tweets"). Users create a username, provide a profile picture ("avatar"), and are given a webpage ("timeline") associated with their account. Users can tweet or retweet content in the form of character-limited messages, pictures, images, "memes," or videos that appear in their timeline. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 480 (2023). By default, Twitter timelines are visible to everyone with internet access, including those without accounts. A124.

Mackey became influential on Twitter for prolific election-related tweets during 2014 and 2016, when he sent "hundreds of thousands" of tweets. A160-61. As a self-described "troll," A286, Mackey sought to "distract" from real political issues with edgy, humorous, or offensive content. A162; *see also, e.g.*, A174, 297-98. In keeping with his flippant tweets, Mackey's Twitter account adopted the fictitious name and avatar of Ricky Vaughn, Charlie Sheen's character in the movie "Major League." His avatar wore a "Make America Great Again" cap. A372.

### B. Mackey Finds and Tweets Publicly Available Memes Encouraging Clinton Supporters To Vote by Text Message.

Weeks before the 2016 election, the Clinton campaign observed memes with voting misinformation that had been posted and shared on political messaging boards, including a publicly accessible, online board known as 4chan. These included memes claiming voters could vote by texting "Hillary" to 59925. *See* A115.

4

On October 29, 2016, the Clinton campaign attempted to ascertain the company that controlled the 59925 number. A97, 104-06, 112. By November 2, 2016, that company created an auto-response message to explain that the ad was not associated with Hillary's campaign. SA69-70.

After the campaign had already begun to respond to the vote-by-text memes, Mackey also noticed them. On November 1 and 2, 2016, while in Manhattan, Mackey pulled and tweeted two memes from 4chan. A153. One contained a picture of a Black woman and urged Clinton supporters to vote by texting "Hillary" to 59925. The other included a picture of a Hispanic woman and the same directions in Spanish:



A371-73. Mackey also retweeted a third, similar meme after one of his followers— whose Twitter handle was @nia4_trump—publicly tagged him. A373.

Although no one asked Mackey to post these memes, coordinated with him, or privately sent them to him, the topic was discussed by other members of one of several dozen Twitter chat groups Mackey had joined, known as "the War Room." A313, 160. The War Room was dedicated to using "counter-messaging" to undermine the Clinton campaign. A301-03, 306. By late October, however, it had become cluttered with 600 messages per day, so Mackey "muted" it to avoid notifications. A168, 172-73, 165 ("would have been [reading] all day" to keep abreast of messages); *see also* A296. Mackey testified without contradiction that he did not see the group's discussion about voting misinformation, A155, and the group messages do not reveal any comments from (or even alluding to) Mackey on the topic.

After Mackey tweeted the memes, CNN and other media outlets picked up the story. A174-75. Mackey touted his trolling success, exclaiming he had "haphazardly post[ed]" a meme that wound up on television. A295. Others were less enthusiastic, and Mackey's Twitter account was suspended on November 2, which made his tweets unviewable. *See* A318.

Yet voting misinformation continued to circulate. After Mackey's suspension, the number of "Hillary" texts sent to 59925 jumped from about 75 to around 5,600. A116-18. More than 98% of those messages triggered an automatic response that the ad was not associated with Clinton's campaign. A192. There is no evidence that anyone, anywhere, failed to properly vote on account of Mackey's tweets.

### C.     The Government Prosecutes Mackey Under a Novel Theory.

In January 2021—two days after President Biden's inauguration but more than four years after the tweets—the Government filed a complaint and affidavit in support of an arrest warrant.  ECF 1.  Eight to ten officers then arrested Mackey.  A149-50.  An EDNY grand jury charged him with one count of violating 18 U.S.C. § 241.  A27.  The indictment alleged that he conspired to "injure, oppress, threaten, and intimidate" persons in the exercise of their right to vote.  *Id.*

Mackey moved to dismiss the indictment.  He argued that he lacked fair warning that his conduct violated § 241, which had never been applied to voting misinformation over its 150-year history.  *See* ECF 43-1 at 13-28.  Mackey also argued that venue was not proper in EDNY because his conduct neither occurred in the district nor bore any substantial contact with it.  *See id.* at 6-12.

Judge Nicholas Garaufis denied the motion.  As for § 241, he held that the statute reached all acts to *impede* voting—including false speech to deceive about the time, place, and manner of an election.  SA32-33.  As to venue, Judge Garaufis acknowledged that the Southern District of New York—where Mackey had lived and tweeted—was "the most obvious place for venue."  SA21.  But the court ruled that venue would be proper in EDNY if the Government proved that Mackey's tweets were "received" or "viewed" in the district, or that electronic data underlying the tweets "passed through" it.  SA17-21.  The court held that the requirement to prove "substantial contacts" with the forum did "not apply in this context."  SA21.

Judge Donnelly presided over the trial because Judge Garaufis became ill. A79. The Government relied mainly on tweets and messages. Some showed that Mackey thought the election would be close, held offensive views, and suspected that minority turnout could prove decisive. *See* SA106. None revealed any comments from Mackey about tricking Clinton supporters out of their right to vote. Nor was there any evidence of Mackey discussing the memes before posting them.

The Government's star witness, known to the jury only by his online sobriquet "Microchip," was another Twitter troll who pled guilty to violating § 241. A145. During the FBI investigation, Microchip denied any "grand plan" to stop anyone from voting and told investigators his own tweets were intended as jokes. A144, 146-47. At trial, however, Microchip told the jury that all members of the War Room had implicitly agreed to work together "to craft memes and tweets and strategies" opposing Clinton's campaign, and thereby had made "kind of like a silent agreement" to mislead voters. A138. There was no evidence that Microchip had ever met Mackey, spoke with him by phone, directly messaged him, or otherwise entered any agreement with him.

Mackey testified in his defense. In addition to reiterating that he did not live, work, or post anything online in EDNY during the conspiracy period, A158-59, Mackey explained—without contradiction—that he had pulled the memes from 4chan and did not recall seeing any discussion in the War Room about the topic, A153, 155. He testified that he did not think anyone would be fooled by the images, but posted them to distract the Clinton campaign and generate media attention. A167.

### D.     A Deadlocked Jury Eventually Convicts.

On March 27, 2023, the jury began its deliberations.  At the end of the following day, the jury told the court it had "completed" deliberations and had "not … reached a unanimous decision."  A269.  The court urged the jury to continue its deliberations and recessed for the night.  A271.  The next day, the jury repeated that it "cannot reach a unanimous decision."  A273.  Mackey moved for a mistrial, but the court instead told the jury again to continue deliberating.  A275-77.  Only thereafter did the jury convict.

Moving for post-trial relief, Mackey argued that spreading misinformation was not clearly proscribed by § 241; venue was improper in EDNY; and the Government failed to prove he had entered a conspiracy.  ECF 135.  Judge Donnelly denied relief, mostly by treating Judge Garaufis's motion-to-dismiss order as "law of the case."  SA99.  She sentenced Mackey to seven months in prison and denied release pending appeal.  SA110.  Mackey timely appealed.  A380.  And this Court granted release pending appeal, recognizing the "substantial" questions presented.  Mot. Order (Dec. 4, 2023).

## STANDARD OF REVIEW

This Court reviews *de novo* whether the evidence is legally sufficient to satisfy the offense elements, *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015), as well as any issues of "statutory interpretation" underlying the challenge, *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016).  This Court also reviews *de novo* whether the evidence supports venue.  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018).

## SUMMARY OF ARGUMENT

**I.**     The Government is trying to put Mackey in prison for tweeting two deceptive memes about how to vote, on the theory that any false speech that "hampers" voting violates the Enforcement Act of 1870.  This is unprecedented, and lawless.  Consistent with its text and history, § 241 has never been employed to criminalize political misinformation, despite the practice's ubiquity.  Instead, § 241 has always been understood in the voting context as reaching coercion (*e.g.*, threatening voters) and ballot-box fraud (*e.g.*, burning ballots).  But no further—*especially* not into the domain of speech and deceit.  Indeed, to reach Mackey's tweets, the Government presses a reading of § 241 that would necessarily criminalize not only lies about *how* to vote, but also lies about also *whether* and *for whom* to vote.  Such a sprawling political speech code is in the teeth of every applicable canon for reading criminal laws, and grossly offends the First Amendment.  Even the proponents of legislation proscribing false speech like that here admit that current federal law does not cover voting-related misinformation, and that any such statute would need to be carefully drawn and assiduously tailored to satisfy the First Amendment.  Section 241 is not that.

Even if the outer bounds of § 241 could present hard questions, whether this conviction may stand is easy.  Section 241 only permits criminal prosecution for "clearly established" violations of law—the same demanding standard that governs qualified immunity.  And there is no serious argument that, in 2016, federal law *clearly* outlawed political misinformation.  That alone compels reversal.

