# No. 23-7577

## United States Court of Appeals
## for the Second Circuit

---

United States of America,
*Appellee,*

v.

Douglass Mackey
*Defendant-Appellant.*

---

On Appeal from the U.S. District Court for the Eastern District of New York
Case No. 21-cr-00080-AMD

---

## BRIEF OF *AMICUS CURIAE* AMERICA FIRST LEGAL FOUNDATION IN SUPPORT OF DEFENDANT-APPELLANT

---

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave. S.E.
  No. 231
Washington, DC 20003
202-964-3721
gene.hamilton@aflegal.org

R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
Andrew W. Smith
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

## CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus* hereby certifies that *amicus* has no parent entities and does not issue stock.

Dated: January 12, 2024           <u>/s/ R. Trent McCotter</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................... iii

INTEREST OF *AMICUS CURIAE*....................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT .................................................................4

    I.   The Government Stretches Section 241 Beyond Its Universally Recognized Limits ...........................................4

    II.  The Government's Rewrite of Section 241 Will Be Impossible to Apply Narrowly ..........................................14

        A.   The Government's Interpretation Lacks Meaningful Limits. ....................................................14

        B.   The Government's Interpretation of Section 241 Invites Selective Prosecution........................................18

    III.  The Government's Use of Improper Venue Compounds Concerns About the Government's Interpretation of Section 241 ..22

CONCLUSION...............................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States,*
572 U.S. 844 (2014) ......................................................................16, 17

*City of Chicago v. Fulton,*
592 U.S. 154 (2021) ............................................................................5

*Jennings v. Rodriguez,*
583 U.S. 281 (2018) ..........................................................................17

*McDonnell v. United States,*
579 U.S. 550 (2016) .......................................... 17, 18, 19, 26

*Missouri v. Biden,*
No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. July 4,
2023). ........................................................................................20, 21

*Missouri v. Biden,*
83 F.4th 350 (5th Cir. 2023) ....................................................3, 20, 21

*Murthy v. Missouri,*
144 S. Ct. 7 (2023) ................................................................3, 20, 22

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
599 U.S. 419 (2023) ............................................................................5

*Ryan v. United States,*
99 F.2d 864 (8th Cir. 1938) ..................................................................8

*Screws v. United States,*
325 U.S. 91 (1945) ..............................................................................7

*Students for Fair Admission, Inc. v. Harvard Coll.,*
600 U.S. 181 (2023) ..........................................................................15

*Travis v. United States,*
364 U.S. 631 (1961) ....................................................................23, 25

iii

*UARG v. EPA*,
    573 U.S. 302 (2014) ....................................................13

*United States v. Acosta*,
    470 F.3d 132 (2d Cir. 2006) ............................................6

*United States v. Brennan*,
    183 F.3d 139 (2d Cir. 1999) ...........................................24

*United States v. Butler*,
    25 F. Cas. 213 (D.S.C. 1877) ............................................8

*Dubin v. United States*,
    599 U.S. 110 (2023) ....................................................16

*United States v. Fortenberry*,
    2023 WL 8885105 (9th Cir. Dec. 26, 2023) .......................25

*United States v. Hansen*,
    599 U.S. 762 (2023) ....................................................17

*United States v. Lanier*,
    520 U.S. 259 (1997) .................................................7, 13

*United States v. Miller*,
    808 F.3d 607 (2d Cir. 2015) ...........................................23

*United States v. Olinger*,
    759 F.2d 1293 (7th Cir. 1985) ..........................................8

*United States v. Price*,
    383 U.S. 787 (1966) ....................................................15

*United States v. Rodriguez-Moreno*,
    526 U.S. 275 (1999) ....................................................23

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008) ...........................................24

*United States v. Salinas*,
    373 F.3d 161 (1st Cir. 2004) ..........................................26

iv

*United States v. Stone*,
    188 F. 836 (D. Md. 1911) ....................................................8

*United States v. Williams*,
    553 U.S. 285 (2008) .........................................................5

*United States v. Wiltberger*,
    18 U.S. (5 Wheat.) 76 (1820) ...........................................6

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ...................................................16

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .........................................................4

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .......................................................18

## Constitution & Statutes

U.S. Const. amend. VI ...........................................................23

