# 23-7577

*To Be Argued By*:
ERIK D. PAULSEN

# United States Court of Appeals

## For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

DOUGLASS MACKEY, also known as "Ricky Vaughn,"

*Defendant-Appellant.*

‒‒‒‒‒‒‒‒‒‒

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF FOR THE UNITED STATES

NICOLE M. ARGENTIERI,
*Acting Assistant Attorney General*

COREY R. AMUNDSON,
*Chief, Public Integrity Section*

WILLIAM GULLOTTA,
*Trial Attorney,*
    *Of Counsel.*

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

NICHOLAS J. MOSCOW,
ERIK D. PAULSEN,
FRANK TURNER BUFORD,
*Assistant United States Attorneys,*
        *Of Counsel.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................iv

PRELIMINARY STATEMENT ..........................................................1

STATEMENT OF FACTS ...................................................................5

I.    Background ...............................................................................5

II.   Mackey's Arrest and Prosecution ...................................18

SUMMARY OF ARGUMENT ...........................................................21

ARGUMENT ......................................................................................23

POINT ONE – The Jury Properly Found that Mackey
           Violated Section 241 by Conspiring to
           Injure the Right to Vote ................................23

I.    Applicable Law .......................................................................23

    A.    Standard of Review .............................................23

    B.    Pretrial Motions to Dismiss ................................25

II.   Section 241 Criminalizes Conspiracies to
      Injure the "Clearly Established" Right to
      Vote .........................................................................26

    A.    The Right to Vote Is Clearly
             Established Such that Mackey Had
             Fair Notice the Conspiracy to Violate
             It Was Criminal.....................................28

    B.    It Was Not Plain Error to Apply
             Section 241 to the Right to Vote for
             President .................................................36

C. The District Court Correctly Defined "Injure" .................................................. 44

D. Mackey's Tweets Calculated to Defeat Constitutionally Protected Rights Are Not Entitled to First Amendment Protections ........................ 47

1. Section 241 Prosecution Does Not Even Arguably Punish Protected Speech ........................ 49

2. This Prosecution Does Not Violate Mackey's First Amendment Rights ..................... 54

3. Section 241 Is Not Vulnerable to Mackey's Threatened Overbreadth Challenge ................ 60

III. Overwhelming Evidence Supported the Jury's Verdict that Mackey and Co-Conspirators Conspired to Injure the Right to Vote ................................................. 64

IV. The Remedy for a Finding of Insufficiency Based on Inaccurate Jury Instructions Should Be a Remand for a New Trial .......................... 70

POINT TWO – Venue Was Proper in the Eastern District of New York ....................... 72

I. Applicable Law ................................................ 72

A. Standard of Review ................................. 72

B. Venue ........................................................ 72

II. The Jury's Venue Finding Is Supported by the Trial Evidence ......................................... 76

iii

A.  The Court's Rulings Were Neither
    Error Nor Plain Error ........................................ 76

B.  The Jury's Venue Finding Was
    Supported by Sufficient Evidence ......................... 79

CONCLUSION .......................................................... 90

iv

## TABLE OF AUTHORITIES

Page

### CASES

Anderson v. United States,
    417 U.S. 211 (1974) ....................................................................... passim

Armour Packing Co. v. United States,
    209 U.S. 56 (1908) ................................................................................ 75

Ashcroft v. Am. Civil Liberties Union,
    535 U.S. 564 (2002) .......................................................................... 47-48

BE&K Const. Co. v. NLRB,
    536 U.S. 516 (2002) ............................................................................... 56

Beauharnais v. Illinois,
    343 U.S. 250 (1952) ............................................................................... 59

Bill Johnson's Restaurants, Inc. v. NLRB,
    461 U.S. 731 (1983) ............................................................................... 56

Brown v. Hartledge,
    456 U.S. 45 (1982) ................................................................................. 56

Burson v. Freeman,
    504 U.S. 191 (1992) ............................................................................... 55

Bush v. Gore,
    531 U.S. 98 (2000) ........................................................................... 40, 41

Chiafalo v. Washington,
    140 S. Ct. 2316 (2020) ..................................................................... 38-39

Ciminelli v. United States,
    598 U.S. 306 (2023) ........................................................................ 36, 62

Counterman v. Colorado,
    600 U.S. 66 (2023) ........................................................................... 51-52

v

Cugini v. City of New York,
941 F.3d 604 (2d Cir. 2019) ................................................................ 35

Davis v. United States,
417 U.S. 333 (1974)..................................................................... 28-29

Donaldson v. Read Magazine, Inc.,
333 U.S. 178 (1948) ............................................................................ 59

Ex parte Yarbrough,
110 U.S. 651 (1884) ................................................................... passim

Garrison v. Louisiana,
379 U.S. 64 (1964) ............................................................................. 57

Gertz v. Robert Welch, Inc.,
418 U.S. 323 (1974) ........................................................................... 56

Giboney v. Empire Storage & Ice Co.,
336 U.S. 490 (1949) ........................................................ 48, 49, 53, 54

Guinn v. United States,
238 U.S. 347, 368 (1915) ........................................................... passim

Guinn v. United States,
228 F. 103 (8th Cir. 1915) ......................................................... passim

Herbert v. Lando,
441 U.S. 153 (1979) ........................................................................... 56

Hope v. Pelzer,
536 U.S. 730 (2002)........................................................................... 32

Hustler Magazine, Inc. v. Falwell,
485 U.S. 46 (1998) ............................................................................ 56

Illinois ex rel. Madigan v. Telemarking Associates, Inc.,
538 U.S. 600 (2003) ........................................................................... 56

In re Quarles,
158 U.S. 532 (1895) ................................................................. 37-38, 42

Keeton v. Hustler Magazine, Inc.,
  465 U.S. 770 (1984) ................................................................. 56

Motes v. United States,
  178 U.S. 458 (1900) ................................................................. 42

Mullenix v. Luna,
  577 U.S. 7 (2015) ..................................................................... 35

Norton v. Sam's Club,
  145 F.3d 114 (2d Cir. 1998) .................................................... 78

Reynolds v. Sims,
  377 U.S. 533 (1964) ........................................................... 28, 34

Screws v. United States,
  325 U.S. 91 (1945) ................................................................... 27

Sloley v. VanBramer,
  945 F.3d 30 (2d Cir. 2019) ...................................................... 47

Time, Inc. v. Hill,
  385 U.S. 374 (1967) ............................................................ 56-57

United States v. Acosta,
  470 F.3d 132 (2d Cir. 2006) .................................................... 45

United States v. Ahaiwe,
  No. 21-2491, 2023 WL 4196954
  (2d Cir. June 27, 2023) ...................................................... 76, 81

United States v. Aleynikov,
  676 F.3d 71 (2d Cir. 2012) ...................................................... 25

United States v. Alfonso,
  143 F.3d 772 (2d Cir. 1998) ............................................... 25-26

United States v. Alvarez,
  567 U.S. 709 (2012) ......................................................... passim

United States v. Anderson,
  747 F.3d 51 (2d Cir. 2014) ...................................................... 24

United States v. Archer,
  977 F.3d 181 (2d Cir. 2020) ............................................. 69-70

United States v. Bastian,
  770 F.3d 212 (2d Cir. 2014) ............................................. 42

United States v. Bathgate,
  246 U.S. 220 (1918) ......................................................... 33

United States v. Beech-Nut Nutrition Corp.,
  871 F.2d 1181 (2d Cir. 1989) ........................................... 72

United States v. Blech,
  550 F. App'x 70 (2d Cir. 2014) ........................................ 37

United States v. Brown,
  293 F. App'x 826 (2d Cir. 2008) ................................. 75, 76

United States v. Bruno,
  661 F.3d 733 (2d Cir. 2011) ............................................. 71

United States v. Candella,
  487 F.2d 1223 (2d Cir. 1973) ........................................... 75

United States v. Capers,
  20 F.4th 105 (2d Cir. 2021) ................................. 23, 70, 78

United States v. Classic,
  313 U.S. 299 (1941) .................................................. passim

United States v. Coplan,
  703 F.3d 46 (2d Cir. 2012) ............................................... 23

United States v. Cores,
  356 U.S. 405 (1958) ......................................................... 75

United States v. Daley,
  702 F.3d 96 (2d Cir. 2012) ............................................... 25

United States v. Dunnigan,
  507 U.S. 87 (1993) ........................................................... 59

United States v. Ellyson,
  326 F.3d 522 (4th Cir. 2003) ................................................................. 71

United States v. Fields,
  228 F.2d 544 (4th Cir. 1955) ................................................................. 46

United States v. Gates,
  84 F.4th 496 (2d Cir. 2023) ................................................................... 43

United States v. Gilliland,
  312 U.S. 86 (1941) ................................................................................. 59

United States v. Glenn,
  312 F.3d 58 (2d Cir. 2002) .......................................................... 23-24, 68

United States v. Guadagna,
  183 F.3d 122 (2d Cir. 1999) .................................................................. 23

United States v. Halloran,
  821 F.3d 321 (2d Cir. 2016) .................................................................. 58

United States v. Hansen,
  599 U.S. 762 (2023) ............................................................... 49, 61, 62, 63

United States v. Hwa,
  No. 18-CR-538 (MKB), 2021 WL 11723583
  (E.D.N.Y. Sept. 3, 2021) ................................................................... 76-77

United States v. Johnson,
  323 U.S. 273 (1944) ............................................................................... 75

United States v. Kirk Tang Yuk,
  885 F.3d 57 (2d Cir. 2018) ...................................................... 73, 85, 87, 88

United States v. Kozminski,
  487 U.S. 931 (1988) ............................................................................... 45

United States v. Kukushkin,
  61 F.4th 327 (2d Cir. 2023) ................................................................... 24

United States v. Lange,
  834 F.3d 58  (2d Cir. 2016) ............................................................... 83-84

United States v. Lanier,
    520 U.S. 259 (1997).................................................................... passim

United States v. Lombardo,
    241 U.S. 73 (1916)............................................................................73

United States v. Mansky,
    138 S. Ct. 1876 (2018).............................................................. passim

United States v. Miller,
    954 F.3d 551 (2d Cir. 2020) ...........................................................25

United States v. Mitchell,
    811 F. App'x 50 (2d Cir. 2020) ......................................................78

United States v. Montague,
    67 F.4th 520 (2d Cir. 2023)............................................................25

United States v. Mosley,
    238 U.S. 383 (1915).................................................................. passim

United States v. Ollinger,
    759 F.2d 1293 (7th Cir. 1985)........................................................46

United States v. Pitre,
    960 F.2d 1112 (2d Cir. 1992) .........................................................24

United States v. Potamitis,
    739 F.2d 784 (2d Cir. 1984) .....................................................72, 84

United States v. Rahman,
    189 F.3d 88 (2d Cir. 1999) .............................................................50

United States v. Ramirez,
    420 F.3d 134 (2d Cir. 2005) .....................................................72, 75

United States v. Reed,
    773 F.2d 477 (2d Cir. 1985) ......................................................72-73

United States v. Robison,
    505 F.3d 1208 (11th Cir. 2007)......................................................71

x

United States v. Rodriguez-Moreno,
   526 U.S. 275 (1999) ................................................................ 73, 80, 81

United States v. Rommy,
   506 F.3d 108 (2d Cir. 2007) ........................................................ 73-74

United States v. Rosa,
   17 F.3d 1531 (2d Cir. 1994) ............................................................... 72

United States v. Rosario,
   7 F.4th 65 (2d Cir. 2021) ................................................................... 37

United States v. Rowe,
   414 F.3d 271 (2d Cir. 2005) ............................................................... 88

United States v. Rowlee,
   899 F.2d 1275 (2d Cir. 1990) ...................................................... 49-50

United States v. Royer,
   549 F.3d 886 (2d Cir. 2008) .................................................... 73, 83-84

United States v. Rutigliano,
   790 F.3d 389 (2d Cir. 2015) ..................................................... passim

United States v. Saylor,
   322 U.S. 385 (1944) ................................................................... passim

United States v. Smith,
   198 F.3d 377 (2d Cir. 1999) ............................................................... 72

United States v. Stevens,
   559 U.S. 460 (2010) ............................................................................ 48

United States v. Stone,
   188 F. 836 (D. Md. 1911) ................................................... 29, 30, 46

United States v. Svoboda,
   347 F.3d 471 (2d Cir. 2003) ......................................................... 72, 84

United States v. Tobin,
   No. 04-CR-216-01-SM, 2005 WL 3199672
   (D.N.H. Nov. 30, 2005) .................................................. 29, 32, 46, 47

United States v. Tzolov,
    642 F.3d 314 (2d Cir. 2011) ................................................. 74

United States v. Wedd,
    993 F.3d 104 (2d Cir. 2021) .......................................... 25-26

United States v. Wells,
    519 U.S. 482 (1997) ............................................................ 59

United States v. Wexler,
    522 F.3d 194 (2d Cir. 2008) ................................................ 24

United States v. Williams,
    553 U.S. 285 (2008) ................................................ 49, 58, 61

Universal City Studios, Inc. v. Corley,
    273 F.3d 429 (2d Cir. 2001) ................................................ 37

Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,
    425 U.S. 748 (1976) ............................................................ 56

Walker v. United States,
    93 F.2d 383 (8th Cir. 1937) .......................................... 40, 41

Wikimedia Found. v. Nat'l Sec. Agency,
    857 F.3d 193 (4th Cir. 2017) ............................................... 86

## STATUTES & CONSTITUTION

18 U.S.C. § 241 ................................................................ passim

18 U.S.C. § 1001 ..................................................................... 59

18 U.S.C. § 3237(a) ................................................................. 74

28 U.S.C. § 112 ....................................................................... 86

U.S. Const. Art. II ................................................................... 38

## RULES

Fed. R. Crim. P. 12(b)(2) ........................................................ 24

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-7577

UNITED STATES OF AMERICA,

<div align="right">

<u>Appellee</u>,

</div>

-against-

DOUGLASS MACKEY, also known as "Ricky Vaughn,"

<div align="right">

<u>Defendant-Appellant</u>.

