# 23-7577

# United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DOUGLASS MACKEY,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of New York
Case No. 21-cr-00080-AMD

## REPLY BRIEF OF DEFENDANT-APPELLANT DOUGLASS MACKEY

Eric S. Dreiband
Yaakov M. Roth
Caleb P. Redmond
Harry S. Graver
JONES DAY
51 Louisiana Ave, N.W.
Washington DC 20001
(202) 879-3939

*Counsel for Defendant-Appellant
Douglass Mackey*

## <u>TABLE OF CONTENTS</u>

**Page**

ARGUMENT ...................................................................................................1

I.   MACKEY'S SPEECH DID NOT VIOLATE "CLEARLY ESTABLISHED" LAW ............1

    A.   The Court Cannot Affirm the Conviction Unless Mackey's
        Speech Violated "Clearly Established" Law ................................................2

    B.   No Court Has Ever Held That § 241 Prohibits Deceptive Speech .........4

    C.   The Analogy Between Ballot Fraud and Spreading Misinformation
        About Voting Is Far From "Obvious." ........................................................7

        1.   *Nobody else drew this analogy* ...................................................8

        2.   *Statutory text and history rebut the analogy.* ............................10

        3.   *The analogy would prove too much* ............................................14

        4.   *The analogy would cause a collision with the First Amendment* ................17

II.  THE GOVERNMENT DID NOT PROVE VENUE IN EDNY ...................................23

    A.   The Government's "Pass-Through" Theory of Venue Fails ..................27

    B.   The Government Cannot Salvage Venue with Its New Theories .........28

III. THERE IS NO SUFFICIENT EVIDENCE THAT MACKEY CONSPIRED TO
     INJURE VOTING RIGHTS ................................................................................30

CONCLUSION .............................................................................................32

CERTIFICATE OF COMPLIANCE.....................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ....................................................................... 4, 21

*Blessing v. Chandrasekhar,*
988 F.3d 889 (6th Cir. 2021) ...............................................................26

*Bush v. Gore,*
531 U.S. 98 (2000) ..............................................................................22

*Dist. of Columbia v. Wesby,*
583 U.S. 48 (2018) .................................................................. 2, 3, 5, 7

*Dubin v. United States,*
599 U.S. 110 (2023) ............................................................................15

*Fabrikant v. French,*
691 F. 3d 193 (2d Cir. 2012) ..............................................................22

*Fields v. United States,*
228 F. 2d 544 (4th Cir. 1955) ...............................................................7

*Friend v. Gasparino,*
61 F.4th 77 (2d Cir. 2023) ............................................................ 18, 19

*Giboney v. Empire Storage & Ice Co.,*
336 U.S. 490 (1949) ............................................................................18

*Guinn v. United States,*
228 F. 103 (8th Cir. 1915) .....................................................................5

*Guinn v. United States,*
238 U.S. 347 (1915) ...............................................................................5

*Haddle v. Garrison,*
525 U.S. 121 (1998) ...................................................................... 11, 12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Haugen v. Brosseau,*
339 F.3d 857 (9th Cir. 2003) ....................................................................... 8

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.,*
538 U.S. 600 (2003) .................................................................................... 20

*Krumme v. WestPoint Stevens Inc.,*
238 F.3d 133 (2d Cir. 2000) ...................................................................... 22

*Mashaud v. Boone,*
295 A.3d 1139 (D.C. 2023) (en banc) .................................................. 18, 19

*Matzell v. Annucci,*
64 F.4th 425 (2d Cir. 2023) ......................................................................... 4

*Miami Herald Pub. Co., Div. of Knight-Ridder Newspaper v. Ferre,*
636 F. Supp. 970 (S.D. Fla. 1985) ............................................................ 13

*Minn. Voters Alliance v. Mansky,*
585 U.S. 1 (2018) ................................................................................. 20, 29

*Mullenix v. Luna,*
577 U.S. 7 (2015) (*per curiam*) .................................................................... 3

*Nat'l Coal. on Black Civic Participation v. Wohl,*
498 F. Supp. 3d 457 (S.D.N.Y. 2020) ....................................................... 20

*Naumovski v. Norris,*
934 F.3d 200 (2d Cir. 2019) ......................................................................... 4

*Nichols v. Kan. Political Action Comm.,*
11 P. 3d 1134 (Kan. 2000) ......................................................................... 13

*Peoples v. Leon,*
63 F.4th 132 (2d Cir. 2023) ......................................................................... 4

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Percoco v. United States,*
  598 U.S. 319 (2023) ................................................................28

*Plumhoff v. Rickard,*
  572 U.S. 765 (2014) ..................................................................2

*Radwan v. Manuel,*
  55 F.4th 101 (2d Cir. 2022) .......................................................4

*Reichle v. Howards,*
  566 U.S. 658 (2012) ................................................................22

*Rivas-Villegas v. Cortesluna,*
  595 U.S. 1 (2021) (*per curiam*) ...............................................4, 7

*Saucier v. Katz,*
  533 U.S. 194 (2001) ..................................................................7

*Sloley v. VanBramer,*
  945 F.3d 30 (2d Cir. 2019) ......................................................5, 6

*United States v. Ahaiwe,*
  No. 21-2491, 2023 WL 4196954 (2d Cir. June 27, 2023) ...........25

*United States v. Alvarez,*
  567 U.S. 709 (2012) ....................................................17, 19, 20

*United States v. Baroni,*
  909 F.3d 550 (3d Cir. 2018) ....................................................22

*United States v. Bathgate,*
  246 U.S. 220 (1918) ................................................................14

*United States v. Brennan,*
  183 F.3d 139 (2d Cir. 1999) ...............................................24, 25

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Brown*,
  293 F. App'x 826 (2d Cir. 2008) ................................................... 24

*United States v. Classic*,
  313 U.S. 299 (1941) ..................................................................... 7

*United States v. Davis*,
  689 F.3d 179 (2d Cir. 2012) ....................................................... 26

*United States v. DeLaurentis*,
  491 F.2d 208 (2d Cir. 1974) ................................................ 15, 22

*United States v. Fortenberry*,
  89 F.4th 702 (9th Cir. 2023) ...................................................... 25

*United States v. Hansen*,
  599 U.S. 762 (2023) ....................................................... 17, 18, 21

*United States v. Kerley*,
  544 F.3d 172 (2d Cir. 2008) ....................................................... 30

*United States v. Kirk Tang Yuk*,
  885 F.3d 57 (2d Cir. 2018) .................................................... 27, 29

*United States v. Lanier*,
  520 U.S. 259 (1997) .................................................................. 2, 3

*United States v. Mosley*,
  238 U.S. 383 (1915) ..................................................................... 7

*United States v. Nusraty*,
  867 F.2d 759 (2d Cir. 1989) ....................................................... 30

*United States v. Rahman*,
  189 F.3d 88 (2d Cir. 1999) ......................................................... 18

v

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Ramirez,*
420 F.3d 134 (2d Cir. 2005) ....................................................... 23, 25, 27, 29

*United States v. Randell,*
761 F.2d 122 (2d Cir. 1985) ....................................................................22

*United States v. Robinson,*
813 F.3d 251 (6th Cir. 2016) ............................................................. 12, 16

*United States v. Rowe,*
414 F.3d 271 (2d Cir. 2005) ....................................................................27

*United States v. Rowlee,*
899 F. 2d 1275 (2d Cir. 1990) .................................................................19

*United States v. Royer,*
549 F.3d 886 (2d Cir. 2008) ....................................................................28

