23-7577
*United States v. Mackey*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2023

(Argued: April 5, 2024     Decided: July 9, 2025)

No. 23-7577

———————————————————

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

DOUGLASS MACKEY, AKA RICKY VAUGHN,

*Defendant-Appellant.*

———————————————————

Before:    LIVINGSTON, *Chief Judge*, RAGGI, and ROBINSON, *Circuit Judges*.

Defendant-Appellant Douglass Mackey ("Mackey") appeals from a judgment of conviction entered on October 25, 2023 after a jury trial in the United States District Court for the Eastern District of New York (Donnelly, *J.*).  Mackey was convicted of conspiring to injure citizens in the exercise of their right to vote in violation of 18 U.S.C. § 241 based on three memes he posted or reposted on Twitter shortly before the 2016 presidential election.  These memes falsely suggested that supporters of then-candidate Hillary Clinton could vote by text message.  On appeal, Mackey argues, *inter alia*, that the evidence was insufficient to prove that he knowingly agreed to join the charged conspiracy.  We agree.

CERTIFIED COPY ISSUED ON 07/09/2025

Accordingly, we **REVERSE** Mackey's conviction and **REMAND** the case to the district court with instructions to enter a judgment of acquittal.

FOR APPELLEE:                    ERIK D. PAULSEN, Assistant United States Attorney (Nicole M. Argentieri, Acting Assistant Attorney General, Corey R. Amundson, Chief, Public Integrity Section, William Gullotta, Trial Attorney, Nicholas J. Moscow, Assistant United States Attorney, Frank Turner Buford, Assistant United States Attorney, *on the brief*), *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, NY.

                                 (Jon M. Greenbaum, Edward G. Caspar, Ezra D. Rosenberg, Marc P. Epstein, Pooja Chaudhuri, Lawyers' Committee for Civil Rights Under Law, Washington, DC, *for amicus curiae Lawyers' Committee for Civil Rights Under Law*)

                                 (Tobin Raju, David A. Schulz, Media Freedom & Information Access Clinic, Abrams Institute, Yale Law School, New Haven, CT, Richard L. Hasen, UCLA School of Law, Los Angeles, CA, Cameron O. Kistler, Catherine Chen, The Protect Democracy Project, Inc., Washington, DC, *for amicus curiae Professor Richard L. Hasen*)

FOR DEFENDANT-APPELLANT:         YAAKOV M. ROTH (Eric S. Dreiband, Joseph P. Falvey, Caleb P. Redmond, Harry S. Graver, *on the brief*), Jones Day, Washington, DC.

                                 (R. Trent McCotter, Jonathan Berry, Michael Buschbacher, Jared M. Kelson, Andrew W.

2

Smith, Boyden Gray PLLC, Washington, DC, Gene P. Hamilton, America First Legal Foundation, Washington, DC, *for amicus curiae America First Legal Foundation*)

(Matthew L. Schwartz, Boies Schiller Flexner LLP, New York, NY, Eric M. Palmer, Boies Schiller Flexner LLP, Fort Lauderdale, FL, *for amici curiae Former Department of Justice Officials*)

(Talmadge Butts, Foundation for Moral Law, Montgomery, AL, *for amicus curiae Foundation for Moral Law*)

(Kyle Singhal, Hopwood & Singhal PLLC, Washington, DC, Joshua L. Dratel, Law Offices of Dratel & Lewis, New York, NY, *for amicus curiae National Association of Criminal Defense Lawyers*)

(Russell B. Balikian, Cody M. Poplin, Gibson, Dunn & Crutcher LLP, Washington, DC, *for amicus curiae Professor Eugene Volokh*)

(Reilly Stephens, Liberty Justice Center, Chicago, IL, *for amicus curiae Liberty Justice Center*)

(Jeffrey A. Hall, Burke Law Group, PLLC, Washington, DC, *for amici curiae Criminal Law Professors Daniel D. Polsby and Craig S. Lerner*)

3

DEBRA ANN LIVINGSTON, *Chief Judge*:

On November 1 and 2, 2016, Defendant-Appellant Douglass Mackey ("Mackey") posted or reposted three "memes" on Twitter falsely suggesting that supporters of then-candidate Hillary Clinton could vote in the 2016 presidential election by text message.[1]   Based on these posts, a jury in the United States District Court for the Eastern District of New York (Donnelly, *J.*) convicted him of conspiring to injure citizens in the exercise of their right to vote in violation of 18 U.S.C. § 241.[2]   Mackey argues on appeal that the evidence was insufficient to prove that he knowingly agreed to join the charged conspiracy.   We agree.[3]

---

[1] The parties and the district court referred to the images Mackey shared as "memes," and we thus use the term as well.   A "meme" is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media."   *Meme*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/meme [https://perma.cc/K98E-DC94].   The social media platform used by Mackey, formerly known as "Twitter," is now "X."   For consistency, we use Twitter throughout this opinion.

[2] 18 U.S.C. § 241 makes it a crime for "two or more persons" to "conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same."

[3] Mackey also argues that the charged conspiracy falls outside Section 241's scope and that venue was improper in the Eastern District of New York.   In light of our determination that the evidence was insufficient to show Mackey joined the alleged conspiracy, we need not reach these arguments but will assume *arguendo* that Section 241 applies to the conspiracy charged in the indictment and that venue was proper in the Eastern District.

The parties do not dispute either (1) that Mackey posted the memes or (2) that his doing so independently would not be a crime under Section 241. Section 241 criminalizes only conspiracies between "two or more persons." As a result, the mere fact that Mackey posted the memes, even assuming that he did so with the intent to injure other citizens in the exercise of their right to vote, is not enough, standing alone, to prove a violation of Section 241. The government was obligated to show that Mackey knowingly entered into an agreement with other people to pursue that objective. *See United States v. Scott*, 979 F.3d 986, 990 (2d Cir. 2020).