**II.**    Mackey's conviction must independently be set aside, because venue was improper in EDNY.  The Government premised venue exclusively on the fact that internet data associated with Mackey's tweets briefly crossed EDNY waters or airspace on its way to the broader internet.  Really, that is it; all agree neither Mackey nor any of his alleged co-conspirators did anything else in the district.  But this theory would allow for trial in *any district* that has internet.  And a venue theory that is indifferent between Brooklyn, NY and Brooklyn, WI makes a hash of this core constitutional protection.  Unsurprisingly, this Court has never upheld criminal venue on such a threadbare basis.  And in analogous contexts, courts have turned back such nationwide theories.  The same should obtain here.  The Government failed to prove that any "essential conduct" took place in EDNY, or even that there were any "substantial contacts" with the forum—at least if those terms are going to have any independent meaning in the context of crimes involving the internet.

**III.**    Even placing these threshold legal defects to the side, the evidence at trial was insufficient to sustain conviction.  Section 241 proscribes *conspiracies* to injure anyone in the exercise of a federal right.  But here, the record failed to reveal any proof that Mackey coordinated his memes with others, or entered any agreement to violate federal law.  At most, the Government adduced evidence suggesting that other Twitter trolls proximate to Mackey may have colluded with one another.  Guilt by association may prove effective at trial, but is paradigmatically insufficient as a matter of law.

11

## ARGUMENT

### I.     MACKEY DID NOT VIOLATE § 241, LET ALONE "CLEARLY" DO SO.

Some have pushed for new laws to combat political or voting misinformation, and Congress has considered legislation to do so.  But even proponents of those efforts admit that, under current law, "it is not a Federal crime to disenfranchise voters by deception."  Hr'g Before Sen. Jud. Comm. on S.453, S. Hrg. 110-277 (June 7, 2007) (Sen. Schumer).  Here, however, prosecutors purported to find a ban on election misinformation in a 150-year-old statute to combat KKK violence.  Section 241 outlaws conspiracies to "injure, oppress, threaten, or intimidate" anyone in the exercise of a federal right.  Relying solely on the verb "injure," the Government (but tellingly, not DOJ's Civil Rights Division) prosecuted Mackey on the theory that deceptive speech "injures" others in the free exercise of the right to vote, because it "impedes" their exercise of that right.  ECF 97 at 11.

On that breathtaking interpretation, § 241 forbids lies not only about *how* to vote, but also *whether* to vote and *for whom* to vote.  That is as unjustified as it is unprecedented.  Section 241 does not give the Government a roving license to criminalize political misinformation.  Consistent with its text and history, § 241 has never been used in the voting context beyond coercive acts (*e.g.*, violence) or ballot-box fraud (*e.g.*, burning ballots).  Every tool of statutory interpretation counsels against a broader reading.  And the First Amendment seals the deal, because extending the statute to deceptive speech would render it grossly unconstitutional.

Just last Term, the Supreme Court provided a roadmap for resolving this case. In *United States v. Hansen*, the Court considered a federal law that forbids "encourag[ing] or induc[ing]" illegal immigration. 599 U.S. 762, 770-71 (2023). The question was whether to construe those verbs broadly (picking up a huge swath of regular speech), or more modestly (covering only traditionally criminal acts of solicitation or facilitation). Citing statutory history, canons of construction, and constitutional avoidance, the Court adopted the narrower reading, and refused to set the statute on a path toward "constitutional collision." *Id.* at 781. Here too, the question is whether to read § 241's verb "injure" broadly to encompass deceit, or more modestly in line with its history. And here too, turning the statute into a sprawling speech code would put it on a direct collision course with the First Amendment. *Hansen* instructs not to do that.

If anything, this is a far easier case, because the Supreme Court has limited § 241 to "clearly established" violations. If nothing else, the Government's unprecedented construction is certainly not that.

### A. Section 241 Is Limited to Violations of "Clearly Established" Law.

It is a crime to conspire to "injure, oppress, threaten, or intimidate any person" in the "free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." 18 U.S.C. § 241. Since § 241 does not state "specific conduct it forbids"—but instead only references the "exercise or enjoyment" of federal rights generally—it fails to "delineate the range of forbidden conduct with particularity." *United States v. Lanier*, 520 U.S. 259, 265 (1997).

In the criminal context, that ordinarily renders a statute void for vagueness. But to avoid that result, the Court "limited" § 241's "coverage" to "rights fairly warned of," meaning those "clearly established" at the time of the conduct. *Id.* at 267, 270-71. This is the same exacting standard that governs qualified immunity. *Id.* at 270-71.

Federal law is "clearly established" only if "every reasonable [defendant] would have understood" his conduct to be proscribed. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). Meaning, what must be "clearly established" is the "violative nature of [his] *particular* conduct." *Id.* (emphasis added); *see also Lanier*, 520 U.S. at 270.

The Supreme Court has repeatedly reversed when courts evaluated conduct at "a high level of generality," rather than asking if "any reasonable official ... would have understood that he was violating" the law. *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014).[1] If a case "presents a unique set of facts," that "alone should [be] an important indication ... that [the] conduct did not violate a 'clearly established' right." *White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam). And absent an "obvious" violation, the Government "must identify a case" providing "notice" that the "specific conduct was unlawful." *Rivas-Villegas*, 595 U.S. at 6. This protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[1] *See also, e.g.*, *City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021) (per curiam); *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam); *Mullenix*, 577 U.S. at 12.

14

This Court has taken these lessons to heart. "Controlling authority" must have placed it "beyond debate" that the "particular" conduct violated federal law. *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017). If the law is not pellucid once "particularized to the facts of the case," no sanction may follow. *Cugini v. City of New York*, 941 F.3d 604, 615-16 (2d Cir. 2019).

### B.     Section 241 Has Never Been Applied to Political Misinformation.

This case involves political misinformation: deceptive speech intended to affect whether or how people vote. For better or worse, such speech is nothing new. But the decision to prosecute deceptive speech is without precedent in § 241's 150-year history, as the Government openly admitted at oral argument on the bond motion. Section 241 has been applied in the voting context only to two distinct categories of conduct: Coercive acts and ballot-box fraud.

**1.**     The Enforcement Act of 1870, from which § 241 derives, was enacted to protect blacks from "increasing violence" from groups like the KKK, "particularly with regard to the exercise of voting rights." Michael T. Morley, *The Enforcement Act of 1870, Federal Jurisdiction Over Election Contests, and the Political Question Doctrine*, 72 FLA. L. REV. 1153, 1159 & n.34 (2020). Consistent with this focus on the "security of life and limb to the voter," *Ex Parte Yarbrough*, 110 U.S. 651, 661 (1884), the first § 241 prosecution in the voting sphere involved election officials who conspired to kill a black man because he was going to vote for a Republican, *United States v. Butler*, 25 F. Cas. 213, 220 (D.S.C. 1877); *see also Felix v. United States*, 186 F. 685, 687 (5th Cir. 1911).

15

Even today, coercive acts to influence voting remain the heart of § 241. *See, e.g.*, *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016) ("[Defendant] … coerced and threatened voters to get them to vote for her by absentee ballot.").

Starting in 1915, the Supreme Court decided a set of cases that extended § 241 to ballot manipulation that operates to "deny or restrict" the right to vote. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). But those decisions were not without bound. Even then, the Court stressed that § 241 does not reach *everything* "supposed[ly] injurious[] to … [the] freedom, honesty, or integrity of an election," *United States v. Bathgate*, 246 U.S. 220, 226 (1918), or give the Government broad license to "stretch[] old statutes to new uses, to which they are not adapted and for which they were not intended," *United States v. Gradwell*, 243 U.S. 476, 488-89 (1917).

Rather, the Court read § 241 to embrace a confined set of conspiracies by public officials to deny, destroy, or dilute the right to vote through *ballot-box fraud*—*e.g.*, stuffing ballot boxes, *United States v. Saylor*, 322 U.S. 385, 386 (1944); casting fictitious ballots, *Anderson v. United States,* 417 U.S. 211, 215 (1974); disqualifying voters on illegal grounds, *Guinn v. United States*, 238 U.S. 347, 365 (1915); and refusing to count valid ballots, *United States v. Classic*, 313 U.S. 299, 308 (1941). The Court thus read § 241 to cover impairing the right to vote through classic acts of electoral fraud, reasoning that the right amounts to nothing if officials refuse to accept the ballot, destroy it after it is cast, or nullify its force by overwhelming the count with fake ballots.

16

The Courts of Appeals, likewise, have applied § 241 to proscribe conspiracies to falsify voting results or directly interfere with the balloting process.[2] That is all.

**2.** In this case, the Government seeks for the first time to expand § 241 well beyond these two categories—beyond coercion or ballot manipulation, to reach speech that *deceives voters* about the right. It cannot identify a single historical example of § 241 ever being used to prosecute any sort of political misinformation before.

Although the Government has pointed to two district court cases, decided 100 years apart, neither supports it. At the outset, district court cases cannot generate clearly established law; only Supreme Court precedent, Second Circuit precedent, or, at times, a "robust consensus" of appellate precedent can dictate "clearly established" law. *Cugini*, 941 F.3d at 615.