U.S. Const. art. III, § 2 .........................................................23

18 U.S.C. § 241....................................2–9, 11–16, 18, 20, 22, 23, 25, 26

18 U.S.C. § 1965 .................................................................26

18 U.S.C. § 3237.................................................................26

## Other Authorities

Brenden Carol, *Your Right to Lie Versus My Right to Vote: A
    Look at Proposed Federal Legislation to Regulate False
    Election Speech in Light of* Alvarez, 46 Seton Hall Leg. J.
    291 (2022) ......................................................................11

Gilda R. Daniels, *Voter Deception*, 43 Ind. L. Rev. 343 (2010) ................9

Elaine Kamarck, *A Short History of Campaign Dirty Tricks
    Before Twitter and Facebook*, Brookings Inst. (July 11,
    2019), http://tinyurl.com/36zuey5j ................................8–10

Spencer Overton, *State Power to Regulate Social Media Companies to Prevent Voter Suppression*, 53 U.C. Davis L. Rev. 1793 (2020) ...................................................................11

Nichole Rustin-Paschal, *Online Behavioral Advertising and Deceptive Campaign Tactics: Policy Issues*, 19 Wm. & Mary Bill Rts. J. 907 (2011) ................................................11

Noah Webster, *An American Dictionary of the English Language* (Chauncey A. Goodrich ed., 1860) ...................................4, 5

Zachary J. Wolfe, *Hate Crimes Law* (2023 ed.) .....................................16

Press Release, U.S. Att'y's Off., E.D.N.Y., Social Media Influencer Douglass Mackey Sentenced After Conviction for Election Interference in 2016 Presidential Race (Oct. 18, 2023), http://tinyurl.com/y57yzr3h................................13

Deceptive Practices and Voter Intimidation Prevention Act of 2018, S. 3279, 115th Cong. (2018)....................................13

Deceptive Practices and Voter Intimidation Prevention Act of 2019, S. 1834, 116th Cong. (2019)....................................13

Deceptive Practices and Voter Intimidation Prevention Act of 2021, S. 1840, 117th Cong. (2021)................................9, 13

*Prevention of Deceptive Practices and Voter Intimidation in Federal Elections: Hearing on S.453 Before the S. Comm. on the Judiciary*, 110th Cong. 6 (2007) ......................................10, 12

*Protecting the Right to Vote: Oversight of the Department of Justice's Preparations for the 2008 General Election: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 113 (2008) ...........................................................10

## INTEREST OF *AMICUS CURIAE*[1]

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States and defending individual rights guaranteed under the Constitution and federal statutes. American First Legal submits this brief to inform the Court about the errors in the government's position and the potential ramifications if the Court adopts that position.

---

[1] Counsel for *amicus curiae* states pursuant to Fed. R. App. P. 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *amicus curiae* or its counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Fed. R. App. P. 29(a)(2).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The government claims that 18 U.S.C. § 241 authorizes the prosecution of private citizens in any venue in the United States for allegedly misleading online speech about an election—even satirical speech—and even for planning with others to do anything that in any way has a tendency to "interfer[e] with" any federal right. That position is as implausible and overbroad as it sounds. Speech about elections and political rivals—even if misleading or inaccurate, and especially satirical speech—is as old as democracy itself, yet no one ever thought section 241 made that a crime. Indeed, until this case the Department of Justice, Congress, and legal scholars acknowledged that federal law did not criminalize deceptive political messaging. And for good reason. Such a broad reading distends section 241's text and embarks on a collision course with the U.S. Constitution.

Members of Congress and voting rights advocates have occasionally pushed for new legislation that would criminalize false statements that mislead voters about election procedures and voting eligibility. Those efforts failed. The government cannot now rewrite a 150-year-old statute to fill the gap.

2

Not only is the government's interpretation wrong, it's dangerous. If section 241 extends beyond coercive speech and ballot-box fraud, nothing in that statute will limit its reach to false statements about election procedures. This new super-charged provision will instead criminalize conduct far beyond what even the (unsuccessful) reformers in Congress desired. Any misleading speech—in the opinion of the Department of Justice—about a political candidate could "hinder" someone's decision to vote for that candidate and thus could become a federal criminal case. Indeed, doing anything that has a tendency to "hinder" anyone's exercise of any federal right would be criminalized.