</div>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Defendant-appellant Douglass Mackey appeals from a judgment entered on October 25, 2023, in the United States District Court for the Eastern District of New York (Donnelly, J.), convicting him, after a jury trial, of conspiring to injure constitutional rights, in violation of 18 U.S.C. § 241, and sentencing him principally to seven months' imprisonment. In sum, the jury found Mackey guilty because he and

others conspired to use Twitter to trick American citizens into thinking they could vote by text and stay at home on Election Day—thereby suppressing and injuring those citizens' right to vote.

On appeal, Mackey seeks to complicate what is in fact a straightforward application of Section 241 by claiming that the government has improperly begun to prosecute "political misinformation" and by challenging time-tested legal principles simply because he carried out his plot via social media. In particular, he argues that (1) a voter-suppression scheme involving lies and social media is textually and constitutionally insulated from prosecution under Section 241 (Br.12-34);[1] (2) the evidence was insufficient to convict Mackey in any event (Br.47-51); and (3) the Eastern District of New York lacked venue in this case (Br.35-46).

None of these arguments has merit. Section 241 has long punished voter-suppression conspiracies, because those conspiracies seek to injure the clearly established constitutional "right to put a ballot in a

---

[1]    Parenthetical references to "Br.," "SA," "A," and "GA" are to Mackey's brief, his special appendix, his appendix, and the government's appendix, respectively. "DE" refers to entries on the district court docket.

3

box." <u>United States v. Mosley</u>, 238 U.S. 383, 386 (1915); <u>accord</u> <u>Guinn v. United States</u>, 238 U.S. 347, 368 (1915) ("<u>Guinn I</u>") (voter-suppression scheme using fraud). This case simply amounts to the latest prosecution of those same-old voter suppression schemes carried out through a twenty-first century means—Twitter. And Mackey's contrary suggestions that Section 241's text and precedent do not clearly prohibit such schemes or that the prosecution here stands in tension with the First Amendment are unavailing.

Moreover, Mackey's Section 241 argument is largely unmoored from any procedural vehicle: he appears to ask the Court to reject "the Government's interpretation" of the statute, without specifying the relief he seeks. (<u>See</u> Br.9 (articulating standards of review for challenges to the sufficiency of the indictment and to venue)). But Mackey's novel arguments about Section 241's scope amount only to a challenge to the district court's jury instructions, not a challenge to the sufficiency of the evidence in this case, which was in any event substantial.

Finally, ample evidence supported the jury's finding that venue lay in the Eastern District of New York ("EDNY"). Mackey's

4

tweets effecting the instant conspiracy were foreseeably sent through the territorial waters of the Eastern District of New York. And, as he and his co-conspirators hoped and expected, the messages they sent triggered responses from EDNY-based campaign officials and voters.

## STATEMENT OF FACTS

### I.   Background

In the lead-up to the 2016 presidential election, Mackey agreed with others to distribute disinformation about how citizens could vote.  He and his co-conspirators did this with the hope and expectation that certain citizens would believe and act on this disinformation and therefore cast "votes" that would not be counted in the 2016 election.

In 2016, Mackey was a Twitter user of significant popularity and reach.  Mackey tweeted anonymously, using variations of the name "Ricky Vaughn" to hide his real identity.  In early 2016, a media lab associated with the Massachusetts Institute of Technology had judged Mackey to be an unusually potent user of Twitter, in large part due to his ability to influence the actions of his followers.  (GA118).  Mackey understood the extent of his popularity and reveled in his influence over his audience.  Among other things, Mackey stated that he could "get anything I want photoshopped in one hour," that he had the "most active fans" and "most loyal army on Twitter," and that "at any one time there is an army of 100 of my followers ready to swarm."  (GA105-06, 151-52, 167).

Throughout 2016, Mackey was a member of several private groups on Twitter that focused on coordinated messaging. (GA28, 56, 67, 69, 222-268, 284-394). The members of these groups discussed messages and memes that they hoped would "trend," or be mentioned more frequently than others and potentially go viral; and the members acted in an organized and coordinated fashion to achieve that virality. (See, e.g., GA222 (depicting the opening instructions of the so-called "War Room," noting that the group should be focused on hijacking hashtags, keeping their materials in "top tweets," getting more retweets ("RT's") than the other side and "work[ing] together like a unit"); GA225 ("Really we should be focusing our tweets on trends and targeting them individually. That's where the front lines are and the people we need to sway"); GA317-20 (noting that the so-called Madman group should work together in a "coordinated" fashion and "all be on the same target together spreading these rumors," sticking to "one narrative" until moving on to the next objective); GA86-89 (cooperating witness who testified using the pseudonym "Microchip" describes organizational purpose of the War Room)). Members understood that if they pushed certain messages in concert and in volume, Twitter's algorithms would

7

see the upswell in interest around the messaging and then deliver the messages to even wider audiences, amplifying their reach and effect. (See GA347 ("Guys we are controlling the narrative this is amazing / MACKEY: we are running Twitter now")).

These private groups were accessible by invitation only and were referred to at trial by the names "Madman #1," "Madman #2," "Micro Chat," and "War Room." (GA222-268, 284-394). The groups' members—of whom there were sometimes dozens—used the groups to discuss and workshop messages, in addition to organizing distribution. (See generally id.). The messages the group members promoted were often political, sometimes expressing either support for then-Candidate Donald Trump, or opposition to then-Candidate Hillary Clinton. (See, e.g., GA225-28; see GA85). At times Mackey vocally participated in the group conversations, and on other occasions he was present but silent. (See generally GA222-268, 284-394). But whether vocal or silent, Mackey acted on the messages the groups chose to propagate, leveraging his outsized power and influence to ensure the groups' messages reached their intended audiences. (GA29, 34-36, 395).

8

In the months prior to the 2016 presidential election, several of these groups began developing and discussing "memes" and other materials which encouraged citizens to vote by ineffective means, such as by telephone "text codes" (i.e., a specific five- or six-digit number that could receive a text message), or through social media. A member of the "Madman" group, of which Mackey was a longstanding member, noted that similar techniques were used in support of the 2016 Brexit vote, and suggested that they do something similar to sabotage Hillary Clinton voters. (GA367). A member of the group asked, "Can we fake something like this for Hillary?," and another member responded, "Typical that all the dopey minorities fell for it." (Id.).

Shortly thereafter, Mackey was suspended from Twitter, and had to return to the platform under a different handle. (GA23-24). Upon regaining access to Twitter, Mackey returned to some but not all of his prior message groups. Significantly, he rejoined the "War Room" group, which cooperating witness Microchip described as the central planning

9

group.[2] (See GA89, 222 ("[L]et's keep this group open and use it like our war room")). Microchip himself was a member of both the "War Room" and "Micro Chat" groups, and the other groups Mackey had belonged to had overlapping members who shared materials between the groups. (GA57, 60-61, 63, 66, 68, 70-71, 75-76, 79-80).

In the lead-up to the election, members of the War Room— like members of the "Madman" and "Micro Chat" groups—began sharing memes encouraging voters for Hillary Clinton to vote by text code or other invalid methods that would leave their vote uncounted (hereinafter, "false ads"). (GA252, 292, 325-94). The false ads tended to copy the look of literature from the Clinton campaign, borrowing the color scheme, fonts, and iconography of legitimate campaign materials. (A371-73; GA3-9). The false ads even included fine print, including language expressly stating that they had been issued by Clinton's campaign.

---

[2] Contrary to Mackey's assertion (Br.48), at trial the government made clear when Mackey had left or reentered a group (GA30-33, 51-53, 58, 60, 73, 81), and noted during closing argument that each time he was suspended from Twitter, Mackey returned to the War Room chat, (GA117).

10

Members of the War Room shared and discussed the false ads. (GA252-54). Both Mackey and cooperating witness Microchip were members of the group who thus had access to these confidential conversations. (GA39-41, 47-51). On October 30, for example, Microchip tweeted similar materials and then shared what he had done with the other members of the War Room, noting that he was concerned that the messages might fool the wrong people ("people on the Trump side"), as depicted in GX400 (GA253-54):



Microchip testified at trial pursuant to a cooperation agreement, in which he acknowledged—as the War Room conversation cited above attested—that he had conspired with others to injure the right to vote. Among other things, Microchip testified that he spread the false ads and similar information with the "hope . . . that Hillary Clinton voters see this and then vote incorrectly." (GA89, 92-94). He added that the members of the War Room used the group for direction and would then go to websites like 4Chan[3] to find other similar examples to distribute. (GA89). He further added that he expected that the members of the War Room would do the same, and that they had been selected for admission because of their influence. (GA90).

At around the same time that the false ads were being discussed in the War Room, the members of the group decided to push another meme, called "Draft Our Daughters." (GA43-47, 248-49, 255, 269-83). Although Mackey did not expressly comment on the Draft Our Daughters meme within the group, he tweeted and retweeted the Draft

---

[3] On direct examination, Mackey claimed that he, like Microchip, had located his false ads on 4Chan, but insisted that when he posted them he was not paying attention to the War Room. (GA96-99).

Our Daughters materials nearly three dozen times on Twitter in coordination with various other members of the War Room group, including Microchip.  (GA395, 103-04).

On or about October 29, around the time that the false ads were being distributed in the War Room and in the other groups with overlapping membership, members of the Clinton campaign initiated a response to the false ads encouraging citizens to vote by text code, including the images that Mackey later distributed.  (GA8, 12-14).  The campaign staff viewed the false ads at campaign headquarters, which was located in Brooklyn, within the Eastern District of New York.  (GA 11, 13-14).  Over the ensuing days, they notified the true owner of the text code, who in turn put in place an automated reply to subsequent text messages stating that the message within the false ads was not legitimate.  (GA14-15).

On November 1, 2016, as members of the Clinton campaign were taking steps toward installing the warning label, Mackey sent the following false ad variation to his followers:

13



(A372). Approximately seven hours later, Mackey sent another false ad variation to his followers—this one in Spanish.



(A372).  Both tweets featured women, one African American and one Hispanic.  Both featured the same text code as the materials distributed in the War Room, and which were seen by the Clinton campaign staffers. In both cases, Mackey manually added the hashtag #ImWithHer—a hashtag used by the Clinton campaign—which would cause Twitter to display the false ads to users interested in searching for legitimate information about Clinton's campaign.  Mackey sent his tweets on November 1, a date that certain co-conspirators within the other Twitter

15

groups had proposed as an ideal day to spread the false ads.  (GA218, 373).

At or around the same time, Mackey retweeted a third false ad, sent by an account that would join the War Room in the days ahead, and which thanked Mackey for spreading the word:



(A373).  Mackey sent each of the tweets depicted above while residing at his apartment in Manhattan, New York.  (GA558-59).  Accordingly, Mackey's tweets necessarily crossed the waters surrounding Manhattan,

thus traveling through the Eastern District of New York on their way to Twitter's servers in Georgia and California. (GA19-20, 22).

In the wake of these tweets, Mackey's account was again suspended and removed from Twitter. (GA52). Shortly thereafter, Mackey returned to Twitter using a third account and promptly returned to the War Room. (GA53, 258; A374-76). Upon his readmission into the War Room, Mackey's co-conspirators feted and celebrated him for his actions, to which he responded, "Thanks fam." (GA53-54).

Throughout 2016, Mackey frequently expressed his opinions about matters relevant to the charged conspiracy. His public and private statements from that time contextualized, and illuminated the intent behind, his disseminating the false ads. Among other things, Mackey discussed: his preoccupation with the election, (see, e.g., GA188-208); his intense partisanship regarding the outcome, (see, e.g., GA209-14); his preference for using memes to accomplish his political aims, (see, e.g., GA120-32); his understanding of his popularity and reach, (see, e.g., GA142-87); and his awareness of his followers' willingness and desire to retweet and redistribute the materials he spread, (see, e.g., GA133-41).