*United States v. Rutigliano,*
790 F.3d 389 (2d Cir. 2015) ....................................................................24

*United States v. Saylor,*
322 U.S. 385 (1944) ............................................................................ 7, 11

*United States v. Sryniawski,*
48 F.4th 583 (8th Cir. 2022) ............................................................. 18, 19

*United States v. Stone,*
188 F. 836 (D. Md. 1911) ...........................................................5, 6, 15, 22

*United States v. Tobin,*
No. 04-CR-216, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) .................5, 6

*United States v. Valle,*
807 F.3d 508 (2d Cir. 2015) ............................................................. 31, 32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Vernace,*
811 F.3d 609 (2d Cir. 2016) ................................................................32

*United States v. Weiss,*
475 F. Supp. 3d 1015 (N.D. Cal. 2020) ............................................18

*Van Buren v. United States,*
141 S. Ct. 1648 (2021) ......................................................................15

*Walczyk v. Rio,*
496 F.3d 139 (2d Cir. 2007) ........................................................ 7, 10

*West Virginia v. EPA,*
597 U.S. 697 (2022) ..........................................................................14

*White v. Pauly,*
580 U.S. 73 (2017) (*per curiam*) ........................................................2

**STATUTES**

18 U.S.C. § 241 ..................................................................................*passim*

18 U.S.C. § 3237 ............................................................................. 24, 25

42 U.S.C. § 1985 ...................................................................................12

**OTHER AUTHORITIES**

Richard L. Hasen, *How To Keep the Rising Tide of Fake News from Drowning Our Democracy*, N.Y. TIMES (Mar. 7, 2022) ............................................9

Hr'g Before Sen. Jud. Comm. on S.1994 ...............................................9

Lawyer's Committee on Civil Rights under the Law, Common Cause, & Century Foundation, *Deceptive Practices 2.0: Legal & Policy Responses* (2008) ..............................................................................................6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Restatement (Second) of Torts* § 865 ................................................................... 12, 13

S. Hrg. 112-893 (June 26, 2012) ............................................................................. 9

Eugene Volokh, *The 'Speech Integral to Criminal Conduct' Exception*, 101
    Cornell L. Rev. 981 (2016) .......................................................................... 18

# ARGUMENT

## I.  MACKEY'S SPEECH DID NOT VIOLATE "CLEARLY ESTABLISHED" LAW.

The Government's argument reduces to this: The Supreme Court has held for a century that 18 U.S.C. § 241 prohibits schemes by government officials to tamper with election results by disqualifying voters or destroying or forging ballots.  Those decisions supposedly established, with "obvious clarity" (Govt.30), that it is also a federal crime to deceive voters about the time, place, or manner of an election, because such a scheme likewise ultimately results in practical nullification of the right to vote.

That is a creative analogy.  It is not a serious argument about "clearly established" law.  The most obvious evidence is that—until this case—nobody thought federal law criminalized misinformation about voting.  Congress tried repeatedly but unsuccessfully to prohibit it.  One of the Government's own *amici* told Congress no statute proscribed it; the other opined in the *New York Times* it was "not clear" the law forbade it.  And DOJ disclaimed the power to prosecute it until this (in its words) "groundbreaking" case, which is why the Government still cannot cite *a single case* applying § 241 to voting misinformation, despite its utter ubiquity.  Was everyone really ignoring the "obvious"?  No.  There are in fact lots of reasons—from the doctrinal to the practical—why ballot-box fraud is not "obviously" the same as misinformation about voting: Section 241's text and history provide no foothold for the latter; extending the statute to cover it based on the Government's analogy would also criminalize lies bearing on *whether* and *for whom* to vote; and that, in turn, would violate the First Amendment.

This Court need not *agree* with all—or even any—of those distinctions. Under the "clearly established" framework, acquittal is required so long as a reasonable person *could have* distinguished ballot-stuffing from lying on Twitter. And surely a reasonable person could have drawn that distinction, when Congress, DOJ, and the Government's own *amici* did. That, in itself, requires the reversal of Mackey's conviction.

## A. The Court Cannot Affirm the Conviction Unless Mackey's Speech Violated "Clearly Established" Law.

The unique § 241 framework is critical to keep front of mind. In most criminal cases, the question is whether the conduct violated the law; here, the question is whether a violation was "clearly established." *United States v. Lanier*, 520 U.S. 259, 270 (1997). As the Government admits, that is the standard that governs in "the qualified-immunity context." Govt.27. And that standard is notoriously "demanding." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *see also* Crim.Profs.16-20 (explicating this test).

The Government devotes scant attention to the "clearly established" framework, and its *amici* simply ignore it. The Government suggests the standard is satisfied just because "the right to vote is clearly established." Govt.28 (capitalization omitted). But that commits the same mistake that the Supreme Court has repeatedly corrected in the qualified-immunity context: "defining the clearly established law at too high a level of generality." *White v. Pauly*, 580 U.S. 73, 78 (2017) (*per curiam*). It "avoids the crucial question whether the [defendant] acted reasonably in the *particular circumstances* that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) (emphasis added).

Instead, the real inquiry is whether, "in light of the *specific context* of the case," "the violative nature of *particular conduct* is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*) (emphasis added); *see also Wesby*, 583 U.S. at 63 (courts must ask whether the law "clearly prohibit[ed] the [defendant's] conduct in the *particular circumstances* before him" (emphasis added)). It is accordingly not enough to say "courts have held for over 100 years that Section 241 protects the right to vote." Govt.55. That general proposition is the start, not the end, of the analysis.

The Government seems to suggest that so long as "the <u>right</u>" is well established, the "<u>method of interference</u>" with the right need not be. Govt.31 (emphasis in original). That is a semantic distinction, not a legal one. The § 241 inquiry must look to "the particular type of conduct at issue," not merely the existence of a "right" in the abstract. *Lanier*, 520 U.S. at 271. Indeed, on a practical level, a defendant must have notice that "the specific conduct in question" violates the law, or else the "clearly established" test will not ensure "fair warning that [the defendant's] *actions violated* constitutional rights." *Id.* at 271-72 (emphasis added). Here, as discussed further below, caselaw established that the "right to vote" prohibits coercing others not to vote, disqualifying them from voting, altering or destroying their ballots, or diluting their votes by falsifying the count. The dispositive question is whether those decisions entail—with "obvious clarity," no less (Govt.30)—that the right to vote *also* includes an entitlement not to be tricked by other citizens about the mechanics of the electoral process.

3

To be clear, neither the qualified-immunity standard nor § 241 requires "a prior case" involving identical facts. Govt.31. But "precedent must have placed the statutory or constitutional question *beyond debate*." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). This ensures defendants are not criminally punished for "reasonable mistakes of … law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019).

Contrary to the Government's suggestion, none of these principles is limited to Fourth Amendment cases. Govt.34-35. This Court routinely invokes them in cases involving a wide range of civil rights. *See, e.g.*, *Peoples v. Leon*, 63 F.4th 132, 143 (2d Cir. 2023) (First Amendment); *Matzell v. Annucci*, 64 F.4th 425, 435-36 (2d Cir. 2023) (Eighth Amendment); *Radwan v. Manuel*, 55 F.4th 101, 129 (2d Cir. 2022) (Due Process). In all these contexts, "clearly established law must be 'particularized' to the facts of the case." *Naumovski*, 934 F.3d at 211. Constitutional doctrine is often painted in "shades of gray." Govt.34. And this is certainly not a case where the law is black-and-white.