This the government failed to do. Its primary evidence of agreement, apart from the memes themselves, consisted of exchanges among the participants in several private Twitter message groups—exchanges the government argued showed the intent of the participants to interfere with others' exercise of their right to vote. Yet the government failed to offer sufficient evidence that Mackey even viewed—let alone participated in—any of these exchanges. And in the absence of such evidence, the government's remaining circumstantial evidence cannot alone establish Mackey's knowing agreement. Accordingly, the jury's verdict and the resulting judgment of conviction must be set aside.

BACKGROUND[4]

I.     **Factual Background**[5]

Twitter is a social media platform that allows its users to post character-limited messages ("tweets"), which may include "hashtags,"[6] images, videos, or links.   Users can interact with each other in several ways.   As relevant here, a user can "follow" another user, in which case the latter user's posts will appear on the former's "timeline."   A user can republish ("retweet") another user's tweets. And a user can "mention" another user by including their account name ("handle") in a tweet, which will prompt a notification to the other user.

Users can also interact through private direct messages.   Unlike tweets, which can generally be viewed by the public, direct messages can be viewed only by the specific user or users to whom the messages are sent.   In addition to

---

[4] Citations to the record are as follows:   "Trial Tr." refers to the trial transcript, "A" refers to the appendix that Mackey submitted, and "GA" refers to the appendix that the government submitted.

[5] "Because this is an appeal from a judgment of conviction entered after a jury trial, the . . . facts are drawn from the trial evidence and described in the light most favorable to the Government."   *United States v. Mangano*, 128 F.4th 442, 452 n.2 (2d Cir. 2025) (internal quotation marks omitted).

[6] A "hashtag" is "a word or phrase preceded by the symbol # that classifies or categorizes the accompanying text (such as a tweet)."   *Hashtag*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/hashtag [https://perma.cc/VP4A-5FZ5].

sending direct messages to an individual user, users can create and join private, invitation-only "direct message groups," which function similarly to group text message threads.   Posts on direct message groups are separate from public tweets and are only visible to current members of the group.

## A. The Alleged Conspiracy

In 2014, Mackey, then 24 years old, began posting on Twitter under the pseudonym "Ricky Vaughn," the name of Charlie Sheen's character in the 1989 movie "Major League."[7]   He selected as his account profile picture ("avatar") an image of Charlie Sheen's Vaughn character wearing a red "Make America Great Again" ("MAGA") cap.   This avatar appeared in the upper left-hand corner of Mackey's tweets.

In the lead-up to the 2016 presidential election, Mackey became influential on Twitter for posting election-related content.   In 2015 and 2016, he tweeted or retweeted "hundreds of times per day," and by September 2016, he had amassed 51,000 followers.   Trial Tr. at 655; *see also* GA-168.   Mackey described himself as

---

[7]   Mackey used three Twitter accounts during the following time periods: "@Ricky_Vaughn99, from at least July 2015 to approximately October 5, 2016; @TheRickyVaughn, from approximately October 8, 2016 to approximately November 2, 2016; and @ReturnofRV, from approximately November 2, 2016 to approximately November 15, 2016."   A-374.

7

a "troll," "shitposter," or "shitlord," which to him meant someone who "post[s] a lot of stuff" to "distract or get the conversation going."[8]   Trial Tr. at 667; *see also* GA-158.   Mackey's tweets often consisted of memes either supporting then-candidate Donald Trump or opposing then-candidate Hillary Clinton.   Some of the content he posted was false or misleading, or derogatory toward women, racial minorities, or immigrants.   The government acknowledged at trial that although such content may have been "outrageous, silly, somewhere in between," "[a]lmost all of [it] . . . was not illegal."   Trial Tr. at 18; *see also id.* at 855–56 (referring to this content as "regular politics" or "political speech").

At various times throughout 2016, Mackey was a member of several direct message groups, three of which are particularly relevant here:   the "War Room," "Micro Chat," and "Madman #2."   In these groups, members shared pro-Trump and anti-Clinton messages and memes and discussed strategies to make their posts trend and go viral on Twitter.   Mackey at times actively participated in these groups, but his engagement declined as the election approached.   He did not post any messages in the War Room in the two weeks before he tweeted the

---

[8] At trial, the parties used the terms "stuff posting" and "stuff lord" so as "not to unnecessarily use offensive language."   Trial Tr. at 666–67.

text-to-vote memes on November 1 and 2, 2016. And he was not even a member of Micro Chat or Madman #2 from approximately October 5, 2016 through the election.

Like most of Mackey's tweets, the exchanges in these groups generally fell within the scope of lawful—albeit sometimes "outrageous" or "silly"—political speech. Trial Tr. at 18. However, the government argued that the groups' "operation turned criminal" when they "trained their si[ghts] not on a particular issue or candidate, but rather on the mechanics of voting." Trial Tr. at 19. The first messages potentially indicative of such a transition were sent on September 26, 2016, when a member of Madman #2 linked to a fake ad suggesting it was possible to vote over social media in the 2016 United Kingdom European Union membership referendum and asked, "[c]an we [m]ake something like this for Hillary?"[9] GA-367. Another user replied five minutes later, "[t]ypical that all dopey minorities fell for it." *Id.* At this point, Mackey was a member of Madman #2, but he denied having seen these messages, and the idea was not mentioned again for almost three weeks.

---

[9] The author of the message initially used the word "fake," but corrected it to "make" in a subsequent message. GA-367.