---

[2] *See United States v. Townsley*, 843 F.2d 1070, 1073-75 (8th Cir. 1988) (destroying ballots); *Connelly v. United States*, 79 F.2d 373, 374 (3d Cir. 1935) (same); *United States v. Haynes*, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992) (destroying voter registrations); *McKenna v. United States*, 127 F. 88, 90 (6th Cir. 1904) (refusing to open polling locations); *United States v. Bryant*, 516 F.2d 307, 308 (7th Cir. 1975) (stuffing ballot boxes); *United States v. Barker*, 514 F.2d 1077, 1079 (7th Cir. 1975) (same); *Prichard v. United States*, 181 F.2d 326, 328 (6th Cir. 1950) (same); *Ledford v. United States*, 155 F.2d 574, 575 (6th Cir. 1946) (same); *Shannabarger v. United States*, 99 F.2d 957, 958 (8th Cir. 1938) (same); *Little v. United States*, 93 F.2d 401, 404 (8th Cir. 1937) (same); *United States v. Bradberry*, 517 F.2d 498, 499-500 (7th Cir. 1975) (same); *United States v. Fontana*, 231 F.2d 807, 808-09 (3d Cir. 1956) (same); *United States v. Howard*, 774 F.2d 838, 840 (7th Cir. 1985) (casting fake ballots); *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952) (same); *Klein v. United States*, 176 F.2d 184, 185 (8th Cir. 1949) (same); *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972) (casting absentee ballots in others' names); *United States v. Weston*, 417 F.2d 181, 182-85 (4th Cir. 1969) (same); *Fields v. United States*, 228 F.2d 544, 548 (4th Cir. 1955) (same); *United States v. Olinger*, 759 F.2d 1293, 1297 (7th Cir. 1985) (failing to count valid ballots); *Ryan v. United States*, 99 F.2d 864, 866 (8th Cir. 1938) (same); *Walker v. United States*, 93 F.2d 383, 386, 395 (8th Cir. 1937) (same).

Regardless, even the Government's "best" cases are far afield. Neither involved pure speech or political misinformation; instead, both involved slightly more creative ways to *physically* interfere with voting. In *United States v. Stone*, county officials prepared doctored ballots that made it "difficult" or "impossible" for illiterate voters to vote for anyone but the Democrat. 188 F. 836, 838 (D. Md. 1911). In *United States v. Tobin*—a case literally never cited until the district court here—a political operative sought to jam telephone lines in an effort to prevent the opposing party from being able to transport voters to the polls. No. 04–CR–216, 2005 WL 3199672, at *1 (D. N.H. Nov. 30, 2005) (denying motion to dismiss). Notably, the jury later *acquitted* him. *See* SA30.

In short, never before has § 241 been used to prosecute political misinformation of any kind. Whatever else might be said of this case, it is the first and only of its class.

## C. Section 241 Does Not Criminalize Political Misinformation.

Mackey is not the first citizen since the Civil War to spread misinformation about voting rights. Rather, this prosecution is novel because the Enforcement Act of 1870 simply does not harbor a political speech code.

**1.** Start with its text. Section 241 proscribes conspiracies to "injure, oppress, threaten, or intimidate" anyone in the free exercise of federal rights. The Government agrees the operative word here is "injure." SA34. But "injure" does not naturally cover harms imposed by *deception*; it typically connotes a *coercive* act. *Compare Webster's Dictionary* 6914 (1828) (Injure: "To hurt or wound"), *with id.* at 4261 (Deceive: "To mislead the mind").

Especially so once "injure" is read alongside the other verbs in the statute—as it must be under the *noscitur a sociis* canon, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). The neighboring verbs on § 241's list are "oppress," "threaten," and "intimidate." All of those verbs connote coercion, too. *See Webster's Dictionary* 8345 (1828) (Oppress: "To overpower"); *id.* at 11552 (Threaten: "To menace"); *id.* at 7035 (Intimidate: "To make fearful"). Indeed, reading these words together, this Court has already explained that their "most obvious" construction is to encompass "conduct … that involves … applying physical force." *United States v. Acosta*, 470 F.3d 132, 136 (2d Cir. 2006) (per curiam). They equally foreclose construing "injure" to mean "deceive."

Deceit is a separate and distinct wrong. Congress consistently uses other words (defraud, deceive, or trick) when it wants to capture such conduct. And that was equally true in 1870. *E.g.*, 17 Stat. 323 (1872) ("That if any person having devised or intending to devise any scheme or artifice to defraud …"); 14 Stat. 471 (1867) ("If two or more persons conspire … to defraud the United States in any manner …"); *Hammerschmidt v. United States*, 265 U.S. 182, 187-88 (1924) (explaining that "defraud" means "deceit, craft or trickery"). This "differing language" should not be accorded "the same meaning." *Russello v. United States*, 464 U.S. 16, 23 (1983).

To "deceive" is not to "injure." It is distinct conduct—and beyond § 241.

**2.** Statutory history points in the same direction. It reaffirms that Congress did not intend § 241 to capture misinformation, even if it deceives voters about whether or how to cast a ballot.

19

The Enforcement Act of 1870 originally "prescribe[d] a comprehensive system … to secure [the] freedom and integrity of elections." *Bathgate*, 246 U.S. at 225. It catalogued and prohibited an array of specific voting-related practices. Here is just one excerpted, illustrative provision (16 Stat. 140, 144 (1870)):

> That if … any person shall knowingly personate and vote, or attempt to vote, in the name of any other person, whether living, dead or fictitious; or vote more than once at the same election for any candidate for the same office; or vote at a place where he may not be lawfully entitled to vote; or vote without having a lawful right to vote; or do any unlawful act to secure a right or an opportunity to vote for himself or any other person; or by force, threat, menace, intimidation, bribery, reward, or offer, or promise thereof, or otherwise unlawfully prevent any qualified voter … from freely exercising the right of suffrage; or by any such means induce any voter to refuse to exercise such right; or compel or induce by any such means, or otherwise, any officer of an election … to receive a vote from a person not legally qualified or entitled to vote; or interfere in any manner with any officer of said elections in the discharge of his duties; … or knowingly and willfully receive the vote of any person not entitled to vote, or refuse to receive the vote of any person entitled to vote; or aid, counsel, procure, or advise any such voter, person, or officer to do any act hereby made a crime, or to omit to do any duty the omission of which is hereby made a crime …, every such person shall be deemed guilty of a crime ….

Congress intended these provisions to be exhaustive "regulations for the conduct of congressional elections." *Gradwell*, 243 U.S. at 483. But in 1894, in the shadow of the Reconstruction Era, Congress repealed these election-related provisions (28 Stat. 36 (1894)), while leaving in place what is now § 241.

Following the repeal, the Supreme Court debated whether acts forbidden by the repealed provisions were nonetheless still criminal under § 241's broader language. It held that some were; others were not. *Compare United States v. Mosley*, 238 U.S. 383, 387-88 (1915) (omitting ballots still violated § 241), *with Bathgate*, 246 U.S. at 226 (bribing voters did not). But the Court at all times recognized that the repeal had a narrowing effect, meaning the repealed provisions formed § 241's outer bounds. *See Bathgate*, 246 U.S. at 226. The original Act was the high-water mark of election regulation.

Under *Bathgate*, § 241 thus extends to a *residuum* of conduct originally proscribed by the Enforcement Act. But even though that Act reached a prodigious array of offenses—from impersonating voters, to voting more than once, to voting in the wrong place, to leveraging employment to influence voting, to evicting people based on their vote, and much (much) else—*even it* did not purport to criminalize mere deception of voters. It barred other forms of fraud, *e.g.*, "fraudulently" making a false election certificate (§ 22). Political misinformation was never within the Act's bounds, however, and accordingly cannot be within whatever residuum was preserved by § 241.

**3.** Moving beyond text and history, the far-reaching practical consequences of the Government's interpretation run up against a brigade's worth of canons of construction—each of which demands a clarity that § 241 lacks.

Again, the premise of this prosecution is that § 241 criminalizes anything, even deceptive speech, that may "hamper," "frustrate," "slow," or "prevent" voting. A70 (jury instructions). Consider the repercussions of that interpretation:

21

Most obviously, it would forbid deception about the time, place, or manner of elections, even though Congress has for years been debating proposals to specifically prohibit such speech.[3]  A Senate report accompanying one of those bills recounted how fliers and robocalls had falsely told voters that immigrants were not permitted to vote; that anyone with a traffic ticket could not vote; and that voting would occur on the wrong day.  S. 453, Rep. No. 110-191, at 2-3 (Oct. 4, 2007).  Yet, as Senator Schumer observed, DOJ "cannot do anything about" these "dirty tricks," because "it is not a Federal crime to disenfranchise voters by deception."  Hr'g Before Sen. Jud. Comm. on S.453, S. Hrg. 110-277 (June 7, 2007) (Sen. Schumer); *see also id.* (Sen. Cardin) ("there is no Federal law that makes these practices illegal").

The Government's theory would equally prohibit false statements bearing on *whether* to vote—every falsehood designed to depress turnout, such as claims that the weather is bad, that polling lines are long, or that early returns show a blowout.  Those lies also "hamper" or "prevent" voting.  A70.  The same goes for falsehoods affecting *for whom* to vote—every lie told about a candidate's background, endorsements, or policies, whether to promote or undermine the candidate.  After all, if deception is akin to coercion or ballot manipulation, *tricking* someone into voting for a candidate is no different than *forcing* them to do so or *altering* their ballot after it is cast.