Nor is this case an aberration. It is part of a "whole-of-government" campaign by the current administration to chill disfavored speech and pursue perceived political opponents. As the litigation in *Missouri v. Biden* recently disclosed, the administration has repeatedly deployed the crushing weight of government power to silence those whose speech it unilaterally deems "misleading" or "misinformation." *Missouri v. Biden*, 83 F.4th 350 (5th Cir.), *cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7 (2023). This is not the system that our Constitution's framers enacted. As Justice Robert Jackson famously put it: "If there is any fixed

star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics[.]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

## ARGUMENT

### I. THE GOVERNMENT STRETCHES SECTION 241 BEYOND ITS UNIVERSALLY RECOGNIZED LIMITS.

This case represents the first time the government has ever pursued and obtained a criminal conviction under 18 U.S.C. § 241 for mere speech, but it surely will not be the last such prosecution if this case stands.

Section 241 makes it a crime to conspire to "injure, oppress, threaten, or intimidate any person" in the "free exercise or enjoyment of any right" under federal law. 18 U.S.C. § 241. The government claims that the statutory term "injure" stretches so broadly that it encompasses any false speech that "'interfer[es] with'" voters, including to "trick would-be voters into abstaining from their constitutional right to vote." Gov't Br. in Opp'n 18 (Nov. 13, 2023). Similarly, the government's proposed jury instructions claimed that it covers actions that make it "more difficult" to exercise the right to vote. Proposed Jury Instructions

4

11, *United States v. Mackey,* No. 21-cr-00080-AMD (E.D.N.Y. Mar. 13, 2023), ECF No. 97.

The term "injure" is not so broad here. The primary definition of "injure" at the time of § 241's enactment was "[t]o hurt or wound, as the person; to impair soundness, as of health." Noah Webster, *An American Dictionary of the English Language* 606 (Chauncey A. Goodrich ed., 1860), http://tinyurl.com/mvuf8xsy. The surrounding verbs confirm that interpretation, conveying physical interference or coercion. "Oppress" meant "[t]o overpower," *id.* at 775; "threaten" meant "[t]o declare the purpose of inflicting punishment, pain or other evil on another," *id.* at 1149; and "intimidate" meant "[t]o make fearful," *id.* at 619. That means not just any colloquial "injury" will suffice. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated").

If "injure" is stretched as broadly as the government insists, it would render superfluous the other verbs in section 241. Doing so would violate "the interpretive principle that 'every clause and word of a statute' should have meaning." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (quoting *Montclair v. Ramsdell*, 107 U.S.

5

147, 152 (1883)). If "[t]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme," *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) (cleaned up), it applies with greatest force when it would do so to *every* other operative verb in the very same sentence.

Further, § 241 is a criminal statute, where concerns about due process and fair notice are at their zenith. As Chief Justice John Marshall put it: "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820).

For all these reasons, to "injure" in this context encompasses only those acts that actually prevent ballot access with force, that coerce voters, or that manipulate the ballot itself (*i.e.*, ballot-box fraud). *Cf. United States v. Acosta*, 470 F.3d 132, 136–37 (2d Cir. 2006) (holding that there is a substantial risk that force will be applied in the commission of

6

a violation of section 241). It does not reach merely *dishonest* political speech or actions that in some way have a tendency to hinder the exercise of any federal right.

The government's interpretation of section 241 extends far beyond Mackey's conduct. If it covers any statement that "inhibits" or "makes more difficult" the right to vote, including when it "tricks" voters, it surely reaches false statements about *candidates*, just as it reaches false statements about election *procedures*. After all, it is hard to say that lies about polling times (about which a voter could quickly find correct information) distort the election or any voter's actions more than lies about the candidates themselves. Someone discouraged from voting because of a false accusation levelled at his otherwise-favored candidate equally had the enjoyment of his right "inhibited."

The government's interpretation of section 241 is thus irreconcilable with its text. The Supreme Court has further made clear that section 241 applies only when "the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). Thus, liability can result only from acting "in defiance of

announced rules of law." *Screws v. United States*, 325 U.S. 91, 104 (1945). The government's new theory of section 241 cannot satisfy that standard.