In these statements, Mackey repeatedly identified his political opponents—focusing primarily on black and women voters, matching the imagery of the two false ads—and expressed concern about the outcome of the election, emphasizing the importance of small numbers of votes in what he expected would be a close contest. (See, e.g., GA188-96, 560-78). Mackey focused on voter turnout (GA197-208) and discussed efforts to reduce the number of black people voting, suggesting that they should "seed . . . black social media spaces" with memes encouraging them not to vote (GA213). Finally, Mackey regularly expressed his sincere belief at the time—which he largely acknowledged on cross examination—that he thought black people were stupid and easily tricked; that immigrants (and the children of immigrants) should not be permitted to vote; that women should not be permitted to vote; and that the 19th Amendment to the Constitution should be repealed. (See, e.g., GA100, 107-08). These statements included, but were not limited to, the following:

- Tweeting "Women are children with the right to vote." (GA567).

18

- Tweeting "It's impossible to have a functioning government when single women & single mothers vote. #Repeal19." (GA568).

- Stating in a podcast interview that universal suffrage is "a terrible thing, you can't have it, because you can't let the people vote who are not contributing, and honestly, I don't think women should vote either . . ." (GA579).

- Tweeting "Trump won natural-born citizens 50% to 45%. Naturalized citizens should not get the vote." (GA577).

- Tweeting "Immigrants, the children of immigrants, et cetera cannot be trusted to vote in the interests of their new country." (GA578).

- Tweeting, "the only thing standing in Trump's path is [redacted] black voters." (GA201).

- Tweeting "Very slight changes in the electorate will lead to a Trump landslide. Small increase in White noncollege voters. Small decrease in blacks." (GA563).

- Tweeting "meanwhile blacks have an average IQ of 85." (GA570).

- Direct messaging that black people are the "[m]ost gullible people ever." (GA215).

- Tweeting "Decent people are fed up with black people because [redacted] they will believe anything." (GA573).

- Tweeting "Black people will believe anything they read ok twitter, and we let them vote why?" (GA569).

## II.  Mackey's Arrest and Prosecution

On January 26, 2021, Mackey was arrested on a complaint charging him with Conspiracy Against Rights, in violation of Section 241

19

(the "Complaint"). On or about February 10, 2021, a Grand Jury sitting in the Eastern District of New York returned an indictment[4] charging Mackey with the same crime (the "Indictment").

Approximately one year later, Mackey moved for a bill of particulars; Judge Garaufis granted the motion in part, and the government filed a bill of particulars in May 2022.

Shortly thereafter, Mackey filed a motion to dismiss the indictment, arguing that (1) there was no venue for this case in the Eastern District of New York; (2) the indictment violated due process because it was not reasonable to believe that Mackey's conduct violated Section 241; and (3) if Mackey's conduct did violate Section 241, then that section was unconstitutionally "overbroad as applied." (DE43). The government opposed this motion, and in January 2023, Judge Garaufis denied Mackey's motion in its entirety.

---

[4] The indictment was signed by Seth DuCharme, then the Acting United States Attorney for the Eastern District of New York, appointed by then-Attorney General William Barr.

20

On March 20, 2023, the trial in this matter commenced, and on March 31, 2023, the jury rendered a guilty verdict on the sole count in the indictment.

Approximately six weeks later, Mackey filed a motion to dismiss the indictment, set aside the verdict, or for a new trial arguing, among other things, that the government failed to prove a "clearly established" violation of Section 241 or venue within the Eastern District of New York. Judge Donnelly, who replaced Judge Garaufis before trial, denied Mackey's motion and sentenced Mackey principally to seven months in prison. This appeal ensued.

## SUMMARY OF ARGUMENT

Drawing all inferences in favor of the jury's verdict, Mackey agreed with others to distribute fraudulent campaign announcements with the intent to deceive voters concerning the methods by which they could cast a vote in the 2016 presidential election. The purpose of the conspiracy was to defraud voters of their right to cast a ballot, not merely to disseminate "political misinformation." The co-conspirators' conduct did not involve speech—honest or otherwise—about political issues, policies, platforms, or candidate biographies. Instead, they attempted to use lies and deception to prevent qualified voters who intended to exercise their right to vote from having their votes counted.

Section 241 has punished such voter-suppression schemes for more than a century, and this case belongs comfortably within that lineage. The statute may never before have been used to prosecute an effort to suppress the right to vote through misleading tweets about voting procedures. But such a scheme is functionally no different from standing on a street corner, impersonating a campaign official, and deliberately diverting voters to invalid polling locations. It thus falls well within Section 241's clearly defined bounds, given the lengthy history of

prosecutions under Section 241 to protect voting rights from fraud and non-violent interference. Nor does prosecuting that conduct under Section 241 raise any First Amendment concerns, as any speech involved is both integral to criminal conduct and prohibitable false speech.

Finally, the jury had ample evidence from which to conclude that Mackey was guilty of the charged crime and that it was properly charged in the Eastern District of New York. Mackey's statements reflected his desire to disenfranchise his adversaries, and the coordinated efforts of the groups of which he was a part were geared toward that precise aim. Mackey's participation in the groups' coordinated efforts to trick people into voting through ineffective means were properly held to be evidence of his intent to deprive others of the right to cast a meaningful ballot. In furtherance of this scheme, Mackey sent tweets through the territorial jurisdiction of the EDNY; he and his co-conspirators aspired to have their efforts viewed in, and have effect in, the EDNY; they in fact did provoke action from Clinton campaign workers in the EDNY; and they elicited text messages from numerous EDNY telephone numbers. Together, this was more than adequate for a jury to find venue in the EDNY by a preponderance of the evidence.

## ARGUMENT

## POINT ONE

## THE JURY PROPERLY FOUND THAT MACKEY VIOLATED SECTION 241 BY CONSPIRING TO INJURE THE RIGHT TO VOTE

I. Applicable Law

A. Standard of Review

"[A] defendant challenging the sufficiency of the evidence . . . at trial bears a heavy burden, as the standard of review is exceedingly deferential." United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012).[5] This Court will "sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Capers, 20 F.4th 105, 113 (2d Cir. 2021). This Court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999). Moreover, "it is well-settled" that this Court will "defer to the

_____

[5] Unless otherwise noted, all case quotations omit internal quotation marks and citations and adopt all alterations.

24

jury's assessment of witness credibility." United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002).

The "high degree of deference we afford to a jury verdict is 'especially important when reviewing a conviction of conspiracy.'" United States v. Anderson, 747 F.3d 51, 72-73 (2d Cir. 2014) (quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992)). "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. at 73. The "agreement [to participate in the conspiracy] may be inferred from the facts and circumstances of the case[,]" and "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." United States v. Wexler, 522 F.3d 194, 207-08 (2d Cir. 2008) (last alteration in original).

Objections to jury instructions, conversely, are reviewed "de novo, reversing only where, viewing the charge as a whole, there was a prejudicial error." United States v. Kukushkin, 61 F.4th 327, 332 (2d Cir. 2023). But when a defendant does not timely object to jury instructions, a challenge to the instructions is reviewed "for plain error, considering

whether (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Miller, 954 F.3d 551, 557-58 (2d Cir. 2020).

B.    Pretrial Motions to Dismiss

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." United States v. Aleynikov, 676 F.3d 71, 75-76 (2d Cir. 2012); Fed. R. Crim. P. 12(b)(2). A district court's denial of a motion to dismiss an indictment presents a mixed question of law and fact and is reviewed de novo. United States v. Montague, 67 F.4th 520, 527 (2d Cir. 2023). The district court's factual findings are reviewed for clear error. United States v. Daley, 702 F.3d 96, 100 (2d Cir. 2012).

An indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and (2) "enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Wedd, 993 F.3d 104, 120 (2d Cir. 2021) (quoting United

26

States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998)) (alteration in original). "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Id. (alteration in original). "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . , the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." Id. at 121.

II.     Section 241 Criminalizes Conspiracies to
        Injure the "Clearly Established" Right to Vote

Section 241 reads, in relevant part:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having exercised the same . . . [t]hey shall be [punished].

As the Supreme Court explained in United States v. Lanier, Section 241 features a rare structure:

> [I]n lieu of describing the specific conduct [section 241] forbids, [the] statute's general terms incorporate constitutional law by reference, and many of the incorporated constitutional guarantees are, of course, themselves stated with some catholicity of phrasing. The result is that

> neither the statutes nor a good many of their
> constitutional referents delineate the range of
> forbidden conduct with particularity.

520 U.S. 259, 265 (1997).  Given this structure, the Supreme Court has held that fair notice of the statute's reach is afforded when a defendant "is charged with violating 'a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them.'" Lanier, 520 U.S. at 267 (quoting Screws v. United States, 325 U.S. 91, 104 (1945)).

Significantly, the Court in Lanier rejected a proposed standard for fair notice that would have required prior judicial decisions establishing criminal liability under "fundamentally similar" facts.  Id. at 267-70.  Instead, the Court linked the concept of fair warning for Section 241 violations to that of "clearly established" law in the qualified-immunity context and observed that it had "upheld convictions under § 241 . . . despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Id. at 269.  The Court went on to say:

> general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

Id. at 271 (alteration in original).

A.    The Right to Vote Is Clearly Established Such that Mackey Had Fair Notice the Conspiracy to Violate It Was Criminal

The constitutional right to vote encompasses both "the right to put a ballot in a box" and a "right to have one's vote counted" fairly. Mosley, 238 U.S. at 386; accord Reynolds v. Sims, 377 U.S. 533, 554 (1964). In this way, "[t]he right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." Reynolds, 377 U.S. at 555. All of this is well settled and clearly established. Id. (collecting cases).

Nonetheless, for well over a hundred years, persons have conspired to injure a citizen's right to vote through diverse schemes, and the government has consistently prosecuted those criminals using Section 241. (SA24-30). It has punished those who plot to use violence or lies to keep voters away from the ballot box. Ex parte Yarbrough, 110 U.S. 651, 656-57 (1884) (violence), abrogated on other grounds by Davis

29

v. United States, 417 U.S. 333 (1974); Guinn v. United States, 228 F. 103, 109-10 (8th Cir. 1915) ("Guinn II") (lies).  And it has punished those who on the back-end refuse to count validly cast ballots, see Mosley, 238 U.S. at 387; falsify the results in a primary election, United States v. Classic, 313 U.S. 299, 308 (1941); or cause "fictitious ballots" to be "fraudulently cast and counted," United States v. Saylor, 322 U.S. 385, 386 (1944); accord Anderson v. United States, 417 U.S. 211, 225-26 (1974).

Mackey followed in these other defendants' footsteps.  He too conspired with others for the specific purpose of interfering with the right to vote.  In particular, he and his confederates intentionally sought to violate American citizens' clearly established right to cast votes in the 2016 election by providing them with a fake electronic ballot box.  See, e.g., Yarbrough, 110 U.S. at 656-57; Guinn II, 228 F. at 109-10; United States v. Tobin, No. 04-CR-216-01-SM, 2005 WL 3199672, at *1, *4 (D.N.H. Nov. 30, 2005); United States v. Stone, 188 F. 836, 838-39 (D. Md. 1911).  And like many others, Mackey and his allies sought to infringe upon the right to vote through lies and deception.  See Saylor, 322 U.S. at 385-86; Mosley, 238 U.S. at 387-88; see also Guinn II, 228 F. at 109-10 (upholding conviction where defendants deliberately and

falsely advised voters that they were ineligible to cast a ballot); Guinn I, 238 U.S. at 368 (expressing no doubt that Section 241 punishes this scheme); Stone, 188 F. at 838-39 (upholding sufficiency of Section 241 indictment alleging that defendants prepared a ballot designed to disguise the option of voting for Republicans).

Mackey's Section 241 conviction thus breaks no new constitutional ground, and he had fair notice that his conduct was illegal. Lanier, 520 U.S. at 267. The conspiracy in which he participated targeted the "clearly established" right to vote by seeking to cause eligible voters to cast only invalid votes, and, like many such schemes, it used lies, deception, and fraud to inflict that "injury." The only difference is that his scheme used twenty-first century technology to carry out a vote-suppression scheme. But that does not change the fact that this Section 241 conviction rested on an area where "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the situation in question." Id. at 271.

Mackey resists this fair-notice conclusion because he claims that the government has expanded Section 241 in an unforeseeable way "to reach speech that deceives voters about the right" to vote. (Br.17

(emphasis in original)).  Put another way, he argues that it is not enough that the right he conspired to injure was clearly established; the precise method employed to deny others the right to vote must have been involved in a prior case. (Id.; see also Br. of Profs. Polsby & Lerner at 19 (asserting that "the key issue" was whether "a reasonable person in Mackey's situation [had] fair notice that deceptive speech about voting procedures was unlawful")).  That argument suffers from both legal and factual flaws.