## B. No Court Has Ever Held That § 241 Prohibits Deceptive Speech.

The easiest way to satisfy the "clearly established" standard is to "identify a case" holding the "specific conduct" to be "unlawful." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (*per curiam*). But the Government cannot do that, because over the 150 years since § 241 was enacted, no court has ever applied it to forbid false speech to deceive a voter—about *how* to vote, *when* to vote, or anything else. During argument on Mackey's bail motion, the Government candidly confessed this case is "novel" and this conduct "has not been prosecuted" before. Oral Arg. at 16:02-16:22 (2d Cir. Nov. 28, 2023).

4

In an effort to walk-back that near-fatal concession, the Government now claims § 241 has been used to punish those who use "lies to keep voters away from the ballot box" (Govt.28), citing *Guinn v. United States*, 238 U.S. 347 (1915) (*Guinn I*), and 228 F. 103 (8th Cir. 1915) (*Guinn II*). The Government cites the two *Guinn* cases more than 15 times. *See* Govt.3, 29-30, 32-33, 34, 51, 60. But it never actually describes their facts or holdings. For good reason—these cases do not remotely support the proposition. *Guinn* involved "election officers" who "refused to allow certain negro citizens to vote" by applying a "test of reading and writing." 238 U.S. at 355-56. Even after the black citizens offered "to read and write any section of the Constitution," the officials turned them away and threatened to have them "arrested." 228 F. at 110. The *Guinn* cases thus involved officials who *refused to let citizens cast ballots*. It has nothing whatsoever to do with *deceptive speech*. To admit those cases may not "precisely resemble the scheme that Mackey employed" (Govt.33) is a prize-winning understatement.

The Government also repeatedly cites two district court decisions: *United States v. Tobin*, No. 04-CR-216, 2005 WL 3199672 (D.N.H. Nov. 30, 2005), and *United States v. Stone*, 188 F. 836, 838-39 (D. Md. 1911). It insists that this pair of trial court orders, one over a century old and the other an unpublished interlocutory ruling, can be enough to create "clearly established" law. Govt.46 n.13. But the decision it cites for that idea held only that district court opinions can form part of a "robust consensus of cases of persuasive authority." *Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019) (quoting *Wesby*, 583 U.S. at 63)). In *Sloley*, "numerous district courts in this Circuit" had already

5

"recognized" that "Supreme Court and Second Circuit precedent clearly foreshadowed the rule" at issue, and even that was insufficient until "the New York Court of Appeals" joined the chorus and adopted the rule in question, such that any reasonable officers in New York would have known it was the law. *Id.* at 41. Even then, there was a fierce dissent on the "clearly established" question. *Id.* at 50-51 (Jacobs, J., dissenting).

*Tobin* and *Stone* do not form a "robust consensus." Nor, in any event, do they even suggest, let alone establish, the criminality of Mackey's conduct. The Government never mentions the facts of *Tobin*, but the defendant there jammed telephone lines to try to prevent a union from transporting voters to the polls—a physical interference in voting, not deceptive speech. 2005 WL 3199672, at *1. As one of the Government's own *amici* has thus acknowledged, *Tobin* leaves open the question "whether a deceptive practice constitutes an injury to the right to vote"—that is an "as-yet-untested" theory. Lawyer's Committee on Civil Rights under the Law, Common Cause, & Century Foundation, *Deceptive Practices 2.0: Legal & Policy Responses* at 27 (2008).[1]

As for *Stone*, county officials there designed ballots that made it "difficult" or "impossible" for illiterate voters to vote Republican. 188 F. at 838. It did not involve speech either. (If anything, *Stone* illustrates why the Government's theory would equally reach lies designed to influence *for whom* people vote. *Infra* at 15.)

---

[1] https://www.commoncause.org/wp-content/uploads/2018/03/0064.pdf.

That leaves cases applying § 241 to ballot-box fraud by election officials. They involve *manipulating ballots*, not *deceiving voters*. In the Government's words, they address officials who "on the back-end refuse to count validly cast ballots; falsify the results in a primary election; or cause 'fictitious ballots' to be 'fraudulently cast and counted.'" Govt.29 (citing *United States v. Mosley*, 238 U.S. 383 (1915); *United States v. Classic*, 313 U.S. 299 (1941); *United States v. Saylor*, 322 U.S. 385 (1944)); *see also, e.g.*, *Fields v. United States*, 228 F. 2d 544, 548 (4th Cir. 1955) (defendants "illegally cast" ballots). None of them involved a citizen who, on the "front-end," used speech to deceive voters.

The Government's concession at the bail argument was therefore well-offered: Until this case, § 241 had never been used to criminalize the (ubiquitous) dissemination of misinformation relating to elections or voting.

## C. The Analogy Between Ballot Fraud and Spreading Misinformation About Voting Is Far From "Obvious."

Given the absence of on-point authority, the Government could only satisfy the "clearly established" test if "every reasonable" person would have "interpret[ed]" the "then-existing precedent … to establish the" unlawfulness of the conduct. *Wesby*, 583 U.S. at 63. That is, the Government must show the precedent on which it relies is not "materially distinguishable." *Rivas-Villegas*, 595 U.S. at 6; *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001) (defining question as whether conduct held unconstitutional is "distinguishable in a fair way from the facts presented in the case at hand"); *Walczyk v. Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) (same).

The Government cannot hope to make that showing here. Even indulging the creative analogy that the Government seeks to draw—between destroying a valid ballot or disqualifying an eligible voter, on the one hand, and misleading a voter about how to cast a vote, on the other—this is at best a debatable argument for extension of the law. There are a host of compelling reasons why a reasonable person would *not* necessarily have accepted the Government's analogy or its conclusion about § 241's scope.

### 1. **Nobody else drew this analogy.**

Perhaps the best evidence Mackey would not have thought his conduct violated § 241 is that nobody else thought so. *Cf. Haugen v. Brosseau*, 339 F.3d 857, 886 (9th Cir. 2003) (Gould, J., dissenting) (arguing that "officers of reasonable competence could disagree" given that "courts of reasonable competence *do* disagree on the issue"), *rev'd*, 543 U.S. 194 (2004) (*per curiam*) (agreeing that law was not clearly established). After all, voting misinformation is "nothing new" (Lawyers.Comm.14-15), yet nobody has ever thought it was criminal (Crim.Profs.7-11). The Government just ignores this.

Start with Members of Congress. They evidently do not believe that current law forbids deceiving voters about the time, place, or manner of voting, because they have repeatedly introduced the "Deceptive Practices and Voter Intimidation Prevention Act" to do exactly that. 109th Cong. S. 1975 (2005); 110th Cong. S. 453 (2007); 117th Cong. S. 1840 (2021); *see also* Crim.Profs.14-15. Senators advocated for the bill because, under current law, "it is not a Federal crime to disenfranchise voters by deception." Hr'g Before Sen. Jud. Comm. on S.453, S. Hrg. 110-277 (June 7, 2007) (Sen. Schumer).

8

That was the position of DOJ, too, before this case. Senator Cardin recounted, at the hearing, "the view from Justice that they do not have the authority currently to go after these practices," noting that Senator Schumer had in fact "contacted the Justice Department" to investigate deceptive flyers and was told by the Attorney General "he did not believe that he had the legal authority to look into these types of issues because there is no Federal law that makes these practices illegal." *Id.* (Sen. Cardin). That is presumably why DOJ has bragged about this prosecution being "groundbreaking"[2] and was forced to concede at the bail argument that it was "novel" (*supra* at 4).