It next came up, and was discussed in more depth, on October 16 and 17, 2017—after Mackey had left the group. A member of Madman #2 shared several memes suggesting that citizens could vote by posting "ClintonKaine" with the hashtag "#PresidentialElection" on their Facebook or Twitter accounts on Election Day, and other members proposed refinements to the memes and discussed the optimal timing for posting. Madman #2 members also distributed and discussed similar memes on October 20, 28, and 29, and November 2, 2016. But Mackey was not a member of Madman #2 during this time, and no evidence was adduced suggesting he could have viewed any of these messages.

Similar posts first appeared in Micro Chat and the War Room on October 29, 2016. Mackey was not then a member of Micro Chat, but he was a member of the War Room. The record contains two sets of War Room posts related to the charged conspiracy: (1) two memes posted on October 29, 2016, both at 8:22 PM, falsely suggesting citizens could vote by tweet or text; and (2) 10 related messages or memes posted on October 30, 2016, from 5:22 PM to 5:42 PM. The October 30 postings focused on strategies for explaining that voting by tweet was available only for Clinton supporters, to ensure that Trump supporters did not "think[] this is legit and . . . stay home." GA-254. One War Room member, who testified

10

anonymously at trial under the pseudonym "Microchip," shared screenshots of tweets in which he indicated that the tweet-to-vote option was "only set up for @HillaryClinton voters." GA-253–54. And another member suggested "ma[king] it more believable" "[b]y acting like it's unfair that they can text and vote and we can't," or "say[ing] something about its [sic] too late [because] we didn't register for it." *Id*. Microchip responded that he was "plotting" and would "have something soon." GA-254.

### B. The Text-to-Vote Memes

As discussed, except for that single day in September (when there was a grand total of two potentially relevant posts in Madman #2), Mackey was not a member of either Madman #2 or Micro Chat during the period in which members exchanged memes or messages about encouraging potential Clinton voters to vote via social media or text. Nor is there evidence that Mackey participated in any such exchanges in the War Room. The crux of the government's case at trial was thus two tweets and a retweet sent by Mackey after these exchanges had taken place.

As to the tweets, on November 1, 2016, Mackey tweeted the following meme suggesting that Clinton supporters could vote by texting "Hillary" to 59925:



A-371.   And shortly after midnight on November 2, 2016, he posted a second meme with similar directions in Spanish:



A-372.   Mackey's tweets, both bearing his signature image of Ricky Vaughn wearing a MAGA cap, included "#ImWithHer" and "#GoHillary" hashtags that do not appear among the 12 relevant messages and memes distributed in the War Room.[10]   Notably, Mackey also omitted any indication that the text-to-vote

---

[10]  Robert McNees, a Twitter user who screenshotted and reported the memes to

option was available only for Clinton supporters, as had been recommended in the October 30, 2016 War Room exchange.

Mackey also retweeted the following post on November 2, 2016:



A-373.    The original tweet, from "nia4_trump," mentioned Mackey's Twitter handle—causing him to receive a notification—and thanked him for "spreading the word."    *Id.*    Like Mackey's tweets, the post included the hashtag "#ImWithHer," but the original poster also added the hashtags "#MAGA" and "#Vote."    *Id.*

The government contended at trial that Mackey's two tweets and his retweet evidenced his knowing participation in a conspiracy hatched in the War Room.

_____

Twitter, testified that because there was "a space between the go and Hillary" in the second tweet, "the hashtag would just be go."    Trial Tr. at 48.

But as to the tweets, Mackey testified—and the government did not contest—that he downloaded the first two memes from 4chan, a public online messaging board. [11]   Similarly, with respect to Mackey's retweet, it is undisputed that because nia4_trump mentioned Mackey's Twitter handle, Mackey automatically received a notification of her post and thus would not have needed to view War Room posts to become aware of and to retweet nia4_trump's meme.   The government argued in its summation that the retweet evidenced "[t]wo members of the War Room working together trying to trick people out of voting."   Trial Tr. at 854.   Significantly, however, the government has since clarified that nia4_trump was not a member of the War Room on November 2, and only "would join . . . *in the days ahead*."   Gov't Br. at 15 (emphasis added); *see also id.* at 67 (noting that Mackey "retweet[ed] a person who soon joined the War Room").

The government's position at trial was that Mackey both visited 4chan to download his memes and retweeted nia4_trump's meme only after viewing the War Room posts of co-conspirators, and for the purpose of furthering his unlawful

---

[11]   The parties stipulated at trial that "[i]n the months prior to the 2016 presidential election, [memes] containing misinformation concerning how to vote were posted and shared on political messaging boards such as 4chan.   At least one member of the Clinton campaign staff observed these [memes] containing misinformation concerning how to vote on 4chan in the months prior to the 2016 presidential election and brought them to the attention of other staff members after she observed them."   Trial Tr. at 825.

agreement with them. Mackey testified, to the contrary, that he never viewed the War Room posts, and that he saw the memes, which the government stipulated were circulating online, for the first time on 4chan.[12] To be sure, the jury was entitled to disbelieve Mackey's testimony. But the government did not contend at trial that Mackey ever communicated with members of the War Room offline, or that he participated in any online discussions with them outside of the War Room related to the conspiracy. And the government effectively conceded at oral argument that it had offered no direct evidence that Mackey was aware of the dozen War Room postings that the government relied on at trial to tie him to a conspiratorial agreement.