---

[3] *See, e.g.*, Deceptive Practices and Voter Intimidation Act, 109th Cong. S. 1975 (2005) (outlawing certain knowingly false communications about time, place, or manner of elections); 110th Cong. S. 453 (reintroducing); 117th Cong. S. 1840 (same).

The Government's expansive interpretation of "injure" would also sweep *beyond speech*, to cover any conduct that makes voting less convenient—or as the Government put it, anything "that makes the right to vote more difficult." ECF 97 at 11. Think about suits challenging voter-identification requirements or limits on early voting. The Supreme Court has been skeptical of those claims when framed as civil violations of the Voting Rights Act. *E.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021). On the theory adopted below, an ambitious prosecutor could charge state officials *criminally* for initiating those reforms to "hamper" or "slow" voting rights.

Finally, the Government's § 241 theory would also extend *beyond voting*, because § 241 applies to all federal rights. The "impedes" theory would make felons of students who shout down a speaker to prevent him from giving a talk (First Amendment); gun control activists who deter people from buying AR-15s by overstating their dangers (Second Amendment); or pranksters who convey incorrect airline information so someone misses an interstate flight (Privileges and Immunities).

With little imagination, the Government's theory thus "makes a federal crime of an almost limitless variety of deceptive actions." *Ciminelli v. United States*, 598 U.S. 306, 315 (2023). The "staggering breadth" of that position is enough to brand it "implausible." *Dubin v. United States*, 599 U.S. 110, 129 (2023). But at minimum, such a sweeping interpretation violates a long list of canons, all designed to avoid "reading incongruous breadth into opaque language in criminal statutes," *id.* at 130:

- Courts do not read federal laws to bring about "a sweeping expansion of federal criminal jurisdiction," *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020); *see also United States v. DeLaurentis*, 491 F.2d 208, 214 (2d Cir. 1974) (same for § 241)—especially when such breadth would exceed Congress's enumerated powers, *Jones v. United States*, 529 U.S. 848, 851, 857-58 (2000);

- Courts do not allow the Government to discover major, "unheralded power" in a "long-extant statute," *Utility Air Regulatory Grp. v. EPA*, 572 U.S. 302, 324 (2014)—particularly when such revelations involve a matter of great "political significance," *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021);

- Courts do not construe statutes to do things that Congress specifically "considered and rejected" or otherwise "declined to enact," *West Virginia v. EPA*, 142 S. Ct. 2587, 2614 (2022); and

- Courts do not construe criminal statutes especially to have a "standardless sweep" that would allow scores of people to "be subject to prosecution[] without fair notice," *McDonnell v. United States*, 579 U.S. 550, 576 (2016), or that leaves the law's "outer boundaries ambiguous," *McNally v. United States*, 483 U.S. 350, 360 (1987).

In case after case, the Supreme Court has cited these canons to reverse decisions that overread vague criminal statutes to forbid conduct not previously understood to be criminal—even when there was no "clearly established" overlay. *Lanier*, 520 U.S. at 265. That message should resonate forcefully here. For the first time, the Government claims that § 241 vests prosecutors with a broad mandate to combat political misinformation. For the Executive to wield that remarkable power, Congress must speak clearly. Whether and how to regulate political misinformation is plainly an issue for Congress—not prosecutors wielding a Civil War-era statute. Yet Congress has not spoken at all, let alone clearly. That demands reversal.

24

### D.    The First Amendment Forecloses the Government's Reading.

Text, history, and canons are reason enough not to extend § 241 beyond the two categories of conduct it has long been understood to prohibit.  But there is also a large pachyderm lurking: the First Amendment.  Reading the statute to cover speech that deceives voters would render it egregiously unconstitutional.  Even assuming that false speech about the time, place, or manner of voting could be permissibly proscribed by a narrowly crafted statute, neither the Government's theory of § 241 nor any principled reading of its text can support drawing that line.  If deceiving voters "injures" their right to vote, then *any* such deceit is a crime—and that interpretation is so overinclusive and so chilling that it would readily fail any form of heightened scrutiny under *United States v. Alvarez*, 567 U.S. 709 (2012).  Indeed, if § 241 means what the Government says, it would be the most pronounced overbreadth violation in the U.S. Code.

**1.**    The First Amendment's protection of *free* speech includes protection of *false* speech.  All nine Justices in *Alvarez*—the seminal decision on this subject—agreed that lies do not categorically lack constitutional cover.  So if Congress seeks to outlaw untruths, it must pass some measure of exacting scrutiny.

*Alvarez* considered the Stolen Valor Act, which proscribed falsely claiming to have been awarded military medals.  18 U.S.C. § 704.  Alvarez had been convicted for saying "an intended, undoubted lie," when he claimed to have earned a Congressional Medal of Honor. 567 U.S. at 715 (plurality).  The Court vacated his conviction.

Writing for four Justices, Justice Kennedy rejected the notion that false speech is unprotected. There is no "exception to the First Amendment for false statements." *Id.* at 718. Indeed, the notion that the Government can criminalize lies necessarily rests on a broader "governmental power" to "compile a list of subjects about which false statements are punishable," which lacks any "clear limiting principle." *Id.* at 723. Such a "broad censorial power" is incompatible with "our constitutional tradition." *Id.*

Justice Breyer, joined by Justice Kagan, concurred in the judgment. He observed that prohibitions on falsehoods "about philosophy, religion, history, the social sciences, the arts, and the like" would present greater "dangers of suppressing valuable ideas." *Id.* at 731-32. But the Stolen Valor Act nonetheless "ranges very broadly" and could allow "censorious selectivity by prosecutors." *Id.* at 736. More, the Act lacked "limiting features" such as materiality, reliance, and injury elements. *Id.* at 734. Its broad reach and narrow guardrails meant that the Act failed constitutional scrutiny. *See id.*

Justice Alito, joined by Justices Scalia and Thomas, dissented. He recognized "there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech," including laws restricting false statements about "matters of public concern," where it would be "perilous to permit the state to be the arbiter of truth." *Id.* at 750-52. But the Stolen Valor Act stood in "stark contrast" to such laws, including because the "false statements proscribed by the Act are highly unlikely to be tied to any particular political or ideological message" and thus did not risk chilling valuable speech. *Id.* at 741.

**2.** The Government's interpretation of § 241 would flunk *every* opinion from *Alvarez*. Even the dissent agreed that, in the political context, concerns about abuse and selective prosecution are at their zenith, yet the Government reads § 241 to forbid lies about elections. Construing § 241 to forbid deceptive speech would render it far more sweeping than the Stolen Valor Act, whose limited breadth was still too much for the plurality. And it equally lacks the limiting features that mattered to the concurrence.

Begin with subject matter. Criminalizing speech "in political contexts" raises a heightened "risk of censorious selectivity." *Id.* at 736 (Breyer, J.); *see also id.* at 738 (recognizing that "criminal prosecution is particularly dangerous" in "political arena"). Indeed, the *Alvarez* dissent would have upheld the Stolen Valor Act only because the speech it prohibited was "highly unlikely to be tied to any particular political or ideological message." *Id.* at 741 (Alito, J.). It agreed, however, that a law restricting speech on "matters of public concern" would present a real "threat," by "open[ing] the door for the state to use its power for political ends." *Id.* at 751-52.

On the Government's view, § 241 forbids deceptive speech bearing on *elections*. In this sensitive "political arena," criminalizing speech invites "selectivity." *Id.* at 736, 738 (Breyer, J.). Look no further than this case. A progressive activist's Twitter posts did the same thing as Mackey's, except she told *Donald Trump supporters* to vote by text. A376. Unlike Mackey, she was not prosecuted. That (not to mention the suspect timing of the indictment) at least suggests political bias, which reinforces why restricting speech in this context is especially fraught.

Turn next to breadth. The Government emphasizes that *this case* involves only verifiably false statements about the time, place, or manner of voting. But its *theory* has no such limits. On its interpretation of the statutory text, § 241 proscribes any deceit that "hampers," "inhibits," or "frustrates" voting rights. As set forth above, that would equally reach other falsehoods designed to suppress turnout—*e.g.*, a false claim that it is supposed to rain on election day, that exit polls revealed a landslide, or that anyone with unpaid parking tickets is ineligible to vote. Same for lies affecting *for whom* to vote. The right to vote includes the right to vote for one's chosen candidate; that is why it violates § 241 for officials to change votes after they are cast, *United States v. Thompson*, No. 6:09–16, 2013 WL 5528827, at *1 (E.D. Ky. Oct. 4, 2013). Deceit going to a voter's choice of candidate would thus be swept up too—or, at minimum, chilled.

Accordingly, once § 241 is extended to deceptive speech, there is no way to stop it from erecting a "Ministry of Truth." 567 U.S. at 723. The Government's reading of § 241 would invite prosecution for every hotly debated political rumor and conspiracy theory—that Barack Obama was born abroad, Donald Trump is a secret Russian agent, or Hunter Biden sold access to the President. Extending § 241 to voter deception thus turns "the state" into "the arbiter of truth." *Id.* at 752 (Alito, J., dissenting). Yet from this country's first contested election, the "response" to the "straight-out lie" has never been criminal sanction, but "the simple truth." *Id.* at 727 (plurality). The First Amendment forbids any statute that would upend that tradition. *Id.* at 728.