It is equally telling that the government has cited no cases where section 241 has been applied to deceptive speech on *any* topic. In fact, it appears section 241 has been applied only to acts that coerce voters[2] or engage in ballot-box fraud, like destroying ballots or falsifying the count.[3] And that's surely not because there was a shortage of political speech designed to mislead and "interfere with" voting.

After all, "dirty tricks" in politics "are nothing new." Elaine Kamarck, *A Short History of Campaign Dirty Tricks Before Twitter and Facebook*, Brookings Inst. (July 11, 2019), http://tinyurl.com/36zuey5j. American politics has seen countless dirty tricks that tried to deceive

---

[2] *See, e.g.*, *United States v. Olinger*, 759 F.2d 1293, 1297 (7th Cir. 1985) (pressing the button for down-the-line Democratic votes while assisting elderly voters); *United States v. Butler*, 25 F. Cas. 213, 220 (D.S.C. 1877) (threatening and then murdering a black man for voting for a Republican).

[3] *See, e.g., Ryan v. United States,* 99 F.2d 864, 867–68 (8th Cir. 1938) (holding that a jury was correct in finding that ballots were falsified and other ballots were changed from Democratic to Republican by a certain ward's Republican Committee-woman); *United States v. Stone*, 188 F. 836, 838–39 (D. Md. 1911) (doctoring ballots to make it impossible to vote).

voters throughout the twentieth and twenty-first centuries, from John F. Kennedy's father allegedly paying a man with a name similar to an opponent to run for a congressional seat and split the Italian vote, to false accusations that Senator Edmund Muskie used a derogatory term about French Canadiens, to insinuations that John McCain had fathered an illegitimate child. *Id.* Throughout that time, section 241 was on the books.

Sometimes the lies concerned the election procedure itself. In 2004, a flyer from a fake organization falsely warned that "people found guilty of any infraction, including traffic tickets" could not vote or they would face imprisonment. Gilda R. Daniels, *Voter Deception*, 43 Ind. L. Rev. 343, 353 (2010). In 2006, Maryland "voters arriving at the polls received a voting guide announcing that prominent African Americans had endorsed the Republican candidates." *Id.* at 344. Similar stories surfaced from the 2012 election: When listing reasons to support a *new* proposed law to supplement section 241, congressional sponsors reported that voters in 2012 had received calls "falsely informing them that they could vote via telephone." Deceptive Practices and Voter Intimidation Prevention Act of 2021, S. 1840, 117th Cong. § 2(12) (2021).

But none of these tricksters ever faced prosecution under section 241 for deceptive speech alone, because no one ever thought that was a federal crime in the first place. The victorious candidate in the 2006 Maryland Senate race even referred the flyer described above to the Department of Justice; no prosecution followed. Daniels, *supra*, at 344, 357.

As a former Deputy Chief of the Department of Justice Civil Rights Division's Voting Section testified, "[A]fter the 2006 federal election" it was clear that the federal government had concluded "that voter deception was beyond its authority; thus, prompting the initiation of new legislation." *Protecting the Right to Vote: Oversight of the Department of Justice's Preparations for the 2008 General Election: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 113 (2008) (testimony of Gilda Daniels). And the Department of Justice told members of Congress that "there was no legal basis" to prosecute those 2006 Maryland voter guides. *Prevention of Deceptive Practices and Voter Intimidation in Federal Elections: Hearing on S.453 Before the S. Comm. on the Judiciary*, 110th Cong. 6 (2007) (statement of Sen. Schumer); *see also id.* at 16 (statement of Sen. Cardin) (noting that "the Justice Department has told us, as they

10

told Senator Schumer, that they do not believe they have the laws necessary in order to deal with this").