To start, the fair warning required to convict a defendant under Section 241 does not require the existence of a prior case or prosecution with "fundamentally similar" facts.  Lanier, 520 U.S. at 269. Instead, this requirement centers on whether the right at issue in any case is one a defendant could have anticipated would be covered by the statute—as the Supreme Court has said:

> [i]t is no extension of the criminal statute . . . to find a violation of it in a new method of interference with the right which its words protect. For it is the constitutional right, regardless of the method of interference, which is the subject of the statute and which in precise terms it protects from injury and oppression.

Classic, 313 U.S. at 324 (emphasis added).  Section 241 convictions may accordingly prove valid despite "notable factual distinctions between" the case at hand and prior precedent, so long as a prior constitutional rule or courts' "prior decisions gave reasonable warning that the conduct" charged would "violate[] constitutional rights."  Lanier, 520 U.S. at 269; see also Hope v. Pelzer, 536 U.S. 730, 739-41 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" and rejecting a requirement that earlier cases must involve "materially similar" facts); Tobin, 2005 WL 3199672, at *4 ("It is not the novelty of the means employed, or the originality of the scheme devised, that 'fair notice' speaks to, but the purpose of the conspiracy or the object of the conduct." (emphasis added)).

Those principles demonstrate why Mackey had ample warning that his scheme would violate another's constitutional rights. Cases such as Yarbrough, Guinn I, and Guinn II left no doubt that preventing another person from casting their vote in a federal election amounted to a denial of the right to vote, and the Guinn decisions in particular showed how lies about a voter's eligibility (deceptive speech) to prevent the voter from voting deny a voter his right to vote.  To be sure,

neither <u>Yarbrough</u> nor <u>Guinn</u> precisely resemble the scheme that Mackey employed. But they confirmed the obvious principles that American citizens have a right to cast their votes at the ballot box and that other Americans cannot steal that right through fraud, violence, or any other method. Cf. <u>Saylor</u>, 322 U.S. at 388 ("If the voters' rights protected by [Section 241] are those defined by the <u>Mosley</u> case," the different manner of frustrating those rights "intended by the defendants in the present case violates them.").[6]

Even setting those cases aside, that Mackey's scheme impermissibly sought to deny others their constitutional right to vote was obvious for another reason. The Supreme Court has over the years affirmed that fraudulent schemes designed to dilute the ballots actually cast could give rise to a prosecution under Section 241. <u>Anderson</u>, 417

---

[6] The Court in <u>United States v. Bathgate</u>, 246 U.S. 220, 224-26 (1918), declined to find bribing voters to be a violation of Section 241, but only because a companion statute specifically prohibiting that very conduct had been repealed by Congress prior to the conduct at issue. As the district court observed, <u>Bathgate</u> is a distinct outlier in Section 241's jurisprudence (SA26-27), and Mackey does not claim that a prior statute, since repealed by Congress, similarly applies to his conduct. See <u>Saylor</u>, 322 U.S. at 388-90 (declining to extend <u>Bathgate</u>'s reasoning to cases in which the charged conduct had not been described by a repealed statute).

U.S. at 225-26; <u>Saylor</u>, 322 U.S. at 386.  In other words, fraud designed to make a vote count for less (but still something) violates the right to vote and may be prosecuted under Section 241.  Given that, a reasonable person would surely have foreseen that a scheme employing fraud and aiming for the more extreme goal of causing a voter's vote to count for <u>nothing</u> would also violate the right to vote.  And of course, that is the blatant and brazen scheme that Mackey pursued here.  <u>See</u> <u>Lanier</u>, 520 U.S. at 271 (noting that a defendant may have fair notice because "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question").

The Section 1983 qualified-immunity cases on which Mackey relies involve factual situations and constitutional rights with more shades of gray than the right to cast a ballot.  After all, the right to cast a vote at the ballot box in some fashion is clearly established.  <u>Reynolds</u>, 377 U.S. at 555; <u>Guinn I</u>, 238 U.S. at 368.  It is not a right "to avoid unreasonable infringement on the right to vote," but rather just a right to vote.  By contrast, the contours of the Fourth Amendment right implicated in an excessive-force lawsuit (virtually all of the cases cited by Mackey involve excessive-force claims, and all involved Fourth

Amendment analyses) always depends on an evaluation of the objective reasonableness of an officer's conduct in the specific fact pattern presented by the case. See Cugini v. City of New York, 941 F.3d 604, 608 (2d Cir. 2019). In the Fourth Amendment context, subtle changes in a case's facts may materially affect the scope of not just a cause of action, but the right itself. See id. In that context, then, identifying cases involving a particularly high level of factual overlap "is especially important" when weighing whether an action violates a Fourth Amendment right. Mullenix v. Luna, 577 U.S. 7, 12 (2015).

Mackey's and amici's concern that this case marks the advent of federal criminal oversight of "political misinformation" is misplaced. This case is not the first in a parade of horribles, in which anyone making a factual claim of dubious accuracy concerning a political issue or candidate is vulnerable to prosecution. This case instead stands only for the limited and well-established proposition that coordinated efforts to fully deprive voters of their right to access the ballot box—for example, by defrauding them concerning the time, place, and manner of voting— violates Section 241. See Classic, 313 U.S. at 324-25 ("To withdraw from the scope of the statute, an effective interference with the constitutional

36

right of choice, because other wholly different situations not now before us may not be found to involve such an interference is to say that acts plainly within the statute should be deemed to be without it because other hypothetical cases may later be found not to infringe the constitutional right with which alone the statute is concerned." (emphasis added)).[7]

B.    It Was Not Plain Error to Apply
       Section 241 to the Right to Vote for President

Some amici assert that Americans have no right to vote in presidential elections except as provided for by state law, supplemented by specific constitutional amendments, and that Section 241 therefore does not reach private conduct on the facts of this case.   (Br. of Former

---

[7]       Mackey and amicus America First Legal Foundation repeatedly argue that no distinction could be drawn between efforts to undermine whether a citizen is able to vote, and whether a citizen is able to use her vote effectively.   (Br.22 ("The Government's theory would equally prohibit . . . falsehoods affecting for whom to vote—every lie told about a candidate's background, endorsement, or policies[.]"); Br. of Am. First Legal Found. at 3 ("Any misleading speech . . . about a political candidate could 'hinder' someone's decision to vote for that candidate.")). But any right to information governing how to spend one's vote stands apart from the right to the vote itself.   Cf. Ciminelli v. United States, 598 U.S. 306, 315 (2023) (distinguishing between property rights, which—like the right to vote—can be infringed by fraud, and the so-called right to control property through accurate information).

Dep't of Justice Officials 3-19).  But Mackey never made this argument below, and he includes only a one-paragraph assertion on appeal that he lacked fair notice of Section 241's application to presidential elections, (Br.34).  He thus has "doubly waived" this issue.  United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014); see also Universal City Studios, Inc. v. Corley, 273 F.3d 429, 445 (2d Cir. 2001) ("Although an amicus brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel.").  And, at best, this argument is subject to plain error review.  See United States v. Rosario, 7 F.4th 65, 69 (2d Cir. 2021).

The district court did not plainly err in applying Section 241 to presidential elections.  The understanding that Congress can protect the act of voting for President has deep roots in Supreme Court opinions.  More than a century ago, the Supreme Court declared that "[a]mong the rights and privileges which have been recognized by this court to be secured to citizens of the United States by the constitution [is] . . . the right to vote for presidential electors or members of congress."  In re Quarles, 158 U.S. 532, 535 (1895).  For this proposition, Quarles cited

Yarbrough, 110 U.S. 651, which held that the right to vote in elections for Members of Congress can be protected against private as well as state action, id. at 662, 666.  The Court later reiterated that "[i]t has long been settled that [Section] 241 embraces a conspiracy to" dilute votes "at an election for federal officers."  Anderson, 417 U.S. at 226 (emphasis added).  Mackey thus had fair notice that Section 241 applies to private parties who seek to impede a person's right to vote in any federal election, including for President.

Mackey's notice that Congress may protect the act of voting in presidential elections stems not only from these statements, but from the structure of the Constitution itself and longstanding law in the States governing Presidential elections.  While the Constitution provides for the election of the President by electors from each State and provides for the appointment of electors "in such Manner as the Legislature thereof may direct," U.S. Const. Art. II, § 1, Cl. 2; see also id. Amend. 12; "every State appoints a slate of electors selected by the political party whose candidate has won the State's popular vote," Chiafalo v. Washington, 140 S. Ct.

39

2316, 2319 (2020).[8]  Popular voting for the electors took hold by the early 18th century, and "[b]y the early 20th century, citizens in most States voted for the presidential candidate himself; ballots increasingly did not even list the electors." Chiafalo, 140 S. Ct. at 2321.  To cement the popular vote as the means of electing the President, many States in the 20th century passed laws to require electors to follow the popular vote, and "States began about 60 years ago to back up their pledge laws with some kind of sanction." Id. at 2322.  Thus, the linkage between the popular vote and the election of the President is embedded in law, under which the popular vote in each State dictates the outcome.  Just as Congress may protect voting for Members of Congress, see, e.g., Yarbrough, 110 U.S. 651, Congress may protect the right of the people to vote for a federal office holder—the President—against conduct that injures or impairs that right.  An alternative reading would lead to the anomalous result that the presidential election, the sole federal office

---

[8]    Two States do not allocate all of the electors to the popular vote winner, but they too, by law, provide for the appointment of electors by popular vote.  Chiafalo, 140 S. Ct. at 2321 n.1.

elected nationally, would receive less protection than any individual congressional election.

The Supreme Court confirmed this principle in <u>Bush v. Gore</u>, 531 U.S. 98 (2000) (per curiam). The Court noted that while "[t]he individual citizen has no federal constitutional right to vote for electors for the President of the United States <u>unless and until</u> the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college," once "the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental." <u>Id.</u> at 104 (emphasis added). The Court added that "[t]he right to vote is protected in more than the initial allocation of the franchise," but extends to "the manner of its exercise." <u>Id.</u> (stating that equal protection principles apply). Thus, Mackey had fair notice that American citizens have a constitutionally enforceable right to vote in presidential elections.[9]

---

[9] The Eighth Circuit held to the contrary in <u>Walker v. United States</u>, 93 F.2d 383 (8th Cir. 1937), concluding that because the right to vote for presidential electors depended on state law, Section 241 did not apply to presidential elections. But its reasoning that the right to vote in such elections "depends directly and exclusively on state

Like the counterpart right to vote in congressional elections, see U.S. Const. Art. I, § 2, the right to vote in Presidential elections, once created by a State, is protected against private as well as governmental impairments.  See Classic, 313 U.S. at 315 (citing Yarbrough, supra). This reflects basic constitutional values.  Both "the interest of the party concerned"—the voter—and "the necessity of the government itself" require "that the votes by which its members of congress and its president are elected shall be the free votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice."  Yarbrough, 110 U.S. at 662 (first emphasis

---

legislation" and so is not federally protected, Walker, 93 F.2d at 388—did not survive Classic, supra, and is belied by Bush v. Gore.  In Classic, the Supreme Court held that the predecessor to Section 241 protects voters in primary elections for Members of Congress even though the Constitution did not require such primary elections, explaining that "where the primary is by law made an integral part of the election machinery," it may be protected by federal law.  313 U.S. at 318; id. at 320 (primary is protected as a "necessary step" in choice of candidates, which "controls that choice").  The same is true here: by law, the popular vote is "an integral part of the [presidential] election machinery" and a "necessary step" that "controls" the appointment of presidential electors. Id. at 318-19.  And directly relevant here, Bush v. Gore confirmed that popular voting in presidential elections, once chosen by the State, forms the basis for a "federal constitutional right."  531 U.S. at 104.

42

added).  When a State decides on an election as the mechanism for selecting its presidential electors, voters have the right to make a "free and uncorrupted choice."  Id.  Section 241 applies to rights like this that "arise[] out of the creation and establishment by the constitution itself of a national government, paramount and supreme within its sphere of action."  Quarles, 158 U.S. at 536; accord Motes v. United States, 178 U.S. 458, 463 (1900).  And Section 241 may protect this right, "essential to the healthy organization of the government itself," against injury by private parties as well as state actors.  Yarbrough, 110 U.S. at 666.

At the very least, the district court did not commit plain error. Mackey concedes (Br.34) that Section 241 applies to congressional elections.  No Second Circuit or Supreme Court precedent holds that Section 241 cannot apply to private conspiracies to violate the right to vote in presidential as well as congressional elections, or that the right is so unclear as to deny defendants fair notice.  This Court "typically do[es] not find plain error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court."  United States v. Bastian, 770 F.3d 212, 220 (2d Cir. 2014). Nor can the Eighth Circuit's isolated and dated holding from nearly a

century ago, whose reasoning has been overtaken by later Supreme Court decisions (see note 9, supra at 40-41), alone create plain error where "the law in this Circuit" at worst "remains silent on the issue." Id. at 221.[10]

Finally, any error would be harmless. Mackey and his co-conspirators agreed and sought to prevent Clinton supporters from casting valid ballots at the polls on election day, thereby frustrating their right to vote in congressional elections as well as the presidential election. Cf. United States v. Gates, 84 F.4th 496, 503-04, 507 (2d Cir. 2023) (denying relief on plain error review based on a lack of prejudice). The government did not have a reason to elicit additional evidence of the down-ballot effects, or intentions, of the conspiracy, because Mackey never previously argued that the right to vote for president was not protected against private actors by Section 241.