Even the Government's own *amici* are on record denying, or at least doubting, that existing law prohibits suppressing votes through deceit. The Lawyers' Committee for Civil Rights Under Law testified before Congress that "current federal and State laws are insufficient" to address voter deception, and specifically called out "conspiracy laws" like § 241 as "inadequate" since they focus on "intimidation." Hr'g Before Sen. Jud. Comm. on S.1994, S. Hrg. 112-893 (June 26, 2012) (Tanya Clay House). Likewise, Professor Hasen admitted, in opining on *this very case*, that "it is not clear if existing law makes such conduct illegal." Richard L. Hasen, *How To Keep the Rising Tide of Fake News from Drowning Our Democracy*, N.Y. TIMES (Mar. 7, 2022); *see also* Crim.Profs.13 (citing other scholarship). Contemporaneous concessions about § 241's unsettled reach speak louder than after-the-fact cheerleading for the prosecution in *amicus* briefs.

---

[2] *See* https://www.justice.gov/usao-edny/pr/social-media-influencer-douglass-mackey-sentenced-after-conviction-election (Oct. 18, 2023).

To be clear, § 241's meaning is not determined by what DOJ or a later Congress thinks, let alone by the views of civil rights lawyers or even law professors. But the fact that sophisticated lawyers and legislators all doubted § 241's application to deception should make it impossible for the Government to argue with a straight face that this was sufficiently "obvious" (Govt.33) to justify upholding a criminal conviction.

### 2. **Statutory text and history rebut the analogy.**

The ballot-box fraud cases do not establish with "obvious clarity" (Govt.30) that spreading voting misinformation is a crime, for the further reason that § 241's text and history present distinctions that cut firmly against extending the statute to the latter.

Starting with text, the statute forbids (in relevant part) conspiracies to "injure" others in the free exercise of their federal rights. As Mackey explained, *injuring* someone is different from *deceiving* him, both as a matter of ordinary parlance and as a matter of contemporaneous congressional language. Mackey.18-19. The Government never actually addresses that point; incredibly, it never attempts *any* textual argument for why Mackey's conduct ran afoul of the statute (let alone *clearly* did so). Instead, it offers only that the Supreme Court has applied § 241 to ballot manipulation, even though it is not "coercive," so "injure" cannot be limited to coercive acts. Govt.44. But even accepting that premise, the question remains whether those holdings made it obvious that "injure" also reaches *deception*. In other words, the question is whether the Court's decisions were "distinguishable in a fair way" in how they construed the operative term "injure." *Walczyk*, 496 F.3d at 166 (Sotomayor, J., concurring).

Ballot-box fraud and voting misinformation are materially distinguishable. When an election official engages in "conduct like casting fake ballots and refusing to count validly cast ballots" (Govt.44), that "injures" the right to vote by taking direct action, beyond the voter's control, to nullify the entitlement. It does not involve violence or threats, but it does to the *ballot* what the government cannot do to the *voter*. It is thus very similar to blocking a voter from a polling station, or threatening to arrest him if he enters. That, at least, was the rationale of the Supreme Court's decisions. *See, e.g.*, *Saylor*, 322 U.S. at 387-88 (reasoning that "to refuse to count and return the vote as cast was as much an infringement … as to exclude the voter from the polling place").

Spreading false information about election dates, times, or procedures, on the other hand, is different. It operates through deceit of the voter rather than by physical interference with the submission or counting of the ballot; it induces the voter to forfeit his own right rather than nullify it directly; it does not actually prevent a voter from casting a valid ballot and therefore does not place the right beyond the voter's control. For all these reasons, it is far from obvious that this conduct counts as "injuring" the right to vote within the meaning of § 241, even if one starts from the now-established premise that burning ballots or stuffing a ballot box does.

Professor Hasen offers a novel textual argument that he admits differs from "the Government's interpretation of the statute." Hasen.22. Citing the Supreme Court's interpretation of "injured in his person or property" in a different statute, *see Haddle v. Garrison*, 525 U.S. 121, 125-26 (1998), the Professor says (i) to "injure" means "to inflict

11

a harm redressable at common law," and (ii) deceiving someone out of the right to vote was supposedly compensable at common law. Hasen.9-21. At the threshold, seeing as even the Government never came up with this obscure set of inferences from *Haddle*, § 1985, and the Restatement of Torts, it is hard to contend that this chain of reasoning solves the fair notice problem (and, to his credit, the Professor never claims it does).

In all events, Professor Hasen's argument is flawed at each step, even assuming that the operative verb "to injure" in the criminal § 241 provision must mean the same as "injured in his person or property," a phrase used in a distinct, civil cause of action (42 U.S.C. § 1985) to define the class of plaintiffs with standing to sue.

*First*, he overreads *Haddle* in claiming it turns every tort into a statutory "injury." *Haddle* held that terminating someone's at-will employment imposes injury "in his person or property." 525 U.S. at 125-26. That is not surprising: An injury to property means a financial harm, which termination is. Nor is that proposition relevant here: Mackey has never denied that threatening to terminate an at-will employee if she exercises her right to vote could violate § 241, as a form of coercion. *Cf. United States v. Robinson*, 813 F.3d 251, 258 (6th Cir. 2016) (threat to evict voter). That has nothing to do with the question in this case, which is whether *deceiving* a voter violates § 241. And *Haddle* did not address whether deception constitutes injury. In observing that termination of at-will employment "has long been a compensable injury under tort law," 525 U.S. at 126, the Court did not hold that *any* tort injury suffices or purport to establish tort redressability as the legal standard to define "injury."

12

*Second*, even if § 241 prohibited any conspiracy to "inflict a harm redressable at common law," there is no common-law tort remedy for deception about how, whether, or for whom to vote.  The Professor cites cases involving officials who "prevented" citizens from voting (*i.e.*, coercion) or "falsely certified" election results (*i.e.*, ballot-box fraud).  Hasen.15, 17.  That tracks § 241 precedent too.  But, like the Government, the Professor comes up short when it comes to cases involving *lying to voters*—citing none.  Nor does the Restatement of Torts fill the gap.  It requires a "wrongful" act, which only begs the question whether misinformation is "wrongful" for these purposes.  *Restatement (Second) of Torts* § 865; Hasen.16.  The Professor cites comments on § 865, but they refer only to depriving someone of the right to vote by "fraud *practiced upon the registrar of voters*"—*i.e.*, causing one to be stricken from the voter rolls—not voter deception.  *Id.*, cmt. a (emphasis added).[3]  Looking to tort law to define the scope of § 241 therefore turns out to be an interesting but pointless detour: There is *still* no authority suggesting liability—whether criminal or tort—for deceiving voters.

Given all of these leaps, Professor Hasen's novel argument may be worth further exploration in a law review article, but it cannot hope to show that Mackey violated "clearly established" law by tweeting the false memes.

---

[3] On top of all that, some courts have rejected § 865 outright, while others have given it only very limited application.  *See, e.g.*, *Nichols v. Kan. Political Action Comm.*, 11 P. 3d 1134 (Kan. 2000) (rejecting); *Miami Herald Pub. Co., Div. of Knight-Ridder Newspaper v. Ferre*, 636 F. Supp. 970, 977 (S.D. Fla. 1985) (limiting).  It is hardly well-established, and there does not appear to be any New York authority adopting it.