The government did argue before the jury, relying on other commentary posted by Mackey, that he had a "technique[]" or "pattern" of (1) viewing War Room messages, (2) not commenting, and (3) then tweeting related content, as part of "a silent agreement" with other War Room members. Trial Tr. at 856, 909. It

---

[12] Mackey stated that he had put the War Room on "mute" so that he would not receive notifications of the "over 600 messages coming in per day." Trial Tr. at 739, 743; *see also id.* at 670 (Mackey indicating that he "would have been [reading] all day if [he] read every message" in the "dozens" of "groups or chat rooms" that he was a member of in 2016); A-296 (Microchip stating on November 2, 2016 that the War Room was "the most active" group that could be used "to [retweet] content"). Mackey estimated that he was posting "about 300 . . . retweets and tweets" per day when he tweeted the text-to-vote memes. Trial Tr. at 682.

pointed, in particular, to tweets related to the "#DraftOurDaughters" hashtag—tweets which, in Mackey's words, sought to discourage support for Clinton by "call[ing] attention to her position" that "women should register for the draft" and suggesting that "maybe she would send them overseas to fight."[13]   Trial Tr. at 671–72.   Mackey used the "#DraftOurDaughters" hashtag in 39 of his tweets from October 28 to 31, 2016, around the same time this topic was the subject of 10 messages or memes in the War Room.[14]   The government acknowledged, however, that Mackey's tweets on this topic constituted lawful "political speech," and that an agreement to engage in such speech would not be subject to prosecution under Section 241.   Trial Tr. at 856.

---

[13] The government contends that Mackey admitted to having viewed War Room messages related to the "#DraftOurDaughters" hashtag, but the record is unclear on this point.   When asked whether he remembered the "DraftOurDaughters stuff that was distributed around the same time" as the "text to vote memes," he responded, "I do remember those."   Trial Tr. at 744.   While the immediate context of this testimony suggests Mackey was referring to material distributed *within* the War Room, however, his subsequent testimony suggests he may have been referring only to *public* DraftOurDaughters tweets from War Room members.   In any event, we need not resolve this ambiguity, as with "all reasonable inferences resolved in favor of the government," a rational juror could have concluded that Mackey admitted to viewing the DraftOurDaughters messages in the War Room.   *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted).

[14] Specifically, the record contains (1) two messages posted on October 27, 2016, at 11:06 PM and 11:11 PM, and (2) eight messages or memes posted on October 28, 2016, from 12:11 AM to 1:21 PM.

### C. The Response

Within an hour of Mackey's posting his first text-to-vote meme on November 1, 2016, McNees had reported it to Twitter. Twitter initially determined in response to this complaint that the tweet was not a violation of its rules. However, after several media organizations picked up the story, Twitter took the position that Mackey's memes did in fact violate its rules, and it suspended Mackey's account and removed his tweets on November 2, 2016. Mackey returned to Twitter with a new account shortly thereafter, and he tweeted a picture of a CNN story displaying one of his memes, adding the caption, "[that feeling when] you haphazardly post a /pol/ meme and it winds up on CNN."[15] A-295. Mackey also shared this tweet in the War Room after rejoining the group on November 4, and he thanked the group's members for welcoming him back.

Even before Mackey sent his first tweet, the Clinton campaign, aware that memes similar to Mackey's (and containing the same text code) were circulating on messaging boards such as 4chan, had taken action to address any potential voter confusion the memes might cause. On October 29, 2016, the very day that

---

[15] As Microchip testified, "/pol/" is 4chan's "political board"—a "place where you could find memes and other election-related content." Trial Tr. at 497.

tweet- or text-to-vote memes were first posted in the War Room, the campaign contacted Upland Software, the company that provided its text message software platform.    Upland Software then reached out to iVision Mobile, the company that controlled the text code listed in the memes, the following day.    By November 2, 2016, the day after Mackey posted his first meme containing this text code, iVision Mobile had instituted an automatic response explaining that any advertisement directing use of the text code was not associated with the Clinton campaign.

While approximately 5,000 people ultimately texted the keyword "Hillary" to 59925, "about 98 percent" received this warning.    Trial Tr. at 840; *see also* Trial Tr. at 121.    The government presented no evidence at trial that Mackey's tweets tricked anyone into failing properly to vote.

## II.    Procedural History

On January 22, 2021, over four years after Mackey posted the text-to-vote memes, the government filed a complaint charging him with conspiring to "injure, oppress, threaten and intimidate persons in the free exercise and enjoyment of . . . the right to vote" in violation of 18 U.S.C. § 241.    D. Ct. Doc. No. 1 at 1. Mackey was arrested shortly thereafter, and a grand jury sitting in the Eastern District of New York returned a one count indictment charging him with the same

18

crime.

## A. The Trial

At trial, the government's evidence consisted predominately of tweets and messages distributed on Twitter. Although the government called 19 witnesses to the stand, it was, in the government's words, "fundamentally a document case." Trial Tr. at 312. These documents established, in addition to the facts discussed above, that Mackey was an influential player in the pro-Trump social media space, that he was aware and proud of his influence and popularity, that he professed racist and misogynistic views around the time he posted the text-to-vote memes, that he expected the election to be close, and that he thought minority voter turnout might prove decisive. The evidence also established that members of the direct message groups in which Mackey at times participated shared many of his views and objectives.

One of Mackey's alleged co-conspirators, Microchip, pled guilty to violating Section 241 and testified pursuant to a cooperation agreement. Microchip, who did not claim to have ever met or spoken to Mackey, admitted that he himself had posted tweets containing false information about how to vote with the "hope . . . that Hillary Clinton voters [would] see [his tweets] and then vote

19

incorrectly," and that he did so pursuant to "kind of like a silent agreement" with other members of the War Room.   Trial Tr. at 483, 510.   Microchip also testified about the War Room's purpose and methods, characterizing the online group as a "strategy room," and claiming that its members would share ideas and then go to websites like 4chan to look for similar content to distribute.   Trial Tr. at 496, 498. Microchip, however, disclaimed the existence of any "expressly stated agreement" to post the tweets.   Trial Tr. at 510.