For that reason, lower courts since *Alvarez* have uniformly invalidated state laws purporting to forbid false statements in elections. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (striking down Ohio law barring "false information" about candidate); *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) (similar for Minnesota law); *Comm. v. Lucas*, 34 N.E.3d 1242, 1257 (Mass. 2015) (similar); *see also Rickert v. State Pub. Disclosure Comm'n*, 168 P.3d 826, 829-31 (Wash. 2007). Yet, the Government's interpretation of § 241 would transform it into a more comprehensive political speech code than any of those state laws, with vast chilling effects.

Finally, § 241 also lacks any of the "limiting features" Justice Breyer identified as necessary when criminalizing falsity. He observed that "virtually all" statutes that forbid false statements include "limitations of context, requirements of proof of injury, and the like" that "narrow the statute" to minimize the First Amendment harm. 567 U.S. at 736. "Fraud statutes, for example, typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury." *Id.* at 734. Perjury laws, likewise, only "prohibit a particular set of false statements—those made under oath—while requiring a showing of materiality." *Id.* And so forth. *See id.* Section 241 has *none* of these limits. It includes no materiality, reliance, or injury element—and none of those was proved below. And as to context, the Government would have § 241 "range[] very broadly," from campaigns to "barstool braggadocio." *Id.* at 736-37. After all, there is no reason the Government's theory would not cover telling a MAGA-hatted man at a bar that the 2016 election was on Wednesday.

29

Put plainly, if the *Stolen Valor Act* could not withstand First Amendment scrutiny, there is no chance the Government's reading of § 241 could survive. This Court should decline the invitation to send this settled civil rights law to swift constitutional demise.

**3.** To be clear, none of this necessarily forecloses a narrowly tailored law to combat knowingly false statements about the time, place, and manner of an election. As noted, Congress has debated such bills (*supra* n.3). Some states have tried their hand too. *See, e.g.*, Minn. Stat. § 204C.035 (2021) (prohibiting "knowingly deceiv[ing] another person regarding the time, place, or manner of conducting an election"); David S. Aria & Evan Ringel, *First Amendment Limits on State Laws Targeting Election Misinformation*, 20 First Amend. L. Rev. 291, 346-50 (2022). *Alvarez* does not close the door on these efforts; it simply narrows the opening. *See* Richard L. Hasen, *A Constitutional Right to Lie in Campaigns and Elections?*, 74 Mont. L. Rev. 53, 69-71 (2013).

All that matters here, however, is that § 241 is not remotely such a law. The Government's interpretation does not limit the statute to false statements about the time, place, or manner of voting. Nor does the law's text, history, or precedent offer any basis to so cabin it. And the Supreme Court has been clear that statutes facing First Amendment challenge cannot be artificially narrowed. *See United States v. Stevens*, 559 U.S. 460, 475-78 (2010) (rejecting atextual narrow construction); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344 (1995) (refusing to read Ohio law as limited to "to fraudulent, false, or libelous statements"); *Talley v. California*, 362 U.S. 60, 64 (1960) (refusing to read ordinance to target only "libel" since its text was "in no manner so limited").

Simply put, if Congress criminalized "any false speech intended to affect how or whether someone votes," nobody would deny that is unconstitutionally overinclusive. But that is what the Government reads § 241 to say—and that is the only way for § 241 to reach Mackey's speech. The Court should reject that overbroad interpretation and avoid forcing a "constitutional collision." *Hansen*, 599 U.S. at 781.

In refusing to dismiss the indictment, the district court missed this. Focusing on Mackey's conduct, it held that "*this prosecution* passes constitutional muster" because the tweets were "*proscribable* false utterances." SA40, 47 (emphases added). Judge Garaufis applied intermediate scrutiny to *Mackey's speech*, emphasizing that his tweets were "indubitably false" and did not concern policy, while the Government supposedly had a "compelling interest" in punishing them. SA47-51. In short, the court held that § 241 was constitutional "as applied" to these facts. SA51.

That analysis was fundamentally misdirected. Even assuming Mackey's speech is theoretically "proscribable," the question is whether § 241 permissibly proscribes it. And even assuming that a narrowly tailored ban on voting-procedure misinformation could survive scrutiny, § 241 is not that. Whether or not applying § 241 to Mackey's speech would violate the First Amendment *as applied*, the bigger problem is that reading § 241 to reach his speech would render it unconstitutionally overinclusive *on its face*. The district court never grappled with that problem, or its implications for the key statutory question. It instead evaluated only whether Mackey's speech could be constitutionally proscribed by a narrow statute targeting it and only it.

31

Ironically, the court relied on *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), which actually exposes its error. *Mansky* confronted a Minnesota law banning voters from bearing any "political" insignia inside a polling place on Election Day. The state tried to apply that law to prohibit wearing a "Please I.D. Me" button, which it said could confuse voters about needing identification to vote (when they did not). *Id.* at 1889 & n.4. In analyzing the law, the Court did "not doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures." *Id.* But it said this while *striking down the law*, reasoning the State's open-ended definition of "political" was too broad for the First Amendment to bear, even if the button at issue could theoretically be proscribed by a tailored statute. *Id.* at 1891.

As in *Mansky*, it does not matter whether the Government may conceivably ban "messages intended to mislead voters about voting requirements and procedures," *id.* at 1889 n.4—or, as the district court put it below, whether Mackey's tweets were "proscribable," SA47. Constitutional scrutiny applies in the first instance to a *statute*, not to a particular *prosecution*. And if one takes the Government's construction seriously, § 241 would be unconstitutional, as it would reach well beyond the narrow band of speech that Congress could potentially proscribe—for that matter, much further than Minnesota's apparel law. Far from salvaging this unprecedented interpretation of § 241, *Mansky* is therefore directly on-point precedent for why it would be unconstitutional and should be rejected.

### E.    At Minimum, Mackey's Conduct Did Not "Clearly" Violate § 241.

The above lays bare that, at the absolute least, it was not "apparent" at the time Mackey posted his memes that doing so was a federal crime. *Lanier*, 520 U.S. at 272. Political misinformation differs in kind from coercive acts and ballot-box fraud. Burning ballots is neither common nor constitutionally protected, whereas political misinformation is both ubiquitous and, at least in significant measure, shielded by the First Amendment. All told, there is no credible claim that it was "beyond debate" in November 2016 that § 241 reached political or voting misinformation. *Brown*, 862 F.3d at 190. This was at worst an "open legal question[]," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)—and that precludes prosecution. Indeed, this Court effectively recognized as much in holding that whether Mackey's conduct violated § 241 was a "close" question that "has not been decided by controlling precedent." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985); *see also* Mot. Order (Dec. 4, 2023). A violation cannot be "clearly established" absent such controlling precedent. *Cf. White*, 580 U.S. at 80.

Concluding otherwise, Judge Garaufis repeated the error that the Supreme Court has consistently corrected—characterizing the right at "too high a level of generality," *City of Tahlequah*, 595 U.S. at 12, rather than "in light of the specific context of the case," *Mullenix*, 577 U.S. at 12. Section 241 has long protected voting rights, to be sure, but what matters is whether it was "clearly established" that Mackey's "particular conduct" was unlawful. *Id.* The answer is decidedly "no."

Moreover, it is not even clearly established that § 241 protects the right to vote in *presidential* elections against *private* conduct. In general, § 241 protects only against invasions of constitutional rights involving "action by the State." *United States v. Price*, 383 U.S. 787, 799 (1966). *Classic* held that the right to vote in *congressional* elections "is secured against the action of individuals as well as that of states," since Article I directly confers that right on "the People." 313 U.S. at 315. But the same is not true of the right to vote for *president*, as Article II empowers state legislatures to determine how to choose electors. *See Bush v. Gore*, 531 U.S. 98, 104 (2000). The right to vote for president is thus analogous to the right to vote in state elections—both are creatures of state law, federally protected only by the Fourteenth and Fifteenth Amendments. Consistent with the limits on enforcement legislation under those Amendments, § 241 protects these rights only from interference by *state* action. *See United States v. Morrison*, 529 U.S. 598, 621 (2000); *United States v. DeFilippo*, No. 3:21-CR-128, 2023 WL 5000385, at *6, *9 (D. Conn. Aug. 4, 2023). But Mackey is not alleged to have conspired with state officials, and so his conduct was (for this reason too) beyond the scope of the statute. At least, it was not clearly established that private interference with the right to vote for president violated the law. No court has ever so held, whereas at least one Court of Appeals has distinguished congressional from presidential elections for § 241 purposes. *See Walker*, 93 F.2d at 388-89; *Little v. United States*, 93 F.2d 401, 403, 409 (8th Cir. 1937).

At bottom, while one can reasonably debate whether Mackey's memes should be forbidden, there is no serious argument that he violated "clearly established" law.

## II. THE GOVERNMENT PROSECUTED MACKEY IN AN IMPROPER VENUE.

The Government secured Mackey's conviction using not only an unprecedented interpretation of § 241. It also resorted to a novel and untenable theory of venue.