Voting-rights scholars have long understood the scope of section 241 similarly. After acknowledging "deficiencies in the current state of the law," they encouraged new federal legislation to fill the "gaps in existing statutes." Daniels, *supra*, at 352; *see* Brenden Carol, *Your Right to Lie Versus My Right to Vote: A Look at Proposed Federal Legislation to Regulate False Election Speech in Light of* Alvarez, 46 Seton Hall Leg. J. 291, 295 (2022) ("Despite the egregious nature of these intentional falsehoods, none of these instances of voter deception currently violate federal law."); Nichole Rustin-Paschal, *Online Behavioral Advertising and Deceptive Campaign Tactics: Policy Issues*, 19 Wm. & Mary Bill Rts. J. 907, 915–16 (2011) ("While voter intimidation has been penalized under the Hatch Act, there is no federal law making deceptive tactics illegal. Though some steps have been taken to enact legislation addressing this gap in election law, they have ultimately been unsuccessful."); Spencer Overton, *State Power to Regulate Social Media Companies to Prevent Voter Suppression*, 53 U.C. Davis L. Rev. 1793, 1800 (2020) ("While no federal law directly criminalizes deceptive

11

practices that result in voter suppression, several States have such laws.").

The same view has long prevailed in Congress. Some members of Congress were frustrated that section 241 left this "void" against even dishonest political speech and proposed new legislation to fill it. Daniels, *supra*, at 356. Specifically, then-Senator Obama and Senator Schumer introduced the Deceptive Practices and Voter Intimidation Act of 2007, S. 453, 110th Cong. (2007). The sponsors recognized that new legislation would have been needed to prosecute that sort of political deception *Prevention of Deceptive Practices, supra,* at 6 (statement of Sen. Schumer) (noting the government "cannot do anything about" these "dirty tricks," because "it is not a Federal crime to disenfranchise voters by deception"); *see also id.* at 32 (statement of Sen. Cardin) ("[T]here is no Federal law that makes these practices illegal").

That proposal would have made it a crime to make knowingly false statements, with the intent to impede voting, regarding "the time, place, or manner of holding any election," "the qualifications for or restrictions on voter eligibility for any such election," or whether individuals or organizations gave an "explicit endorsement" of a candidate. S. 453 § 3(b).

12

Near-identical bills have been introduced in almost every Congress since. *See*, *e.g.*, Deceptive Practices and Voter Intimidation Prevention Act of 2021, S. 1840, 117th Cong. (2021); Deceptive Practices and Voter Intimidation Prevention Act of 2019, S. 1834, 116th Cong. (2019); Deceptive Practices and Voter Intimidation Prevention Act of 2018, S. 3279, 115th Cong. (2018). But Congress has passed none of those bills.

Given this history, and the lack of corresponding prosecutions, it could not have been "reasonably clear" that section 241 covered Mackey's conduct. *Lanier*, 520 U.S. at 267. History instead points in the opposite direction. Ironically, if this Court upholds Mackey's conviction, it could very well provide that "reasonably clear" precedent and open the door to even more abusive and widespread prosecutions.

So instead, the Department of Justice suddenly "discover[ed] in a long-extant statute an unheralded power to regulate" deceptive speech that might influence voters in an election. *UARG v. EPA*, 573 U.S. 302, 324 (2014). This Court should "greet [the government's] announcement" of this new authority "with a measure of skepticism." *Id.* Prosecution under a 150-year-old statute should never be "groundbreaking" for its novel theory of law, as the Department of Justice trumpeted here. Press

13

Release, U.S. Att'y's Off., E.D.N.Y., Social Media Influencer Douglass Mackey Sentenced After Conviction for Election Interference in 2016 Presidential Race (Oct. 18, 2023), http://tinyurl.com/y57yzr3h.

For all these reasons, the Court should reject the government's newfound interpretation of section 241.

## II.  THE GOVERNMENT'S REWRITE OF SECTION 241 WILL BE IMPOSSIBLE TO APPLY NARROWLY.

Whatever the merits of the unenacted Deceptive Practices and Voter Intimidation Prevention Act, it was at least tailored to specific acts, namely knowingly false statements about election procedures, qualifications, and endorsements, with the intent to impede or prevent another person from voting. But if the government prevails here, section 241 will reach far and wide, allowing selective prosecutions for broad swaths of typical American politics and speech, and even well beyond to actions that may seem unsavory or misguided but have never been considered *criminal*.