---

[10] Should this Court nevertheless find that Mackey lacked fair warning, for the sake of providing such warning going forward the Court should first make clear that voters have a constitutional right to vote for President and Vice-President that can be protected against attempted injury by private actors.

44

C.  <u>The District Court Correctly Defined "Injure"</u>

Mackey alternatively argues that the operative words in Section 241—"injure, oppress, threaten, or intimidate"—require some form of coercive act to establish guilt.  To the extent this is offered in support of the proposition that Section 241 should be limited, as a matter of statutory interpretation, to conduct that could fairly be considered coercive, that view has long been left behind by the jurisprudence exploring the scope of the statute.

As discussed above and in Judge Garaufis's careful opinion (SA32-36), Section 241 has been applied for decades without controversy to conduct like casting fake ballots and refusing to count validly cast ballots—activities unrelated to coercion.  The Supreme Court explained in <u>Mosley</u> itself that the statute has "a general scope" and uses general words" that do not "naturally . . . confine [the statute] to conspiracies contemplating violence."  238 U.S. at 387-88.  And the Court now routinely describes the type of conduct proscribed by Section 241 with words like "interfering with," "frustrating," or "preventing" the free exercise of established constitutional rights.  <u>See, e.g.</u>, <u>Lanier</u>, 520 U.S. at 264-65 ("§ 241 . . . speaks of conspiracies <u>to prevent</u> the free exercise

of any right or privilege secured to [any person] by the Constitution or laws of the United States." (alteration in original, emphasis added)); United States v. Kozminski, 487 U.S. 931, 941 (1988) ("Section 241 creates no substantive rights, but prohibits interference with rights established by the Federal Constitution or laws and by decisions interpreting them." (emphasis added)); Anderson, 417 U.S. at 223 ("[S]ince the gravamen of the offense under [Section] 241 is conspiracy, the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question." (emphasis added)); Saylor, 322 U.S. at 388 (overturning dismissal of indictment because Section 241 would be offended by "the frustration [of voting rights] . . . intended by the defendants").[11]

To the extent Mackey relies on the wording of Section 241 to claim that the verbs used therein denied him fair notice that the statute

---

[11]    Mackey cites United States v. Acosta, 470 F.3d 132, 136 (2d Cir. 2006), for the proposition that this Court has observed the most obvious "construction" of Section 241's operative verbs is "conduct that involves applying physical force." (Br.19 (ellipses omitted)). But in Acosta this Court stated that "applying physical force" was the "most obvious way" to violate the statute, without suggesting that the statute's coverage be limited to such conduct. 470 F.3d at 136.

would punish a conspiracy using falsehoods to interfere with the right to vote, the cases cited above again prove fatal to the argument. (See supra, at 30-36). But further examples abound. In Anderson, among the conduct supporting the defendants' Section 241 convictions was their accompanying voters, who had requested assistance using voting machines to cast ballots for one slate of candidates, to the machines and casting votes for another slate of candidates while "aligning their bodies so as to conceal what they were doing" from the voters. 417 U.S. at 225. And the Fourth Circuit has affirmed convictions under Section 241 based on, inter alia, evidence indicating that illiterate voters had been "help[ed]" by the defendants to complete ballots in favor of the defendants' preferred candidates.[12] United States v. Fields, 228 F.2d 544, 547 (4th Cir. 1955); see also Stone, 188 F. at 838-39.[13]

---

[12] The Seventh Circuit found similar conduct to violate Section 241. See United States v. Ollinger, 759 F.2d 1293 (7th Cir. 1985). In Ollinger, the defendants conspired to pay "elderly and mentally handicapped" residents of a facility for their votes and entered computerized ballots for defendant's preferred party regardless of "the wishes of the residents." See id. at 1297.

[13] In his brief in support of bail pending appeal, Mackey argued that Stone and Tobin (discussed earlier) do not count for fair-notice

47

These historical precedents make clear that Section 241 is not limited to addressing coercive conduct, but instead applies to conduct, including fraudulent conduct, specifically intended to prevent citizens from exercising their right to vote.

> **D.** Mackey's Tweets Calculated to Defeat Constitutionally Protected Rights Are Not Entitled to First Amendment Protections

Mackey next wrongly cites First Amendment concerns with this Section 241 prosecution and invokes the constitutional-avoidance canon to urge this Court to read Section 241 not to apply here. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject

---

purposes because only Supreme Court and circuit court decisions can "clearly establish" the law in the absence of "robust consensus." (2d Cir. DE16.1 at 11). But this Court has observed that state court decisions and the decisions of federal district courts are "relevant and often persuasive authority on the clearly established issue." Sloley v. VanBramer, 945 F.3d 30, 42 (2d Cir. 2019); see generally Lanier, 520 U.S. at 269 (rejecting any "categorical rule" as to which courts are capable of supplying fair warning that particular conduct can violate Section 241). Mackey makes much of the fact that the jury in Tobin acquitted. (Br.18). If anything, the verdict in Tobin showcases the robust protection afforded defendants by the necessity of the government's having to prove an intent to injure the right to vote beyond a reasonable doubt.

48

matter, or its content." United States v. Alvarez, 567 U.S. 709, 716 (2012) (plurality opinion) (alteration in original) (quoting Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)). "[C]ontent-based restrictions on speech" are therefore "presumed invalid," id. at 716-17, unless "confined to the few 'historic and traditional categories [of expression] long familiar to the bar,'" id. at 717 (alteration in original) (quoting United States v. Stevens, 559 U.S. 460, 470 (2010)), including, inter alia, "speech integral to criminal conduct," id. (citing Giboney v. Empire Storage & Ice Co., 336 U.S. 490 (1949)).

To the extent Section 241—which criminalizes conspiracies to interfere with the exercise of constitutional rights—reaches any "speech" at all, it targets only speech integral to the criminal conduct of these illegal conspiracies. Alternatively, this particular Section 241 prosecution permissibly targets and punishes only a limited category of false speech about voting procedures. Accordingly, no First Amendment concerns exist here, and the constitutional-avoidance canon has no role to play in determining whether Section 241 proscribes Mackey's conduct.

1.  Section 241 Prosecution Does Not
    <u>Even Arguably Punish Protected Speech</u>

The application of Section 241 to Mackey's criminal conspiracy poses no First Amendment problem, as the district court recognized. (SA52). "Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected" under the First Amendment. <u>United States v. Hansen</u>, 599 U.S. 762, 783 (2023). The Supreme Court has thus repeatedly observed: "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." <u>Id.</u> (quoting <u>Giboney</u>, 336 U.S. at 502). Indeed, "[m]any long established criminal proscriptions—such as laws against <u>conspiracy</u> . . . —criminalize speech," <u>United States v. Williams</u>, 553 U.S. 285, 298 (2008) (emphasis added), and, were it otherwise, it would prove "practically impossible ever to enforce laws against . . . conspiracies deemed injurious to society," <u>Giboney</u>, 336 U.S. at 502; <u>see also</u> <u>United States v. Rowlee</u>, 899 F.2d 1275, 1278 (2d Cir. 1990) ("[S]peech is

not protected by the First Amendment when it is the very vehicle of the crime itself." (alteration in original)).

That rule applies here and extinguishes any First Amendment concern regarding Mackey's prosecution or Section 241 right-to-vote prosecutions of injuries to constitutional rights carried out through speech more generally. Speech-related conduct in furtherance of an illegal conspiracy is "not protected by the First Amendment merely because, in part, it may have involved the use of language." Rowlee, 899 F.2d at 1278. That remains true even when "political speech" (if Mackey's purely rights-defeating speech can somehow be called that) is used to commit a conspiracy offense. United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999). So once Mackey "crossed the line" and began circulating false speech about voting procedures to further a conspiracy to deny others the right to vote, that speech lost whatever First Amendment protection it might otherwise have enjoyed. Id.; cf. id. ("[The defendant's political] speeches were not simply the expression of ideas; in some instances they constituted the crime of conspiracy to wage war on the United States.").

51

Nor should that result come as a surprise in the Section 241 context specifically. The Supreme Court has long held that Section 241 permissibly punishes, among other things, the submission of fraudulent ballots, falsifying elections results, or lying to turn away eligible voters from the polls. See Saylor, 322 U.S. at 385-86; Guinn I, 238 U.S. at 368; Guinn II, 228 F. at 109-10; Classic, 313 U.S. at 308. Those forms of "speech" enabled the criminal conspiracies to deprive citizens of the right to vote; and to suggest that after all these years a First Amendment problem lurked behind each of these Section 241 prosecutions is alarmist and wrong.

Importantly, the government's Section 241 theory did not merely allege that "deceiving voters 'injures' their right to vote." (Br.25.). The government instead charged Mackey with joining a conspiracy to use false statements with a specific intent to deprive voters fully of their constitutional right to vote. That agreement and the joint specific intent among the co-conspirators to harm another's constitutional right to vote constitute the Section 241 crime—not the mere propagation of false speech. See Counterman v. Colorado, 600 U.S. 66, 75 (2023) (explaining that the First Amendment may "demand a subjective mental-state

52

requirement" in a criminal statute concerning proscribable speech to avoid chilling other protected speech); <u>Alvarez</u>, 567 U.S. at 719 (noting the requirement of a <u>mens</u> <u>rea</u> to punish falsity); <u>id.</u> at 733 (Breyer, J., concurring in the judgment).

Section 241 and this prosecution specifically then do not involve protected speech, and Mackey's invocation of <u>Alvarez</u> and the concerns discussed therein are a red herring. (Br.25-27). That case, after all, struck down the Stolen Valor Act, which criminalized certain false representations made for any purpose. 567 U.S. at 715. Accordingly, the statute in <u>Alvarez</u> did not concern speech integral to other criminal conduct, and every opinion in <u>Alvarez</u> reiterated that laws "implicat[ing] . . . speech integral to criminal conduct" remain constitutional because that speech enjoys no First Amendment protection. 567 U.S. at 721 (plurality opinion); <u>id.</u> at 734-36 (Breyer, J., concurring in the judgment); <u>id.</u> at 747 (Alito, J., dissenting).

As such, Section 241's application to Mackey's conduct does not trigger the analysis employed in <u>Alvarez</u> or even <u>United States v. Mansky</u>, 138 S. Ct. 1876, 1883, 1889-91 (2018), in which Minnesota law prohibited, among other things, wearing any political insignia inside

53

polling locations irrespective of the wearer's intent and with an imprecise definition of "political." In <u>Mansky</u>, the Supreme Court observed: "We do not doubt that the State may prohibit messages <u>intended to mislead voters about voting requirements and procedures</u>." <u>Id.</u> at 1889 n.4 (emphasis added). The Court concluded that the state law in <u>Mansky</u> did not "align" with that concededly valid statutory purpose. <u>Id.</u>

Given their explicit prohibitions on categories of speech without regard to intent, <u>Alvarez</u> and <u>Mansky</u> and similar cases are not proper analogs for this prosecution. Instead, this case is like <u>Giboney</u>. The state laws at issue in <u>Giboney</u> prohibited, in essence, unreasonable restraints on trade (a state law equivalent to the Sherman Act). <u>Giboney</u>, 336 U.S. at 491-93 & n.1. The defendants in the case were labor unions who were undisputedly engaging in peaceful picketing (core First Amendment conduct), but for the unlawful purpose of compelling the plaintiff company to make an illegal agreement in restraint of trade. <u>See</u> <u>id.</u> at 498. The Supreme Court upheld an injunction against the picketers over a First Amendment challenge, observing: "[f]or the placards were to effectuate the purpose of an unlawful combination, and their sole,

54

unlawful immediate objective was to induce [the plaintiff company] to violate the Missouri law by acquiescing." Id. at 502.

In this case, the jury's verdict establishes that the intent of the conspiracy was to injure the right to vote. As in Giboney, this unlawful objective forfeited whatever protection might otherwise have been afforded by the First Amendment to the means employed to commit the crime. For this reason, this prosecution did not intrude on Mackey's First Amendment rights.

### 2.    This Prosecution Does Not Violate Mackey's First Amendment Rights

Even if Mackey's speech somehow did not constitute "speech integral to criminal conduct"—and it does—this case results only in the criminalization of inarguably false speech regarding the time, place, and manner of elections with the intent (proven beyond a reasonable doubt) to injure the right to vote as part of a criminal conspiracy. As discussed above, Mackey's conviction was for conspiring to injure the right to vote by agreeing with others to defraud voters into effectively invalidating their own ballots. To accomplish this goal—which the Mansky Court affirmatively recognized as a legitimate basis to limit speech—Mackey

55

deliberately and purposely employed false speech about verifiable government procedures, categories of speech entitled to less deference. See generally Alvarez, 567 U.S. at 739; SA44. Judged in this context, the prosecution does not infringe Mackey's First Amendment rights.