Turning from text to history, the story is the same. The Government ignores it. History would not have suggested to a reasonable person, much less made it "obvious," that § 241 reaches voting misinformation, even assuming it reaches conventional ballot fraud. Indeed, even the later-repealed "comprehensive" provisions of the Enforcement Act of 1870, understood to demarcate the outer bound of § 241, *United States v. Bathgate*, 246 U.S. 220, 225-26 (1918), never criminalized mere deception or "voter-suppression" (Govt.21), even as they expressly forbade other election-related frauds. Mackey.20-21.

### 3. **The analogy would prove too much.**

Even if the Government's analogy were textually and historically plausible, its practical implications render it a non-starter—and certainly not inescapably obvious.

To start, reading § 241 to forbid spreading false information about the time, place, or manner of voting would enact a measure Congress repeatedly "considered and rejected." *West Virginia v. EPA*, 597 U.S. 697, 731 (2022). The Government never so much as *mentions* the Deceptive Practices and Voter Intimidation Prevention Act that has been kicking around since at least 2005. *See supra* at 8. Prohibiting false statements about voting times and procedures simply has not succeeded in Congress.

An even bigger problem is that the Government's analogy, by extending § 241 to deception that interferes with civil rights, would sweep *far further. See* Mackey.23. For the most part, the Government does not even try to rebut these implications. Instead, it pooh-poohs the "parade of horribles" by insisting *this case* is "limited" by its facts. Govt.35. That misses the point. In considering the viability of an interpretation, courts

regularly look at whether it would cause absurd results *beyond* the instant case. *E.g.*, *Dubin v. United States*, 599 U.S. 110, 129 (2023); *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021). Indeed, *this* Court has done exactly that for *this* statute. *United States v. DeLaurentis*, 491 F.2d 208, 211 (2d Cir. 1974) (rejecting novel § 241 theory that would have "consequence" of criminalizing "not uncommon acts" yet had only once before been prosecuted). The implausible implications of the Government's extension-by-analogy underscore that a reasonable person could easily have rejected it.

Most implausible of all is that § 241 is a general political speech code, prohibiting not only false statements bearing on *how* to vote but also lies going to *whether* to vote or *for whom* to vote. Yet if telling people that the election is on Wednesday is a scheme "to deprive voters fully of their constitutional right to vote" (Govt.51), so too is telling them that voting is futile because the election is rigged, or that a long queue will keep them in the cold for hours, or that exit polls already show a landslide, or that voting will invite scrutiny of their immigration status, or that they will need to show a passport to vote. Indeed, the Government's *amicus* points to such things as "disinformation campaigns" that § 241 supposedly forbids. Lawyers.Comm.14-15. And if lying about how to vote is akin to *disqualifying* the voter or *destroying* his ballot after it is cast (Govt.29), then lying about a candidate's background, policies, or endorsements is analogous to *preventing* the voter from supporting his candidate of choice (as in *Stone*, *supra* at 6), or *altering* the ballot after it is cast. In sum, once one equates deception with injury, as the Government does, § 241 becomes an all-purpose "truth in politics" offense.

Even here, the Government does not deny its analogy and interpretation carry this far. It merely hedges, suggesting perhaps a "distinction could be drawn." Govt.36 n.7. But its proposed distinction only exposes the flaw in the original analogy. It offers that "any right to information governing how to spend one's vote stands apart from the right to the vote itself." *Id.* There is indeed an intuitive difference between a right on the one hand, and information bearing on its exercise on the other. Mackey's conduct, however, and misinformation more generally, "injures" only the latter—information that *bears on* the right to vote. So the Government's "distinction" appears to abandon the core theory of its own prosecution here.

The Government also suggests that tricking someone as to *how* to vote "frustrates voters' actual attempt to exercise their right," whereas deception about *whether* to vote "simply discourages someone from exercising that right." Govt.62. But that distinction does not track anything in § 241's text, history, or precedent. To the contrary, it is clear that "discourag[ing]" voting using *coercion—e.g.*, threatening to evict someone for their vote—suffices. *See Robinson*, 813 F.3d at 258. Why would discouraging using *deception* be any different, if the two mechanisms of interference are truly equivalent? In the end, both function "to prevent the voter from voting." Govt.32.

For his part, Professor Hasen claims limiting § 241 to "tortious conduct" would avoid the "parade of horribles." Hasen.19. But he never explains why fraud is tortious when it deceives about voting mechanics but not when it deceives a voter into staying home or voting for someone else. If fraud counts, these are all equally fraudulent.

16

Once again, the Court need not necessarily accept that the Government's theory would entail all of these consequences; perhaps a court *could* draw some line to narrow the statute's reach. Even still, none of this was clearly established in 2016. A reasonable person in Mackey's shoes could therefore readily have concluded that § 241 does not extend from ballot-box fraud to voting misinformation, lest that extension lead down a slippery slope—as the Government implicitly admits it would.

### 4. **The analogy would cause a collision with the First Amendment.**

An interpretation that turns § 241 into a political speech code is not only unlikely to be what Congress intended; it would also be unconstitutional. That is further reason to reject that interpretation, and certainly to deny its "obvious clarity" (Govt.30).

As just discussed, the Government barely disputes that its interpretation of § 241 would criminalize all lies bearing on voting. That blunderbuss approach would violate the First Amendment under all three opinions in *United States v. Alvarez*, 567 U.S. 709 (2012). Mackey.25-30; Volokh.8-9. It would arrogate to prosecutors the people's basic right to determine political truth, threatening censorial bias and chilling core speech. Even Professor Hasen does not dispute this would violate the First Amendment; he merely claims (incorrectly) that his novel narrowing construction solves the problem. Hasen.26-27. Any interpretation that sets the statute on a course to "constitutional collision" must be avoided. *United States v. Hansen*, 599 U.S. 762, 781 (2023).

The Government denies there is any constitutional roadblock, but its arguments misapprehends both the First Amendment and its role in this case.

*First*, the Government says any speech "in furtherance of an illegal conspiracy" falls within the "integral to criminal conduct" exception, which "extinguishes any First Amendment concern." Govt.49-54. As other courts have recognized, "[t]hat argument is circular and unpersuasive. Congress may not define speech as a crime, and then render the speech unprotected by the First Amendment merely because it is integral to speech that Congress has criminalized." *United States v. Sryniawski*, 48 F.4th 583, 588 (8th Cir. 2022); *see also Mashaud v. Boone*, 295 A.3d 1139, 1170 (D.C. 2023) (en banc) ("fatally circular"); *United States v. Weiss*, 475 F. Supp. 3d 1015, 1033 (N.D. Cal. 2020) (same). So the exception "cannot be triggered just by speech itself being a violation of a law, even a law that bans conduct as well as speech." Eugene Volokh, *The 'Speech Integral to Criminal Conduct' Exception*, 101 CORNELL L. REV. 981, 1052 (2016).

Rather, "[t]o qualify as speech integral to criminal conduct, the speech must be integral to conduct that constitutes another offense that does not involve protected speech." *Sryniawski*, 48 F.4th at 588. For example, a gang leader's instruction to his accomplice to "shoot!" is not protected, since it is intended to cause a distinct criminal act (murder). "The existence of a separate unlawful act is key." *Weiss*, 475 F. Supp. 3d at 1034. There must be a "predicate crime" that the speech solicits, facilitates, or promotes. *Friend v. Gasparino*, 61 F.4th 77, 90 (2d Cir. 2023); *see also Hansen*, 599 U.S. at 784 (exception applies to "solicitation and facilitation of criminal conduct"). All of the Government's cited cases fit that mold. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (speech "to induce" company "to violate" antitrust law); *United States v.*

18

*Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) (speech conspiring "to wage war" and "solicitation of attack" and "of murder"); *United States v. Rowlee*, 899 F. 2d 1275, 1276-78 (2d Cir. 1990) (speech advocating and teaching "evasion of taxes" to others).