Mackey testified in his own defense.   In addition to claiming, as discussed above, that he did not view the relevant War Room posts, he denied having shared the memes with the intent to "threaten," "intimidate," "oppress," or "injure anyone's right to vote."   Trial Tr. at 650.   He testified, rather, that he thought "anyone who saw this would know that you can't vote from home."   Trial Tr. at 732.   Mackey described the memes as "sort of a shit post" that he hoped would "go[] viral" and "rile . . . up" the media and the Clinton campaign, "get under their skin," and "get them off the[] message that they wanted to push."   Trial Tr. at 682.

### B.  The Verdict and Post-Trial Motions

After a five-day trial, the jury began its deliberations on March 27, 2023.

20

The next day, the jury informed the court that it had "completed" deliberations and had "not reached a unanimous decision."   Trial Tr. at 972.   The court then gave "a mild modified *Allen* charge." [16]   Trial. Tr. at 970.   After further deliberations, the jury informed the court the next day, on March 29, that it had "not reached a verdict."   Trial Tr. at 977.   The court asked for clarification as to what the jury meant, and it responded with another note stating that it had "not reached a unanimous decision."   Trial Tr. at 984.   The court again requested clarification, asking, "whether you cannot reach a unanimous decision or whether you're just updating me on your progress."   Trial Tr. at 985–86.   The jury then responded with the following note:   "Dear Judge Donnelly, based on our thorough review of all material by all jurors and active discussion among all jurors, we cannot reach a unanimous decision.   Your guidance would be greatly appreciated."   Trial Tr. at 986.   Mackey then moved for a mistrial, but the court instead gave a full *Allen* charge.   After further deliberations, the jury returned a guilty verdict on March 31, 2023.

---

[16]  "An *Allen* charge is a type of supplemental instruction that a district court may give after receiving notice that a jury is deadlocked.   The *Allen* charge 'urges the jurors to continue deliberations in order to reach a verdict.'"   *United States v. Melhuish*, 6 F.4th 380, 391 (2d Cir. 2021) (quoting *United States v. Vargas-Cordon*, 733 F.3d 366, 377 (2d Cir. 2013)).

On May 12, 2023, Mackey sought post-trial relief. He argued, *inter alia*, that the evidence that he joined the charged conspiracy was legally insufficient. After briefing and oral argument, the district court denied relief. During oral argument, the court noted that the evidence regarding the direct message groups was "a little bit confusing" and requested that the government clarify the dates during which Mackey was a member of the War Room, Micro Chat, and Madman #2. D. Ct. Doc. No. 175 at 59. But the court ultimately rejected Mackey's sufficiency challenge. On October 25, 2023, the court sentenced Mackey principally to seven months in prison. Mackey appealed.

## DISCUSSION

We review the sufficiency of the evidence *de novo*, viewing the evidence "in a light that is most favorable to the government." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted). We must "uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

A defendant challenging the sufficiency of the evidence thus "shoulders a heavy burden." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). But it is

"not an impossible one." *Id.* While we resolve "all reasonable inferences . . . in favor of the government," *Persico*, 645 F.3d at 104 (internal quotation marks omitted), "specious inferences are not indulged," *Jones*, 393 F.3d at 111. Nor are inferences based on "conjecture" or "pure speculation." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (internal quotation marks omitted). A conviction cannot stand where the "evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *United States v. Aquart*, 912 F.3d 1, 45 (2d Cir. 2018) (internal quotation marks omitted).

Mackey was convicted of "conspir[ing] to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States," in violation of Section 241. As a general matter, we have emphasized that "the high degree of deference we afford to a jury verdict is 'especially important when reviewing a conviction of conspiracy.'" *United States v. Anderson*, 747 F.3d 51, 72–73 (2d Cir. 2014) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). Yet the justification for such heightened deference—that "a conspiracy by its very nature is a secretive operation"—has less force where, as here, the government (1) had extensive access to Mackey's actual tweets and private messages and (2) does not

contend that Mackey ever met a single alleged co-conspirator or ever communicated offline with those with whom he supposedly conspired. *Id.* at 73 (quoting *Pitre*, 960 F.2d at 1121). In such circumstances, this appears to be one of the "rare case[s] where all"—or at least most—"aspects of a conspiracy *can* be laid bare in court." *Id.* (emphasis added) (quoting *Pitre*, 960 F.2d at 1121).

"'To prove conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent,' and that those persons 'agreed to participate in what they knew to be a collective venture directed toward a common goal.'" *United States v. Jimenez*, 96 F.4th 317, 324 (2d Cir. 2024) (alteration accepted) (quoting *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021)). The defendant must have "knowingly joined and participated" in this joint enterprise. *Anderson*, 747 F.3d at 60 (internal quotation marks omitted). "[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement." *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989).

To underline the point, the government must prove the defendant's knowing agreement as to the conspiracy's "unlawful purpose." *Jimenez*, 96 F.4th at 324 (internal quotation marks omitted). Here, that meant proving that Mackey

24

knowingly agreed with members of the War Room to injure others "in the free exercise or enjoyment of" the right to vote.   18 U.S.C. § 241.   We conclude that the government failed to present sufficient evidence, even when viewed deferentially, to support a reasonable jury determination that such knowing agreement was established beyond a reasonable doubt.

## I.     Evidence of the Alleged Conspiracy's Formation

To begin, the government presented *no evidence* that Mackey participated in the conspiracy's formation.   The government put forth extensive evidence that other members of the War Room, as well as members of Micro Chat and Madman #2, distributed and discussed memes suggesting citizens could vote by tweet or text in the lead-up to the election.   But notably absent from this evidence was a single message from Mackey in any of these direct message groups related to the scheme.   Indeed, Mackey was not even a member of Madman #2 or Micro Chat from approximately October 5, 2016 through the election.   And the record contains no evidence that Mackey posted *any messages* in the War Room in the two weeks before he tweeted the text-to-vote memes.