Both the Constitution and the Federal Rules guarantee a defendant's right to be tried in "the district where the crime was 'committed.'" *United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016) (quoting U.S. Const. amend. VI); *see also* Fed. R. Crim. P. 18. This is not a matter of "mere procedure." *Travis v. United States*, 364 U.S. 631, 634 (1961). The venue right was "highly prized by the founding generation," *Smith v. United States*, 599 U.S. 236, 248 (2023), which recognized that giving prosecutors "leeway" to hand-select a "favorable" forum "leads to the appearance of abuses, if not to [actual] abuses." *United States v. Johnson*, 323 U.S. 273, 275-76 (1944). To prevent "prosecutorial abuse" and its "appearance," the Founders thus limited venue to the district "where the wrong was committed." *United States v. Miller*, 808 F.3d 607, 614 (2d Cir. 2015).

The Government bears the burden to prove that an offense was "committed" in the forum. *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005). In cases involving "continuing offenses" like conspiracy, the Government must make two showings. *First*, that "acts constituting the offense—the crime's 'essential conduct elements'—took place" in the forum. *Id.* at 138-39. Congress "codified" that rule by conferring venue on districts where offenses were "'begun, continued, or completed.'" *Id.* (quoting 18 U.S.C. § 3237(a) par. 1). *Second*, the Government must prove "substantial contacts" with the forum, to ensure venue is not extended "too broadly." *Id.* at 139.

The Government did not come close to making either showing here. Mackey lived in and tweeted from Manhattan throughout the alleged scheme. He did not direct his tweets at anyone in EDNY; none of his alleged co-conspirators or victims bore any connection to EDNY; and nearly every witness came from elsewhere. Thus, as even the district court acknowledged, the *Southern* District was the "most obvious place for venue." SA21. Yet the Government prosecuted Mackey in *EDNY*. It maintained that venue was proper solely because internet data associated with Mackey's tweets briefly flashed through EDNY en route to elsewhere. But such data passes through *every district in the country*, so treating that fleeting connection as establishing venue would license the Government to prosecute any internet-linked offense *anywhere*. The Constitution denies that "leeway." *Johnson*, 323 U.S. at 275-76. Because the Government failed to establish venue, the conviction cannot stand.

### A.    The Government Failed To Prove "Essential Conduct" in EDNY.

Under the "essential conduct elements" test, venue is proper only where the "physical conduct" constituting the offense occurred. *Ramirez*, 420 F.3d at 144. In a conspiracy case, venue therefore lies only where the conspirators formed the agreement, committed an overt act in furtherance of it, or caused others to do so. *Miller*, 808 F.3d at 617; *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008). But neither Mackey nor anyone else committed such "essential conduct" in EDNY, and Twitter data that briefly pulsed through the district does not overcome that fatal deficiency.

36

1.      At trial, the Government did not prove that anyone—not Mackey, not his alleged co-conspirators, and not anyone else—committed "essential conduct" toward the offense in EDNY. *Ramirez*, 420 F.3d at 144.

Start with Mackey. It is indisputable that he did not commit *any* acts—let alone "essential" acts—in EDNY. He did not live in the district, form any agreements in the district, or post the memes from the district. To the contrary, all agree that he lived in and used Twitter from an "apartment in Manhattan." ECF 140 at 35; *see* A136, 159, 183. Nor did the Government present evidence that Mackey's tweets deceived (or were even viewed by) a single voter in EDNY. *See* ECF 140 at 35. Mackey's alleged co-conspirators did not commit "essential conduct" in EDNY either. Despite contending that Mackey conspired with dozens of fellow internet trolls, the Government did not identify a single co-conspirator with any connection to EDNY. *See id.*

Nor did the Government show that Mackey or his alleged co-conspirators caused anyone else to commit an overt act furthering the conspiracy in EDNY. *See Royer*, 549 F.3d at 896. The only conduct in the district that the Government even attempted to identify involved two Clinton campaign staffers, who viewed text-to-vote memes while working at campaign headquarters in Brooklyn. *See supra* at 4. That, however, obviously did not "materially further[] the ends of the conspiracy." *Royer*, 549 F.3d at 896. It *undermined* the alleged scheme by escalating the Clinton campaign's response efforts. A86-88, 96-97; *see supra* at 5.

Moreover, the Government did not even prove that the Clinton staffers viewed *Mackey's* tweets, or any tweets at all. According to the staffers themselves, they viewed various text-to-vote "graphics" and "image[s]" *comparable* to those that Mackey tweeted, A83-85, 94, but did so "*before*" he posted the tweets at issue here in November 2016—as the Government recognized, A190-91 (emphasis added). The memes the staffers saw, then, necessarily were *not* Mackey's tweets. Any notion that the staffers ever saw Mackey's tweets rests on "speculation rather than evidence." *United States v. Purcell*, 967 F.3d 159, 187 (2d Cir. 2020).

**2.** Unable to prove "essential conduct" in EDNY, the Government pressed a sweeping theory this Court has never endorsed: Venue was proper, it argued, because internet data associated with Mackey's tweets briefly "passed through" EDNY. ECF 140 at 35. According to the Government, "data packet[s]" associated with Mackey's tweets must have made their way from Manhattan to Twitter servers in Georgia and California—and on to Twitter users nationwide—via one of several possible routes through EDNY. Either it traversed a sliver of EDNY waters while passing through fiber-optic cables along the Lincoln Tunnel, Holland Tunnel, or 59th Street Bridge, or "jumped" over those waters through EDNY airspace to reach cellphone towers in New Jersey, Brooklyn, or Queens. A125-29; *see also* A119-20, 131-32. Treating that evanescent connection as justifying venue, however, is legally indefensible, doctrinally unprecedented, and practically untenable.

Internet data passing through EDNY en route to elsewhere does not satisfy the "essential conduct elements" test. Again, the relevant conduct for conspiracy offenses is the formation of the illegal agreement and any overt acts in furtherance of it. Passive transfer of internet data through EDNY is not *action* by *anyone* in the district; it is merely a consequence of how the internet operates.

Importantly, Congress "knows how" to establish venue based on merely passing through a district. *Pereida v. Wilkinson*, 141 S. Ct. 754, 761 (2021). The *second* paragraph of § 3237(a) specifically extends venue for certain offenses to districts "through" which mail, commerce, objects, or persons "move[]." 18 U.S.C. § 3237(a) par. 2. But the *first* paragraph, which applies here, contains no such language. Absent "legislative action," this Court should not "impose the same result by way of the expansive statutory interpretation urged … by the [G]overnment." *United States v. Brennan*, 183 F.3d 139, 148 (2d Cir. 1999); *see also United States v. Fortenberry*, No. 22-50144, 2023 WL 8885105, at *8-9 (9th Cir. Dec. 26, 2023) (rejecting broad venue theory that Congress was "well equipped" to enact with "specifi[city]"); *United States v. Salinas*, 373 F.3d 161, 169 (1st Cir. 2004) (refusing to "expand the scope of venue" where Congress "knew how").

Moreover, a contrary rule would allow the Government to prosecute Mackey—and any other defendant whose offense includes internet activity—*anywhere in the country*. When someone posts on Twitter (or on a webpage, or on social media), the post does not just travel to a single recipient in a single district. It is viewable in every district across the country—to anyone "online." A124. Thus the Government could readily

present evidence that data associated with such posts "passed through" all 94 federal districts (even if nobody in them read it).

That alone requires rejection of this novel theory. To ensure compliance with constitutional safeguards against "prosecutorial abuse," *Miller*, 808 F.3d at 614, venue provisions "should not be so freely construed as to give the Government the choice of a tribunal favorable to it," *Brennan*, 183 F.3d at 146-47 (quoting *Travis*, 364 U.S. at 635). "The founding generation had a deep and abiding antipathy to letting the government arbitrarily choose a venue in criminal prosecutions." *Fortenberry*, 2023 WL 8885105, at *9. Venue provisions therefore must be "narrowly construed." *Ramirez*, 420 F.3d at 146. Even when Congress "define[s] continuing offenses having the potential for multiple venues," a "narrow" interpretation is "'more consonant with … the venue safeguards in the Constitution.'" *United States v. Saavedra*, 223 F.3d 85, 89, 92 (2d Cir. 2000) (alterations omitted).

By facilitating venue everywhere internet data travels, the Government's unrestrained theory improperly "give[s] the Government the choice of a[ny] tribunal." *Brennan*, 183 F.3d at 147; *see also, e.g.*, *United States v. Provoo*, 215 F.2d 531, 539 (2d Cir. 1954) (rejecting venue theory that allowed Government to "handpick its forum"); *Salinas*, 373 F.3d at 169 (rejecting theory that "effectively authorize[d] the [G]overnment to choose a venue of its liking"); *United States v. Morgan*, 393 F.3d 192, 200-01 (D.C. Cir. 2004) (similar); *Fortenberry*, 2023 WL 8885105, at *6, *8-9 (rejecting venue theory that would effectively allow Government to "choose" venue).