### A.  The Government's Interpretation Lacks Meaningful Limits.

The government's interpretation of section 241—*i.e.*, that a right is "injured" by any false speech that "impedes" or "tricks" voters—is

14

virtually limitless. There is no limit on specific types of falsehoods criminalized under section 241. Any lie or statement considered misleading by the government that might impact even a single voter will become a crime. Nothing in section 241 would limit the government only to prosecuting lies about election timing, procedures, or eligibility. Conspiracies to spread supposed untruths about political *candidates* would cause just as much (if not more) "injury" because they could cause someone not to vote at all.

The government also need not stop at prosecuting liars in the political arena. Section 241 was "intended to deal … with conspiracies to interfere with Federal rights, and with *all* Federal rights." *United States v. Price*, 383 U.S. 787, 803 (1966) (cleaned up) (emphasis added). That encompasses a broad set of both statutory and constitutional rights.

Some hypotheticals show just how far this goes. Consider admissions officers at Harvard College and the University of North Carolina who factored applicants' race beyond what the Constitution and Title VI allow. *See Students for Fair Admission, Inc. v. Harvard Coll.*, 600 U.S. 181 (2023). By disfavoring students because of their race, those admissions officers certainly "injure[d]," *i.e.*, interfered with, the federal

15

rights of those applicants to be free from race discrimination. And if those officers made any false statements about the role that race would play in the admissions process, those statements could themselves serve as the basis for finding violations of section 241 under the government's arguments in this case. Although their conduct was distasteful and ultimately found to be illegal, nobody considered it to be *criminal*.

Similarly, under the government's view, any coordinated violation of Title VII would apparently be a federal crime under section 241, too. *See* Zachary J. Wolfe, *Hate Crimes Law* § 6.2 (2023 ed.) ("[A] conspiracy to deprive a person of employment rights may be a violation of Title VII of the Civil Rights Act as well as … § 241."). And the same holds for dozens of other federal rights that could ostensibly be "injured."

The Supreme Court has repeatedly rejected "improbably broad" interpretations of criminal statutes that would reach large swaths of previously non-criminal conduct. *Bond v. United States*, 572 U.S. 844, 860 (2014); *see, e.g., Dubin v. United* States, 599 U.S. 110, 130 (2023) (rejecting interpretation of identity theft statute that "would sweep in the hour-inflating lawyer, the steak-switching waiter, the building contractor who tacks an extra $10 onto the price of the paint he

16

purchased"); *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (rejecting interpretation of computer fraud statute that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"); *McDonnell v. United States*, 579 U.S. 550, 574–76 (2016) (rejecting "expansive interpretation" of bribery statute that would reach "normal political interaction between public officials and their constituents"); *Bond*, 572 U.S. at 863 (rejecting interpretation that would turn chemical weapons statute "into a massive federal anti-poisoning regime that reaches the simplest of assaults").

The case against such improbably broad interpretations is even stronger when it would set up a "constitutional collision," as the "prospect of unconstitutional applications" should instead "urge a narrower construction" of the statute. *United States v. Hansen*, 599 U.S. 762, 781 (2023) (cleaned up); *see, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) ("When 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932) (cleaned up))).

17

Nor can prosecutorial discretion serve as an adequate check against abuse of an expansive section 241. The Supreme Court has been clear that courts "cannot construe a criminal statute on the assumption that the Government will use it responsibly." *McDonnell*, 579 U.S. at 576 (cleaned up); *cf. Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001) (explaining the government cannot avoid a constitutional problem with a statute "by adopting in its discretion a limiting construction").

There certainly was no prosecutorial discretion here. The very existence of this case—arresting and imprisoning a Twitter poster, when no evidence suggests the post changed or prevented even a single vote, then objecting to release pending appeal so he would possibly serve his entire sentence before the briefing in this appeal was complete—is a poor assurance that the government will appropriately handle so powerful a weapon.

If the government succeeds in expanding section 241, there's no telling where it will stop.

## B.    The Government's Interpretation of Section 241 Invites Selective Prosecution.

By viewing section 241 as "so shapeless a provision," the government inherently invites "arbitrary and discriminatory

18

enforcement." *McDonnell*, 579 U.S. at 576 (cleaned up). If the government can criminalize allegedly false political statements, it opens the door for selective prosecution of political opponents, even for run-of-the-mill political attacks.