As an initial matter, courts have held for over 100 years that Section 241 protects the right to vote in an election and to have one's vote counted. See, e.g., Mosley, 238 U.S. at 386. The constitutional right to vote is imperative—it is the right that secures all other rights. It is indisputable that the government's interest in protecting the right to vote is a "substantial justification" to regulate. Alvarez, 567 U.S. at 737; see also Mansky, 138 S. Ct. at 1889 n.4.[14]

In addition, Mackey's fraudulent campaign announcements consist of "false statements about easily verifiable facts" concerning the available methods of voting and do not in any way touch on "philosophy,

---

[14] Because the right to vote is a substantial interest justifying regulation, restrictions on speech are permissible in analogous contexts. See, e.g., Burson v. Freeman, 504 U.S. 191, 199 (1992) (plurality opinion) (applying strict scrutiny but upholding a state statute establishing campaign-free polling locations because "protecting voters from confusion and undue influence" in the voting process is a "compelling interest").

56

religion, history, the social sciences, the arts, and the like." Alvarez, 567 U.S. at 731-32 (Breyer, J., concurring). If true, they would have been banal campaign information regarding available voting procedures. Their falsity did not somehow imbue them with additional protections attendant to high-value political speech.[15]

---

[15] The Supreme Court has a long history of recognizing that the right to free speech does not protect false factual statements that inflict real harm and serve no legitimate interest. Alvarez, 567 U.S. at 739, 746-47 (Alito, J., dissenting), citing Illinois ex rel. Madigan v. Telemarking Associates, Inc., 538 U.S. 600, 612 (2003) ("Like other forms of public deception, fraudulent charitable solicitation is unprotected speech"); BE&K Const. Co. v. NLRB, 536 U.S. 516, 531 (2002) ("[F]alse statements may be unprotected for their own sake" (alteration in original)); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52 (1998) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective"); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 776 (1984) ("There is no constitutional value in false statements of fact." (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974))); Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743 (1983) ("False statements are not immunized by the First Amendment right to freedom of speech."); Brown v. Hartledge, 456 U.S. 45, 60 (1982) ("Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements."); Herbert v. Lando, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."); Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); Time, Inc. v. Hill, 385 U.S. 374, 389 (1967)

The statements also concern the integrity of government procedures, a category of statements in which the government has generally enjoyed greater license to regulate.  (See SA44 (noting general agreement between Alvarez majority and concurring opinions that "statutes that prohibit falsities in order to protect the integrity of government processes (e.g., perjury statutes, laws barring lying to government officials, and those prohibiting falsely representing that one is speaking on behalf of the government) are properly within the government's regulatory authority")).

Finally, the nature of Section 241's scienter requirement—an intent, proven beyond a reasonable doubt, to injure the right to vote— necessarily guards against the deficiencies identified in the Stolen Valor Act by the Supreme Court and also distinguishes this case from Mansky (where the relevant prohibition had no intent requirement).  Cf. Alvarez,

---

("[T]he constitutional guarantees [of the First Amendment] can tolerate sanctions against calculated falsehood without significant impairment of their essential function." (alterations in original)); Garrison v. Louisiana, 379 U.S. 64, 75 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." (alterations in original)).

58

567 U.S. at 734, 736-37 (Breyer, J.); see also id. at 722-23 (plurality

opinion).  As the district court held, in contrast to Alvarez:

> This prosecution targets only false speech
> intentionally used to injure other individuals'
> attempt to exercise their constitutionally
> guaranteed right to vote, and to secure an outcome
> of value to Mr. Mackey—an advantage in a
> Presidential election for his preferred candidate—
> despite Mr. Mackey's knowledge that the
> statements in his tweets were false.

(SA47).  Recognizing that Section 241 permits "a narrow set of

prosecutions regarding conspiracies to make verifiably false utterances

about the time, place, or manner of elections that would injure the right

to vote" does not offend the First Amendment; and Section 241's intent

requirement simultaneously imposes a burden on the government to

establish the material nature of the false statements, even as it "ensures

that accidental misinformation will not be criminalized."  (Id. at 48-49,

51).[16]

---

[16]    Indeed, many types of false statements in similar contexts
have long been regulated and proscribed without running afoul of the
First Amendment, including laws against fraud, perjury, and
defamation.  Williams, 553 U.S. at 297 ("Offers to engage in illegal
transactions are categorically excluded from First Amendment
protection."); United States v. Halloran, 821 F.3d 321, 340 (2d Cir. 2016)

59

Mackey argues that, even if this Court were to conclude that application of Section 241 to the facts present here does not cause a First Amendment problem, the Court should nonetheless find that Section 241 does not cover Mackey's conduct out of fear that future prosecutions may run afoul of the First Amendment. (Br.10 (asserting that the district court's reading "would necessarily criminalize not only lies about <u>how</u> to vote, but also lies about also [sic] <u>whether</u> and <u>for whom</u> to vote" (emphasis in original))). This assertion is unsound—one does not inextricably flow from the other. Prior precedent establishes, among

---

(rejecting the defendant's argument that the First Amendment protects bribery when the bribery was accomplished through arguably protected speech – specifically, political donations); <u>Donaldson v. Read Magazine, Inc.</u>, 333 U.S. 178, 190 (1948) (fraud); <u>United States v. Dunnigan</u>, 507 U.S. 87, 97 (1993) (perjury); <u>Beauharnais v. Illinois</u>, 343 U.S. 250, 255-56 (1952) (libel). Criminal statutes have long prohibited certain kinds of false statements without violating the First Amendment, including false statements made to a federal official in violation of 18 U.S.C. § 1001. A violation of § 1001 does not require any proof that the statement was made under oath, that it was relied upon to the detriment of the government, or that it resulted in some pecuniary or other property harm to the government. Instead, the statute has been upheld based on the need for it to protect against the potential harm to the integrity of government agencies and investigations. <u>United States v. Gilliland</u>, 312 U.S. 86, 93 (1941). In fact there are over 100 federal false statement statutes in the United States Code. <u>See</u> <u>United States v. Wells</u>, 519 U.S. 482, 505-07, and nn. 8-10 (1997) (Stevens, J., dissenting).

other points, that, for example, telling voters that they are ineligible to vote (surely as much a form of "speech" as Mackey's fraudulent campaign announcement) can violate the statute. Guinn I, 238 U.S. at 368; Guinn II, 228 F. at 109. As discussed above, this prosecution does not represent an expansion of Section 241's scope, much less the radical change that Mackey claims, and the speculative First Amendment concerns he raises do not warrant the unnecessarily cramped reading of the statute he urges this Court to adopt.

3.    Section 241 Is Not Vulnerable to
      Mackey's Threatened Overbreadth Challenge

Some of Mackey's and amici's arguments sound in "overbreadth" claims, rather than as-applied First Amendment challenges, as if to threaten that this Court might have to engage in a close analysis to determine whether to invalidate the law (if interpreted in the government's favor), such that the doctrine of constitutional avoidance fairly comes into play. The contention is that, if Section 241 reaches Mackey's conduct, then it necessarily also reaches a wide swath of protected speech, with the result that the statute must be invalidated

notwithstanding its valid application to non-protected conduct. That suggestion is meritless.

"To judge whether a statute is overbroad, [courts] must first determine what it covers." <u>Hansen</u>, 599 U.S. at 770. Even a showing that a statute, fairly interpreted, encompasses some speech—even too much speech—does not end the overbreadth inquiry. Instead, "[t]o succeed, [a defendant] has to show that [the statute's] overbreadth is 'substantial relative to [its] plainly legitimate sweep.'" <u>Id.</u> at 784 (last alteration in original) (quoting <u>Williams</u>, 553 U.S. at 292).

It is undisputed that Section 241 covers "a great deal of nonexpressive conduct—which does not implicate the First Amendment at all." <u>Hansen</u>, 599 U.S. at 782. This includes decades of precedent upholding the statute's use to protect the right to vote discussed above, as well as other rights. Accordingly, the "plainly legitimate sweep" side of Section 241's "ledger" is substantial. <u>See</u> <u>id.</u> at 782, 784.

Against this extensive history of vindicated civil rights, Mackey offers only the facts of this case and "a string of hypotheticals." <u>Hansen</u>, 599 U.S. at 782. For the reasons discussed above, this prosecution does not offend the First Amendment. The "speech" here—a

fraudulent campaign announcement intended to trick voters into depositing their ballots into a digital void—was simply the mechanism by which Mackey and his co-conspirators accomplished the injury to the right to vote.

As for the hypotheticals, Mackey contends sanctioning this prosecution would permit future prosecutions of individuals who make false statements about the weather on election day, exit polls revealing a lopsided election, or a particular candidate's qualifications or background. (Br.28). He is mistaken. Cf. Hansen, 599 U.S. at 779 ("To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful . . . ."). Critically, false statements regarding the time, place, and manner of an election are distinct from, for example, statements regarding the weather. The former type of statement frustrates voters' actual attempt to exercise their right to vote, while the latter simply discourages someone from exercising that right. Cf. Ciminelli, 598 U.S. at 315 (distinguishing between a right to accurate information about property and an actual property right).

Irrespective of whether hypothetical, unrealized fact patterns might violate Section 241, such concerns do not outweigh the plainly

63

legitimate, and critical, sweep of the statute.  <u>Hansen</u>, 599 U.S. at 784
("[T]he ratio of unlawful-to-lawful applications is not lopsided enough to
justify the strong medicine of facial invalidation for overbreadth.").  As
the Supreme Court concluded in <u>Hansen</u>, case-specific as-applied
challenges to the statute, which are not foreclosed by the rejection of an
overbreadth claim, should be sufficient to police any stray prosecutions
that encroach on ground protected by the First Amendment.  <u>Id.</u> at 784-
85.

<div align="center">* * *</div>

In sum, Mackey's prosecution and conviction was not based
on his political endorsement, viewpoint, or advocacy.  Rather, the focus
of this case was narrow and specific: his agreement and efforts to mislead
certain voters about how, where, and when to cast a vote in a federal
election and his effort to ensure that they never voted.  True or not, words
designed to carry out this criminal goal do not enjoy the same First
Amendment protections that apply to other types of speech, and even if
they did, they would be proscribable.  For this reason, the content-
regulating state laws Mackey cites as having been invalidated are

64

irrelevant because those state laws prohibited false information about candidates or issues, not the mechanics of voting.  (See Br.29).[17]

III.  **Overwhelming Evidence Supported
the Jury's Verdict that Mackey and
<u>Co-Conspirators Conspired to Injure the Right to Vote</u>**

As the evidence demonstrated at trial, there is no actual dispute that the charged conspiracy existed, and that its members distributed disinformation with the intent to injure the right to vote. This was patent in the documents themselves and in the actions and testimony of "Microchip," who acknowledged and described what the members of the conspiracy had done, and why.  (<u>See, e.g.</u>, GA252-54; 82 ("I intentionally spread those memes to defraud voters of their right to vote"); 84 (noting that Microchip spread disinformation with "the hope . . . that Hillary Clinton voters see this and vote incorrectly"). Mackey's central argument is rather that when he, to all appearances, acted in lockstep with the members of the conspiracy, he was actually

---

[17]  At least one <u>amicus</u> brief supporting Mackey's position appears to acknowledge this distinction.  (<u>See</u> Br. for Prof. Eugene Volokh at 13 (distinguishing between "broad bans on false speech in elections," which are barred, and "narrow and clearly defined bans on knowing lies regarding objectively verifiable facts about election procedures," which "the First Amendment likely permits")).

acting alone, and acting with innocent intent. (GA97-98). The jury rejected this precise argument at trial for good reason, and, given the posture of this review—with all inferences drawn in favor of the government—the jury's verdict must be affirmed.

It is undisputed that Mackey distributed and retweeted the false ads on November 1 and 2, 2016, in the week prior to the 2016 election. It is also undisputed he manually added the #ImWithHer hashtag to the false ads when he did so, such that the false ads would naturally be seen by supporters of then-candidate Hillary Clinton. (A371-72). The rest of the evidence—which served to illuminate why and with whom he committed these acts—proved the government's charge of conspiracy to injure rights beyond a reasonable doubt.

The evidence demonstrated that throughout 2016, Mackey was a prominent and influential member of several invitation-only Twitter direct message groups that were focused on sharing and distributing messaging. (See supra at 6-12). Members of these groups, who frequently belonged to more than one, worked to spread their messaging as widely as possible, coordinating their social media efforts

66

to make their chosen messages "trend" and go viral. (Id.). As the district court noted, this was a "yearlong" effort. (SA104).