Properly understood, this exception has no application here, because there is no allegation that Mackey's tweets were intended to solicit, induce, or facilitate any distinct criminal act. At worst, they were calculated to cause voters to send futile text messages and then stay home on election day. That conduct is not illegal; there was no "predicate crime," *Friend*, 61 F.4th at 90, to which Mackey's speech was "integral." *See Sryniawski*, 48 F.4th at 588; *Mashaud*, 295 A.3d at 1170. The Government's claim, rather, is that his speech "itself" was "a violation of a law"—namely § 241. Volokh, *supra*, at 1052. As such, the Government cannot avoid First Amendment scrutiny of that statute.

*Second*, the Government submits that "*this prosecution* does not offend the First Amendment." Govt.61 (emphasis added). "Irrespective" of other "hypothetical" fact patterns, prosecuting Mackey's tweets does not infringe the First Amendment, it says, because those tweets were constitutionally "*proscribable*." Govt.62-63 (emphasis added). The *amicus* similarly argues that Mackey's "memes" are not "shielded from government regulation" because they are "lies" that threaten "injury." Lawyers.Comm.4-5.

All that misses the point. As Mackey acknowledged, it is possible that a narrowly tailored ban on certain material false statements about the time, place, or manner of voting could satisfy scrutiny under *Alvarez*, and in that sense his memes may well be theoretically "proscribable." Mackey.30-32; Volokh.11-13. But § 241 is not such a law.

*See* Volokh.27-28.  Indeed, § 241 only reaches his speech if deception counts as "injury," which would transform the statute into a generalized political speech code that would be facially unconstitutional.  Volokh.16-21.  Far from narrowly tailored, it would drape across the body politic, smothering democratic discourse.  If these are "hypotheticals" for now (Govt.61) that is only because the Government's interpretation is novel.

*Third*, the Government says any "overbreadth" challenge fails.  Govt.60.  As a matter of doctrinal precision, this is not an overbreadth challenge, as Mackey is invoking *his own* First Amendment rights.  His memes are not categorically unprotected.[4]  They may be *proscribable* but have not been validly *proscribed*: A statute may "prohibit messages intended to mislead voters about voting requirements and procedures," but it must do so in a tailored way.  *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 18 n.4, 21 (2018).  The Government is wrong in overbreadth terms too, however; it learns the wrong lesson

---

[4] Aside from the "integral to criminal conduct" exception, the Government does not claim Mackey's tweets were *categorically* unprotected.  It merely cites (Govt.56 n.15) the *Alvarez* dissent's position that "false factual statements possess no intrinsic First Amendment value."  567 U.S. at 746 (Alito, J., dissenting).  A majority of the Court, however, rejected that "categorical" view.  *Id.* at 719 (plurality op.); *see also id.* at 731-32 (Breyer, J., concurring in judgment).  For its part, the Lawyers' Committee argues that the memes "fall under the well-recognized First Amendment exception for fraud."  Lawyers.Comm.12.  "Simply labeling an action one for 'fraud,' of course, will not carry the day."  *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 617 (2003).  Fraud "typically requires proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury."  *Alvarez*, 567 U.S. at 734 (Breyer, J., concurring in judgment).  Section 241 contains no such elements, nor were they proved here.  And "the Supreme Court has not crafted" any other exception for non-coercive "false statements that discourage people from exercising the right to vote."  *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 478 (S.D.N.Y. 2020).

from *Hansen*. The Court there rejected an "expansive reading" of the statute that would have "render[ed] it vulnerable to an overbreadth challenge." 599 U.S. at 774, 781. Mackey urges exactly the same path: construe § 241's verbs narrowly, consistent with 150 years of precedent, to not reach misinformation. Like in *Hansen*, that reading avoids a violent collision with the First Amendment. Unlike in *Hansen*, it also requires reversal of the conviction on the instant facts.

Accordingly, the Government (and its *amici*) are misguided in focusing on the particular facts of "this case." Govt.54. Reading the statute to reach Mackey's tweets means reading it to reach *all* election lies, which would obviously be unconstitutional. That direct "constitutional collision," *Hansen*, 599 U.S. at 781, is more proof that the Government's interpretation is wrong, or at bare minimum not "clearly established."

\*             \*             \*

To return to the start, the ultimate question for this Court is whether Mackey's deceptive speech violated "clearly established" law. It did not, because § 241 has never before been applied to misinformation, and there are many good reasons—interpretive, practical, and constitutional—to doubt it reaches this far. Whether or not this Court agrees with those reasons, they make it impossible to conclude that the criminality of Mackey's tweets was "beyond debate" at the time. *al-Kidd*, 563 U.S. at 741.

And all of that is before confronting the separate question whether § 241 reaches *private* interference with *presidential* voting. Mackey.34; Former.DOJ.3-19. Devoting eight pages to that issue, the Government claims "the structure of the Constitution"

and inferential reasoning from *Bush v. Gore*, 531 U.S. 98 (2000), support its theory. Govt.38-40. Yet it admits the Eighth Circuit "held to the contrary." Govt.40 n.9. Its decision may be "nearly a century" old (Govt.42-43), but that still makes it younger than the Government's *Stone* case; regardless, the Government cannot cite a single case going the other way since. That is a death knell for a prosecution that must prove "clearly established" law. *See Reichle v. Howards*, 566 U.S. 658, 669-70 (2012). Hoping for a procedural save, the Government objects that Mackey did not raise this point below. But because the "clearly established" test is purely legal, this Court has reached such issues even when presented "for the first time on appeal." *Fabrikant v. French*, 691 F. 3d 193, 212 (2d Cir. 2012); *see also Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 142 (2d Cir. 2000) (preservation not an "absolute bar" for "pure question[s] of law").

For one reason or the other, it was not clearly established that Mackey committed a federal crime by tweeting false voting information. That lack of clarity is why the motions panel granted Mackey release pending appeal. *See United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (authorizing release where question is "fairly debatable"). And it is why the merits panel should now reverse his conviction.[5]

---

[5] The Government feigns confusion (Govt.70-71), but reversal is the required remedy when the prosecution fails to prove a violation of "clearly established" law in a § 241 case. *See, e.g.*, *United States v. Baroni*, 909 F.3d 550, 588 (3d Cir. 2018) (finding law not clearly established and therefore "revers[ing] and vacat[ing] Defendants' civil rights convictions and remand[ing] with instructions to dismiss"); *DeLaurentis*, 491 F.2d at 214 (rejecting § 241 theory and therefore reversing conviction). This defect cannot be cured at a new trial, with new evidence, or through new jury instructions; none of that can change the fact that Mackey's speech did not amount to a federal crime.

## II. THE GOVERNMENT DID NOT PROVE VENUE IN EDNY.

Just as the Government stretches § 241 beyond recognition, it presses boundless and unprecedented theories of venue to defend prosecuting Mackey in EDNY, where neither he nor any alleged co-conspirator did *anything*. The Government admits that a defendant is open to prosecution "only where" some "essential element of the crime" was committed. Govt.73; *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005). But it fails to satisfy that test. During and after trial, the prosecutors defended venue exclusively on the basis that internet data associated with Mackey's tweets briefly pulsed through EDNY en route to the rest of the country. Facing pushback for that overreach, the Government now floats several alternative theories, including one even the district court rejected. None succeeds; the conviction must, at minimum, be vacated.