The evidence of Mackey's involvement in the conspiracy thus stands in stark contrast to that of other group members' involvement, such as Microchip,

who testified at trial. The record contains several War Room messages in which Microchip explicitly proposed and discussed strategies for optimizing the scheme's effectiveness. In these messages, Microchip shared his own posts suggesting citizens could vote by tweet, noted that he was "worried" Trump supporters might "think[] this is legit and . . . stay home," and informed the group that he was "plotting" and would "have something soon." GA-254. The government presented no comparable evidence of Mackey's involvement.

While Microchip testified at length regarding the conspiracy's formation and operation, moreover, his testimony was of little probative value with respect to Mackey's role. Microchip had never met Mackey—nor, so far as the record discloses, had any other member of the War Room or the other message groups. Microchip's relationship with Mackey, such as it was, was exclusively online. As a result, only online interactions could prove that Mackey participated with Microchip in planning the conspiracy. And the record contains no evidence of such interactions.

## II. Evidence that Mackey was Aware of and Joined the Conspiracy

The government argues that even if there is no evidence Mackey participated in the planning of the conspiracy, if he viewed the messages related

to the conspiracy, he had express knowledge that an agreement had been formed. And by posting the text-to-vote memes with knowledge of this existing agreement, Mackey "knowingly joined and participated" in the conspiracy. *Anderson*, 747 F.3d at 60 (internal quotation marks omitted). We conclude, however, that the evidence is insufficient to establish either of these points as well.

To be sure, nothing is amiss in the government's *theory* as to how it proved its case. For many conspiracies—whether formed in person or online—the defendant's conduct itself, considered in light of the surrounding circumstances, is highly probative of his knowing participation in the unlawful enterprise. For example, if members of an online message group discussed the details of a plan to commit a terrorist attack, and then another member of that group who did not post any messages went on to participate in that specific attack, the defendant's actions in carrying out the attack might well be enough to support the reasonable inference that he was aware of the group's plotting and knowingly joined the conspiracy.

In *Anderson*, for example, we found the evidence sufficient to infer the defendant's knowing participation in a drug conspiracy—and rejected as implausible the alternative explanation that he was an "unwitting courier"—based

27

on a combination of "common sense" inferences and "corroborative testimony and circumstances." 747 F.3d at 70–71. Specifically, we emphasized (1) the plausibility of the inference that "an individual who accepts sole custody of valuable contraband was a trusted member of the conspiracy, with knowledge of the contraband's true nature"; (2) the fact the defendant had "followed [a co-conspirator] to a remote location, and was poised to receive hundreds of thousands of dollars' worth of drugs"; and (3) "testimony from a co-conspirator that only a trusted member of the conspiracy would be permitted to serve in such a capacity." *Id.*

But the reasonableness of the inference of knowing agreement from the government's circumstantial proof depends on the nature of that proof. Consider *United States v. Bufalino*, 285 F.2d 408 (2d Cir. 1960). We famously concluded there that the government had offered insufficient evidence that suspected Mafia members—who gathered in Apalachin, New York, for a prearranged meeting—agreed among themselves, in the meeting's aftermath, that they would conceal that it had been planned in advance. *Id.* at 414–15. We emphasized the plausibility of the alternative explanation that the participants, who explained variously to law enforcement or to grand juries that they were in

28

the area, *inter alia*, to visit a sick friend, attend to business, or accompany another, might well have independently decided to lie out of self-interest. *Id.* We reasoned that although it was possible, as the government argued, that the "lies were told pursuant to an agreement," "[t]here [was] nothing in the record or in common experience to suggest that it [was] not just as likely that each [participant in the meeting] decided for himself that it would be wiser not to discuss all that he knew." *Id.* at 415.

The instant case is more like *Bufalino* than *Anderson*. Here, the conduct at issue—posting text-to-vote memes similar to others circulating publicly online—does not in isolation show awareness of, much less knowing participation in, a conspiracy. The government does not contest that Mackey downloaded the memes from 4chan but argues that the inspiration to do so came from discussion in the War Room. This is possibly true. But the inference is speculative and the government relies largely on conjecture to rule out the alternative scenario: that Mackey's conduct was independent of any knowledge of the War Room discussions. Mackey did not send *any* messages in the War Room in the two weeks before his text-to-vote tweets, despite having actively participated in the group in the past. Moreover, there were "over 600 messages coming in per day

29

in the War Room" and only 12 posts related to the alleged conspiracy, two of which were sent within one minute of each other and the other 10 within a 20-minute period.   Trial Tr. at 743–44.

To be sure, Mackey sent his first tweet on November 1, 2016, only a few days after the relevant October 29 and 30 War Room posts.   But this was also days before the election, and the very time that the Clinton campaign, after having been aware of the memes for months, became sufficiently concerned about their online proliferation (which also made it more likely Mackey could have come across the memes independently) to "initiate[] its defensive response."   Gov't Br. at 82. This is thus nothing like the "hardly coincidental" conduct in *Anderson*, where "common sense" and "corroborative testimony and circumstances" all supported an inference of conspiracy.   747 F.3d at 70–71.   Nor does it even approach the sort of "suspicious circumstances" we have found *insufficient* to support a conspiracy conviction.   *E.g.*, *Nusraty*, 867 F.2d at 764 (concluding that meeting a known associate at the airport at the time he emerged from customs carrying a drug-laden suit which he attempted to deliver to the defendant was "not, by itself, an act from which knowing guilty involvement can reasonably be inferred").