40

The "rule favoring restrictive construction of venue provisions," *Brennan*, 183 F.3d at 146, is even more critical today, since the "ever-increasing ubiquity of the Internet" amplifies the "'danger'" that the Government will charge "cybercrimes" as if they occurred in "some metaphysical location" that "allow[s] the [G]overnment to choose its forum free from any external constraints," *United States v. Auernheimer*, 748 F.3d 525, 541 (3d Cir. 2014). That is an impermissible and "outlandish outcome" that "cannot be squared with the Constitution." *Fortenberry*, 2023 WL 8885105, at *6.

Authority in analogous contexts is in accord. Specific personal jurisdiction is "similar" to criminal venue, as both tests inquire into the nexus between the defendant's conduct and the forum. *United States v. Jang*, No. 1:07-cr-52, 2007 WL 4616927, at *6-9 (S.D. Ind. Dec. 27, 2007). Yet courts "routinely" disclaim personal jurisdiction over individuals even when their social-media or internet publications travelled *to* the forum (not merely *through* it). *Blessing v. Chandrasekhar*, 988 F.3d 889, 905-07 & n.15 (6th Cir. 2021); *see also, e.g., Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318-19 (5th Cir. 2021) (website); *Lyons v. Rienzi & Sons, Inc.*, 856 F. Supp. 2d 501, 510 (E.D.N.Y. 2012) (Facebook); *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 413 15 (S.D.N.Y. 2021) (LinkedIn); *cf. Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 253 (2d Cir. 2007) (same under New York long-arm statute for national website not "directed to New Yorkers"). That is why, for instance, an anti-"MAGA" comedian cannot be haled into court wherever her tweets travelled. *Blessing*, 988 F.3d at 905-07. The same goes for this pro-MAGA Twitter troll.

**3.** The district court identified no case holding that venue lies in every district traversed by data associated with nationally accessible internet posts—and, at oral argument on the bond motion, the Government conceded no such case exists. That itself is powerful evidence. *See Fortenberry*, 2023 WL 8885105, at *8-9 (considering "historical practices and traditions" in evaluating venue theory). Lacking on-point authority, the district court instead invoked cases involving direct point-to-point communications like phone calls, text messages, emails, and wire transfers.[4]

Those facts are meaningfully different. When a communication is targeted and thus "directed at" a district, acts constituting the offense actually occur in that district (*e.g.*, answering a call), and treating that as sufficient for venues does not license the Government to select any venue it wishes. *Kirk Tang Yuk*, 885 F.3d at 75.

---

[4] *See United States v. Rommy*, 506 F.3d 108, 122-23 (2d Cir. 2007) (venue where calls were placed); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (where calls were placed and received); *Kirk Tang Yuk*, 885 F.3d at 71, 73-75 (where calls and texts were initiated or received); *Lange*, 834 F.3d at 72-74 (where calls and emails were received); *Royer*, 549 F.3d at 894-96 (where electronic messages were received); *United States v. Rowe*, 414 F.3d 271, 273-74, 279-80 (2d Cir. 2005) (where chatroom messages and transmissions between directly "linked" computers were placed and received); *United States v. Rutigliano*, 790 F.3d 389, 397-98 (2d Cir. 2015) (where wire transfer traversed and mail was received); *United States v. Brown*, 293 F. App'x 826, 829 (2d Cir. 2008) (unpub.) (where wire transfer traversed); *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982) (where wire transfers traversed and phone calls and telexes were placed or received); *United States v. Kim*, 246 F.3d 186, 191-93 (2d Cir. 2001) (where wire transfers were initiated and faxes were received); *United States v. Kenner*, No. 13-CR-607, 2019 WL 6498699, at *5, *7-9 (E.D.N.Y. Dec. 3, 2019) (where wire transfers, calls, and emails were initiated or received); *United States v. Ng Chong Hwa*, No. 18-CR-538, 2021 WL 11723583, at *20-21 (E.D.N.Y. Sept. 10, 2021) (where wire transfers and telecommunications traversed).

Moreover, with the exception of a few wire-transfer cases, this Court has found venue only where a communication *began* or *ended*—*e.g.*, in the narrow set of districts where calls were placed or received. *See supra* at 42 n.4. And the wire-transfer cases (finding venue in districts through which a transfer crossed) were governed by the *second paragraph* of § 3237(a), which as discussed above expressly authorizes venue in districts "through" which certain things "move[]." *Gilboe*, 684 F.2d at 238-39; *see also Rutigliano*, 790 F.3d at 397; *Brown*, 293 F. App'x at 829. By contrast, Mackey's tweets were not "directed at" EDNY and did not begin or end there; the second paragraph does not apply; and no statute extends venue to districts that internet data "passes through."

To justify its departure from precedent, the district court claimed "technological change" requires "interpretive dynamism." SA18. But if anything, the changes of the internet era call for strict adherence to the Constitution's venue protections to ensure they are not "erode[d]" by "innovation." *Carpenter v. United States*, 138 S. Ct. 2206, 2214, 2223 (2018). Even "technological changes" cannot alter the bedrock rule that "[o]nly essential conduct elements provide the basis for venue." *United States v. Calonge*, 74 F.4th 31, 35 (2d Cir. 2023). "Though our nation has changed in ways which it is difficult to imagine that the Framers … could have foreseen, the rights of criminal defendants which they sought to protect in the venue provisions of the Constitution are neither outdated nor outmoded." *Auernheimer*, 748 F.3d at 541. Those rights were violated here, so the conviction must be reversed. *See Purcell*, 967 F.3d at 188, 198.

### B. The Government Also Failed To Prove "Substantial Contacts" with EDNY.

Even if the Government had proved essential conduct in EDNY, there is also a second hurdle. The Government had to prove that Mackey's conduct bore "substantial contacts" with the forum, including a "sense" that the defendant knowingly "chose[]" it, considering "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012). This test is a "valuable safeguard," *Kirk Tang Yuk*, 885 F.3d at 70, that "operates to limit venue," *Auernheimer*, 748 F.3d at 536. Here, the Government failed to satisfy it.

**1.** Again, even the district court acknowledged the *Southern* District had the "most obvious" connection to this case. A21. Far from proving "*substantial* contacts" with EDNY, the Government struggled to identify *any* contacts.

Looking to each *Davis* factor illustrates the deficiencies in the Government's case for venue. EDNY was not the "site" of any "acts" committed by Mackey or his alleged co-conspirators. *Davis*, 689 F.3d at 186. Nor did the Government show that the charged conspiracy's "elements and nature" were substantially connected to EDNY. *Id.* In particular, there was no evidence that Mackey "conspire[d]" in EDNY or with anyone from EDNY, or that any EDNY voters were "injure[d]." 18 U.S.C. § 241. The "locus" of that scheme plainly was not EDNY, *Davis*, 689 F.3d at 186, as it aimed to distribute memes "everywhere" "across the Internet," without focusing on EDNY,

A80, 186.  Finally, EDNY was not more "suitab[le] for accurate factfinding" than other districts.  *Davis*, 689 F.3d at 186.  After all, the documentary evidence could have been presented anywhere, and witnesses came from all over the country.  *See, e.g.*, A81, 102 (Illinois), A82 (Washington, D.C.), A91, 109, 135 (California), A121 (North Carolina), A122 (Wisconsin), A123 (Nebraska), A134 (Massachusetts), A166 (Florida).  The need for "accurate factfinding" thus did not favor EDNY either.  *See Saavedra*, 223 F.3d at 94 (venue with "only a slight relationship" to the offense does not "further" accuracy).

In response, the Government again insisted venue was proper because data briefly "passed through" EDNY when Mackey posted his tweets.  ECF 140 at 35.  That fleeting contact was anything but "substantial."  Indeed, data associated with social-media posts often travels through every district in the country as it surges to viewers nationwide.  *Supra* Part II.A.2.  Courts routinely hold that this does not even satisfy the *minimum* contacts test for civil personal jurisdiction.  *Supra* at 41.  Treating it as satisfying the *substantial* contacts test for criminal venue would all but nullify the test for internet offenses, when it is supposed to be a critical protection that "operates to limit venue." *Auernheimer*, 748 F.3d at 536; *see also Kirk Tang Yuk*, 885 F.3d at 70.

Prosecuting Mackey in EDNY on these facts "prejudiced" him and "undermined the fairness of [his] trial."  *Ramirez*, 420 F.3d at 143.  Given the meager nexus between this case and EDNY, selection of that forum (headquarters of the Clinton campaign) at minimum risked the "appearance" of manipulation.  *Miller*, 808 F.3d at 614.  That is what the "substantial contacts" test is designed to prevent.  *Davis*, 689 F.3d at 186.

**2.** Lacking evidence of "substantial contacts," the district court tried to avoid the test altogether. Judge Garaufis reasoned that the test may be ignored if "an overt act in furtherance of [the] criminal conspiracy [was] committed in the district." SA16-17, 20 (quoting *Kirk Tang Yuk*, 885 F.3d at 70). Even if so, the Government failed at trial to prove that anyone committed an overt act furthering the conspiracy in EDNY. *See supra* Part II.A.1. The "substantial contact" test thus remains "relevan[t]" here. *Kirk Tang Yuk*, 885 F.3d at 70. And the Government failed it.