Indeed, the government has *already* shown that it intends to use the statute selectively. Progressive activist Kristina Wong posted a video on Twitter the morning of the 2016 election. It shows her in a MAGA hat in front of Trump yard signs and encourages Trump voters to vote by *text* on *Wednesday*, the day after the election—yet no prosecution appears to have been initiated.



Kristina Wong (@mskristinawong), Twitter (Nov. 8, 2016, 9:38 AM), https://perma.cc/7GG2-TBC4.

The prosecution here is particularly concerning because it appears to be part of a larger effort by the current administration to use government power to target perceived political opponents. An expansive section 241 would provide perhaps the most lethal tool yet for suppressing the government's opposition, with the threat of criminal prosecution now on the table.

The *Missouri v. Biden* litigation revealed that the administration brazenly (and successfully) coerced private social media companies to drive disfavored speech from their platforms or otherwise suppress its reach. *Missouri v. Biden*, No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. July 4, 2023), *aff'd in part,* 83 F.4th 350, *cert granted sub nom. Murthy v. Missouri*, 144 S. Ct. at 8. The speech-suppression scheme was extensive, involving the White House, the CDC, the FBI, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, the Surgeon General's office, the National Institute of Allergy and Infectious Diseases, and the Department of State. *Missouri*, 83 F.4th at 359–60. The President himself was even involved. *Id.* at 386. His

20

administration has targeted speech concerning COVID-19 lockdowns, mask mandates, vaccines, and elections. *Id.* at 361, 365. It "also asked social-media companies to censor misinformation regarding climate change, gender discussions, abortion, and economic policy." *Missouri*, 2023 WL 4335270, at *13.

The effort to attack so-called election "misinformation" bears specific mention here because there is concrete evidence that the administration will not hesitate to act in a politically biased manner. Consider, for instance, the Hunter Biden laptop story. The FBI knew that the laptop was authentic and *not* Russian disinformation. *Id.* at *29. Yet the FBI "misled" social-media companies that were blocking access to stories about the laptop, and the FBI thereby harmed "millions of U.S. citizens" who "did not hear the story prior to the November 3, 2020 election." *Id.* at *50–51. It's hard to avoid the conclusion that the entire operation was simply about suppressing perceived "misinformation" that would hurt a favored political candidate.

The sheer scope and sophistication of the government's "misinformation" task forces and the success they achieved raises the stakes of the Court's decision here. The government already has in place

21

the machinery to identify and silence even ordinary citizens who criticize, satirize, or oppose the government.

If this Court blesses an expansive interpretation of section 241, the government will be able to criminally prosecute many of them, too, with its new, even more powerful and "heavy-handed tactic[]" "to skew the presentation of views" in public debate. *Murthy*, 144 S. Ct. at 9 (Alito, J., dissenting from grant of application for stay).

## III. THE GOVERNMENT'S USE OF IMPROPER VENUE COMPOUNDS CONCERNS ABOUT THE GOVERNMENT'S INTERPRETATION OF SECTION 241.

The government's insistence that venue is proper anywhere that online statements may have "passed through," or the district court's addition that venue is also proper wherever online posts "could foreseeably have been viewed by third parties," makes political prosecutions even more likely. Gov't Br. in Opp'n 8, 22.

Democrats could be selectively indicted and tried in the most Republican-leaning districts in the country, and vice versa. Almost all online activity, including any statements and social media, almost surely "passed through" or is otherwise accessible in every federal district in the

22

country. Section 241 prosecutions will inevitably become politically balkanized to wherever defendants are most likely to face a hostile jury.

Consider those Harvard and UNC admissions officers discussed above. Little did they know that, under the government's view, they could be indicted and prosecuted in any district where an acceptance or rejection letter merely *passed through* or was likely to be seen.

Neither the Constitution nor the venue statute permit this sort of flagrant abuse by the government. Defendants must be tried in "the state and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see also id.* art. III, § 2, cl. 3. The location of the crime "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (cleaned up).

Courts cannot "freely construe[]" venue provisions so "as to give the Government the choice of a tribunal favorable to it." *Travis v. United States*, 364 U.S. 631, 634 (1961) (cleaned up). Rather, this Court must identify where the crime's "'essential conduct elements'" were committed. *United States v. Miller*, 808 F.3d 607, 615 (2d Cir. 2015).