Throughout these endeavors, Mackey—a particularly influential user with "the most loyal army on Twitter" and who noted that "at any one time there is an army of 100 of my followers ready to swarm" (GA25, 26.1-27, 105-06, 151, 167)—was an important part of the groups to which he belonged. He sometimes commented or played a leadership role, while on other occasions he stayed silent. The evidence showed, however, that regardless of whether he saw fit to comment about the plans discussed in the groups, he always acted in concert with the members of the groups. (GA29, 34-36, 395).[18]

In the weeks before the 2016 election, several Twitter groups that Mackey participated in throughout the year pivoted toward the distribution of messages meant to trick citizens into casting ineffective votes. (See GA252-54, 277). This included the Madman group, from

---

[18] While Mackey asks the Court to draw certain inferences from the periods in which he did not comment, the jury—which heard the same arguments (GA2, 102, 119)—was free to draw contrary inferences, including that Mackey sometimes was a silent participant in the groups' activities.

which the idea seems to have originated: members in that group expressly hoped to copy disinformation campaigns that had been used during Brexit, noting that "dopey minorities" had fallen for it. (GA367). Mackey was a part of the Madman group when this discussion took place but did not immediately return to the group following his first suspension from Twitter. (GA73 (noting that Mackey did not return to the Madman Group until approximately a month later)). Instead, Mackey consistently returned to the War Room group, a group with membership that overlapped with the other groups (like Madman) and which Microchip had described as the central planning group. (See GA89, 222). And like the other groups, the members of the War Room group shared and discussed efforts relating to the false ads, discussing ways to make them more effective. (GA252-54).

After Mackey distributed the false ads described above—including by retweeting a person who soon joined the War Room—he was removed from Twitter. (GA52, 258; A374-75). When he returned to Twitter under a new handle, among the first things he did was return to the War Room, the central planning group where Microchip and others had discussed the release of the false ads. (GA53, 260). Mackey was

promptly celebrated for what he did. (GA258-62). He basked in the adulation and called further attention to his acts.

Having received this evidence, the jury found that the defendant had conspired to injure the right to vote. In so holding, the jury's verdict endorsed what was obvious. Mackey, who spent nearly all of 2016 acting in concert with the members of his subterranean Twitter groups, had not—as he implausibly testified—suddenly become a lone wolf acting with innocent intent. Rather, the jury drew the correct conclusion: that when Mackey acted exactly as the other co-conspirators did—and then returned to the group to celebrate what he had done—he was acting in concert and with the shared purpose of the other members of the conspiracy. Mackey's incredible testimony to the contrary was dismissed by the jury, as it should have been. Glenn, 312 F.3d at 64 (noting that appellate courts will "defer to the jury's assessment of witness credibility").

While this evidence on its own was sufficient to support the determination of guilt, the jury had access to a wealth of other information which evinced Mackey's intent. Put simply, Mackey spent much of 2016 all but announcing his intent and desire to act in

furtherance of the aims of the conspiracy, and otherwise to limit effective voting to those who agreed with him. Among other things, Mackey stated that women should not have the right to vote; that the 19th Amendment to the Constitution—which gives women the vote—should be repealed; that universal suffrage is a "terrible thing"; that immigrants should not have the right to vote; and that the children of immigrants should not have the right to vote. Mackey often identified black people and women as his prime political opponents, frequently stated his belief that black people were stupid and gullible, and claimed that governments cannot function when single women and mothers vote. (See supra at 17-18). Finally, Mackey was preoccupied with election turnout, was convinced the final election margin would be razor thin, and endorsed using social media to convince his opponents not to vote. (Id.). The jury was right to conclude that when Mackey chose to distribute false ads featuring two women—one black, one Spanish speaking—he was acting with the intent to further the purposes of the charged conspiracy. United States v. Archer, 977 F.3d 181, 190 (2d Cir. 2020) (noting that to sustain a conspiracy charge, the government must prove that a defendant "willfully and knowingly became a member of the conspiracy, with intent

to further its illegal purposes—that is, with the intent to commit the object of the charged conspiracy."); <u>Capers</u>, 20 F.4th at 113 (noting that a jury verdict should be sustained if "credit[ing] every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (alteration in original)).

IV. The Remedy for a Finding of Insufficiency Based on
<u>Inaccurate Jury Instructions Should Be a Remand for a New Trial</u>

Finally, Mackey's argument that his conviction requires "reversal" (Br.2, 10, 24, 52), is incorrect. Mackey does not specify how this Court should interpret his challenge to what he describes as the "Government's theory" of Section 241 (Br.13, 21-25, 27-31), after a district court instructed the jury (with little guidance from Mackey in the district court (DE96)), the jury convicted Mackey using that instruction as a yardstick, and the district court held that the evidence adduced at trial was sufficient to convict him using that framework.

Mackey is, in effect, arguing that the government's proof is insufficient to meet elements that it was not asked to prove—but Mackey

has not meaningfully identified what changes to the district court's instructions might make it appropriate. Accordingly, the government even now has not had the "incentive to present evidence that might have cured any resulting insufficiency." United States v. Robison, 505 F.3d 1208, 1225 (11th Cir. 2007); see also United States v. Ellyson, 326 F.3d 522, 534 (4th Cir. 2003) ("If the evidence in the record is insufficient to support a verdict under [the law as later interpreted], it is not because of the government's failure of proof but because of the changes [in law]."); but see United States v. Bruno, 661 F.3d 733, 742-43 (2d Cir. 2011) (considering the sufficiency of the trial evidence against a clearly defined standard laid out by the Supreme Court prior to the appeal). In such circumstances, the government has no direction in which to marshal its evidence, and evaluating the sufficiency of trial evidence against an undefined standard is impossible. Accordingly, should this Court hold that the district court's construction of Section 241 was incorrect—and, for the reasons noted above, it was not—the appropriate remedy would be to remand the case to determine whether and how to proceed in light of whatever standard the Court articulates.

POINT TWO

VENUE WAS PROPER IN THE EASTERN DISTRICT OF NEW YORK

I.    Applicable Law

A.    Standard of Review

This Court reviews the denial of a post-trial motion regarding venue de novo.  United States v. Svoboda, 347 F.3d 471, 482 (2d Cir. 2003).  "Because it is not an element of the crime, the government bears the burden of proving venue by a preponderance of the evidence."  United States v. Smith, 198 F.3d 377, 382 (2d Cir. 1999).  Venue may be proved by circumstantial evidence.  United States v. Potamitis, 739 F.2d 784, 791 (2d Cir. 1984).  This Court reviews the sufficiency of the evidence as to venue in the light most favorable to the government, crediting "every inference that could have been drawn in its favor."  United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994).

B.    Venue

If a crime consists of a single, non-continuing act, the proper venue is clear: the crime "is committed in the district where the act is performed."  United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989)).  In other cases, however, the Constitution does not

command a single exclusive venue for prosecution.  United States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985).  Thus, "where the acts constituting the crime and the nature of the crime charged implicate more than one location," id., venue is properly laid in any of the districts where an essential element of the crime took place, see United States v. Rodriguez-Moreno, 526 U.S. 275, 281 (1999) ("[W]here a crime consists of distinct parts which have different localities [,] the whole may be tried where any part can be proved to have been done." (quoting United States v. Lombardo, 241 U.S. 73, 77 (1916))).  In addition to the essential element requirement, this Circuit has also added a foreseeability consideration, requiring "some sense of venue having been freely chosen by the defendant," though not necessarily "[a]ctual knowledge" of such contact.  United States v. Kirk Tang Yuk, 885 F.3d 57, 69-70 (2d Cir. 2018).

In a conspiracy case like this one, venue-conferring acts include "not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy."  United States v. Royer, 549 F.3d 886, 896 (2d Cir. 2008).  Applying this standard, "a defendant need not himself have ever been

74

physically present in a district for a conspiracy charge against him to be venued there." United States v. Rommy, 506 F.3d 108, 120 (2d Cir. 2007). Indeed, simply passing through a district in furtherance of a criminal conspiracy is sufficient to confer venue. United States v. Tzolov, 642 F.3d 314, 320 (2d Cir. 2011). Telephone calls and wires into or through a district can also confer venue. United States v. Rutigliano, 790 F.3d 389, 397 (2d Cir. 2015) (affirming venue in the Southern District of New York where, as part of the scheme, "payments were made by wire, and traveled through the waters over which the Southern and Eastern Districts share jurisdiction"); Rommy, 506 F.3d at 120 ("It is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy," and therefore finding that they could constitute venue).

Moreover, conspiracies are "continuing offenses." (See SA11 (collecting cases)). Congress has codified the rule for continuing offenses in 18 U.S.C. § 3237(a):

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be . . . prosecuted in any district in which such offense was begun, continued, or completed.

Thus, venue is properly laid in "the whole area through which force propelled by an offender operates." Ramirez, 420 F.3d at 147 n.11 (2d Cir. 2005) (quoting United States v. Candella, 487 F.2d 1223, 1228 (2d Cir. 1973) (where a false statement made in Brooklyn was later conveyed by the receiving agency to Manhattan, venue was proper in Manhattan)); United States v. Cores, 356 U.S. 405, 407-08 (1958) (same) (citing United States v. Johnson, 323 U.S. 273, 276 (1944)); cf. Armour Packing Co. v. United States, 209 U.S. 56, 77 (1908) (in the context of a transportation offense, describing a "single, continuing offense . . . continuously committed in each district through which the [illegal] transportation [of goods]" occurs).

In line with these principles, courts in this Circuit have upheld venue based on jurisdictional wires passing through the district of prosecution. See, e.g., United States v. Brown, 293 F. App'x 826, 829 (2d Cir. 2008). Such decisions have also included cases where the relevant wires were not jurisdictional, but rather mere overt acts in furtherance of a continuing offense. Rutigliano, 790 F.3d at 397-98 (wires provided venue for conspiracy to commit health care fraud, on the basis that it was a continuing violation, as well as substantive wire and health

76

care fraud charges); <u>United States v. Ahaiwe,</u> No. 21-2491, 2023 WL 4196954, at *1-2 (2d Cir. June 27, 2023) (finding that wires that passed through the Southern District of New York were sufficient for venue in charges sounding in bank fraud conspiracy, money laundering conspiracy and aggravated identity theft).

II.     <u>The Jury's Venue Finding Is Supported by the Trial Evidence</u>

        A.     <u>The Court's Rulings Were Neither Error Nor Plain Error</u>

                In line with such authority, the district court held, and later instructed the jury, that the government could prove venue if it could establish that electronic wires in furtherance of the conspiracy did in fact transit through the EDNY. (SA18 (noting that "[v]enue is proper in any district through which electronic communications in furtherance of the conspiracy passed" (citing <u>Brown</u>, 293 F. App'x at 829 (affirming venue as appropriate in the Southern District of New York where a wire transfer was automatically routed through a bank's Manhattan branch, even though it was not processed in Manhattan))). In so holding, the district court followed Judge Brodie's opinion in <u>United States v. Hwa</u>, holding that pass-through communications, in addition to pass-through wires, were a sufficient basis for venue so long as the communications in

77

question were acts in furtherance of the relevant conspiracy. No. 18-CR-538 (MKB), 2021 WL 11723583, at *20 (E.D.N.Y. Sept. 3, 2021) ("Venue is also appropriate in any district through which electronic communications are routed" (collecting cases)); (SA15 (explaining that "[t]his principle builds on the Second Circuit's longstanding willingness to find venue for a conspiracy properly laid in districts through which conspirators merely passed"); SA18 ("[t]here is no meaningful difference between automatic routing of funds or wire communications and the movement of electronic messaging over Twitter servers")).[19]

In addition to the "transit" theory noted above, the Court also instructed that the jury could find venue if (1) the false ads were "viewed in the Eastern District and that such viewing (even if innocent) was a foreseeable overt act furthering the ends of the conspiracy," or (2) if "[e]ither the defendant, or a co-conspirator, or an innocent non-

_____

[19] Although amici argues that this rule promotes universal venue, (see Br. of Nat'l Assoc. of Crim. Def. Lawyers at 7), they are wrong—the venue theory was not that "venue would be proper in any district in which [Twitter] could be viewed," (id.), but that Mackey's messages necessarily had to go through the EDNY to reach Twitter's servers, as part of his immediate posting.

78

conspirator (caused to act by members of the conspiracy) tweeted an allegedly [false ad] into the Eastern District in furtherance of the alleged scheme, provided that, if tweeted by someone other than the defendant, that act was reasonably foreseeable to the defendant." (A59-60; SA99).[20]

Each of these standards was met by the evidence presented in this case.