### A. The Government's "Pass-Through" Theory of Venue Fails.

The district court rested its denial of post-trial relief on the pass-through theory, since that was the only venue theory the Government sought to prove at trial (A184-860) and the only one it "opted to argue" to defend the verdict (SA100-01). But the theory fails as a matter of law. It neither proves "essential [offense] conduct" in EDNY nor shows "substantial contacts" with the forum. *Ramirez*, 420 F.3d at 138-39.

Internet data traveling through a district is not within-district "conduct," much less an "essential element of the crime." Govt.73. Internet data flashes through a district as a byproduct of how the internet operates. Such an incidental, ephemeral, and arbitrary connection does not support venue. *See* Mackey.36.

23

Lacking any principle, the Government turns to precedent. But no precedent supports it. It cites *United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015), for the point that communications through a district suffice for venue. Govt.79-81. But, as Mackey explained, *Rutigliano* addressed crimes "involving the use of the mails [or] transportation in interstate … commerce," and for such offenses venue is expressly conferred on any district "through" which such mail or commerce travels. 18 U.S.C. § 3237(a) par. 2; *see Rutigliano*, 790 F.3d at 396-97 (relying on this language). The same is true for *United States v. Brown*, 293 F. App'x 826 (2d Cir. 2008), where the wires through the district were admittedly "jurisdictional" (Govt.75). So the "pass-through" theory of venue in those cases was expressly grounded in the applicable venue statute.

Section 241 is different. Its elements do not involve mail or interstate commerce. As the Government admits, venue for § 241 is thus governed by the *first* paragraph of § 3237(a), which does not confer venue on districts "through" which anything passed. The Government cannot rewrite the venue statute to add "through" language into its first paragraph. *See United States v. Brennan*, 183 F.3d 139, 148 (2d Cir. 1999).

Resisting this distinction, the Government notes that *Rutigliano* involved not only wire fraud, but also health-care fraud, which lacks an interstate-commerce jurisdictional hook. Govt.80. As to the health-care offense, however, this Court grounded venue in other, traditional contacts with the district, including doctor visits and insurance claims that were submitted to a company "in" the district. *Rutigliano*, 790 F.3d at 394, 398. A wire passing through the district would not alone have sufficed as to that offense.

24

The Government also points to the non-precedential summary order in *United States v. Ahaiwe*, but since the defendant there expressly *agreed* that a wire transfer would confer venue and merely disputed whether he had participated in the conspiracy, that decision rendered no holding on the legal question at issue here. *See* No. 21-2491, 2023 WL 4196954, at *1 (2d Cir. June 27, 2023).

In short, this Court has never before held that a communication passing through a district suffices for criminal venue, outside the context of offenses governed by the second paragraph of § 3237(a). Meanwhile, three other lines of authority independently highlight why the broader "pass-through" theory cannot be correct.

*First*, this Court (and others) have stressed that venue provisions "should not be so freely construed as to give the Government the choice of a 'tribunal favorable' to it." *Brennan*, 183 F.3d at 147; *see also Ramirez*, 420 F.3d at 146 (venue rules must be "narrowly construed"). Only hemmed-in theories of venue comport with the Framers' "deep and abiding antipathy to letting the government arbitrarily choose a venue in criminal prosecutions." *United States v. Fortenberry*, 89 F.4th 702, 712 (9th Cir. 2023). Yet, in direct conflict with that authority, the pass-through theory would let prosecutors charge internet-related crimes anywhere in the country. Mackey.39-41; NACDL.4.

The Government denies that its "pass-through" theory allows universal venue for internet offenses. It says that theory permitted venue here only by virtue of a quirk of the "unique geography of New York." Govt.86 & n.21. That contrived limit is illusory. Tweets (like social media posts generally) can be viewed in *any district* of the

25

country (A124), so the internet data associated with Mackey's posts must have passed through *every one of them*. Nor would this be hard to prove for data traveling beyond Manhattan. *Contra* Govt.86. In fact, the Government here traced the data as it zipped down to Atlanta and shot across the country to Sacramento. *See* A185. And because everyone knows that internet posts reach the entire country, "foreseeability" likewise fails to cabin the Government's theory in any meaningful way. NACDL.6-7; *contra* Govt.87. The theory is unrestrained, and that makes it indefensible.

*Second*, courts "routinely" reject an analogous jurisdictional theory in civil cases, reasoning that even individuals whose internet posts *arrive at* a particular forum still lack "minimum contacts" with it. *Blessing v. Chandrasekhar*, 988 F.3d 889, 904-05 & n.15 (6th Cir. 2021) (collecting cases); *see also* Mackey.41. *A fortiori*, data that merely *passes through* a district does not sufficiently tie a defendant to that venue, especially as criminal cases require not merely "minimum" contacts but rather "substantial" ones. *See United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012). The Government offers no rebuttal.

*Third*, the "pass-through" theory runs afoul of that separate requirement that the defendant have "substantial contacts" with EDNY—enough to provide a "sense" that he "chose[]" that forum. *Id.* The arbitrary travel path of internet data does not establish any meaningful contacts; nor does it suggest that the defendant chose the forum in any sense. The district court thought the substantial-contacts test does not apply to conspiracy cases (Govt.88), but there is no such categorical carve-out. Rather, the substantial-contacts test is a "valuable safeguard" that becomes unnecessary only when

"an overt act in furtherance of a criminal conspiracy has been committed in the district." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018). Here, no one committed an overt act in EDNY, and the Government does not claim otherwise. Without that showing, the substantial-contacts test applies. *See id.*; *Ramirez*, 420 F.3d at 139. And even the Government does not claim the test can be satisfied on these facts, *i.e.*, based solely on the travel path of internet data transmissions.

Instead of claiming the substantial-contacts test was satisfied, the Government says it is meant to guard against "bias and inconvenience," which were "not substantially present" here. Govt.88 (quoting *United States v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2005)). But those are *reasons* for "the constitutional venue provisions," not the *test* for venue. *Rowe*, 414 F.3d at 279-80. That is why *Rowe* upheld venue only after explaining that the lower court "found venue proper in light of the factors listed in this Circuit's 'substantial contacts' test." *Id.* at 280. Here, by contrast, the court did not apply the substantial-contacts factors to analyze Mackey's connection to EDNY. Nor does the Government contend that those factors could support its chosen forum on these facts.

For all of these reasons, the pass-through theory is legally inapplicable here; it is irreconcilable with statutory text, precedent, and purpose alike. At a minimum, though, the conviction cannot stand because the jury was never instructed to find substantial contacts. *See Kirk Tang Yuk*, 885 F.3d at 70. Though Mackey explained as much in his opening brief (Mackey.46), and the Government acknowledged this challenge (Govt.78 n.20), it offered no merits response and thus implicitly admitted this error.

27

### B. The Government Cannot Salvage Venue with Its New Theories.

On appeal, the Government pivots to venue theories that it neither tried to prove to the jury nor "opted to argue" below. SA100-01. Far from establishing venue, these alternative, undeveloped theories are riddled with legal and factual flaws and serve only to highlight the problems with prosecuting Mackey in EDNY. They also cannot avoid vacatur, since the jury was instructed on the erroneous "pass-through" theory.

The Government's first belated theory is based on Mackey's testimony that he wanted his posts to "be seen by members of Clinton's campaign staff." Govt.80. But the district court correctly rejected the premise that venue may lie based on the location of "intended victims" alone. SA20-21. The Government never explains why that was wrong; it simply ignores that ruling, and ignores that a conviction cannot be sustained on a theory not charged to the jury. *Percoco v. United States*, 598 U.S. 319, 332 (2023).