Given the plausible non-conspiratorial alternative for Mackey's postings,

the government needed to offer evidence either affirmatively supporting its theory (that Mackey viewed the relevant War Room messages and decided to join a conspiracy) or undermining the plausibility of the alternative scenario in which Mackey acted independently. *Bufalino* provides helpful guidance as to the type of evidence that might have supported Mackey's conviction—but which the government failed to produce. There, we noted that "[i]f a precisely similar explanation in support of a claim of casual attendance had been given by those present, rather than statements similar only in that they denied that presence was planned, this would be some evidence of agreement." *Bufalino*, 285 F.2d at 415. But we concluded that "the similarity of the stories told is insignificant under all the circumstances." *Id.* So too here. Had Mackey posted "precisely similar [memes]" to those distributed in the War Room, "this would be some evidence of agreement." *Id.* But Mackey's memes, while they shared similar messaging and the same text code (59925) as at least one meme distributed in the War Room, otherwise differed in significant respects from those discussed in the War Room. *Compare* A-371–73, *with* GA-252. For example, instead of mentioning the text-to-vote option being available only for Clinton supporters, as War Room discussants had recommended, Mackey's tweets featured an avatar of a character wearing a

31

MAGA cap, and the post he retweeted included the hashtag "#MAGA." Thus, "under all the circumstances"—namely, the ubiquity of similar memes on websites like 4chan—any "similarity" between Mackey's memes and those posted in the War Room "is insignificant." *Id.*

Perhaps the evidence that comes closest to suggesting that Mackey's postings were knowingly instigated to further a conspiratorial scheme is Mackey's apparent admission to having viewed War Room posts related to the DraftOurDaughters hashtag. The record contains 10 such posts—two sent on October 27, 2016, and eight sent on October 28, 2016. The government contended at trial that if Mackey viewed these posts, he likely also viewed content related to the text-to-vote conspiracy posted on October 29 and 30, 2016, mere days before his first text-to-vote meme.

This inference, however, is still too tenuous to support a reasonable jury verdict. Mackey belonged to "dozens" of "groups or chat rooms" at the time, Trial Tr. at 670, and he was posting "about 300 . . . retweets and tweets" per day when he tweeted the text-to-vote memes, Trial Tr. at 682. Against this backdrop, even if Mackey may have viewed up to 10 War Room posts related to DraftOurDaughters on two days, that fact is hardly probative of whether he

viewed 12 other posts on different days.   Again, "there were over 600 messages coming in per day in the War Room," and the two October 29 text-to-vote posts and 10 October 30 posts were distributed, respectively, within one and 20 minutes of each other.   Trial Tr. at 743–44.

Nor, for that matter, can much be made of the government's broader suggestion that because Mackey had previously posted memes after viewing related War Room content, he necessarily followed the same "technique[]" or "pattern" when he posted the text-to-vote memes.   Trial Tr. at 856, 909.   To be sure, the government presented evidence that Mackey often posted tweets on the same topics as other War Room members, and that he did so in some instances after viewing related War Room messages.   But the government's evidence fell well short of establishing that this was the only—or even primary—process that Mackey adhered to in posting his "hundreds of thousands" of tweets.   Trial Tr. at 654, 707.   The mere fact that Mackey and other War Room members often tweeted the same popular and trending hashtags provides little incremental support for the government's theory.

### III.   Other Circumstantial Evidence

Finally, there remains the question whether other circumstantial evidence

could nonetheless establish that Mackey knowingly entered into a conspiratorial agreement, even if he did *not* view the relevant War Room posts. At trial, the government relied on two such categories of evidence: (1) evidence of the general shared purpose and methods of the members of the various message groups, as avowed before the conspiracy's inception, and (2) Mackey's retweet of another text-to-vote meme. We conclude that none of this evidence is sufficient to make up for the government's inability to establish that Mackey viewed the messages in which the conspiracy was planned.

## A. Shared Purpose and Methods

Much of the government's evidence—including hundreds of direct messages and tweets—focused on the general objectives and methods of the War Room, Micro Chat, and Madman #2. This evidence established, *inter alia*, (1) the groups' objective of creating and promoting messages and memes in support of Donald Trump, or in opposition to Hillary Clinton, and (2) their members' understanding of the importance of coordination in attempting to reach as broad of an audience as possible on Twitter. The government has not alleged that any of these messages and tweets were unlawful. But it nonetheless relies on this evidence to infer Mackey's involvement in the later conspiracy.

The more modest inference the government seeks to draw is that the groups' prior "techniques" or "pattern[s]"—namely, posting content after viewing related group discussions—suggest Mackey viewed the relevant War Room posts before tweeting his text-to-vote memes.   Trial Tr. at 856, 909.   For the reasons already discussed, the evidence is insufficient to support this inference.   But there is nothing wrong with this argument in principle.

At times, however, the government also appears to urge a broader inference from the groups' methods and objectives:   that Mackey necessarily "act[ed] in concert and with the shared purpose of the other members of the conspiracy" when he posted the text-to-vote memes.   Gov't Br. at 68.   The argument—to the extent it is meant to support more than an inference that Mackey viewed the relevant War Room posts—is that because Mackey's tweets were both similar to the posts of other group members and consistent with the group members' previously avowed methods and objectives, those tweets remained within the scope of a broader prior agreement.   The government also points to Mackey's return to and subsequent participation in the War Room after he posted the text-to-vote memes as further evidence that Mackey and his alleged co-conspirators "shared" a common "purpose."   *Id.*

35

This argument, however, plainly extends the concept of a conspiratorial agreement past its breaking point. To be sure, we have long considered the presence or absence of a "common purpose," *United States v. Potash*, 118 F.2d 54, 56–57 (2d Cir. 1941), or "common goal," *Jimenez*, 96 F.4th at 324 (internal quotation marks omitted), when assessing whether a defendant has joined a conspiracy. But the government must establish that any purpose the defendant and his alleged co-conspirators shared (i.e., knowingly agreed to) was unlawful. *See id.* It cannot skirt this obligation by framing the purpose at a higher level of generality. The government put forward evidence that Mackey (1) agreed with War Room members to achieve the broad—and generally lawful—objective of distributing content in support of Trump or in opposition to Clinton, and (2) may have had an individual objective, evidenced by three memes posted in November 2016, to distribute tweets with the specific goal of inducing voters to cast what he knew and intended would be invalid ballots for Clinton. But that does not mean the government proved he knowingly reached an agreement *with other War Room members* to achieve the latter objective. *See* 18 U.S.C. § 241 (criminalizing only conspiracy, not underlying act). His "mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement."