**3.** At minimum, even if the Court thinks the trial evidence could satisfy the "substantial contacts" test, the conviction must still be vacated because the jury was never instructed to find those contacts. *See* ECF 140 at 27-30. Indeed, consistent with the district court's ruling that the test did not apply, the jury instructions said nothing about that "valuable safeguard." *Kirk Tang Yuk*, 885 F.3d at 70. The instructions thus "misl[ed] the jury as to the correct legal standard or d[id] not adequately inform the jury on the law." *Id.* And that error was "prejudicial," *id.*, since a properly instructed jury could assuredly have found that no "substantial contacts" were proved. The conviction therefore must be vacated. *See Percoco v. United States*, 598 U.S. 319, 332 (2023) (finding prejudice where jury could have convicted on erroneous basis); *Murray v. UBS Sec., LLC*, 43 F.4th 254, 262-63 (2d Cir. 2022) (similar).

### III. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT MACKEY CONSPIRED TO INJURE VOTING RIGHTS.

Even if the Government's § 241 theory and venue theory were legally viable, the evidence it introduced cannot sustain his conspiracy conviction. The trial evidence showed that Mackey found publicly available memes and posted them without anyone asking him to do so; there was no contrary evidence. The district court upheld the conviction anyway based on evidence suggesting that *others* in the War Room may have conspired, but precedent forecloses such guilt-by-association analysis—especially given that Mackey's participation in the War Room was otherwise plainly protected by the First Amendment. Mackey's conviction cannot stand given this failure of proof.

### A. The Evidence Failed To Establish Mackey's Knowing Agreement.

To establish a conspiracy, the Government must prove a defendant "knowingly joined and participated" in an unlawful joint effort. *United States v. Valle*, 807 F.3d 508, 516 (2d Cir. 2015). The defendant "must at least have had knowledge" of the criminal endeavor. *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989). But it is not enough merely to show that he "was aware of the conspiracy and associated with some of its members." *United States v. Young*, 745 F.2d 733, 764 (2d Cir. 1984). The evidence must establish that the defendant *agreed to join* the conspiracy. *See id.* Here, the Government failed to show that Mackey even *knew about* any conspiracy to injure voters by deceiving them about how to vote, let alone "joined" or "participated" in it.

The Government's theory was that Mackey conspired with members of three group chats on Twitter, each of which discussed and shared an assortment of memes that communicated vote-by-text or vote-by-hashtag misinformation. *E.g.*, A205-06, 210, 213-14, 217. But, as to two of those groups, Mackey was no longer even a member at the time of those discussions; he had not rejoined them after one of his earlier Twitter accounts was suspended. A379; *see also* A349-70 (Madman chat), 322-41 (Micro chat), A374 (noting dates of suspension). This critical fact did not become clear until the district court asked the Government for clarification *after verdict*. A378-79. Based on its belated explanation, it is now obvious that Mackey could not have seen the memes from two of the three groups, and thus could not have conspired with their members.

That leaves one chat group—the War Room. Although Mackey had rejoined it, the Government failed to prove that Mackey entered any conspiratorial agreement with its members. Some members discussed voting misinformation and shared memes from October 27 through October 30, 2016. But Mackey testified—without rebuttal—that he never saw these communications because he had muted the group thread due to its overwhelming number of daily messages. *See* A155, 168, 170, 172.[5]

The record corroborated that unrebutted testimony in numerous ways:

---

[5] Even Microchip missed at least part of the discussion, including some responses to a meme that he himself had shared in a private chat. A142.

- Not only does the War Room not reveal a single comment from Mackey about voting misinformation memes, he did not send *any messages at all* to the group in the *two weeks* leading up to his posts. A308-19.

- The memes Mackey posted were *different* from the ones circulated in the War Room. *Compare* A371-73, *with* A313. If Mackey had been participating in a War Room conspiracy, presumably he would have simply posted the memes shared in that chat group.

- Instead, it is undisputed that Mackey found the two memes he posted on 4chan, a public online board, not the War Room (and he retweeted a third meme after one of his followers publicly tagged his account). A153.

- War Room members discussed how any vote-by-text meme should "say something" about it being "too late" for Trump supporters to vote by text because the campaign "didn't register," to make the meme "believable." A314-15. Yet Mackey's tweets displayed none of that nuance. To the contrary, he posted from an account featuring his profile picture, a character in a pro-Trump MAGA cap. A371-72.

Meanwhile, there was *no evidence* that Mackey coordinated with anyone to create the memes, solicited them from anyone, or was asked by anyone to post them.

That lack of evidence is itself probative, because Mackey routinely offered his thoughts on Twitter strategy. He often let people know if they had suggested a "good plan" or "good idea," A282, like spreading rumors about celebrities supporting Trump, A342, and he also expressly approved certain graphics, A343-44. Mackey frequently coached his followers on how to frame or boost their tweets. *E.g.*, A303-05, 278-83. Time and again, he also issued and responded to calls for particular action, including to follow a specific Twitter account, retweet certain messages, make a word or phrase trend, or create memes. *E.g.*, A284-85, 287-89, 293-94, 307, 345-48, 320. Yet he did *none of this* with respect to the vote-by-text misinformation memes.

49

On this record, only rank speculation could lead a jury to conclude that Mackey had even *viewed* the voting misinformation content in the War Room. After all, similar misinformation was ubiquitous online. The Clinton campaign learned of these memes months earlier. A97, 104-06, 112. People had circulated at least a dozen unique voting misinformation memes within two weeks of the election, including on Twitter. *See, e.g.*, A299-300, 313-15, 321, 328, 370-73. Since Mackey's tweets coincided with this proliferation of voting misinformation, no reasonable jury could trace his memes back to the distinct memes sent in the War Room—let alone draw that conjectural inference beyond a reasonable doubt. For the same reason, Mackey's use of popular hashtags is not probative of any conspiratorial agreement with anyone. *See* A168-69.

Remarkably, the obvious disconnect between Mackey and the War Room prompted the district court to ask during post-trial argument whether Mackey was even "a member of the War Room from October 27th to November 2nd." A379. He was, but the court's uncertainty underscores the lack of evidence tying him to this group. Verdicts cannot be based on "conjecture" or "pure speculation." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016). Where the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Valle*, 807 F.3d at 522. Here, no reasonable jury could conclude beyond a reasonable doubt that Mackey had agreed to "join[] and participate[]" in "a common endeavor" with War Room members to deceive voters. *Nusraty*, 867 F.2d at 763.

### B.     The District Court's Analysis Cannot Withstand Scrutiny.

The district court found the evidence sufficient, but its analysis was wrong at every turn. The court principally focused on evidence showing that War Room members had discussed text-to-vote memes. *See* SA104-06. That is undisputed. But it is also beside the point, without evidence connecting Mackey to those discussions. His "mere association" with War Room members does not prove "knowing involvement" in their purported conspiracy. *Nusraty*, 867 F.2d at 764. For the reasons already explained, the record cannot support an inference that Mackey silently agreed to join this ostensibly criminal venture.

To bridge the gap, the district court emphasized that Mackey engaged in *other* joint efforts with the War Room to share *distinct* content. That is also true, but it does not advance the ball either. Mackey cannot be guilty of conspiracy unless he agreed to participate in *unlawful* conduct. *See Valle*, 807 F.3d at 516. Yet even the Government did not take the position that any of Mackey's other Twitter trolling was criminal; nor did the district court suggest otherwise. *See* A208 (concession by Government that the draft-our-daughters memes, which suggested that Hillary Clinton would introduce conscription for women, was "not criminal"); A207 (concession that most of the War Room members' uses of hashtags were "regular politics" and "[n]othing unlawful").[6]

---

[6] The district court's claim that Mackey also participated in "discussing, creating and spreading deceptive information about how to vote" was not supported with any record citations. SA106. As explained, the record shows the opposite.

To the contrary, Mackey's work with the War Room "to spread their political messages" was textbook First Amendment speech: He expressed predictions about the election, coaxed Trump supporters to vote, publicly encouraged others not to vote, and spread rumors. SA106. Treating that conduct as evidence of criminal intent, as the court did, *see id.*, only exacerbates the offense to the First Amendment.

Put another way, if all of Mackey's political trolling violated § 241, the statute is plainly unconstitutional. *See supra* Part I.D. And if the statute can somehow be limited to false information about the time, place, or manner of voting, no evidence shows Mackey's agreement to work with others to disseminate that material. With nothing to bridge this evidentiary chasm, the conviction cannot stand.

## CONCLUSION

The Court should reverse Mackey's conviction.

Dated: January 5, 2024

/s/ *Yaakov M. Roth*
Eric S. Dreiband
Yaakov M. Roth
Joseph P. Falvey
Caleb P. Redmond
Harry S. Graver
JONES DAY
51 Louisiana Ave, N.W.
Washington, D.C. 20001
(202) 879-3939
yroth@jonesday.com

*Counsel for Defendant-Appellant*
*Douglass Mackey*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for Defendant-Appellant certifies that this brief:

(i)      complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,969 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(ii)      complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared using Microsoft Office Word 2016 and is set in 14-point Garamond font.


/s/  *Yaakov M. Roth*
Yaakov M. Roth