23

In Mackey's case, none of the essential conduct elements occurred in the Eastern District of New York (EDNY). For a conspiracy prosecution, venue is proper only where the agreement was formed or where "an overt act in furtherance of the conspiracy was committed." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (cleaned up). The overt acts of this conspiracy were the Twitter posts and the coordination with fellow internet trolls, but the government agrees Mackey did not post the tweets from EDNY, nor did the government show that any of the alleged co-conspirators were in EDNY, either.

Resisting this conclusion, the government claims that the act of tweeting *was* committed in EDNY because the tweets "passed through the EDNY *en route* from Manhattan to Twitter's servers elsewhere." Gov't Br. in Opp'n 22. But in an analogous context, this Court has rejected the argument that venue is available in "districts through which mailings merely passed *en route* to their destination." *United States v. Brennan*, 183 F.3d 139, 148–49 (2d Cir. 1999). Further, unlike wire transfers or text messages, *see* Gov't Br. in Opp'n 23, a tweet has no end point—it just resides on Twitter's servers, available for anyone with internet access to see. Under the government's theory, a person sending

24

a text message from point A to someone located in point B could be charged in every venue in between.

But even that still does not describe how broad the government's theory is. A tweet goes through *every* district. If everywhere that a tweet has "passed through" gives rise to venue, all prosecutions where tweets or similar social media posts were part of the criminal conduct now have *nationwide* venue.

Establishing *de facto* nationwide venue for crimes demonstrates how far off the rails the government's theory is. It flouts the Supreme Court's instruction *not* to interpret statutes so broadly as to give the government free rein to choose "a tribunal favorable to it." *Travis*, 364 U.S. at 634. In the context of political prosecutions like what the government's interpretation of section 241 will unleash, the composition of the district's jury pool could make all the difference. *Cf. United States v. Fortenberry*, 2023 WL 8885105 (9th Cir. Dec. 26, 2023) (throwing out the conviction of a Nebraska Congressman tried in California).

The government's theory of nationwide venue for crimes involving social media also runs headlong into congressional practice. When Congress wants broad criminal venue, it uses clear language. In the

25

Racketeer Influenced and Corrupt Organizations Act, for example, Congress specifically provided that venue is proper for any defendant in the conspiracy once venue is established for any other defendant. 18 U.S.C. § 1965(b). Further, for specific offenses involving "use of the mails," "transportation in interstate or foreign commerce," or the "importation of an object or person" from abroad, venue is appropriate in any district "from, through, or into which such commerce, mail matter, or imported object or person moves." 18 U.S.C. § 3237(a).

Section 241 has no such language. And further, the broad venue in the statutes cited above is *still* not as encompassing as the government's theory here, which would allow for venue in literally every district in the country. This Court should refuse to "expand the scope of venue" when Congress "knew how" to do so but declined. *United States v. Salinas*, 373 F.3d 161, 169 (1st Cir. 2004).

\*     \*     \*

This Court must consider "the broader legal implications of the Government's boundless interpretation" of section 241. *McDonnell*, 579 U.S. at 580–81. The government's arguments contain no meaningful limiting principles. The combination of a statute that criminalizes

26

falsehoods—with nothing more—to influence voters, and a venue rule that allows online speech to be prosecuted in any district in the country, is untenable. The Department of Justice has crossed the Rubicon. This Court should not follow.

## CONCLUSION

The Court should reverse the conviction below.

/s/ R. Trent McCotter

Gene P. Hamilton
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave. S.E.
  No. 231
Washington, DC 20003
202-964-3721
gene.hamilton@aflegal.org

R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
Andrew W. Smith
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

January 12, 2024

*Counsel for Amicus Curiae*

27

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ACMS system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>/s/ R. Trent McCotter</u>
R. Trent McCotter
*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief of *amicus curiae* complies with Fed. Cir. Rule 29(a)(5) because it has 5009 words, excluding those parts of the brief exempted by Fed. Cir. Rule 32(b)(2).

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


<u>/s/ R. Trent McCotter</u>
R. Trent McCotter
*Counsel for Amicus Curiae*