---

[20] Mackey's appeal does not challenge the jury instructions relating to venue on any issue other than the purported requirement of a "substantial contacts" test. (See Br.46; but see Br. for Nat'l Assoc. of Crim. Def. Lawyers at 6 (challenging the jury instructions)). Moreover, although he raised it in his motion to dismiss, he did not object to the district court's instruction that venue could be found by virtue of the wires through the EDNY at the conference discussing the jury charge, although venue was discussed at some length. (GA109-15; see also SA100 n.35 (noting that Mackey also declined to challenge the verdict form and permitted the jury to return a verdict on venue without clarifying the basis on which it determined venue)). In fact, Mackey's proposed jury instructions included the instruction that "[v]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue; or (2) it is foreseeable that such an act would occur in the district of venue and it does" (DE96 at 3 (alterations omitted)). Accordingly, Mackey has waived the argument that the jury instructions were error for any reason other than their failure to include the "substantial contacts" test. Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998); United States v. Mitchell, 811 F. App'x 50, 52 (2d Cir. 2020). To the extent it is not waived, any alleged error in the jury instructions would have to be reviewed for plain error, see Capers, 20 F.4th at 116—and, as stated above, there was no error, much less error that was plain. Moreover, for the reasons stated below, Mackey cannot meet the plain-error standard because any error would have been harmless and would

B.   The Jury's Venue Finding Was
      <u>Supported by Sufficient Evidence</u>

Reading the record in the light most favorable to the jury's venue finding, venue existed because (1) Mackey foreseeably and indisputably used wires passing through the EDNY's waters to tweet out the false ads; (2) the conspirators expected—or even intended—that Clinton campaign staffers, whose headquarters was in the EDNY, would view and react to the false ads; (3) members of that campaign did in fact view those false ads; and (4) phone numbers associated with the EDNY sent text messages to the false number listed in the false ads. That evidence more than sufficed to prove by a preponderance of the evidence that venue lay in the EDNY.

First, pass-through wire transmissions occurred here, and as noted above, this Court has previously affirmed findings of venue based on wires passing through the Eastern or Southern Districts of New York when in furtherance of various conspiracies. In <u>Rutigliano</u>, the defendants were charged with conspiracy to commit wire fraud, mail

---

not have affected his substantial rights—the jury would have found venue to be proper under any circumstances.

80

fraud, and health care fraud in connection with efforts to defraud the
Long Island Rail Road pension plan.  As to the wire fraud convictions,
the Court held that venue was proper in the Southern District of New
York because unlawfully obtained benefits were wired "through or over
the waters within the Eastern District, which are statutorily defined to
also be part of the Southern District."  Rutigliano, 790 F.3d at 397
(further stating that "venue lies where a wire in furtherance of a scheme
begins its course, continues or ends" and noting that "[f]or venue
purposes, it therefore matters that the fraudulently obtained disability
annuity payments were wired through the Southern District").
Significantly, this Court found that those same actions were sufficient to
establish venue for the charge of conspiracy to commit healthcare fraud—
a continuing offense that does not require a wire or mailing for
jurisdictional purposes. Id. (holding that a scheme to violate the health
care fraud statute was a continuing offense and that it is committed "in
all of the places that any part of it took place, and venue . . . was
appropriate in any of them." (alteration in original) (quoting United
States v. Rodriguez-Moreno, 526 U.S. 275, 282 (1999)).  In discussing
venue, the Court added that the electronic communications containing

the fraudulent claims were "at the core of conduct criminalized" by the statute.  Id.

The Court reached a similar decision last year in Ahaiwe. 2023 WL 4196954.  There, citing Rutigliano, this Court found that wires traveling "through" the Southern District created sufficient venue for criminal charges—including bank fraud conspiracy and aggravated identity theft—where the wires in question were merely acts in furtherance of a continuing offense, not jurisdictional elements.  Ahaiwe, 2023 WL 4196954, at *1.

Second, Mackey not only testified that he knew that the conspiracy's actions would have foreseeable (and foreseen) consequences in the EDNY, but also insisted that he specifically desired that the criminal postings would be seen by members of Clinton's campaign staff, who were located in the EDNY.  (GA101 (noting that he "especially" hoped the false ads would be seen by "the ones working for [Clinton]"); see also GA98 ("I don't recall what I was thinking.  But it was sort of a shit post, like let me post these on Twitter, see what happens, see if anyone picks it up, see if it goes viral.  Maybe even the media picks it up, the Clinton campaign, and then it riles them up, get under their skin, get

82

them off their message that they wanted to push."); 99.1-99.2 (when asked why he added the hashtag #ImWithHer to his false ads: "The Hillary Clinton campaign is constantly monitoring their hashtag. If I put the hashtags on, then maybe they would freak out about it, or they would have to spend time dealing with it rather than focus on their campaign"); 99.3 (noting that he posted the false ads, in part, to confuse the Clinton campaign)). Mackey's testimony established that, at a minimum, he specifically anticipated that his posts would reach, and have effects in, the EDNY, regardless of wherever else they went.

Third, the record suggests that Mackey's co-conspirators in fact accomplished what Mackey hoped they would. From Brooklyn, the Clinton campaign initiated its defensive response to the false ads just as false ads bearing the exact same text code were shared in the War Room and the Micro Chat. (Compare GA222-68, 284-305 (showing false ads distributed to the group on October 29) and GA325-94 (showing false ads being distributed starting on October 16, with increased distribution on October 28-29) with GA16-17 (noting that the Clinton campaign had contacted Mattias Chesley concerning the ownership of the short code listed in the false ads on October 29). Those defensive efforts began

shortly before the false ads went viral, and just before Mackey sent out his own tweets. But that sequencing nevertheless implies that Mackey's co-conspirators had already begun the launch of the planned disinformation campaign and that the Brooklyn staffers had viewed and reacted to these fraudulent materials while in the EDNY. And as with Mackey's own tweets—which, as noted above, he expected and hoped would be seen by residents of the EDNY—it was foreseeable to Mackey that the products of the conspiracy would also reach the EDNY through the acts of his co-conspirators.

Finally, the jury was shown an exhibit listing the telephone numbers that texted the code depicted on the false ads like the ones tweeted by Mackey. (GA396-557). The list contained several thousand telephone numbers, including over 85 with area codes primarily associated with the EDNY (including 516, 631, and 718), and many more with generic New York City area codes (including 347, 917, and 929). (Id.). Each of these numbers texted the short code. Cf. United States v. Lange, 834 F.3d 58, 70 (2d Cir. 2016) (noting that acts in furtherance of a conspiracy can include innocent acts that the co-conspirators caused others to take that materially furthered the ends of the conspiracy (citing

Royer, 549 F.3d at 896)); Svoboda, 347 F.3d at 483 (noting that in a case where all the defendant's acts took place in the Eastern District, prosecution was proper in the Southern District because the defendant was a "savvy investor" and "could reasonably foresee" that his acts in the Eastern District would lead to acts by his victims in the Southern District).

All this collectively provided the jury with grounds to find venue in the EDNY. Potamitis, 739 F.2d at 791 (noting that venue must be established by a preponderance of the evidence and that venue may be established by circumstantial evidence). The evidence showed that Mackey and his co-conspirators took overt acts that deliberately and foreseeably directed the false ads through and into the EDNY. And these conspirators specifically hoped to cause (and caused) EDNY voters to react to those materials, also correctly anticipating that the Clinton campaign would respond in the EDNY. These various acts collectively enabled the jury to find venue in the EDNY.

Yet, it also bears noting that the jury's venue finding is particularly appropriate here, given the deliberate nature of the conspiracy's interactions with the EDNY. Again, Mackey and his

conspirators expected voters and Clinton campaign workers in EDNY to see these materials. Mackey can thus hardly complain about prosecution in the EDNY when he and his co-conspirators expressly aimed for the false ads to have some specific effect in that district. Kirk Tang Yuk, 885 F.3d at 69-70 (noting that the foreseeability consideration envisions "some sense of the venue having been freely chosen by the defendant").

Mackey resists the jury's venue finding because he claims it hinged solely on wires passing through the EDNY and that such a theory could confer venue in countless districts when it comes to internet crimes. (Br.38-43; see also Br. of Nat. Assoc. of Crim. Def. Lawyers 6-11 (same)). This Court's case law supports a finding of venue even just on such facts, so long as the defendant has in some sense intentionally availed himself of that venue. (See supra at 73-76). But this case does not even require this Court to reiterate such a ruling because the facts available to the jury permitted them to find venue for reasons above and beyond those pass-through wires. (See supra at 81-84).

Mackey's other concern (Br.39-40) is that another defendant who committed the same crimes could face prosecution in the government's choice of tribunal if the transmission of internet data over

wires always gave rise to venue. That is unlikely. It is typically not possible to trace the definitive path of internet transmissions. See generally Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 204 (4th Cir. 2017). Indeed, the government could achieve that task here and prove that the transmissions definitively crossed through the wires beneath the Eastern District of New York only because of the unique geography of New York.[21] And for those defendants concerned that their tweets to New York City could cause them to be haled into the Southern or Eastern Districts of New York, this Court has offered them clear relief

---

[21] New York City is unusual in that it is subsumed in two separate federal districts. Local venue law grants dual jurisdiction to the Eastern and Southern Districts over the waters in and surrounding both districts. 28 U.S.C. § 112 (noting concurrent jurisdiction of waters). Given that both Manhattan and the entirety of the Eastern District (which consists of Staten Island and Long Island, including Brooklyn and Queens) are located on islands, communications and transit to and from each area or to any other part of the United States necessarily cross through its sister district. This geographical division grants both districts overlapping venue over criminal cases where relevant conduct crosses the waters, whether corporally or electronically.

While Second Circuit law on venue is not predicated on this geographical division—it is, as noted above, grounded in established Supreme Court authority for continuing offenses—it has particular and frequent applicability to a location like New York City, where two districts share jurisdiction over the communication pathways leading both in and out of the city.

87

from that fear.  See Kirk Tang Yuk, 885 F.3d at 69-70 (discussing the foreseeability component of the venue analysis in this Circuit and how it restrains findings of venue based on unforeseeable overt acts in conspiracy cases).

Of course, Mackey cannot take advantage of that foreseeability refuge because the record overwhelmingly demonstrates his and his co-conspirators' intent to influence the course of events in many locations, including specifically the EDNY.

Mackey appears to grasp the weakness of his argument in the context of his testimony that he hoped the Clinton campaign would see his messages, and he asks that this clear and purposeful availment of the EDNY should somehow be ignored because the observation of the false ads by the Clinton campaign and the subsequent remedial measures it undertook "undermined the alleged scheme." (Br.37).  Putting aside that this defense is factually untrue—the conspiracy clearly aimed for virality,[22] and the spread to places like the EDNY did not "undermine"

---

[22]    Even this intended result of the conspiracy confirms that venue was appropriate, insofar as the goal was the mass distribution of fraudulent images from the island of Manhattan, which on its face

the effort—Mackey cites no authority for the novel proposition that a deliberate act in a venue should be ignored on the grounds that it may have backfired.

Finally, Mackey is wrong to state that the district court "ignored" the "substantial contacts" test. (Br.44-46). It did not. (SA16-17 (outlining "[t]he substantial contacts test in the Second Circuit"), 21 (discussing the applicability of the test to Mackey's case)). Instead, the district court reviewed this Court's directions concerning the application of the test and noted that the "substantial contacts" test does not apply in conspiracy cases. (SA21 (quoting Kirk Tang Yuk, 885 F.3d at 70)). However, recognizing that the test served "as an additional check on fairness," the court discussed the test anyway and found that the "two chief ills" against which the test meant to guard, namely, "bias and inconvenience," were "not substantially present in this case" given Mackey's residency in New York City at the time of the offense. (SA21 (citing United States v. Rowe, 414 F.3d 271 (2d Cir. 2005)). Accordingly,

---

requires that the would-be viral messages must traverse the waters of the EDNY, meaning "passing" the relevant messages "through" the EDNY was essential to the commission of the crime.

89

both as a matter of law and in application to these facts, the district court found that the "substantial contacts" test did not undermine the government's theory of venue, and this Court should not hold differently.

90

CONCLUSION

For the reasons stated above, the judgment should be affirmed in all respects.

Dated:     Brooklyn, New York
           February 5, 2024

                              Respectfully submitted,

                              BREON PEACE,
                              United States Attorney,
                              Eastern District of New York.

             By:    /s/_____
                              ERIK D. PAULSEN
                              FRANK TURNER BUFORD,
                              Assistant U.S. Attorneys

| | |
|---|---|
| NICOLE M. ARGENTIERI | BREON PEACE, |
| Acting Assistant Attorney General | United States Attorney, |
| U.S. Department of Justice | Eastern District of New York |
| | 271-A Cadman Plaza East |
| COREY R. AMUNDSON, | Brooklyn, New York 11201 |
| Chief, Public Integrity Section | (718) 254-7000 |
| | |
| WILLIAM GULLOTTA, | NICHOLAS J. MOSCOW, |
| Trial Attorney, | FRANK TURNER BUFORD, |
| (Of Counsel). | ERIK PAULSEN, |
| | Assistant United States Attorneys, |
| | (Of Counsel). |

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 17,440 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  The government previously moved this Court, with Mackey's consent, for permission to file an oversized brief of no more than 18,000 words; this motion remains pending.  On the advice of the Clerk of Court's Office, the government has filed this brief while the motion remains pending, so as not to be untimely.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        February 5, 2024

                            /s/ Nicholas J. Moscow
                            Nicholas J. Moscow
                            Assistant U.S. Attorney