Moving from intent to effects, the Government argues that the campaign *did* see deceptive memes and undertook a "defensive response" in EDNY to thwart them. Govt.82-83. In fact, there is no evidence the campaign saw any tweets from Mackey or his co-conspirators. Rather, the campaign viewed *other* false ads and began its efforts "*before* Mackey sent out his own tweets." Govt.82-83 (emphasis added). In any event, only acts "*in furtherance* of the conspiracy" can support venue. *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (emphasis added). The campaign's efforts to *prevent* voter confusion were obviously not in furtherance of any conspiracy; they did not help deceive voters or even help Mackey's posts achieve "virality." Govt.87.

28

Indeed, this entire focus on the Clinton campaign is a red herring, because § 241 prohibits conspiracies "to deprive *voters*" of their rights. Govt.51 (emphasis added). To the extent that Mackey's tweets riled up or distracted *campaign staffers*, that is completely irrelevant to the offense. Hence prosecutors argued below that Mackey was *not* "trying to bother the campaign." A836. Mackey's needling had nothing to do with the charged crime, and therefore cannot support venue. *See Ramirez*, 420 F.3d at 139.

Finally, the Government points to a 161-page list of phone numbers and—from this alone—argues that Mackey caused some "EDNY voters" to text the fake number. Govt.84. That flimsy reed cannot support its own weight. A phone number does not even establish residence, let alone status as a voter, and not a *single person* from EDNY testified to attempting to vote by text. Nor could any of these texts reasonably be traced to Mackey anyway, given that similar memes were ubiquitous. Mackey.50. Simply put, this theory heaps speculation about voter status onto conjecture about causation. That fails to live up to the Government's acknowledged obligation to adduce "exact and definitive" proof of venue facts. Bail.Opp.25 (2d Cir. Nov. 13, 2023).

Last, even if any of these new theories had merit, a new trial would be required because the jury was instructed it could find venue on the invalid pass-through theory. *See Kirk Tang Yuk*, 885 F.3d at 70. Especially since the Government did not even try to prove its alternative theories at trial (A184-86), that error prejudiced Mackey.[6]

---

[6] Mackey preserved this challenge. *Contra* Govt.78 n.20. An objection to jury instructions is preserved if a defendant makes clear what instructions he "prefer[s]."

## III. THERE IS NO SUFFICIENT EVIDENCE THAT MACKEY CONSPIRED TO INJURE VOTING RIGHTS.

Because § 241 prohibits only a *conspiracy* to injure rights, the Government had to prove beyond a reasonable doubt that Mackey *agreed* to distribute his misinformation memes. Govt.69. It failed to carry this burden. Voting misinformation ran rampant online in the lead up to the 2016 election. Mackey.50. Mackey found his memes on a publicly accessible site and shared them without any request, direction, or collaboration. Mackey.49; Govt.10-13. On this record, no rational jury could find beyond a reasonable doubt that Mackey entered an unlawful agreement to injure voting rights.

In response, the Government principally rests on Mackey's "access" to the War Room. Govt.10, 67. But such "association" with alleged criminals does not show any wrongful *agreement* on Mackey's part. *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989). To the contrary, he did not participate in the War Room *at all* during the two weeks prior to his posts, let alone coordinate to spread misinformation. A308-19. Nor did Mackey copy the War Room's content: His posts included *unique* hashtags, featured *different* pictures, and relayed *distinct* text (some in another language). A313-15, 371-73.

---

*United States v. Kerley*, 544 F.3d 172, 177 (2d Cir. 2008). Mackey did that by specifically challenging the pass-through theory in his motion to dismiss (Govt.78 n.20), and then specifically proposing instructions *without* pass-through language (ECF 96 at 2).

Mackey did not press this instructional error in his opening brief because he was already challenging the legal sufficiency of the pass-through theory and the Government had abandoned its alternative theories after trial. *Accord* ECF 140 at 34-45 (post-trial brief defending venue solely on pass-through theory). Mackey's need to reassert the instructional error now has only arisen thanks to the Government's belated pivot to new theories. If there is any preservation problem, it lies at the Government's feet.

If anything, Mackey's posts *flouted* the only agreement reached by other War Room members. Some participants had strategized about how to make the remote-voting idea "more believable" by complaining about unfairness and saying "something about" it being "too late" for the Trump campaign to "register." A314-15. Mackey's posts reflected none of that subtle duplicity. A371-73.

The Government nonetheless asserts that Mackey "always acted in concert with the members of the groups." Govt.78. That is an absurd overstatement. The evidence showed at most that Mackey—who posted "hundreds of thousands" of tweets on hot-button political topics—sometimes tweeted about the same trending issues or deployed the same popular hashtags as those discussed on the War Room. A160-61; GA102-03. That is just a function of social media; it cannot be stretched to imply that he reached an agreement with War Room members to break the law.

Falling back, the Government points to Microchip's testimony about why he spread voting misinformation. Govt.64. Yet Microchip's personal intentions do not help meet the Government's burden, since they say nothing about whether Mackey linked arms with Microchip to break the law. And that is the only question that matters. *United States v. Valle*, 807 F.3d 508, 516 (2d Cir. 2015) (proof must include defendant's joint participation in criminal effort). Critically, the Government cites no evidence that Microchip ever met Mackey, spoke to him, shared one-on-one messages about *anything*, or otherwise plotted with Mackey about his memes. No such evidence exists.

Perhaps trying to bias the Court, the Government also plays up Mackey's (past) objectionable views. Govt.17-18, 69. This is yet another distraction. *See United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (conviction cannot be based on "passion, prejudice or sympathy"). As even the district court agreed, Mackey was not (and could not be) prosecuted for his "political beliefs or for expressing them." ECF 176 at 21. Again, the only relevant question is whether he acted *alone* or *in concert* with others. Offensive opinions do not make the latter any more likely than the former.

Finally, the Government seeks to lower its burden of proof by suggesting this was "a secretive operation" that could not fully "be laid bare in court." Govt.24. Quite the opposite. This was an alleged *online* conspiracy, and the Government obtained all of Mackey's tweets and private messages—giving it full access to all potentially relevant material. A313-15, 371-73. Even so, the best evidence it could muster shows Mackey tweeting his own distinct memes, without any coordination or any of the trickery hatched in the War Room. Mackey.47-49. Because such evidence gives at least "nearly equal circumstantial support" for Mackey's "theory of innocence," a "reasonable jury must necessarily entertain a reasonable doubt." *Valle*, 807 F.3d at 522.

At bottom, with no actual evidence of conspiracy, the Government rests on *guilt by association* and *character assassination*. Neither is legally sufficient, so reversal is required.

## CONCLUSION

The Court should reverse Mackey's conviction.

Dated: February 20, 2024

/s/ *Yaakov M. Roth*

Eric S. Dreiband
Yaakov M. Roth
Caleb P. Redmond
Harry S. Graver
JONES DAY
51 Louisiana Ave, N.W.
Washington, D.C. 20001
(202) 879-3939
yroth@jonesday.com

*Counsel for Defendant-Appellant*
*Douglass Mackey*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for Defendant-Appellant certifies that this brief:

(i) complies with the Court's order of February 15, 2024, granting leave to file a reply brief not exceeding 9,000 words, because it contains 8,964 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(ii) complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), because it has been prepared using Microsoft Office Word 2016 and is set in 14-point Garamond font.

*/s/ Yaakov M. Roth*
Yaakov M. Roth