36

*Nusraty*, 867 F.2d at 764.

### B. Mackey's Retweet

The government also points to Mackey's retweet of nia4_trump's text-to-vote meme to bolster its case.   At the outset, it bears emphasizing that the retweet cannot support the government's primary argument, discussed above, that Mackey viewed the relevant War Room posts before tweeting his text-to-vote memes.   As the government acknowledged on appeal, nia4_trump was not even a member of the War Room at the time Mackey retweeted her post.   Thus, the retweet does not support an inference that Mackey knowingly and intentionally joined *War Room members* in a common scheme.   If anything, it undermines this inference, as it suggests that Mackey would not have needed to view War Room posts—or even interact with the group's current members—to become aware of the text-to-vote memes.

The government, however, also suggested in its summation that Mackey's retweet *alone* sufficed to prove an agreement.   It argued to the jury that the retweet evidenced "[t]wo members of the War Room working together trying to trick people out of voting," and was thus "on its own . . . enough to show [a] common criminal plan in action."   Trial Tr. at 854.   But, again, nia4_trump was

not a War Room member at the time.

Nor does the retweet otherwise establish an unlawful agreement between nia4_trump and Mackey, so as to salvage the government's case. To be sure, nia4_trump was not entirely a stranger to Mackey on Twitter. Mackey had retweeted her posts before, and while she was not a member of the War Room at the time, she would later join the group. Her text-to-vote post also mentioned Mackey's Twitter handle and thanked him for "spreading the word"—facts which might arguably suggest that Mackey's retweet reflected something closer to a bilateral agreement than in the typical case. A-373.

But even assuming that a retweet could under certain circumstances reflect an agreement, for such an agreement to be *conspiratorial*, it must be directed toward an "unlawful purpose." *Jimenez*, 96 F.4th at 324 (internal quotation marks omitted). And as relevant here, that means the "common goal" of injuring citizens in the exercise of their right to vote. *Id.* (internal quotation marks omitted). As already discussed, the government presented evidence that Mackey, individually, may have intended to injure citizens in the exercise of their right to vote. And the government presented evidence that War Room members who workshopped the tweet- or text-to-vote posts reached an agreement aimed at

38

this objective.

But the government did not and could not argue that every Twitter user who posted or reposted text-to-vote memes did so for a conspiratorial purpose. A user might, for example, have posted or reposted such memes for purely satirical purposes. Or users might even have done so because they were genuinely tricked into believing that texting to vote was a viable option, and they wanted to spread the word. Mackey offered another alternative in his testimony: that he wanted to "rile . . . up" the media and the Clinton campaign, "get under their skin," and "get them off the[] message that they wanted to push." Trial Tr. at 682. The jury was not required to—and did not—credit this explanation, but the point is that one cannot infer from a retweet alone that the original poster and the reposter reached an agreement to injure citizens in the exercise of their right to vote.

So, too, with regard specifically to nia4_trump and Mackey. The record is devoid of evidence that would permit a rational juror to conclude that nia4_trump and Mackey reached an agreement for the common goal of injuring citizens in the exercise of their right to vote. If anything, the sparse evidence in the record as to nia4_trump's and Mackey's shared objective suggested a contrary inference. The

post Mackey retweeted included a caption with a "#MAGA" hashtag.    A-373.

And including that hashtag alongside a text-to-vote meme is fundamentally at

odds with a purpose of deceiving *Clinton supporters* into believing they could vote

by text.    In sum, this meager evidence is insufficient to establish beyond a

reasonable doubt that Mackey and nia4_trump possessed an unlawful common

goal.

## CONCLUSION

Congress expressly limited Section 241's reach to conspiracies.    There are

several reasons why Congress may have done so—for example, that "[c]oncerted

action both increases the likelihood that the criminal object will be successfully

attained and decreases the probability that the individuals involved will depart

from their path of criminality," or that "[g]roup association for criminal purposes

often, if not normally, makes possible the attainment of ends more complex than

those which one criminal could accomplish."    *Cf. Callanan v. United States*, 364

U.S. 587, 593 (1961).    But the critical point is that Congress made this choice—one

it has declined to deviate from in the more than 150 years since Section 241's

enactment.    *See United States v. Price*, 383 U.S. 787, 801–03 (1966).

Here, the government conceded that Mackey downloaded his text-to-vote

tweets from 4chan. It failed to establish, in accordance with its theory of the case, that Mackey became aware of the text-to-vote memes in the War Room and tweeted them pursuant to a conspiracy launched there. That theory was possible, but so was an alternative one: that Mackey became aware of the memes independently and decided on his own to post them. There was no evidence from which a juror could "choose among [the] competing inferences" as to these two scenarios and resolve those inferences in the government's favor. *Aquart*, 912 F.3d at 44 (internal quotation marks omitted). Nor was there any basis in "common sense and experience" to do so. *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008). And without establishing that Mackey was at least aware of the War Room posts, the additional evidence (or lack thereof) was inadequate to show his knowing participation in a conspiracy.

A Section 241 conviction requires proof that the defendant knowingly entered into an unlawful agreement. Here, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. For these reasons, we **REVERSE** Mackey's conviction and **REMAND** the case to the district court with instructions to enter a judgment of acquittal.



A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

41